## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES EDWARD GARY, JR., AIS #222516 | ) ) ) | |
| PETITIONER, | ) ) | |
| vs. | ) ) | CIVIL ACTION: 3:07-CV-1074-WKW |
| KENNY JONES, WARDEN, et al. | ) ) | |
| RESPONDENTS. | ) ) ) | |

## RESPONDENTS' ANSWER TO PETITION FOR
## WRIT OF HABEAS CORPUS

Come now the Respondents, by and through the Attorney General for the State of Alabama, and, pursuant to this Court's December 13, 2007 order, hereby respectfully submit this Answer to the petition for writ of habeas corpus filed by James Edward Gary, Jr., challenging his Lee County Circuit Court conviction of capital murder , a violation of Alabama Code (1975) Section 13A-5-40(a)(2).

The Respondents deny that Gary is entitled to any relief whatsoever under the federal writ of habeas corpus.

## PROCEDURAL BACKGROUND

### A. Conviction and sentence in Lee County Circuit Court CC-02-0492, and direct appeal

1.     On February 19, 2002, Gary, during a post-custodial interrogation, executed a waiver of his <u>Miranda</u>[1] rights and gave a statement to law enforcement. Ex. 1A, 1B.

2.     On August 4, 2005, Gary was convicted in Lee County Circuit Court, CC-02-0492, on one count of capital murder, a violation of Alabama Code (1975) Sections 13A-5-40(a)(2), and on October 12, 2005, the trial court sentenced him to life imprisonment without the possibility of parole.  Ex. 1C.

3.     On October 26, 2005, Gary appealed to the Alabama Court of Criminal Appeals (Ex. 1C), and, in his June 6, 2006 Appellant's Brief, submitted the following arguments against his conviction:

> 1) The trial court committed reversible error in its denial of Gary's motion to suppress his statement given to law enforcement due to his request for an attorney during custodial questioning; and

> 2) The trial court committed reversible error in its denial of Gary's motion to suppress his statement given to law enforcement due to law enforcement's inducements of hope  of lighter sentencing.  Ex. 2.

4.     On April 20, 2007, the Alabama Court of Criminal Appeals, following the State's filing of its June 27, 2006 appellee's brief (Ex. 3), affirmed Gary's

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

capital murder conviction by memorandum opinion in <u>Gary v. State</u>, CR-05-0133,

(Ala. Crim. App. Apr. 20, 2007).  Ex. 4.  The Court of Criminal Appeals held:

> In denying Gary's motion to suppress, the trial court determined that
> Gary did not unequivocally request an attorney during his
> questioning…the trial court obviously determined that Gary
> consistently told [law enforcement] that "y'all" could talk with his
> attorney, as opposed to "I want to" talk with his attorney.  In telling
> [law enforcement] that [they] could speak with Gary's lawyer, Gary
> did not make an unequivocal request to speak with an attorney.  The
> statement is capable of equally plausible, differing
> interpretations…Accordingly, we cannot say that the trial court erred
> in denying Gary's motion to suppress his statement to law
> enforcement on the ground that Gary had requested an attorney during
> his interrogation by law enforcement…
>
> We have fully considered Gary's contentions regarding the
> admissibility of his videotaped statement and find no grounds for
> reversal.

Ex. 4, pp. 8-9, 12.

5.     On May 4, 2007, Gary filed an application for rehearing in the

Alabama Court of Criminal Appeals, raising the identical issues he raised on direct

appeal.  Ex. 5.  The Court of Criminal Appeals overruled Gary's application for

rehearing on May 11, 2007.  Ex. 6.

6.     In his May 25, 2007 petition for writ of certiorari to the Alabama

Supreme Court, Gary again raised the identical issues he raised in the Alabama

Court of Criminal Appeals.  Ex. 7.  On July 13, 2007, the Alabama Supreme Court

denied Gary's petition for writ of certiorari and entered a certificate of judgment in

Gary's direct appeal.  Ex. 8.  The Alabama Court of Criminal Appeals also issued

its certificate of judgment on July 13, 2007.[2]  Ex. 9.

### B. Gary's post-conviction proceedings pursuant to Ala. R. Crim. P. Rule 32

7.      Gary has not, as of the date of this response, filed an Alabama Rules

of Criminal Procedure Rule 32 petition in the Lee County Circuit Court.

### C. The instant petition for habeas corpus

8.      On  December 11, 2007, Gary filed the instant petition for habeas

corpus in this Court challenging his Lee County Circuit Court conviction of capital

murder, alleging that he had made an unequivocal request to speak with an

attorney during a post-waiver custodial interrogation, and that, due to that

unequivocal request, questioning should have ceased, and his resultant statement

should have been suppressed by the trial court.  Doc. 1, pp. 12-16.

9.      By its December 13, 2007 order, this Court directed the Respondents

to answer Gary's petition.

---

[2] It appears Gary's instant petition for habeas corpus is filed within the one-year limitations period, pursuant to 28 U.S.C. § 2244(d).

## ARGUMENT

## GARY IS NOT ENTITLED TO RELIEF ON HIS HABEAS CLAIM, BECAUSE IT IS MERITLESS.

10.    If a federal claim has been first fairly presented to the state courts and all state court remedies have been exhausted on the claim, this Court may award federal habeas relief only if the state courts' adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1), (2). A state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in" relevant case law. Williams v. Taylor, 529 U.S. 362, 405 (2000). "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of...clearly established Federal law.'" Williams, 529 U.S. 362, 407-408. A state court decision will also be "contrary to" "clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams, 529 U.S. 362, 406. "[A] federal habeas court making the 'unreasonable application' inquiry should ask

whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. 362, 409.

11.    In determining whether the trial court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as required by 28 U.S.C. § 2254(d) (2), the petitioner must demonstrate, by "clear and convincing evidence," the "unreasonable determination" of the facts by the state courts, otherwise, the "AEDPA … requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' § 2254(e)(1)." Schriro v. Landrigan, 127 S. Ct. 1933, 1939-1940 (2007); Jones v. Walker, 496 F. 3d 1216, 1226 (11th Cir. 2007). Also, "the question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold. See Williams v. Taylor, 529 U.S. 362, 410 […](2000)." Schriro v. Landrigan, 127 S. Ct. at 1939; Jones v. Walker, 496 F. 3d at 1226; Hart v. Attorney General of State of Florida, 323 F. 3d 884, 904 ( 11th Cir. 2003) .

12.    Because Gary's claim was decided on the merits in state court, he "is not entitled to relief unless he can establish that the state court's decision was 'contrary to or involved an unreasonable application of, clearly established Federal law,' " or 'resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding.'"

Stephens v. Hall, 407 F. 3d 1195, 1201-1202 (11th Cir. 2005) quoting, 28 U.S.C.

§2254(d); see, also, Robinson v. Moore, 300 F. 3d 1320, 1342 (11th Cir. 2002).

     13.    In its order denying Gary's motion to suppress his statement, the Lee

County Circuit Court found:

> At [a] hearing [on Gary's motion to suppress his statement] this
> [c]ourt watched the entire video of the [d]efendant's interrogation,
> along with a [c]ourt [r]eporter's transcript of the interrogation, and
> heard arguments from the attorneys…After careful review of the cases
> cited in the briefs of the [p]arties it is the opinion of the [c]ourt that
> the interrogation of the [d]efendant, James E. Gary, Jr., by
> investigators Van Jackson and Heath Taylor was conducted in
> accordance with the rulings of the Alabama Court of Criminal
> Appeals in State v. Collins, [937 So. 2d 86 (Ala. Crim. App. 2005)],
> wherein the Court of Criminal Appeals adopted the U.S. Supreme
> Court's findings in Davis v. U.S., 512 U.S. 452 … [(1994)], as it
> applied to post waiver interviews, and Judge Ed Carnes' opinion in
> Coleman v. Singleton, 30 F. 3d 1420 [(11th Cir. 1994)], addressing the
> effects of Davis on cases heard within the Eleventh Circuit after the
> Supreme Court's ruling in Davis…When a [d]efendant is being
> interrogated by law enforcement office[r]s, the United States Supreme
> Court stated that a determination regarding voluntariness of a
> confession must be viewed in the totality of the circumstances to
> determine if the accused's will has been overborne, Arizona v.
> Fulminante, 499 U.S. 279… [(]1991[)]. Applying the totality-of-the-
> circumstances test, the [c]ourt concludes the [d]efendant's confession
> was voluntary.

Ex. 10, pp. 26-27.

     14.    In its review of this issue in his direct appeal, the Alabama Court of

Criminal Appeals found:

The record shows that the trial court viewed [Gary's] videotaped statement. Pursuant to the ore tenus rule ["When evidence is presented ore tenus to the trial court, the court's findings of fact based on that evidence are presumed to be correct," Ex parte Perkins, 646 So. 2d 46, 47 (Ala. 1994)], it was up to the trial court to resolve the alleged discrepancies between what the parties said was the specific language used in the disputed statements. Although the trial court did not specifically set out his findings of fact, for reasons discussed below, the court had to have found that Gary said "y'all talk to my lawyer" instead of "I want to talk to my lawyer," as Gary, in his motion to suppress, contended was actually said. Based on our review of the evidence, we cannot say that the trial court's determination was clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence...In denying Gary's motion to suppress, the trial court determined that Gary did not unequivocally request an attorney during his questioning. As discussed above, the trial court obviously determined that Gary consistently told Investigator Jackson that "y'all" could talk with his attorney, as opposed to "I want to" talk with his attorney. In telling Jackson that Jackson could speak with Gary's lawyer, Gary did not make an unequivocal request to speak with an attorney. The statement is capable of equally plausible, differing interpretations...Accordingly, we cannot say that the trial court erred in denying Gary's motion to suppress his statement to law enforcement on the grounds that Gary had requested an attorney during his interrogation by law enforcement... We have fully considered Gary's contentions regarding the admissibility of his videotaped statement and find no grounds for reversal.

Ex. 4, p. 6, 8-9, 12.

15.    Gary began his argument to this Court, citing Hart v. Attorney General of the State of Florida, 323 F. 3d 88 (11th Cir. 2003), claiming "the state court[']s decision [wa]s identical to the state court[']s decision in Hart v. Attorney General ... because they failed to determine whether Hart's waiver was voluntary,

knowing and intelligent pursuant to <u>Miranda</u>." Doc. 1, p. 10. However, this claim and the facts in <u>Hart</u> are significantly distinctive and not "materially indistinguishable" from the claim Gary made to the trial court, the state appellate courts, and now makes in his habeas petition to this Court. In <u>Hart</u>, the defendant waived his <u>Miranda</u> rights under false pretenses and that waiver was determined to be, from the "totality of the circumstances," not voluntary, knowing, and intelligent.[3] <u>Hart v. Attorney General</u>, 323 F. 2d at 893. In his claims to the trial court, the state appellate courts, and this Court, Gary claimed the trial court incorrectly determined that he made equivocal requests for an attorney during his post-custodial interrogation, not that his <u>Miranda</u> waiver was not voluntary, knowing, and intelligent. <u>See</u> Ex. 10, pp. 26-27; Ex. 2; Ex. 4, pp 6, 8-9, 12; Ex. 7; Doc. 1, pp. 10-16.[4]

16.    To the extent, if any, Gary's claim is based upon 28 U.S.C. § 2254(d) (1) grounds, that the state courts made an "unreasonable application of clearly

---

[3] The court based its determination on the deceptive manner under which Hart's <u>Miranda</u> waiver was made. <u>Hart v. Attorney General</u>, 323 F. 2d at 893

[4] To the extent Gary claims otherwise, he has not made a claim, in the trial court or in the state appellate courts, that his <u>Miranda</u> waiver was not voluntary, knowing, or intelligently given. He, therefore, has failed to properly exhaust the claim in the state courts and is, therefore, procedurally barred from this Court's review. <u>See</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842 (1999)(holding "[b]efore a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.")

established Federal law," he has not shown that the trial court applied a rule that

contradicted with existing "established Federal law." Gary has not demonstrated

that the state appellate courts applied a rule that contradicts relevant and governing

case law. See Williams v. Taylor, 529 U.S. at 405. Gary has not shown that this

case illustrated "a set of facts that are materially indistinguishable from a decision

of [the U.S. Supreme] Court" and that the state courts' decision "arrive[d] at a

result different from ... precedent." Id. At 406.

    17.    It appears Gary's claim primarily rests upon the assertion that that

trial court made an "unreasonable determination of the facts", pursuant to 28

U.S.C. § 2254(d) (2). Gary's argument is based upon his contention that the trial

court made the wrong interpretation of what was said during a statement given to

law enforcement, citing to a transcript prepared by his defense lawyer and a

secretary -- not the transcript prepared by the Lee County Circuit Court official

court reporter. Ex. 11, p. 901. As Gary notes in his petition, the transcript of the

statement, by the Lee County Circuit Court official court reporter, differs from

Gary's version of the transcript of his statement. Doc. 1, p. 12; Ex. 10. In its

review of the evidence during the motion to suppress hearing, the trial court

watched the video tape of the confession made to law enforcement, comparing the

video to the copy of the official transcription of the statement. Ex. 10, p. 28-29.

Outside of his citations to the differences between a transcript his defense attorney

prepared and the official transcript, Gary has cited no other facts in rebuttal, and

nothing that overcomes the presumption of correctness or reasonableness of the

findings of fact in the state courts, which must be demonstrated by "clear and

convincing evidence." Robinson v. Moore, 300 F. 3d 1320, 1342 (11th Cir.

2002). The trial court made an objective determination that the official court

reporter transcript more accurately discerned the actual content of the videotape

statement given by Gary. See Ex. 4, pp. 6, 8-9, 12; Ex. 10, pp. 26-27. Gary has

not shown any evidence that would, again, by "clear and convincing evidence,"

demonstrate the trial court made an unreasonable determination of what was said

during Gary's post-custodial interrogation.

　　　18.　　To the extent that Gary asserts that, assuming the State's

interpretation of the transcript was correct, that a reasonable officer still should

have ceased questioning him, not only has Gary not presented this argument to the

state courts, but that claim is unsupported. That claim, as a claim the trial court

made an "unreasonable application of clearly established Federal law," fails to

show that the trial court applied a rule that contradicted with existing "established

Federal law." Gary's statements referring to an attorney, as properly found by the

trial court, and affirmed by the Alabama Court of Criminal Appeals, were not

unambiguous requests for assistance of an attorney. See U.S. v. Del Rio, 168 Fed.

Appx. 923, 927 (11th Cir. 2006)(holding "Law enforcement officers are not

required to terminate an interrogation, however, unless the invocation of the right to remain silent is unambiguous. See Medina v. Singletary, 59 F.3d 1095, 1100-01 (11th Cir.1995) (citing Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994)).").  The inquiry into the ambiguity of a suspect's invocation of his right to remain silent is objective, with the salient question being whether the "suspect ... articulate[d] his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." Coleman v. Singletary, 30 F. 3d 1420, 1424 (11th Cir.1994).   Therefore, because Gary's statements were ambiguous, law enforcement did not have to discontinue its questioning, or clarify Gary's intent. See United States v. Mikell, 102 F. 3d 470, 476 (11th Cir.1996)(holding that if the invocation is ambiguous or equivocal, the interrogating officer has no duty to clarify the suspect's intent and may proceed with questioning.).

19.    Because Gary has not shown that the trial court's determination -- that Gary's requests for an attorney during his post-custodial interrogation were ambiguous and therefore there was no requirement for law enforcement to cease its questioning -- was "contrary to our clearly established precedent [and that the state court did not] appl[y] a rule that contradict[ed] the governing law set forth in" relevant case law or that the trial court's decision was an  unreasonable

determination of the facts and rebutted by clear and convincing evidence, Gary has

not sustained his burden to warrant relief pursuant to 28 U.S.C. § 2254(d) (1) and

(2).  See Williams v. Taylor, 529 U.S. at 405-409.


## CONCLUSION

For the foregoing reasons, this Court should dismiss Gary's petition for writ

of habeas corpus.

Respectfully submitted,

Troy King(KIN047)
Attorney General

By:


 s/Marcus S. Bass
Marcus S. Bass
Assistant Attorney General

# EXHIBITS

Ex. 1A:     Waiver of <u>Miranda</u> rights form executed by James Edward Gary, Jr., on February 19, 2002.

Ex. 1B:     Transcript of videotaped statement and interview with James Edward Gary, Jr., on February 19, 2002.

Ex. 1C:     Lee County Circuit Court, <u>State v. Gary</u>, CC-02-0492, case action summary detailing conviction and sentence.

Ex. 2:     Gary's appellant's direct appeal brief to the Alabama Court of Criminal Appeals, <u>Gary v. State</u>, CR-05-0133, June 6, 2006.

Ex. 3:     State of Alabama's appellee's direct appeal brief to the Alabama Court of Criminal Appeals, <u>Gary v. State</u>, CR-05-0133, June 27, 2006.

Ex. 4:     Alabama Court of Criminal Appeals memorandum opinion in Gary's direct appeal, <u>Gary v. State</u>, CR-05-0133, April 20, 2007.

Ex. 5:     Gary's application for rehearing to the Alabama Court of Criminal Appeals pursuant to the denial of his direct appeal, <u>Gary v. State</u>, CR-05-0133, May 4, 2007.

Ex. 6:     Alabama Court of Criminal Appeals notice that Gary's application for rehearing was overruled in <u>Gary v. State</u>, CR-05-0133, May 11, 2007.

Ex. 7:     Gary's petition for writ of certiorari to the Alabama Supreme Court pursuant to the denial of his direct appeal, <u>Gary v. State</u>, No. 1061197, filed on May 25, 2007.

Ex. 8:       Alabama Supreme Court's certificate of judgment ordering Gary's petition for writ of certiorari as denied, <u>Gary v. State</u>, No. 1061197, July 13, 2007.


Ex. 9:       Alabama Court of Criminal Appeals certificate of judgment, affirming by memorandum, <u>Gary v. State</u>, CR-05-0133, July 13, 2007.


Ex. 10:      Lee County Circuit Court, CC-04-0492, <u>State v. Gary</u>, Supplemental transcript.


Ex. 11:      Lee County Circuit Court, CC-04-0492, <u>State v. Gary</u>, Transcript of suppression hearing, May, 23, 2005.

## CERTIFICATE OF SERVICE

I hereby certify that on this the 28th day of January, 2008, I electronically filed the foregoing, and I hereby certify that I have mailed by United States Postal Service the document with all exhibits to the following non-CM/ECF participant:

James Edward Gary, Jr., AIS# 222516, Donaldson Correctional Facility, 100 Warrior Lane, Bessemer, Alabama, 35023.

/s/Marcus S. Bass
Marcus S. Bass (BASSM4870)
Office of the Attorney General
Alabama State House
11 South Union Street
Montgomery, Alabama  36130-0152
Telephone:  (334) 242-7300
Fax:  (334) 242-2848
E-Mail:  mbass@ago.state.al.us

ADDRRESS  OF COUNSEL:

Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300

373381/116300-001

# YOUR RIGHTS

Name _JAMES EDWARD GARY_

Place _RUSSELL CO. SHERIFF OFFICE_

Date _2-19-02_

Time _11:45 AM/CST_

Education _11TH_

Before we ask you any questions you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed _James Gary_

Witness _4333_

Witness

Time _11:46 AM/CST_

EXHIBIT
_1A_

PENGAD 800-631-6989

440

Form: LCS-004 (11/96)
DARCO

1

# JAMES GARY INTERVIEW

(Proceedings February 19, 2002)

(This is transcribed from a videotape)

\*\*\*\*\*\*\*\*

VAN JACKSON:     Now, my name is Van Jackson.  I am going to
be back to talk to you in just a minute.  All
right?

JAMES GARY:     Okay.

(Left and came back in.)

VAN JACKSON:     All right.  Okay.  Like I said, my name is Van
Jackson.  I am an investigator with the Lee
County Sheriff Office.

JAMES GARY:     Lee County?

VAN JACKSON:     Yeah.  You know –

JAMES GARY:     Smith's Station?

VAN JACKSON:     Yes.  Smith's Station.  And your first name is?

JAMES GARY:     James Gary.

VAN JACKSON:     Middle name?

JAMES GARY:     (Inaudible.)

VAN JACKSON:     Are you a Junior or anything like that?

EXHIBIT

1B

PENGAD 800-631-6989

452

2

| | | |
|---|---|---|
| 1 | JAMES GARY: | No.  Just James Gary.  That's it. |
| 2 | VAN JACKSON: | What's the highest grade you completed in |
| 3 | | school? |
| 4 | JAMES GARY: | Eleventh. |
| 5 | VAN JACKSON: | Did you get a GED or anything? |
| 6 | JAMES GARY: | Nah. |
| 7 | VAN JACKSON: | All right.  Here's your rights' form.  I'm going |
| 8 | | to read it to you and get you to just sign right |
| 9 | | here. |
| 10 | | (Van Jackson reading rights.) |
| 11 | VAN JACKSON: | Do you understand that? |
| 12 | JAMES GARY: | Yes. |
| 13 | | (Continues reading waiver.) |
| 14 | VAN JACKSON: | And coercion means force.  All right? |
| 15 | JAMES GARY: | (No response.) |
| 16 | | (Mr. Gary writing.) |
| 17 | JAMES GARY: | Man, what y'all want to ask me questions |
| 18 | | about Smith Station? |
| 19 | VAN JACKSON: | Huh? |
| 20 | JAMES GARY: | Why y'all want to ask me questions about |

3

| | | |
|---|---|---|
| 1 | | Smith's Station? I mean, it's been like about |
| 2 | | 2000 since we moved from out there. |
| 3 | VAN JACKSON: | Where did you used to live in Smith Station? |
| 4 | JAMES GARY: | Right there on, uh, what it is -- it's on -- the |
| 5 | | little dirt road right there by the Boons. |
| 6 | VAN JACKSON: | You are talking about -- uh-- the one that goes |
| 7 | | behind the Dudley lumber company? |
| 8 | JAMES GARY: | Unh-unh (negative response). No, the one -- |
| 9 | VAN JACKSON: | By the junkyard? |
| 10 | JAMES GARY: | You know where the Boons is at? |
| 11 | VAN JACKSON: | Yeah. |
| 12 | JAMES GARY: | Okay. Them houses sitting right there before |
| 13 | | you get to the Boons, we stay right there. My |
| 14 | | sister stay right there. |
| 15 | VAN JACKSON: | What's your sister's name? |
| 16 | JAMES GARY: | Tracy Hill. |
| 17 | VAN JACKSON: | Tracy Hill? |
| 18 | JAMES GARY: | Yeah. |
| 19 | VAN JACKSON: | You got any brothers? |
| 20 | JAMES GARY: | Nah. Well, I got a step-brother. Well, my |

4

|   |   |   |
|---|---|---|
| 1 | | brother-in-law, he married my sister. |
| 2 | VAN JACKSON: | Who is that? |
| 3 | JAMES GARY: | And I got a little baby brother. Do you know |
| 4 | | what I am saying? |
| 5 | VAN JACKSON: | Who is your brother? |
| 6 | JAMES GARY: | Charles Hill. |
| 7 | VAN JACKSON: | Charles Hill? |
| 8 | JAMES GARY: | Yeah. He's gone down the road now. |
| 9 | VAN JACKSON: | Oh, okay. See, I have been working out in that |
| 10 | | area for a little while, man. I am just trying to |
| 11 | | see if I knew who some of your folks was. |
| 12 | | Some of your people. You got people that live |
| 13 | | out in Crawford? |
| 14 | JAMES GARY: | Nah. Not that I know of. |
| 15 | VAN JACKSON: | You don't know any down there? |
| 16 | | Because there is some Garys that live out that |
| 17 | | way, too. |
| 18 | JAMES GARY: | No, see, like my dad's uncle, see he was a |
| 19 | | Gary. Do you see what I am saying? My |
| 20 | | family is really Alexanders and Coles. |

5

| | | |
|---|---|---|
| 1 | VAN JACKSON: | Oh, okay. Okay. Well, there are some |
| 2 | | Alexanders out there, too, ain't it? |
| 3 | JAMES GARY: | Yeah (inaudible). |
| 4 | VAN JACKSON: | Oh, okay. All right. Well, why do you think |
| 5 | | that a Lee County Investigator would be |
| 6 | | interested in talking to you? |
| 7 | JAMES GARY: | Um, I'd say about some drugs. That's why I |
| 8 | | say I ain't -- do you know what I am saying -- I |
| 9 | | know I ain't sold nobody nothing, so -- you |
| 10 | | know. |
| 11 | VAN JACKSON: | Can you think of any other reason? |
| 12 | JAMES GARY: | I mean, tickets. You know, but I ain't never |
| 13 | | even got no ticket out there, though. |
| 14 | VAN JACKSON: | You ain't got no ticket out there? What are |
| 15 | | you in jail for? |
| 16 | JAMES GARY: | Tickets. |
| 17 | VAN JACKSON: | What; driving? |
| 18 | JAMES GARY: | Yeah. |
| 19 | VAN JACKSON: | What you got? |
| 20 | JAMES GARY: | False information. |

6

| | | |
|---|---|---|
| 1 | VAN JACKSON: | When did this happen? |
| 2 | JAMES GARY: | Uh, about last year, around this time. |
| 3 | VAN JACKSON: | Oh. So you just -- they just ran up on you like |
| 4 | | that? |
| 5 | JAMES GARY: | Well, I had went to court, do you know what I |
| 6 | | am saying, my court date came up. I went on |
| 7 | | to court. I got a little bit. |
| 8 | VAN JACKSON: | Oh. Okay. So how long have you been locked |
| 9 | | up? |
| 10 | JAMES GARY: | Uh, probably about -- about fourteen days. |
| 11 | VAN JACKSON: | Fourteen days. See, you said that like you |
| 12 | | wasn't sure. Most of the folks that I talk to |
| 13 | | that's in jail, they can tell you exactly how |
| 14 | | many days they did. |
| 15 | JAMES GARY: | I mean, it's like they give me sixty days, so — |
| 16 | | do you know what I am saying? |
| 17 | VAN JACKSON: | All right. |
| 18 | JAMES GARY: | Yes. |
| 19 | VAN JACKSON: | Well, like I told you, man, what I do is |
| 20 | | I investigate major cases, you know, and that's |

7

| | | |
|---|---|---|
| 1 | | what I'm doing now. |
| 2 | JAMES GARY: | Okay. |
| 3 | VAN JACKSON: | And, uh, we have been working on it for quite |
| 4 | | some time, and so that's why I pulled you out |
| 5 | | to talk to you about it. And I want to give you |
| 6 | | a chance to think about the stuff that you have |
| 7 | | been involved with, and, uh, we are going to |
| 8 | | have to talk about it because it's very serious, |
| 9 | | and I know you know exactly what I'm talking |
| 10 | | about, because we did a lot of legwork on it |
| 11 | | and we got a lot of information, and, you |
| 12 | | know, the best thing now is for you to tell me |
| 13 | | the truth so we can work through all this stuff. |
| 14 | | So -- |
| 15 | JAMES GARY: | Well, what you want to know? |
| 16 | VAN JACKSON: | Well, the first thing is, is how long have you |
| 17 | | known Michael? |
| 18 | JAMES GARY: | Who? |
| 19 | VAN JACKSON: | How long have you known Michael? |
| 20 | JAMES GARY: | Michael? What Michael? |

8

| | | |
|---|---|---|
| 1 | VAN JACKSON: | That works for the bonding company. |
| 2 | JAMES GARY: | Oh, shit. Since he got me out on bond. |
| 3 | VAN JACKSON: | When was that? |
| 4 | JAMES GARY: | September. |
| 5 | VAN JACKSON: | Back in September? |
| 6 | JAMES GARY: | Yeah. |
| 7 | VAN JACKSON: | How much did you have to pay him to get out? |
| 8 | JAMES GARY: | Uh, well, I had a $16,000 bond. |
| 9 | VAN JACKSON: | $16,000? |
| 10 | JAMES GARY: | And he charged me ten percent, so it was |
| 11 | | $1,600.00. |
| 12 | VAN JACKSON: | You are kidding me? |
| 13 | JAMES GARY: | I had a $1,600.00 bond. |
| 14 | VAN JACKSON: | What kind of case was that on? |
| 15 | JAMES GARY: | A trafficking charge. |
| 16 | VAN JACKSON: | All right. |
| 17 | JAMES GARY: | But I sat down there for a month before, do |
| 18 | | you know what I am saying, they dropped my |
| 19 | | bond. See, it was 40 -- I think it was like about |
| 20 | | $42,000. They dropped my bond to $16,000. |

9

| | | |
|---|---|---|
| 1 | VAN JACKSON: | So you have been working since you got out on |
| 2 | | it? |
| 3 | JAMES GARY: | Oh, yeah.  I do all kinds of stuff now.  Do you |
| 4 | | know what I am saying?  I hang sheetrock.  Do |
| 5 | | you know what I am saying.  Paint.  Yard |
| 6 | | work. |
| 7 | VAN JACKSON: | All right.  When was the last time you saw |
| 8 | | Michael? |
| 9 | JAMES GARY: | Hum, I could say like -- I know I made my last |
| 10 | | payment to him like -- like at the end -- right |
| 11 | | before Christmas. |
| 12 | VAN JACKSON: | Right before Christmas? |
| 13 | JAMES GARY: | Uh-huh. |
| 14 | VAN JACKSON: | You haven't seen him since then? |
| 15 | JAMES GARY: | (Shakes head in the negative.) |
| 16 | VAN JACKSON: | Now, see, now, what I'm doing now is, is I'm |
| 17 | | asking you questions because I told you we did |
| 18 | | a lot of legwork on this case that I'm working |
| 19 | | on right now and that I'm talking to you about, |

10

|    |    |    |
|----|----|----|
| 1 |  | and it's very important that you be truthful |
| 2 |  | because this is serious. Serious -- |
| 3 | JAMES GARY: | Yeah. I seen them boys on the news, though, |
| 4 |  | and that's fucked up that they killed that little |
| 5 |  | child like that, Man. That's nasty. |
| 6 | VAN JACKSON: | Yeah. |
| 7 | JAMES GARY: | I mean, you know, that was a baby, Man. Do |
| 8 |  | you know what I am saying. |
| 9 | VAN JACKSON: | So what about the other boy that you saw on |
| 10 |  | the news? |
| 11 | JAMES GARY: | I don't know that cat. |
| 12 | VAN JACKSON: | You don't know him? |
| 13 | JAMES GARY: | (Shaking head in the negative.) |
| 14 | VAN JACKSON: | Never met him? |
| 15 | JAMES GARY: | (Shaking head in the negative.) |
| 16 | VAN JACKSON: | Well, let me tell you this right here, what we |
| 17 |  | are working on in Lee County is the death of |
| 18 |  | two folks, and uh, it's in your best interest to |
| 19 |  | go on and shoot it to me straight what |
| 20 |  | happened. |

| | | |
|---|---|---|
| 1 | JAMES GARY: | It's in my best interest? |
| 2 | VAN JACKSON: | It's in your best interest to tell me the truth |
| 3 | | about what happened on that day. |
| 4 | JAMES GARY: | I don't know nothing about no death, now. |
| 5 | | Do you know what I'm saying. I do know -- I |
| 6 | | don't know nothing about no death and shit |
| 7 | | like that, man. I mean -- |
| 8 | VAN JACKSON: | Uh-huh. You don't know anything about it? |
| 9 | JAMES GARY: | Not no death. Not in no Lee County. Nothing |
| 10 | | like that. |
| 11 | VAN JACKSON: | What kind of car does Mike drive? |
| 12 | JAMES GARY: | I don't know. He used to drive a red Blazer. |
| 13 | VAN JACKSON: | What else? |
| 14 | JAMES GARY: | I know he used to come in that Blazer and that |
| 15 | | red TransAm. |
| 16 | VAN JACKSON: | And what else? |
| 17 | JAMES GARY: | Shit. Ain't no telling. I know he come down |
| 18 | | to my house, do you know what I am saying, in |
| 19 | | like the red Blazer and the TransAm. |
| 20 | VAN JACKSON: | When was the last time he came down to your |

12

| | | |
|---|---|---|
| 1 | | house? |
| 2 | JAMES GARY: | Shit, like in – before Christmas when I made |
| 3 | | my last payment. |
| 4 | VAN JACKSON: | What if I were to tell you that he had been to |
| 5 | | your house since then that we know of. |
| 6 | JAMES GARY: | Shit. (Shaking head, negative.) |
| 7 | VAN JACKSON: | See what I'm trying to tell you is, is we have |
| 8 | | been doing a lot of homework, man. We know |
| 9 | | what has happened, and right now, it's in your |
| 10 | | best interest to tell me the truth about what |
| 11 | | happened. Because you know I know this |
| 12 | | man, he is making your bond, he got you out; |
| 13 | | you owe him money, but you need to come |
| 14 | | clean. |
| 15 | JAMES GARY: | I done paid him his money. I don't owe him |
| 16 | | nothing. |
| 17 | VAN JACKSON: | Now, you need to tell the truth about what |
| 18 | | happened. |
| 19 | JAMES GARY: | Well, he got me out on bond. I started making |

13

| | | |
|---|---|---|
| 1 | | payments on the bond and paid him off. I |
| 2 | | mean — |
| 3 | VAN JACKSON: | When did you pay him off? |
| 4 | JAMES GARY: | Like before Christmas. |
| 5 | VAN JACKSON: | Where'd you get the money? |
| 6 | JAMES GARY: | I been working doing all kinds of stuff. I'm |
| 7 | | telling you. |
| 8 | VAN JACKSON: | For who? |
| 9 | JAMES GARY: | Man, wherever I could go to work at. I could |
| 10 | | do some work for you if you let me. I know |
| 11 | | how to hang sheetrock; do you know what I'm |
| 12 | | saying. I did some work out on Summerville |
| 13 | | Road. |
| 14 | VAN JACKSON: | Out on Summerville Road? |
| 15 | JAMES GARY: | Yeah. |
| 16 | VAN JACKSON: | Where at? |
| 17 | JAMES GARY: | Right there on -- that yellow house. You see |
| 18 | | that yellow house right across from that big |
| 19 | | house; that's the lawyer's house — the Judge |
| 20 | | house, -- |

14

| | | |
|---|---|---|
| 1 | VAN JACKSON: | Uh-huh. |
| 2 | JAMES GARY: | -- that yellow house. We painted that. Me and |
| 3 | | my uncle Rick. |
| 4 | VAN JACKSON: | Rick who? |
| 5 | JAMES GARY: | Rick -- Rick Crool. |
| 6 | VAN JACKSON: | Oh, okay. |
| 7 | JAMES GARY: | Yeah. |
| 8 | VAN JACKSON: | Oh. All right. Well, Mike has got you in a |
| 9 | | position now that you need to come clean and |
| 10 | | tell the truth about what happened, and that's |
| 11 | | what I'm asking you, man. I'm asking you |
| 12 | | what happened. Because you know exactly |
| 13 | | what happened. Right now, you know, this is |
| 14 | | -- this is strictly for you to have an opportunity |
| 15 | | to tell your side of what happened. |
| 16 | JAMES GARY: | Of what? Tell my side of what? Okay. You |
| 17 | | saying -- Uh -- he got me out on bond. |
| 18 | VAN JACKSON: | Uh-huh (affirmative response). |
| 19 | JAMES GARY: | Okay. I made my payment -- paid -- what -- |
| 20 | | what you want me to tell you? |

15

| | | |
|---|---|---|
| 1 | VAN JACKSON: | I want you to tell me what happened the day he |
| 2 | | came and got you – that Mike came and got |
| 3 | | you. |
| 4 | JAMES GARY: | He came and got me and took me home. |
| 5 | VAN JACKSON: | And y'all went to these folks' house. He told |
| 6 | | you what needed to be done. |
| 7 | JAMES GARY: | I ain't never went nowhere with Mike. I ain't |
| 8 | | never went nowhere with Mike. |
| 9 | VAN JACKSON: | See, that's what I'm saying. Now, see, we |
| 10 | | have got evidence to show that you did. |
| 11 | JAMES GARY: | Well, you ain't shown me because I'm |
| 12 | | telling you I ain't never went nowhere with |
| 13 | | Mike. Nowhere. Anybody, do you know what |
| 14 | | I'm saying, can tell you I ain't never went |
| 15 | | nowhere – my old lady house, now -- that man |
| 16 | | came down there and hounded me about that |
| 17 | | money. I give him his money. That was it. I |
| 18 | | paid him off right before Christmas. It was |
| 19 | | probably about the 15th or 16th, somewhere up |
| 20 | | in there. But that was it. Do you know what |

16

|    |               |                                                                 |
|----|---------------|-----------------------------------------------------------------|
| 1  |               | I'm saying. I ain't got nothing else to do with                 |
| 2  |               | that. Mike -- I don't owe him nothing else, so                  |
| 3  |               | -- do you know what I'm saying, about what he                   |
| 4  |               | done did to the little child, he was wrong for                  |
| 5  |               | that, and he is going to get what he deserves,                  |
| 6  |               | but other than that, I ain't got no dealings with               |
| 7  |               | Mike, as far as he got me out on bond and got                   |
| 8  |               | my boys out on bond. Do you know what I'm                       |
| 9  |               | saying.                                                         |
| 10 | VAN JACKSON:  | What was your boy in jail for?                                   |
| 11 | JAMES GARY:   | Dope.                                                           |
| 12 | VAN JACKSON:  | Where does he live at?                                           |
| 13 | JAMES GARY:   | Oh, he locked up now.                                            |
| 14 | VAN JACKSON:  | Where did he live when he -- before he got                      |
| 15 |               | locked up?                                                      |
| 16 | JAMES GARY:   | Out there by the Boons. Right across from the                   |
| 17 |               | dog wash (phonetic).                                            |
| 18 | VAN JACKSON:  | And so, uh, so I know you all -- you have been                  |
| 19 |               | involved in cocaine selling.                                    |
| 20 | JAMES GARY:   | That's what I thought y'all was trying to put a                 |

17

| | | |
|---|---|---|
| 1 | | little sale case on me, Man. I ain't – do you |
| 2 | | know what I'm saying – I ain't selling nobody |
| 3 | | no drugs, man. |
| 4 | VAN JACKSON: | What about Mike and cocaine?  What's up |
| 5 | | with that? |
| 6 | JAMES GARY: | Uh, I know my partner, he said something |
| 7 | | about it before, do you know what I'm saying? |
| 8 | VAN JACKSON: | Who did? |
| 9 | JAMES GARY: | Little T. |
| 10 | VAN JACKSON: | What did he say? |
| 11 | JAMES GARY: | He was like saying something about, do you |
| 12 | | know what I'm saying, he wanted to hook up. |
| 13 | VAN JACKSON: | He wanted to hook up with Mike? |
| 14 | JAMES GARY: | Yeah.  I guess so.  But see, I didn't trust him. |
| 15 | | I was like, shit, he is a bond, but he wanted to |
| 16 | | fuck with us once we got out on bond.  This |
| 17 | | was after, do you know what I'm saying, he |
| 18 | | got us out on bond.  He got my boy out on |
| 19 | | bond. |
| 20 | VAN JACKSON: | Uh-huh (affirmative response). |

18

| | | |
|---|---|---|
| 1 | JAMES GARY: | So I was, like, well, that don't sound right |
| 2 | | because he is on my bond, so why he want, do |
| 3 | | you know what I'm saying, to be into drugs, do |
| 4 | | you know what I'm saying? Then y'all was in |
| 5 | | with that. |
| 6 | VAN JACKSON: | So what did Little T do? |
| 7 | JAMES GARY: | Nothing really. He couldn't do nothing |
| 8 | | because it was my call. |
| 9 | VAN JACKSON: | So he didn't mess with him at all? |
| 10 | JAMES GARY: | (Shaking head in the negative). Unh-unh. It |
| 11 | | was my choice. |
| 12 | VAN JACKSON: | Okay. What is Little T's real name? |
| 13 | JAMES GARY: | Benjamin Hastings. |
| 14 | VAN JACKSON: | Benjamin -- Benjamin Hastings. |
| 15 | JAMES GARY: | Yeah. |
| 16 | VAN JACKSON: | So y'all got locked up together? |
| 17 | JAMES GARY: | Yeah. Do you know what I'm saying. He got |
| 18 | | locked up the day I got locked up. See they on |
| 19 | | some -- |
| 20 | VAN JACKSON: | All right. |

19

| | | |
|---|---|---|
| 1 | JAMES GARY: | -- some more cases, though, do you know what |
| 2 | | I'm saying?  Do you know what I am saying; |
| 3 | | out there by the Boons.  That's what I am |
| 4 | | saying.  When y'all called me out saying Lee |
| 5 | | County, out in Smiths Station by the Boons, |
| 6 | | do you know what I am saying, I said I know I |
| 7 | | ain't sold – I ain't do no selling out there, do |
| 8 | | you know what I am saying. |
| 9 | VAN JACKSON: | Well, uh, we are going to have to deal with this |
| 10 | | today, man, and I think from what I observe |
| 11 | | from you that you want to do the right thing, |
| 12 | | and the right thing in this: -- |
| 13 | JAMES GARY: | Yeah.  I'm trying to -- |
| 14 | VAN JACKSON: | -- is for you to tell the truth. See, you are not |
| 15 | | telling me the truth right now.  Let me tell you |
| 16 | | this – |
| 17 | JAMES GARY: | I am not going to lie. I'm telling you the |
| 18 | | truth, man? |
| 19 | VAN JACKSON: | I am fixing to explain this to you.  I'm fixing to |

20

| | |
|---|---|
| 1 | explain this to you. We have done a |
| 2 | tremendous amount of legwork in this case. |
| 3 | Not the one involving the little boy. |
| 4 | The one that happened in Lee County. And |
| 5 | what we have discovered is, is that you were |
| 6 | with these boys when it happened, and the only |
| 7 | person that can tell the circumstances about -- |
| 8 | behind why you were with them is you. Okay. |
| 9 | What we are getting told is that you is the main |
| 10 | one. |
| 11 | JAMES GARY: The main one of what? |
| 12 | VAN JACKSON: And so you need to – in committing these |
| 13 | murders. |
| 14 | JAMES GARY: Man, y'all gone crazy. Look a here. Listen to |
| 15 | me, Brother. Now, I admit that I mess around |
| 16 | these streets and I do a lot of hustling, but hey, |
| 17 | I don't care; you can go out in the middle of |
| 18 | the street and ask anybody about me. I make |
| 19 | my money and I go home. I don't got nothing |
| 20 | to do with no kind of murder. I ain't never |

21

1  harmed or hurt nobody; never. I make my

2  money and do my thing now. But y'all ain't

3  putting me in no murders and all that junk

4  there because I ain't got nothing to do with no

5  murder. Anybody can tell you, you can go

6  catch anybody on the street. Any – any

7  inform. Anything. Anybody you can find that

8  will tell you I ain't fixing to do nothing like

9  that. I'm telling you. I promise you that.

10  That's on my mamma's grave and my

11  mamma's been dead for thirteen years. I ain't

12  never hurt, murdered and all that shit. I ain't --

13  y'all need to go find out who did it.

14  VAN JACKSON:        We have who did it. What we need is for you

15                              to tell us what happened. You are not going –

16  JAMES GARY:         See, you telling me –

17  VAN JACKSON:        Because from what we got as far as evidence –

18  JAMES GARY:         You're -- see, you steadily saying that I need to

19                              tell you something about -- I can tell you

20                              anything about drugs.

22

| | | |
|---|---|---|
| 1 | VAN JACKSON: | You need to tell me what happened that night. |
| 2 | JAMES GARY: | But I don't know nothing about no murder. |
| 3 | VAN JACKSON: | You was with Mike and this other boy. You |
| 4 | | need to tell the truth because we have tracked |
| 5 | | this thing from your house to the storage |
| 6 | | building over there in Phenix City. We tracked |
| 7 | | this thing to LaGrange. We tracked this thing |
| 8 | | to these folks' house, and everyone continues |
| 9 | | to say and some which have picked out you as |
| 10 | | the person that was with them. You need to |
| 11 | | tell me what happened and how it was that you |
| 12 | | was with them because it's gotten serious. |
| 13 | | Anything is possible, but we need to hear – we |
| 14 | | need to hear your side of what happened that |
| 15 | | day. It's that serious. And any -- any lies right |
| 16 | | now is the worst thing you can do. |
| 17 | JAMES GARY: | I'm just saying, man, what is you trying to say: |
| 18 | | I'm talking about, okay, you are saying this |
| 19 | | man got me out on bond. True enough. Okay. |
| 20 | | Yeah. He come to my house to, do you know |

23

| | | |
|---|---|---|
| 1 | | what I am saying, to pick his payment up, |
| 2 | | worrying me and shit; do you know what I am |
| 3 | | saying, worrying the shit out of me, waking my |
| 4 | | children up. Okay? But see, you talking, do |
| 5 | | you know what I am saying, on some other shit |
| 6 | | in Lee County. Lee County. |
| 7 | VAN JACKSON: | Uh-huh. |
| 8 | JAMES GARY: | Smith Station. |
| 9 | VAN JACKSON: | Opelika. |
| 10 | JAMES GARY: | See, I don't even go to Opelika. |
| 11 | VAN JACKSON: | You did this day. |
| 12 | JAMES GARY: | I mean, that's all I can tell you, man. All I can |
| 13 | | tell you, man. All I can tell you is, do you |
| 14 | | know what I am saying, I'm just telling you, do |
| 15 | | you know what I am saying, this is what you |
| 16 | | came at me with. I'm telling you what I know, |
| 17 | | do you know what I am saying. True enough, |
| 18 | | he got me out on bond, yeah, worry the shit out |
| 19 | | of me, do you know what I am saying. I paid |
| 20 | | him the money, but as far as me going |

24

| | | |
|---|---|---|
| 1 | | anywhere with him like that, no, I ain't had no |
| 2 | | dealings with him like that on nothing, no |
| 3 | | drugs, no nothing. |
| 4 | VAN JACKSON: | Well – |
| 5 | JAMES GARY: | I mean, that –- that's the straight up, honest |
| 6 | | truth. That's the truth. I mean, do you know |
| 7 | | what I am saying, I mean, do you know what I |
| 8 | | am saying, whatever you got, you just got, but |
| 9 | | that –- you ain't got me on it because I'm |
| 10 | | telling you I ain't got nothing to do with no |
| 11 | | shit like that, do you know what I am saying. I |
| 12 | | hustle. Don't get me wrong. I admit that, do |
| 13 | | you know what I am saying. I'm locked up |
| 14 | | and I got to go to court for that, do you know |
| 15 | | what I am saying. I hustle. It's obvious to see. |
| 16 | | Everybody know what I do, but, you see, I |
| 17 | | ain't never did nothing to nobody. I ain't |
| 18 | | never hurt nobody. |
| 19 | VAN JACKSON: | Listen. I understand you hustle, and I |

25

| | | |
|---|---|---|
| 1 | | understand why you are saying you do it and |
| 2 | | it's our job to do what we need to do. |
| 3 | JAMES GARY: | I have hustled. I ain't still hustling now. |
| 4 | VAN JACKSON: | I ain't concerned about that. |
| 5 | JAMES GARY: | Yeah. |
| 6 | VAN JACKSON: | Right now the only thing I'm concerned about |
| 7 | | is what happened the night the three of y'all |
| 8 | | were together. You went to Opelika, and now |
| 9 | | two people are dead. Today, this thing is not |
| 10 | | going to go away, and the thing that you are |
| 11 | | going to have to do is you are going to have to |
| 12 | | face up to it, and you are going to have to tell |
| 13 | | the truth about it because lying ain't going to |
| 14 | | work. |
| 15 | JAMES GARY: | You are steadily saying I'm lying, man, and |
| 16 | | I'm telling you everything about -- do you |
| 17 | | know what I am saying, you asking me about |
| 18 | | dealings with this man Mike, do you know |
| 19 | | what I am saying. I'm telling you everything, |
| 20 | | that -- do you know what I am saying, that we |

26

| | | |
|---|---|---|
| 1 | | ever had dealings with. That's it. That man |
| 2 | | got me out on bond, do you know what I am |
| 3 | | saying. He hounded the shit out of me. You |
| 4 | | can ask -- my old lady is at home. She is at |
| 5 | | home. |
| 6 | VAN JACKSON: | Yeah. Well, you know, I thought that, you |
| 7 | | know, a man like you of some intelligence |
| 8 | | would know when it gets to this point, the best |
| 9 | | thing for you to do is to tell the truth. It's not -- |
| 10 | | it's -- you -- the only person that can take care |
| 11 | | of you and all of this is -- |
| 12 | JAMES GARY: | Is me. |
| 13 | VAN JACKSON: | -- is tell the truth of what happened. I'm |
| 14 | | telling you step by step all the things that you |
| 15 | | are up against and you are not going to be able |
| 16 | | to explain why different people from all over, |
| 17 | | Seale, Seale Road, Phenix City, Opelika, and |
| 18 | | LaGrange, they don't have any reason to lie on |
| 19 | | you. They don't have any reason. So if you |
| 20 | | really see what I'm telling you -- |

27

| | | |
|---|---|---|
| 1 | JAMES GARY: | Nah. You need to go on and speak out in the |
| 2 | | open because, do you know what I am saying, |
| 3 | | you are talking about -- |
| 4 | VAN JACKSON: | Out in the open, man. Out in the open now is, |
| 5 | | I don't know -- I know that your connection |
| 6 | | with Mike is this bonding thing. I don't know |
| 7 | | how much money you owe him. |
| 8 | JAMES GARY: | $1,600. |
| 9 | VAN JACKSON: | You know that you paid him. Paid him with |
| 10 | | cash. And you know where that money came |
| 11 | | from. |
| 12 | JAMES GARY: | Two here or three or whatever. |
| 13 | VAN JACKSON: | So what I'm getting at is you need to tell me |
| 14 | | the truth about what happened. Just lay it on |
| 15 | | the line. Just lay it on the line. |
| 16 | JAMES GARY: | I'm trying. See, you are still speaking in |
| 17 | | general, man. |
| 18 | VAN JACKSON: | No, I'm not, man. No, I'm not, man. |
| 19 | JAMES GARY: | You take it down – |

28

| | | |
|---|---|---|
| 1 | VAN JACKSON: | Man, if somebody – if somebody – if someone |
| 2 | | asks you to do something and be involved in |
| 3 | | something and you might not want to do it, but |
| 4 | | you feel pressured -- I mean, I don't know.  If |
| 5 | | that's it, you need to tell me.  Everything you |
| 6 | | did was because of money and that's why you |
| 7 | | went and did this, you need to tell me.  If you |
| 8 | | just went along, you need to tell me.  But |
| 9 | | whatever the circumstances is you need to tell |
| 10 | | me what happened. |
| 11 | JAMES GARY: | I'm telling you what happened, man.  The man |
| 12 | | used to come to my house worry the shit out of |
| 13 | | me about me paying him. |
| 14 | VAN JACKSON: | About his money. |
| 15 | JAMES GARY: | Every time he came, I have him $150, $200.  I |
| 16 | | ain't just straight gave him no cash money |
| 17 | | because I ain't have it.  I still ain't got no |
| 18 | | money.  I always gave him – when he come – |
| 19 | | every time he came -- my old lady can tell you, |
| 20 | | every time I would give him 100.  I even got |

29

|    |              |                                                      |
|----|--------------|------------------------------------------------------|
| 1  |              | money from her when she get paid $200, $150,         |
| 2  |              | what I ain't have.  Every time I paid him, just      |
| 3  |              | like that.  Other than that, that's that.  I ain't   |
| 4  |              | have no dealings with him, Man.                      |
| 5  | VAN JACKSON: | Man – they tell me --                                |
| 6  | JAMES GARY:  | You need to tell me what you trying to say.          |
| 7  | VAN JACKSON: | They tell me you did it all as well.                 |
| 8  | JAMES GARY:  | Did what?                                            |
| 9  | VAN JACKSON: | Went in the house.                                   |
| 10 | JAMES GARY:  | Who is they?  Who is they?                           |
| 11 | VAN JACKSON: | The guys you was with the night this                 |
| 12 |              | happened.  Mike and this other guy that you          |
| 13 |              | say you don't know.  He knows you and you            |
| 14 |              | were with them.                                      |
| 15 | JAMES GARY:  | Well, I mean, whatever you are going to say,         |
| 16 |              | you got to --                                        |
| 17 | VAN JACKSON: | Man, what I want you to do, man, is just tell        |
| 18 |              | me the truth about what happened and we will         |
| 19 |              | take it step by step. Right now they are             |
| 20 |              | blaming everything on you.                           |

30

| | JAMES GARY: | Me? |
|---|---|---|
| 1 | JAMES GARY: | Me? |
| 2 | VAN JACKSON: | They are blaming everything on you. |
| 3 | JAMES GARY: | How I killed the kid and I'm in jail? |
| 4 | VAN JACKSON: | Nah. Not that case. Uh, the two folks in |
| 5 | | Opelika. That's in Lee County. That's what |
| 6 | | I'm talking to you about, man. I'm not talking |
| 7 | | to you about the little kid because you was in |
| 8 | | jail. We know that. I'm talking about the |
| 9 | | folks in Lee County. |
| 10 | JAMES GARY: | (Shaking head in the negative.) |
| 11 | VAN JACKSON: | Oh, yeah. |
| 12 | JAMES GARY: | You are saying Opelika. Do you know what I |
| 13 | | am saying? I know I ain't never been no |
| 14 | | farther than Smith's Station, man. I'm telling |
| 15 | | you. |
| 16 | VAN JACKSON: | We've got people that's telling us, besides |
| 17 | | these guys, that you was in Opelika. |
| 18 | JAMES GARY: | Well, shit, you got me on a camera or a picture |
| 19 | | or anything, because I'm telling you, I ain't |
| 20 | | been to no Opelika. As far as I been – you are |

31

| | | |
|---|---|---|
| 1 | | talking about Lee County. I know Smith |
| 2 | | Station out there on Almond Road right there |
| 3 | | by the Boon. That is as far as I ever been. |
| 4 | | And you can even go bring my sister back up, |
| 5 | | because I stayed out there with them. |
| 6 | VAN JACKSON: | Uh-huh (affirmative response). |
| 7 | JAMES GARY: | We had a house in the back, do you know what |
| 8 | | I am saying, other than that, I ain't been no |
| 9 | | farther, no – do you know what I am saying, |
| 10 | | you are talking about Opelika. I don't know |
| 11 | | nobody in no Opelika. And I do not – I will |
| 12 | | tell you again, I ain't had no dealings with no |
| 13 | | Mike like that. He used to come worry me |
| 14 | | about that money. He get paid. I paid him his |
| 15 | | money. He done left me alone. My old lady |
| 16 | | can tell you that. She can tell you. She at |
| 17 | | home now. Now, you trying to, do you know |
| 18 | | what I am saying, talking about I killed two |
| 19 | | people now. No, man. I'm telling you, I might |
| 20 | | do my little thing on the side, Man, but I ain't |

32

1    going to hurt nobody, man, and anybody that

2    knows me can tell you that, man.  I don't care

3    what they say, do you know what I am saying.

4    They ain't got me on nothing like that, man.

5    Not that, do you know what I am saying. Now,

6    I'm thinking like, okay.  True enough.  I know

7    I ain't sold nobody no dope, do you know what

8    I am saying, because I ain't never really just

9    straight out hand sold nobody nothing, but as

10    far as, do you know what I am saying, you are

11    talking about killing somebody, no, man.  That

12    ain't even me, man.  I ain't even that type of

13    person, man.  I do a lot of things.  Now, don't

14    get me wrong, now, as far as hustling,  Do you

15    know what I am saying, I might, do you know

16    what I am saying, steal a little bit, shoot me

17    some dice, do you know what I am saying, but

18    as far as that, I ain't gonna do nothing like that,

19    man, and that's the honest to God Truth, Man.

20    I'm telling you.  That's the -- that's the truth.  I

|   |   |   |
|---|---|---|
| 1 | | mean, do you know what I am saying, that's |
| 2 | | just – that's it. That's what it is. That is what |
| 3 | | it is. So if this is why y'all got me shackled up |
| 4 | | -- |
| 5 | VAN JACKSON: | Yep. Because today is the day. |
| 6 | JAMES GARY: | Today is the day for what? |
| 7 | VAN JACKSON: | Where you are going to have to face the music. |
| 8 | | What I'm telling you right now is that this |
| 9 | | thing is going the distance today. It's going |
| 10 | | the distance. It's over with. And my only |
| 11 | | hope is that you are going to tell the truth. |
| 12 | JAMES GARY: | Well, only hope. Y'all are saying y'all got |
| 13 | | me on this, I might as well stop talking now |
| 14 | | and y'all talk to my lawyer because I'm telling |
| 15 | | you, man, I ain't had no dealings with that man |
| 16 | | in no kind of way as far as he got me out on |
| 17 | | bond and worried the shit out of me about that |
| 18 | | money, man. As far as that, that's it. That's it. |
| 19 | | do you know what I am saying, if you know |
| 20 | | what I'm saying, you saying you gonna put |

34

|   |   |   |
|---|---|---|
| 1 | | something like that on me, then you might as |
| 2 | | well talk to my lawyer then, and it's just that |
| 3 | | because it ain't me, bro.  Now, I promise you |
| 4 | | and that's the honest to God truth, and I'll put |
| 5 | | that on my momma, and she's been dead |
| 6 | | thirteen years. |
| 7 | VAN JACKSON: | All right.  Well, you just sit here, man.  It's |
| 8 | | gonna be a while.  Like I said, it's gonna be a |
| 9 | | while.  But you know, I would like to show |
| 10 | | you something. |
| 11 | JAMES GARY: | Show me.  Show me.  I would like to see. |
| 12 | VAN JACKSON: | Well, you know, I hate for somebody to make |
| 13 | | a decision to not tell the truth and that they |
| 14 | | suffer for the rest of their life, and it's a big |
| 15 | | decision.  That's a big choice. |
| 16 | JAMES GARY: | Man, you can talk to my lawyer, man. |
| 17 | | Because I'm telling you I ain't got nothing to |
| 18 | | do with no shit like that, man.  That's on |
| 19 | | everything, man.  Everything.  My children. |
| 20 | | Everything, man.  I ain't got shit to do with no |

35

|    |    |    |
|----|----|----|
| 1 | | shit like that. I do my thing, true enough, but I |
| 2 | | ain't fixin to do nothing like that. I ain't fixin |
| 3 | | to go no distance, do you know what I am |
| 4 | | saying, to do nothing. I hustle. Do you know |
| 5 | | what I am saying; it's obvious to everybody |
| 6 | | that knows, it's there, it's out there in the open. |
| 7 | | I got to go to court for it now, but that is as far |
| 8 | | as I'm gonna go. As far as you talking about |
| 9 | | killing somebody, ain't no way in the world I'll |
| 10 | | kill nobody, especially no children. And I |
| 11 | | know for a fact I ain't killed no children. You |
| 12 | | keep hollering about two people got killed, that |
| 13 | | man and that child. That's them two people. |
| 14 | | But y'all ain't fixing to put that on me because |
| 15 | | I know I been in jail. |
| 16 | VAN JACKSON: | Oh, no. We're not trying to put that on you. |
| 17 | | Like I told you, that – that case right there, we |
| 18 | | know you didn't have nothing to do with that. |
| 19 | JAMES GARY: | Well, what are you talking about some two |
| 20 | | people murdered? Do you know what I am |

36

| | | |
|---|---|---|
| 1 | | saying? |
| 2 | VAN JACKSON: | This happened to two people that's in Opelika |
| 3 | | and this was before this happened with this |
| 4 | | little kid and this man. That's what we are |
| 5 | | talking about. |
| 6 | JAMES GARY: | I'm telling you I ain't been to Opelika, man. I |
| 7 | | ain't been to Opelika for nothing. |
| 8 | VAN JACKSON: | Do you want me to show you? |
| 9 | JAMES GARY: | Yeah. |
| 10 | VAN JACKSON: | Hold on a minute. I'll be right back. Just sit |
| 11 | | there. |
| 12 | | (PAUSE WAS HAD.) |
| 13 | VAN JACKSON: | Let's see. "Mike left me and James at the |
| 14 | | storage building on Pierce Road in Phenix |
| 15 | | City." That is just one segment here. That's |
| 16 | | just one segment. |
| 17 | JAMES GARY: | I mean, Mike left me and James at a storage |
| 18 | | room. |
| 19 | VAN JACKSON: | Yep. You know what that is? |
| 20 | JAMES GARY: | (Nodding head.) |

37

| | | |
|---|---|---|
| 1 | VAN JACKSON: | Who is that right there? |
| 2 | | (Mr. Gary viewing document.) |
| 3 | JAMES GARY: | That's me. |
| 4 | VAN JACKSON: | Well, I'm telling you, man, we have been |
| 5 | | working on it and, uh, we were trying to |
| 6 | | provide you an opportunity to tell your side, |
| 7 | | and, uh, that's – that's why I wanted to talk |
| 8 | | to you, to give you that opportunity, and, uh, |
| 9 | | you know, if you want to see it, I will show |
| 10 | | you a little segment that these boys are putting |
| 11 | | everything on you, and if you continue to not |
| 12 | | tell the truth about what happened, then I don't |
| 13 | | know what we can do. But hold on. Let me |
| 14 | | see. I am going to get this thing and show you. |
| 15 | | Because I want you to know exactly what you |
| 16 | | are up against, because everybody is saying |
| 17 | | you did it. Other people out there that don't |
| 18 | | know you are saying you was with them and |
| 19 | | uh – |
| 20 | JAMES GARY: | Uh, show me what you have got to show me, |

38

| | |
|---|---|
| 1 | other than that, talk to my lawyer. I would like |
| 2 | to see it, though. |
| 3 | (Pause was had.) |
| 4 | (Jackson left and entered.) |
| 5 | VAN JACKSON: Now, this isn't it. This isn't everything, but |
| 6 | I'm going to collect this stuff right here |
| 7 | because what we're talking about is so serious |
| 8 | that I think that you really need to think about, |
| 9 | you know, what we are talking about and |
| 10 | reading the paper or trying to take your mind |
| 11 | away from it, this is -- this is about you. This |
| 12 | is about the future for you, and you need to |
| 13 | think about what I'm talking to you about. |
| 14 | That's one thing, but I'm still getting you |
| 15 | another thing that's going to, you know, show |
| 16 | you how important this is. |
| 17 | (VAN JACKSON LEFT.) |
| 18 | (MR. TAYLOR ENTERED THE |
| 19 | ROOM.) |
| 20 | HEATH TAYLOR: How are you doing? |

39

| | | |
|---|---|---|
| 1 | JAMES GARY: | All right. |
| 2 | HEATH TAYLOR: | Good. My name is Heath Taylor. I'm a |
| 3 | | lieutenant here with the Sheriff's Office in |
| 4 | | Russell County. I'm kind of over the |
| 5 | | investigative unit back here. I'm just going to |
| 6 | | talk to you for a few minutes. I'm gonna take |
| 7 | | these cuffs off you. Are you going to go |
| 8 | | somewhere? Huh? |
| 9 | JAMES GARY: | I ain't going nowhere, man. |
| 10 | HEATH TAYLOR: | All right. I'm just -- I'm just asking, bro. I |
| 11 | | just don't -- you know. I'll take the cuffs off of |
| 12 | | you and make you a little more comfortable, |
| 13 | | but, you know, don't act crazy up in here. |
| 14 | JAMES GARY: | I ain't gonna act crazy. |
| 15 | HEATH TAYLOR: | You know, we get some folks up here |
| 16 | | sometimes that just act all crazy. I just want to |
| 17 | | talk to you for a few minutes while Detective |
| 18 | | Jackson is getting a couple of things ready that |
| 19 | | he wants to show you. Um, James, there's a |
| 20 | | couple of things that I think is important to |

40

|   |   |
|---|---|
| 1 | you, okay, and I'm just gonna be front with |
| 2 | you. Okay. I'm working the case that |
| 3 | happened a couple of days ago, but I have been |
| 4 | working with Van and the folks from Lee |
| 5 | County for a long time, and they are really |
| 6 | good guys. They came down and helped me |
| 7 | yesterday and we got to looking at some |
| 8 | things, and some things happened that kind of |
| 9 | fell into place. Okay? I'm just telling you. |
| 10 | From the case I'm working in Russell County |
| 11 | that you was in jail on, you ain't got nothing to |
| 12 | do with. I agree with you. You keep saying – |
| 13 | JAMES GARY: That's what I keep telling him. |
| 14 | HEATH TAYLOR: But listen to me. There are some things that |
| 15 | happened, bro, that go back a couple of weeks. |
| 16 | Now, I'm going to tell you something. Look at |
| 17 | me. Now, I'm going to tell you some things |
| 18 | that are not important to me. They're not |
| 19 | important to Van. They are not important to |
| 20 | nobody but James. I'm gonna tell you that. |

41

1    Now you can believe me. You don't have to

2    believe me. You've been in the system long

3    enough to know. Okay? When you go before

4    somebody, you go before a jury, you go before

5    a Judge, you go before me, you talk to your

6    attorney, you talk to the district attorney, it

7    don't matter. In this business -- and I'm

8    talking law enforcement, the -- the justice

9    system. Okay? You follow me? When you

10   talk to somebody in that system, the only type

11   person that they care to help is a person who is

12   still a good person, who has had something bad

13   happen to them. The people that have no

14   conscience, the people that don't care about

15   any mistakes they make, the people that don't

16   want to do the right thing, they lock that person

17   up for the rest of their life. You know that.

18   You see that on a daily basis. Am I telling you

19   the truth?

20   JAMES GARY:          Yeah.

42

| | | |
|---|---|---|
| 1 | HEATH TAYLOR: | When you are a person who we in this |
| 2 | | profession consider to be sociably redeemable, |
| 3 | | you're a good person; you have redeeming |
| 4 | | values that are good, you are sociably.  And I |
| 5 | | mean -- sociably, I mean, society in -- in a |
| 6 | | whole.  That is what we consider somebody |
| 7 | | that we want to rehabilitate, change their |
| 8 | | actions, and put them back in society.  You |
| 9 | | follow me?  When there is a person who what |
| 10 | | we consider a sociopath -- now, that's a big |
| 11 | | word, but do you know what a sociopath is? |
| 12 | JAMES GARY: | (Shaking head in the negative.) |
| 13 | HEATH TAYLOR: | A sociopath in this line of work is somebody |
| 14 | | who has no redeeming values, who is a bad |
| 15 | | person, who has no social value in our society, |
| 16 | | who we don't want to rehabilitate, and put |
| 17 | | back out on the streets.  Somebody that we |
| 18 | | want to lock away for as long as we can. |
| 19 | | That's what we call a sociopath personality. |
| 20 | | Now, there's only -- that's only two people that |

43

1    we deal with. That's it.  A person who is a

2    good person who has had bad things happen to

3    them.  I have had bad things happen to me.  I

4    have made bad decisions, but I am a good

5    person.  You are a good person who has had

6    some bad unfortunate things happen in your

7    life that have caused you to make bad

8    decisions.  That's understandable, but you are

9    still a good person.  Okay?  The person that

10   I'm talking about is the person – the other --

11   there's only two.  The other person I'm talking

12   about is that guy that I'm telling you is a

13   sociopath personality. That's a bad person.

14   That's a -- that's a bad, bad person that we

15   never want to get out of the jail as long as they

16   live.  Now, when you go before a judge or a

17   jury, you don't want to be portrayed as a

18   sociopath personality.  Right?

19   JAMES GARY:         (Nodding head.)

20   HEATH TAYLOR:       You don't want to be the bad guy.  You want

44

|   |   |   |
|---|---|---|
| 1 |  | to be portrayed as a good guy. Somebody that |
| 2 |  | is a good guy that has had some bad incidents |
| 3 |  | happen. You see what I'm saying? You want |
| 4 |  | them to think that you are worth putting back |
| 5 |  | in society. Do you not follow what I'm |
| 6 |  | saying? |
| 7 | JAMES GARY: | Man, you lost me for a second. |
| 8 | HEATH TAYLOR: | Well, what I'm saying is – is when you go |
| 9 |  | before a jury or a judge, you want that judge |
| 10 |  | to know that you are a good person. James is a |
| 11 |  | good person. You don't want that Judge to |
| 12 |  | think that you are a sociopath personality, that |
| 13 |  | you have no conscious, that you don't care |
| 14 |  | about things you've done wrong. Do you |
| 15 |  | follow what I'm saying? You want that Judge |
| 16 |  | to know that you are a good guy. You just |
| 17 |  | made some mistakes like everybody else in this |
| 18 |  | world. What I'm telling you, James, is you |
| 19 |  | can't do that unless you're honest. You can't |
| 20 |  | portray that you're a good guy that made |

45

| 1 | | mistakes unless you're honest. We had two |
|---|---|---|
| 2 | | guys yesterday and the day before in a Russell |
| 3 | | County case who decided they can't make a -- |
| 4 | | anybody believe that they are not bad people |
| 5 | | unless they tell the truth. And I'm telling |
| 6 | | you -- |
| 7 | JAMES GARY: | (Inaudible) |
| 8 | HEATH TAYLOR: | Okay. And I'm telling you that this man and |
| 9 | | Mike has came clean about everything they |
| 10 | | have done. |
| 11 | JAMES GARY: | I see. I see. |
| 12 | HEATH TAYLOR: | They came clean. Listen to me. This is |
| 13 | | important to you, James. They came clean |
| 14 | | about what happened in Russell County, that |
| 15 | | you was in jail, in the last two days. They |
| 16 | | came clean about what happened in Lee |
| 17 | | County three weeks ago when you were with |
| 18 | | them. Now, what I'm telling you is, you've |
| 19 | | got an opportunity -- Listen to me, buddy. |
| 20 | | You have an opportunity to tell your side of the |

46

story because they have told theirs. We know

the whole deal. Van has got everything he

needs to send you away as long as you live or

possibly to send you to the electric chair.

Now, the difference is James, because James

has a chance to be a good person who had

something bad happen and James made

a mistake, just like they have, or you can say to

hell with it. Y'all think y'all got me on

something. Y'all ain't got shit, and make

Jackson – make Van, make Investigator

Taylor, make all those guys from Lee County

show in a courtroom to a jury and a

judge everything they've got, and you're going

to be in bad, bad trouble. Two reasons. One,

because they've got all the evidence they need,

and, two, because you're going to appear --

because they've already admitted it; they've

come forward and said I'm sorry. I didn't

mean to kill her. I didn't mean to kill this

47

1   woman. We got there. It went wrong. Things

2   happened, and we did – I'm sorry. That's what

3   they're saying. You, on the other hand, are

4   going to stand up there and go, they're lying on

5   me; I ain't done a damn thing. You know what

6   that looks like. That looks like you don't care

7   about anybody you hurt; that looks like that

8   you're a person who don't need to be back in

9   society, who needs to be locked up for the rest

10  of his life. Now, those things are important to

11  you for one reason, one reason only; you know

12  what happened. You know in your head why

13  you walked in that house with Jimmy and why

14  y'all did those things at Mike's request. Now,

15  I'm going to tell you, he is in the same boat

16  you are and he sat right there and was honest

17  because it was on his heart. He didn't like it,

18  but y'all did it and it's a mistake and now he

19  sees the only way that he can overcome it,

20  James, is to be honest. He was pressured by

48

1  Mike. That's his story. Now, my thing to you

2  is he can't speak for James, but he can and has

3  told us every step of the way. We've got it.

4  We've got Mike. Mike is saying the same

5  thing. He is what we call corroborating. We –

6  we get one story. We get another story. We

7  put them together, and if they match, that's

8  called corroboration. We've corroborated

9  everything they have said, James. Everything.

10  We know that – who -- how much money was

11  divided up between the three of you, how

12  much each one of you got. We know that --

13  the whole nine yards. We know that you went

14  into sit in somebody's car as part of an alibi.

15  We know the whole – and I'm going to tell you

16  this: You're talking about ain't nobody saw

17  you. They saw you that day. They saw you

18  and they've got it. They saw the three of you

19  riding in the Crown Vic. They saw -- people

20  have came forward and put you in the car with

49

1   the two boys that day. Got it. And what I'm

2   telling you is you're looking at an opportunity

3   to be truthful and honest and you tell what was

4   in your head and the reason you did that

5   because he can't speak for you. He can only

6   speak for himself. But he is able to tell the

7   truth about what happened and tell the truth

8   about everybody there. Okay? That is a fact;

9   that has been already corroborated between the

10   two of them. The difference is, is James going

11   to appear to be this hardened criminal killer

12   who don't give a dang about anybody but

13   himself or did James make some mistakes and

14   is he sorry for that mistake and does he want to

15   at least rectify the things he's done wrong.

16   Does he at least want to say I'm sorry? I've

17   done this. I'm sorry, but let's get it over with,

18   because if you don't, James, you're looking at

19   going to trial for capital murder. Now, capital

20   murder and murder is two different things.

50

| | | |
|---|---|---|
| 1 | | Capital murder means that you could possibly |
| 2 | | get the death penalty for capital murder. |
| 3 | | Murder means that you just do life in prison. |
| 4 | | You could get life in prison.  You could get |
| 5 | | five years, but you could get life in prison. |
| 6 | | Now, the difference is -- in my opinion, the |
| 7 | | difference is James.  That's the difference.  Not |
| 8 | | whether or not they charge you with capital |
| 9 | | murder or not, but the difference is what James |
| 10 | | is going to do is depending on James.  Because |
| 11 | | nobody can speak for James.  See, Detective |
| 12 | | Jackson, Investigator -- Sergeant Jackson, with |
| 13 | | the Sheriff's office that was just in here, he is |
| 14 | | going to tell you or he is -- his job is a lot like |
| 15 | | an artist.  You follow me? |
| 16 | JAMES GARY: | (No response). |
| 17 | HEATH TAYLOR: | He has to paint a picture to a jury.  When he |
| 18 | | goes to trial, his job is to paint a picture for a |
| 19 | | jury to show them what happened.  Okay? |
| 20 | | Now, his job can be one or two ways.  He can |

51

1    either paint it by what Jimmy and Mike and

2    everybody has told him, that everybody was

3    there. Y'all were all involved. Y'all two went

4    in. Or he can paint it the way he wants to and

5    the way you're going to make him paint it is

6    that you're the bad guy and you're not wanting

7    to be honest with it, and you're not wanting to

8    say what the deal is and that you're this –

9    you're this monster that's not wanting to come

10    forward. Everybody in the whole picture that

11    he's going to paint is being truthful.

12    Everybody in the whole picture is sorry that

13    they made some mistakes. Everybody but

14    James. So see, he has got to go to court and

15    paint this nice big picture of Mike and Jimmy

16    and James all in this thing together and now

17    when they get caught, when the things go to

18    shit, when everything starts going down hill, at

19    least they were honest and said the gig's up.

20    Everybody but James. So they are -- he's

52

1    going to take his paintbrush; he's going to

2    walk in that courtroom and he's going to say

3    you know what, I think James was the

4    mastermind. I think James is the one that

5    convinced these two to do it and he is the one

6    that got the InterTech and the nine MM

7    handgun. He's the one that did it. He's the

8    one that disposed of the guns because he's the

9    one not wanting to admit it. He's the person

10   that we don't need to put back in society; he's

11   the person we need to lock away for the rest of

12   his life or send him to the death chair. That's

13   what he's going to take his paintbrush and

14   paint for the jury. You're going to look like

15   terrible because you still can't come to the

16   reality and see where I'm coming from, in that

17   everything is not excusable, James, but at least

18   if you -- if me and you get into a fight and you

19   come up to me the next day -- and you started

20   the fight and you came up to me the next day

53

| | | |
|---|---|---|
| 1 | | and you busted my lip and you walk up and |
| 2 | | you say, Man, I'm sorry, I was pissed off, I |
| 3 | | didn't mean to do it, I apologize, and I'm |
| 4 | | sorry. Does my lip automatically go back to |
| 5 | | being fixed or is it still swollen and still |
| 6 | | busted? |
| 7 | JAMES GARY: | It's still swollen. |
| 8 | HEATH TAYLOR: | That's right, but at least I forgave you. At least |
| 9 | | you were man enough to come forward and say |
| 10 | | I'm sorry. Now, my wound won't go away |
| 11 | | right off the bat, but eventually it heals, don't |
| 12 | | it? If you come to me and say you are sorry |
| 13 | | and my wound heals, three weeks down the |
| 14 | | road, we're friends again. If you never come |
| 15 | | to me and say you're sorry, every time |
| 16 | | something happens to my lip, I'm going to cuss |
| 17 | | you like a dog, ain't I? |
| 18 | JAMES GARY: | Yep. |
| 19 | HEATH TAYLOR: | I'm going to think about you busting my lip |

54

| | | |
|---|---|---|
| 1 | | and that son of a gun is swollen up -- and see |
| 2 | | I'm a fat man — |
| 3 | JAMES GARY: | Right. |
| 4 | HEATH TAYLOR: | -- and I like to eat and every time something |
| 5 | | happens and I can't eat for that whole three |
| 6 | | weeks that my lip is swole up, I'm going to be |
| 7 | | cussing you like a dog. |
| 8 | JAMES GARY: | Yeah. |
| 9 | HEATH TAYLOR: | But if you apologize to me and you tell me |
| 10 | | you're sorry, it don't take away the injury, but |
| 11 | | it does heal eventually, and what I'm telling |
| 12 | | you, James, is you made a mistake.  I'm not – I |
| 13 | | don't – you have never one time heard me say |
| 14 | | I think anything.  I know what happened.  We |
| 15 | | know what happened.  The question is:  Does |
| 16 | | James want to at least heal the injury, because |
| 17 | | to me, that's the most important thing.  That's |
| 18 | | a man and a woman's daddy.   That's a son's |
| 19 | | parents and mother and father.  To me, you've |
| 20 | | — you've got a choice.  You can help heal or |

55

1     you cannot help heal, and it be a thorn in your

2     side until your last breath is taken. I don't

3     believe for five minutes, James -- I don't

4     believe for five minutes that you wanted to

5     hurt nobody, and that it don't bother you in

6     your heart to this day. I don't believe you

7     don't have nightmares about it because if you

8     don't, you're a lot harder person than I

9     thought. People make mistakes. Things

10    happen that are out of control and sometimes

11    they're irreversible. This is one of them. But

12    you know what? You have an opportunity to

13    heal and close that chapter of your life. You're

14    going to have to -- you're going to be punished

15    for that. No doubt about that. There's no

16    doubt about it. You have to. Don't think for

17    five minutes that society is not going to let you

18    and them and anybody else that does that go

19    and just not -- just say I'm sorry and it be done.

20    But it's -- it's so much easier when that is said,

56

| | |
|---|---|
| 1 | James. It's so much smoother and easier to get |
| 2 | over because you can close it in your life. |
| 3 | They can close it in their life. Right now, they |
| 4 | can't. Right now, there's a son and a family |
| 5 | that is grieving over the loss of that man and |
| 6 | woman. They don't know what happened. |
| 7 | They are still guessing. Well, we know. |
| 8 | We're going to -- they're going to know |
| 9 | eventually, but the difference is, you can help |
| 10 | solve it. You can help in your heart get rid of |
| 11 | it. You don't want to. I understand that. You |
| 12 | don't want to come out and say because in the |
| 13 | back of your head, maybe you've killed |
| 14 | somebody before. I don't know. But in the |
| 15 | back -- |
| 16 | JAMES GARY: I ain't never killed nobody. |
| 17 | HEATH TAYLOR: Listen. In the back of your head you're saying |
| 18 | I would really like to tell somebody because it |
| 19 | would help you get over it, and all I'm telling |
| 20 | you, Bro -- believe me if you want, I've seen a |

57

1    hundred people come in here and say I didn't

2    touch him; I didn't do nothing, and I -- and I go

3    through this process, and it's -- it's normal.

4    It's a phase. First is denial. They just

5    absolutely deny it, and it's the same in every

6    person every time. You can write a book by it.

7    You deny it. You deny it. You deny it. Then

8    you start accepting it, and you start minimizing

9    what happened. Then you go into the phase of

10   acceptance to where it's just all off your chest

11   and -- and it's a burden that you would not

12   believe. Now what I'm telling you is, is I've

13   had people a lot harder than you, a lot harder

14   than you, and they will tell you that when they

15   finally said, okay, when they finally said I'm

16   sorry, I didn't mean to do it, but I did. I did it,

17   and -- and I'm sorry for it, when they finally

18   said that, I can give you a page full of names in

19   murder cases that said I was one hundred

20   percent at peace, no matter if I went to the

58

1    death chair, no matter if I went to life without

2    parole, no matter if I did five years, I was

3    happy because I got it off my chest and I

4    couldn't live with it much more, and I'm

5    telling you, you can deny all you want, James;

6    you're not going to beat this case. You're not

7    going to beat it. Don't look at me like we

8    don't have a case. We've got everything. Do

9    you hear me? We've got everything. We

10   know you went to LaGrange afterwards. We

11   know you sat there at Mike's house. We know

12   you took the guns apart. We know where y'all

13   parked and run and jumped the fence and went

14   into the back of the house. We know every

15   single thing that happened. We know you tried

16   to shoot him in the ass and actually shot him in

17   the back or the spine the first time. We know

18   you shot him in his hand. We know you shot

19   him in the head. And all I'm telling you is you

20   can believe me if you want, but they are going

59

1    to put you away for life, and you can do one or

2    two things.  You can either say I'm sorry and

3    tell the truth as far as you're concerned about

4    the case, or you can just say to hell with it,

5    y'all ain't got nothing on me and let them take

6    everything that they have got and take you to

7    court and you will lose.  Listen to me.   You

8    will lose.  This man was standing right there

9    with you.  He was in that house.  He had the

10   other gun, and he was right there with you.

11   And he has spilled his fucking guts.  Believe

12   me when I tell you, he spilled them.  And I

13   don't care.  I've done told them use my case,

14   use it.  Get the -- get the video and show James

15   the video of him running his mouth.  You

16   know why, because I don't care.  You don't

17   have to believe me because what I'm going to

18   suggest to them is this:  I'm going to suggest

19   that they go ahead and just say to hell with you

20   and present you as being the ring leader that is

60

| | | |
|---|---|---|
| 1 | | a -- that is a ruthless fucking killer that don't |
| 2 | | ever need to get out of jail. That's what I'm |
| 3 | | going to do. And I'm going to do everything |
| 4 | | in my power in Russell County to make sure |
| 5 | | that we treat you that way in that jail for the |
| 6 | | rest of the time because I think that's possible. |
| 7 | | (VAN JACKSON ENTERED.) |
| 8 | HEATH TAYLOR: | You got the tape? |
| 9 | VAN JACKSON: | I got the tape. |
| 10 | HEATH TAYLOR: | I think it's possible. I think you are the one. |
| 11 | | And I think it's very possible and I think that |
| 12 | | when we get done because I've got a little bit |
| 13 | | of power and a little bit of influence, and when |
| 14 | | they call me as an expert witness in homicide, |
| 15 | | I'm going to tell them that guy never ever |
| 16 | | needs to be out from behind bars or you need |
| 17 | | to put him -- strap him to the chair and get rid |
| 18 | | of him. He's useless. He's a killer. He never |
| 19 | | needs to be let out, and if he gets out again, |
| 20 | | he'll kill again. That's what I'm going to say. |

61

| | | |
|---|---|---|
| 1 | | Because other than that, you've given me no |
| 2 | | reason to; other than that, you give this man no |
| 3 | | reason to.  Without your side and you being |
| 4 | | honest and you telling us what happened in |
| 5 | | that house, we have no choice, James, but to |
| 6 | | point to you and say that's the son of a bitch |
| 7 | | that don't never need to be out of jail again, |
| 8 | | believe me when I tell you that's him. |
| 9 | JAMES GARY: | I didn't kill nobody. |
| 10 | HEATH TAYLOR: | Well, that's good.  Let's show him the tape. |
| 11 | VAN JACKSON: | All right.  See if you can set it up.  Let me |
| 12 | | know when you get it ready.  See, man, what |
| 13 | | I'm trying to tell you is, like you say, is all I |
| 14 | | want to do is just tell your side of what |
| 15 | | happened. |
| 16 | JAMES GARY: | I didn't kill nobody, man. |
| 17 | VAN JACKSON: | I mean, if you would – if you would just tell |
| 18 | | me.  If you would tell me. |
| 19 | JAMES GARY: | I'm talking about that shit eat at me every day, |
| 20 | | man.  That mother fucker there is crazy, man. |

62

| | | |
|---|---|---|
| 1 | VAN JACKSON: | And that's what we -- what we need to know, |
| 2 | | what happened.  And I know you can tell me. |
| 3 | JAMES GARY: | That mother fucker there is crazy, man. |
| 4 | VAN JACKSON: | Okay.  So what happened. |
| 5 | JAMES GARY: | He went up in there, man.  Okay.  See -- but |
| 6 | | you got to promise me, man. |
| 7 | VAN JACKSON: | Tell me what happened. |
| 8 | JAMES GARY: | I want it in writing that you gonna help me if I |
| 9 | | tell you everything that happened, man.  If you |
| 10 | | would -- just think about it, man.  Just put two |
| 11 | | and two together.  I'm a black man.  These two |
| 12 | | -- you know, they ain't -- |
| 13 | VAN JACKSON: | I understand that. |
| 14 | JAMES GARY: | They came at me with this shit, man. |
| 15 | VAN JACKSON: | Why do you think I'm asking you, because I |
| 16 | | understand what you're saying. |
| 17 | JAMES GARY: | Mike -- I owed Mike all this money, man. |
| 18 | VAN JACKSON: | Right. |
| 19 | JAMES GARY: | He came to me, he said well, you got it today |

63

| 1 | | or you going back to jail, and I don't want to |
|---|---|---|
| 2 | | leave my children, man. |
| 3 | VAN JACKSON: | I understand. |
| 4 | JAMES GARY: | He came to me, man. He said well, this kid, |
| 5 | | Jim, they call him Jim, got this lick, just go in, |
| 6 | | do you know what I am saying, and get the |
| 7 | | money out. This son of a bitch here just lose – |
| 8 | | straight lose his mind, man. |
| 9 | VAN JACKSON: | And he did everything in there and you just -- |
| 10 | JAMES GARY: | Man, I'm talking he – when he shot that lady, |
| 11 | | man, I was like nah, when he first walked in, |
| 12 | | man. |
| 13 | VAN JACKSON: | Let me talk to him just a minute. I don't |
| 14 | | think we are going to need it. He's telling me |
| 15 | | right now what happened so we can work it |
| 16 | | out. |
| 17 | JAMES GARY: | That man shot that man at first. Okay. He said |
| 18 | | well, he went in – he jumped the fence, cut |
| 19 | | the wire or something. He said we gonna cut |
| 20 | | the phone wire. |

64

| | |
|---|---|
| VAN JACKSON: | All right. |
| JAMES GARY: | When he went in -- okay. I opened the screen door. He kicked the door in. He made her lay down. I said I'm not fixing to go in there like that because I'm thinking these white folks got guns, they might be shooting, kicking the door in. He opened it blind, man. This man here, go in there, he kicked the door in, he made them lay down, man. I came in shortly behind him. By that time this man is laying down like this and he shot him in the hand. The man was shot in his hand. |
| VAN JACKSON: | Yes, you are right. |
| JAMES GARY: | He just shot him in his hand. The lady was sitting up praying. I was like, nah, man, just because it didn't supposed to go that way. We was supposed to take the ties and tie them up, and just get the money and leave. This mother fucker just goes on a rampage, man. I'm talking about out of control like he wasn't even |

|   |   |   |
|---|---|---|
| 1 | | Jim no more.  It's like he just – like he already |
| 2 | | just instinct just -- do you know what I am |
| 3 | | saying, he just – he knew what he was going to |
| 4 | | do before we even got there. |
| 5 | VAN JACKSON: | Uh-huh. |
| 6 | JAMES GARY: | And he shot that man in his hand, then he |
| 7 | | grabbed the lady – I already had the man |
| 8 | | laying down. |
| 9 | VAN JACKSON: | Right. |
| 10 | JAMES GARY: | Okay. |
| 11 | VAN JACKSON: | So you had the – you had the tech 9; right? |
| 12 | JAMES GARY: | At first.  Then he came and got it because, you |
| 13 | | know, he had – when he took the tech because |
| 14 | | I was like, hell, no, because I'm not fixing to |
| 15 | | kill.  I didn't kill nobody.  I promise.  I put that |
| 16 | | on my children. |
| 17 | VAN JACKSON: | Okay. |
| 18 | JAMES GARY: | I was there, -- |
| 19 | VAN JACKSON: | All right. |
| 20 | JAMES GARY: | -- but that man killed them folks, man.  I |

66

| | | |
|---|---|---|
| 1 | | wasn't fixing to kill no old people like that, |
| 2 | | man.  My mission was just to get the money. |
| 3 | | Okay.  Make them lay down and, do you know |
| 4 | | what I am saying, get my little shit, and get the |
| 5 | | fuck on. |
| 6 | VAN JACKSON: | Uh-huh. |
| 7 | JAMES GARY: | But that man killed them folks, man. |
| 8 | VAN JACKSON: | Yeah. |
| 9 | JAMES GARY: | He killed them people, man. |
| 10 | VAN JACKSON: | And see, -- and you had to – you had to |
| 11 | | witness this and this is what we been trying to |
| 12 | | talk to you this whole time. |
| 13 | JAMES GARY: | I witnessed this shit and don't you know I |
| 14 | | dream about this shit every night, man. |
| 15 | VAN JACKSON: | You dream about it every night? |
| 16 | JAMES GARY: | I been here.  I know I lost weight, man.  I see |
| 17 | | that man every night.  Every night, Man, I see |
| 18 | | that man.  That old man.  The expression on |
| 19 | | his face when he was looking, man, that man |
| 20 | | shot him in his hand. |

67

| | | |
|---|---|---|
| 1 | VAN JACKSON: | So what time did, uh, Mike come and get you? |
| 2 | JAMES GARY: | I don't know.  It like -- well, he came like a |
| 3 | | couple of days before, he was like well, I'm |
| 4 | | gonna come back and holler at you in a couple |
| 5 | | of days and let you know what is going on. |
| 6 | | Now see about that – like that kid – that man |
| 7 | | and that kid, -- |
| 8 | VAN JACKSON: | Uh-huh. |
| 9 | JAMES GARY: | -- see, that's the one it was supposed to have |
| 10 | | been. |
| 11 | VAN JACKSON: | Okay. |
| 12 | JAMES GARY: | All right.  The old lady was supposed to been – |
| 13 | | the old lady was supposed to tell where the |
| 14 | | money was at, do you know what I am saying, |
| 15 | | and that was that, but the lady was gone, so |
| 16 | | Jim started talking about the man, do you know |
| 17 | | what I am saying, was supposed to be in the |
| 18 | | mob and got the car lot, and do you know what |
| 19 | | I am saying, and I don't know the sum was |
| 20 | | supposed to be like -- it's got to be like three |

68

| | | |
|---|---|---|
| 1 | | million or something like that he was saying |
| 2 | | and he had a safe at the house, but then, do you |
| 3 | | know what I am saying, when we went to, uh, |
| 4 | | where -- out by the storage room. |
| 5 | VAN JACKSON: | Uh-huh. |
| 6 | JAMES GARY: | Okay. The man who -- like the kid who they |
| 7 | | did the other day, do you know what I am |
| 8 | | saying, they stay like around the street from the |
| 9 | | storage room. |
| 10 | VAN JACKSON: | Uh-huh. |
| 11 | JAMES GARY: | All right. Now, they wasn't there, some reason |
| 12 | | I was like it was an act of God that they |
| 13 | | wasn't there, but the whole time I really didn't |
| 14 | | want to go like that, man. |
| 15 | VAN JACKSON: | Yeah. |
| 16 | JAMES GARY: | Because, do you know what I am saying, |
| 17 | | really, do you know what I am saying, I did |
| 18 | | leave, I did -- but he hounded me so much, |
| 19 | | man, about that money, man, my old lady will |
| 20 | | tell you he is calling my house like early in the |

|   |   |   |
|---|---|---|
| 1 |  | morning, seven o'clock. He come at night |
| 2 |  | when I'm at home worrying me about that |
| 3 |  | money, man. He gonna lock me back up, and |
| 4 |  | then, do you know what I am saying, on top of |
| 5 |  | that, he had gave me some more money. |
| 6 | VAN JACKSON: | Wait. He loaned you some money? |
| 7 | JAMES GARY: | Yeah. |
| 8 | VAN JACKSON: | How much money? |
| 9 | JAMES GARY: | Well, really, like first he gave me $800 and |
| 10 |  | Then I think $200. Do you know what I am |
| 11 |  | saying. |
| 12 | VAN JACKSON: | So you were really in debt? |
| 13 | JAMES GARY: | Yeah. |
| 14 | VAN JACKSON: | At that point? |
| 15 | JAMES GARY: | Yes. |
| 16 | VAN JACKSON: | So how much money did y'all get out of the |
| 17 |  | house after – |
| 18 | JAMES GARY: | I know I left with like – he gave me, like, |
| 19 |  | 8,000. |
| 20 | VAN JACKSON: | 8,000? |

70

| | | |
|---|---|---|
| 1 | JAMES GARY: | Uh-huh. |
| 2 | VAN JACKSON: | How much money was in the house all |
| 3 | | together there? |
| 4 | JAMES GARY: | Uh, I think it was like 25,000; something like |
| 5 | | that. |
| 6 | VAN JACKSON: | All right. So where did y'all split the money |
| 7 | | up at? |
| 8 | JAMES GARY: | At that, uh, storage room. |
| 9 | VAN JACKSON: | When y'all got back to the storage room. All |
| 10 | | right. And then when y'all left from the |
| 11 | | storage room, where did you go then? |
| 12 | JAMES GARY: | I went home. |
| 13 | VAN JACKSON: | And o Mike took you back home? |
| 14 | JAMES GARY: | Unh-unh. Jim did. |
| 15 | VAN JACKSON: | In his car? |
| 16 | JAMES GARY: | Unh-unh. In the Blazer. |
| 17 | VAN JACKSON: | In the Blazer? |
| 18 | JAMES GARY: | (Nodding head in the affirmative.) |
| 19 | VAN JACKSON: | All right. Well, you have done the right thing. |
| 20 | | You know, that is what we were trying to get |

71

|   |   |   |
|---|---|---|
| 1 | | you to do from the very beginning, is just to |
| 2 | | tell the truth. Your side of what happened, |
| 3 | | because like I said, you know, we have been |
| 4 | | working on it a long time and this was coming. |
| 5 | | We was on y'all's track, and of course, then |
| 6 | | they go and do something else. |
| 7 | JAMES GARY: | That's why I say that ought to tell you who did |
| 8 | | all the killing. Man, that man is a psychopath, |
| 9 | | man. That man killed -- |
| 10 | VAN JACKSON: | Where the guns at, man? |
| 11 | JAMES GARY: | Huh? |
| 12 | VAN JACKSON: | Where the guns at? |
| 13 | JAMES GARY: | I don't know. Mike took the guns. |
| 14 | VAN JACKSON: | He did? |
| 15 | JAMES GARY: | Yeah. |
| 16 | VAN JACKSON: | Where did he take them to? |
| 17 | JAMES GARY: | I don't know. He just took the guns; he put the |
| 18 | | guns in a bag and just left. I jumped in the |
| 19 | | Blazer with him and he got in the Crown Vic |
| 20 | | and left. |

72

| | | |
|---|---|---|
| 1 | VAN JACKSON: | What kind of bag did he put them in? |
| 2 | JAMES GARY: | Like a plastic bag. Like when you go to the |
| 3 | | store. Do you know what I am saying. One of |
| 4 | | them store bags. Like a -- like a Home Depot |
| 5 | | bag. |
| 6 | VAN JACKSON: | Did he tell you what he did with the guns after |
| 7 | | that? |
| 8 | JAMES GARY: | Nah, he just said he got rid of the guns. He |
| 9 | | gonna get rid of the guns. |
| 10 | VAN JACKSON: | When was that? |
| 11 | JAMES GARY: | Like, that was that night. |
| 12 | VAN JACKSON: | That night he told you that. All right. Okay. |
| 13 | | Now, when -- all right. |
| 14 | JAMES GARY: | He told -- like then when he was riding I told |
| 15 | | Mike. And Mike should be able to tell you that |
| 16 | | I said that man done killed them folks and he |
| 17 | | wasn't supposed to do it because it wasn't |
| 18 | | supposed to go that way; right. |
| 19 | VAN JACKSON: | So you did tell Mike that? |
| 20 | JAMES GARY: | Yeah. I told him. I was like, man, this man |

73

1                 shot – he shot that lady in the head. He said, I

2                 just seen her brains splatter like – you know,

3                 all excited about this shit, man, so I was just

4                 sitting there – really, I was in shock kind of.

5                 But then he just like you got -- I was like, no,

6                 man. He is like, you got to finish. I was just

7                 like, no; he just took the gun and he – pow.

8                 And I stood there for a minute, man, and that's

9                 when I see – I still see that. That's when I see

10                when he shot that man in the back of his head.

11   VAN JACKSON:       Where was the man at when he shot him? I

12                mean, what part of the house?

13   JAMES GARY:        Like when you first walk in; like in front of the

14                T.V.

15   VAN JACKSON:       Was he sitting up or where was he? And I

16                know he --

17   JAMES GARY:        And then the man, he was laying down. The

18                man wasn't bucking or nothing. He wasn't

19                doing nothing. The man just – I already know

20                I'm through now, but shit.

74

| | |
|---|---|
| VAN JACKSON: | Man, you have done the right thing. You have done the right thing. And being a good person, you feel better having an opportunity to tell what happened in that house. I mean, that's just the way it is. It's a fact of life. Do you still have any of the money from that? |
| JAMES GARY: | Shit, he came and got most of that back, because I still owed him $3,800, and I bought my kids some shoes, and shit, that was it. I owed all the rest of the money to people I owed. |
| VAN JACKSON: | Who did you owe? |
| JAMES GARY: | Shit, man. I owed another cat on the street for some reefer and stuff. |
| VAN JACKSON: | How much did you owe him? |
| JAMES GARY: | Like 1,600. |
| VAN JACKSON: | You said you paid him 1,600. |
| JAMES GARY: | Yes, and Mike got it out of the 8,000, you know. Shopped. Went shopping. Got my kids because I didn't get my kids nothing for |

| | | |
|---|---|---|
| 1 | | Christmas. And all that shit was just on me, |
| 2 | | man. What -- I'm thinking about; I'm in the |
| 3 | | house and I can't get my kids nothing for |
| 4 | | Christmas and then this man he is hounding |
| 5 | | me. He is on my bond and he give me the |
| 6 | | money, you know. |
| 7 | VAN JACKSON: | So did anything else happen that I hadn't asked |
| 8 | | you about that you want to tell me about now? |
| 9 | | So -- while we are getting it all out there in the |
| 10 | | open, you can tell me about it now. |
| 11 | JAMES GARY: | Well, that night, right -- because the whole |
| 12 | | night, it was just like -- we just rode the whole |
| 13 | | -- like all fucking night, like from six all the |
| 14 | | way up until like say about ten or eleven. |
| 15 | | Okay. We was waiting trying to get the one |
| 16 | | that they killed the other day, the little kid, he |
| 17 | | was, like, the kid go to school and the dude |
| 18 | | stay there, but that got a lady keep the kid. She |
| 19 | | was supposed to be where we was supposed to |
| 20 | | went at, do you know what I am saying; but for |

76

| | | |
|---|---|---|
| 1 | | some reason the lady — the lady she was |
| 2 | | outside when we first seen them. |
| 3 | VAN JACKSON: | Uh-huh. |
| 4 | JAMES GARY: | Okay. But then there's a golf course across |
| 5 | | from their house -- |
| 6 | VAN JACKSON: | Uh-huh. |
| 7 | JAMES GARY: | -- and then people was out there playing golf |
| 8 | | and that's when Jim was like, you know, we |
| 9 | | can go and check on this other cat, do you |
| 10 | | know what I am saying. He in the mob, do you |
| 11 | | know what I am saying. I know it's got to be — |
| 12 | | see like with the dude and the kid, was -- he |
| 13 | | was like, well, I know it's at least $50,000 or |
| 14 | | $60,000, but I'm like it's money. I'm with it, |
| 15 | | you know. |
| 16 | VAN JACKSON: | Yes. |
| 17 | JAMES GARY: | I mean, we ain't gonna kill nobody; do you |
| 18 | | know what I am saying. That's why we had |
| 19 | | ties. We had the ties; we had, do you know |

| | | |
|---|---|---|
| 1 | | what I am saying, the things that go over our |
| 2 | | face, you know. |
| 3 | VAN JACKSON: | What do you mean?  Masks or something? |
| 4 | JAMES GARY: | Yeah.  So , I am, like, do you know what I am |
| 5 | | saying.  He ain't got no means of killing |
| 6 | | nobody.  We got all this; you know, gloves. |
| 7 | | Then, shit, I don't know what happened, man. |
| 8 | | It seemed like, you know, he kicked that door. |
| 9 | | Okay.  We got the door, rolled back, and |
| 10 | | there's a car lot at the front of the house. |
| 11 | VAN JACKSON: | Uh-huh. |
| 12 | JAMES GARY: | Okay.  We seen the last dude had left, and he |
| 13 | | dropped me off on the back.  Jumped the fence. |
| 14 | | Climbed – well, he run down that field. |
| 15 | | Climbed the fence.  And he went on down.  I |
| 16 | | was standing behind the shed.  He was over |
| 17 | | there doing something.  He cut a wire or |
| 18 | | something.  He cut some wires or something, |
| 19 | | then we went in.  Then when I opened the |
| 20 | | screen door, he kicked the door in and he ran in |

78

| | | |
|---|---|---|
| 1 | | and that's when, you know, I stood back |
| 2 | | because I was, like, this man is fixing to open |
| 3 | | fire with you kicking that door in, because we |
| 4 | | didn't really know where he was at in the |
| 5 | | house. |
| 6 | VAN JACKSON: | Uh-huh. |
| 7 | JAMES GARY: | So, you know, me – I'm not just fixing to go |
| 8 | | up in no house like that, you know. But just so |
| 9 | | happens that the man and the lady was just |
| 10 | | sitting right there, because he – do you know |
| 11 | | what I am saying, right there. |
| 12 | VAN JACKSON: | Yes. |
| 13 | JAMES GARY: | -- when he ran in, I – like I heard a gun shot. |
| 14 | | Pow. Shot the man in the hand. The man's |
| 15 | | hand was like -- the man was laying down, til |
| 16 | | he grabbed the lady. He was like snatching on |
| 17 | | the old lady. The man wasn't going to move. |
| 18 | | He took the old lady in the back. That's when |
| 19 | | I heard some more gunshots. It was like – do |

79

| | |
|---|---|
| 1 | you know what I am saying. I heard like a |
| 2 | couple of shots. |
| 3 VAN JACKSON: | What did you hear him saying? |
| 4 JAMES GARY: | Then he came out, he was, like, man, the lady |
| 5 | tried to shoot me. Do you know what I am |
| 6 | saying. Something – I guess he took the pistol |
| 7 | from the lady or something and, of course, I |
| 8 | walked back there. The lady was laying down. |
| 9 | She was bleeding. I was like, nah, man. You |
| 10 | know, I was ready to go, really. You know, he |
| 11 | was like you can't leave without it, you know. |
| 12 | He was, like, well, where's the safe; where's |
| 13 | the safe. Man, a lot – a lot -- a lot really went |
| 14 | on in that house that night, man. I mean, it was |
| 15 | like – we just like – it was like he was really |
| 16 | just there to kill. It wasn't -- like it wasn't |
| 17 | even about getting the money no more, man. |
| 18 VAN JACKSON: | Uh-huh. And you was just right there caught |

80

|    |                |                                                                      |
|----|----------------|----------------------------------------------------------------------|
| 1  |                | up in the middle of it.  Because you had                             |
| 2  |                | decided you needed the money and the chips                          |
| 3  |                | was down.                                                            |
| 4  | JAMES GARY:    | The chips was down.  Then he was like – when                        |
| 5  |                | – like, when I saw the lady laying on the floor                     |
| 6  |                | and she was like praying, I was like – that's                       |
| 7  |                | when it really just got to me, you know.  I was                     |
| 8  |                | like, man, I'm not fixing to do nothing. He got                     |
| 9  |                | the gun.  Do you know what I am saying?                              |
| 10 |                | (Inaudible).  You got to finish.   (inaudible) he                   |
| 11 |                | seen her brains like he was excited.  He was                        |
| 12 |                | like go on and finish it.  I was like man, shit,                    |
| 13 |                | man.  I mean, we got the money; do you know                         |
| 14 |                | what I am saying?                                                    |
| 15 | VAN JACKSON:   | Where was the money at?                                              |
| 16 | JAMES GARY:    | It was in the back somewhere because he came                        |
| 17 |                | out with it.  It was like in some -- in a little                    |
| 18 |                | zipper like bank things, you know.  And when                        |
| 19 |                | he came out, he was like finish it, you got to                      |
| 20 |                | finish it.  I was like no, you already got the                      |

| 1 | | money. Then he was like -- and he just shot the |
| 2 | | man. Then just -- like he just -- like his whole |
| 3 | | body just contracted, you know. |
| 4 | VAN JACKSON: | You have been having a hard time dealing with |
| 5 | | all this, huh? |
| 6 | JAMES GARY: | Yeah, man. |
| 7 | VAN JACKSON: | What did you wear out there that night when |
| 8 | | y'all went out there? |
| 9 | JAMES GARY: | Once again? |
| 10 | VAN JACKSON: | What kind of clothes did you have on that |
| 11 | | night? |
| 12 | JAMES GARY: | Uh, a pair of blue jeans and a gray shirt. |
| 13 | VAN JACKSON: | Some blue jeans and a gray shirt. Are you |
| 14 | | sure? |
| 15 | JAMES GARY: | Yeah. |
| 16 | VAN JACKSON: | Do you remember what Jim had on? This guy |
| 17 | | right here? |
| 18 | JAMES GARY: | I think he had on something like blue jeans and |
| 19 | | I think some -- I don't know. I know it was |
| 20 | | some Nikes because he kept talking about he |

82

| | | |
|---|---|---|
| 1 | | got them from Texas. I can't remember what |
| 2 | | kind of shirt he had on. |
| 3 | VAN JACKSON: | So he had on some Nikes that he said he got |
| 4 | | from Texas? |
| 5 | JAMES GARY: | Yeah. |
| 6 | VAN JACKSON: | All right. What did Mike have on? |
| 7 | JAMES GARY: | Um, like a regular ole like gray T-shirt and |
| 8 | | some jeans. |
| 9 | VAN JACKSON: | Okay. So Mike never got out? |
| 10 | JAMES GARY: | He pulled up. He was just driving. He like |
| 11 | | Had some walkie talkies. He came back with |
| 12 | | the walkie talkies and stuff. |
| 13 | VAN JACKSON: | What kind of walkie talkie? What do they look |
| 14 | | like? |
| 15 | JAMES GARY: | Like some like walkie talkies you buy from |
| 16 | | Radio Shack or somewhere. |
| 17 | VAN JACKSON: | And what was -- how was they involved in it? |
| 18 | JAMES GARY: | Like when we leave out, we was supposed to |
| 19 | | mash the button twice. |
| 20 | VAN JACKSON: | Who had the walkie talkies? |

83

| | | |
|---|---|---|
| 1 | JAMES GARY: | Jim and Mike. |
| 2 | VAN JACKSON: | Uh-huh. So where did the guns come from |
| 3 | | originally? |
| 4 | JAMES GARY: | Well, I had the tech that had been in my house, |
| 5 | | you know; he used to be in the Army. Then he |
| 6 | | bought, do you know what I am saying the tech |
| 7 | | and I still had it. And he was like he needed a |
| 8 | | gun and I gave it to him; really, do you know |
| 9 | | what I am saying, but I owe him, you know. |
| 10 | VAN JACKSON: | Wait a minute. |
| 11 | JAMES GARY: | I gave it to him. |
| 12 | VAN JACKSON: | So you gave it to Mike? |
| 13 | JAMES GARY: | Yeah. |
| 14 | VAN JACKSON: | Okay. And the nine MM pistol, where did |
| 15 | | it come from? |
| 16 | JAMES GARY: | I don't know. I guess they already had it. |
| 17 | VAN JACKSON: | So he didn't give you the tech back after all |
| 18 | | this? |
| 19 | JAMES GARY: | Nah. He just said he was going to get rid of |

84

| | | |
|---|---|---|
| 1 | | them. You know what I am saying. And I |
| 2 | | didn't need them, you know. |
| 3 | VAN JACKSON: | So which gun was the lady shot with? |
| 4 | JAMES GARY: | Shit, uh, he had that nine. He shot her with |
| 5 | | that nine. |
| 6 | VAN JACKSON: | With the nine. And the man was shot with |
| 7 | | what? |
| 8 | JAMES GARY: | With that tech. |
| 9 | VAN JACKSON: | All right. Okay. Well, listen, man. You are |
| 10 | | really doing the right thing. And all of this is |
| 11 | | telling the truth about what happened. There's |
| 12 | | one thing that you still need to tell me that |
| 13 | | happened in that house. What we have |
| 14 | | discovered -- I'm sure you've seen all these |
| 15 | | forensic shows about how they can determine |
| 16 | | what exactly happened in the house. |
| 17 | | Whenever a person goes into a room, they |
| 18 | | leave evidence that they were there that you |
| 19 | | can find. |
| 20 | JAMES GARY: | Uh-huh. Uh-huh. |

85

| | | |
|---|---|---|
| 1 | VAN JACKSON: | And when that person leaves, they leave the |
| 2 | | room, then that evidence is still there.  What |
| 3 | | our scientists do is they find it.  And what I'm |
| 4 | | suggesting to you that has happened -- |
| 5 | JAMES GARY: | I walked through the whole house. |
| 6 | VAN JACKSON: | I know. |
| 7 | JAMES GARY: | Yeah. |
| 8 | VAN JACKSON: | But you see, one of the problems is is that from |
| 9 | | where one of the guns was fired, you shot the |
| 10 | | gun one time. |
| 11 | JAMES GARY: | Yeah, I did. |
| 12 | VAN JACKSON: | Tell me about when you made that shot. |
| 13 | JAMES GARY: | Well, when he shot him -- when he shot him in |
| 14 | | the hand, he was like – do you know what I am |
| 15 | | saying, he was – like he was really talking, but |
| 16 | | he was like mumbling, and do you know what |
| 17 | | I am saying, he was like, prove – do you know |
| 18 | | what I am saying, he was like prove it to him, |
| 19 | | you know, you are the man; like I stood over |
| 20 | | him and he was laying like this.  I was standing |

86

| | | |
|---|---|---|
| 1 | | like this.  But I was hesitant, you know, but I |
| 2 | | pulled the trigger and I tried to shoot him in the |
| 3 | | back of the leg, -- |
| 4 | VAN JACKSON: | Uh-huh. |
| 5 | JAMES GARY: | -- but I like hit him like above his butt. |
| 6 | VAN JACKSON: | Okay.  All right.  So your – so your intentions |
| 7 | | when you shot the man was to try to shoot him |
| 8 | | in his leg or in his butt. |
| 9 | JAMES GARY: | In the back of his leg, really. |
| 10 | VAN JACKSON: | Hit him in the back.  Okay.  All right.  And |
| 11 | | where else did you shoot him? |
| 12 | JAMES GARY: | I didn't shoot him no more. |
| 13 | VAN JACKSON: | You didn't shoot him no more.  So Jim did all |
| 14 | | the rest of the shooting and that was the only |
| 15 | | one? |
| 16 | JAMES GARY: | He was just shooting. |
| 17 | VAN JACKSON: | Which – which gun did you have when you |
| 18 | | shot that one? |
| 19 | JAMES GARY: | With the Tech. |
| 20 | VAN JACKSON: | With the Tech 9.  Okay.  Anything else you |

| | | |
|---|---|---|
| 1 | | want to tell me about that you've been |
| 2 | | involved with that happened with this or any |
| 3 | | other case that you want to tell me about? |
| 4 | JAMES GARY: | (Shaking head in the negative.) |
| 5 | VAN JACKSON: | You know, it's like I told you to begin with, |
| 6 | | you know, this -- this is the step that we needed |
| 7 | | to take to start helping you to deal with this |
| 8 | | stuff. You got to deal with it. And you feel |
| 9 | | better already. |
| 10 | JAMES GARY: | Yep. I still ain't gonna be able to sleep, |
| 11 | | though, I know -- you know what I am saying. |
| 12 | | I saw that man die, you know. |
| 13 | VAN JACKSON: | Yeah. Humph. All right. |
| 14 | JAMES GARY: | He shot that man in the head, man. |
| 15 | VAN JACKSON: | Was that on the way while you were standing |
| 16 | | up there or was that when he was in the back. |
| 17 | | How did that happen? |
| 18 | JAMES GARY: | See, like I heard the gunshots. He had came |
| 19 | | out with the money. He went back and he was |
| 20 | | like I saw the lady's brain, do you know what I |

88

1    am saying, he shot -- he shot -- do you know

2    what I am saying -- obviously shot her in the

3    head. He was like, I seen the lady's brains

4    splatter, like he got excited. When he came in,

5    see, I was standing like behind the chair, I was

6    looking at him because, do you know what I

7    am saying, the dude, he was still breathing, but

8    he was like taking deep breaths. Like -- you

9    know, like -- so he was like well, go on finish

10   him. I was like, no, man; you got the money.

11   So he was like -- grabbed the gun, do you

12   know what I am saying, and stood over him,

13   man, and he was like -- I think he shot like two

14   times. He shot like two times; like, pow; pow.

15   I seen him do it. Just like -- his whole body,

16   like it stretched out. I sat there and just looked

17   at him for a minute, man.

18   VAN JACKSON:    Um. Well, that's horrible. But like I say, it's

19   the step, and we have made it and what we are

20   going to do is, is you know at this point now is

89

1                     -- of course, you know these guys is in jail on

2                     this other case, and we are going to have to

3                     find out exactly what our next step is, you

4                     know, because, you know, we can't tell you

5                     what's going to happen, what the outcome is

6                     going to be, but the best thing that you could

7                     have done was tell your side of what happened

8                     inside that house.

9   JAMES GARY:         And I could tell you again and it would be the

10                    same story because that's the truth.  And that's

11                    really the honest to God truth.

12   VAN JACKSON:       And I believe you.  Well, all right.  Just bear

13                    with me for a minute, and I'll be back right

14                    you.  All right?

15                    (TAPE WAS CONCLUDED.)

16

90

### REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing transcript of proceedings in the matter aforementioned was taken down in machine shorthand, and that the questions and answers thereto reduced to writing under my personal supervision, and that the foregoing represents a true and correct transcript of the proceedings.

I further certify that I am neither of counsel nor related to the parties to the action, nor am I in any wise interested in the result of said cause.

DATED this the 25th day of April, 2005.


JANET C. SMITH, CSR
OFFICIAL COURT REPORTER

FORM CSR - LASER    REPORTERS PAPER & MFG. CO.  800-626-6313

State of Alabama
Unified Judicial System

Form C-7 Rev. 2/79

**CASE ACTION SUMMARY**
**CONTINUATION**

Case Number
CC −2002-000492
CR-05-0133

| ID | YR | Number |
|----|----|--------|

Style:  **STATE OF ALABAMA v. JAMES E. GARY, JR.**

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 05/11/06 | Motion to Amend Record on Appeal, **GRANTED**. |
| | John V. Denson, II, CIRCUIT JUDGE |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

EXHIBIT

_IC_

PENGAD 800-631-6989

| State of Alabama<br>Unified Judicial System`<br><br>Form C-7 Rev. 2/79` | **CASE ACTION SUMMARY**<br>**CONTINUATION** | Case Number<br>CC-02-492 | | |
|---|---|---|---|---|
| ` | | **ID** | **YR** | **Number** |

**Style:**     STATE OF ALABAMA v. GARY, JAMES EDWARD, JR.

Page Number _____ of _____ Page

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 10/12/05 | On this date, the Defendant, JAMES EDWARD GARY, JR.., along with his attorneys, Honorable Richard Keith and Honorable Daniel Hamm, appeared along with the State of Alabama being represented by District Attorney for Lee County, Alabama, Nick Abbett, and Chief Assistant District Attorney for Lee County, Alabama, David Glanzer. This being the day set for sentencing, the Court hereby files the pre-sentence report and both the State and the defense attorneys confirmed that they have reviewed the report and the defense attorneys indicated that they had reviewed the report with their client. The Court asked if there was any statement to be made before sentencing and both the State and the defense made statements on behalf of the State and the Defendant, respectively. The Defendant was asked if he had anything to say and he stated that he gave oral notice of Appeal. The defense attorneys stated that they were giving oral notice of Appeal and this would be followed by written notice to be filed with the Clerk. The Court, in accordance with the jury verdict reached in this case on August 4, 2005, adjudged the Defendant guilty of CAPITAL MURDER sentenced the Defendant to life in imprisonment without parole. A detailed, written Court Order will be filed with the Clerk immediately. The Defendant was remanded to the custody of the Lee County Sheriff to be held without bond and transferred to the State Penal System for life imprisonment without parole. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| State of Alabama Unified Judicial System` | CASE ACTION SUMMARY CONTINUATION | Case Number CC-02-492 | | |
|---|---|---|---|---|
| Form C-7 Rev. 2/79` | | ID | YR | Number |
| ` | | | | |

**Style:** STATE OF ALABAMA v. GARY, JAMES EDWARD, JR.                    Page Number _____ of _____ Page

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 08/04/05 | The Defendant, JAMES EDWARD GARY, JR., along with his attorneys, Honorable Richard Keith and Honorable Daniel Hamm, heretofore having been arraigned upon an indictment on the charge of CAPITAL MURDER and having pled not guilty thereto, issue joined on said plea. Thereupon comes a jury of men and women, who being duly impaneled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant, JAMES EDWARD GARY, JR., along with his attorneys, Honorable Richard Keith and Honorable Daniel Hamm, being in open Court at each and every stage and during all proceedings in this cause, now on this the 4th day of August, 2005, said jurors upon their oaths do say: "We, the Jury, find the Defendant, JAMES EDWARD GARY, JR., guilty of CAPITAL MURDER, as charged in the Indictment." /s/ Foreperson |
| 08/05/05 | The jury returned a unanimous verdict at the sentencing Hearing as follows: "We, the Jury, fix the punishment of the Defendant, JAMES EDWARD GARY, JR.., at life imprisonment without parole." /s/foreperson The vote of the jury was unanimous; 12-0. |
| | The Court ordered the preparation of a pre-sentence report. The Court set the sentencing date for **October 12, 2005 at 9:00 a.m. in courtroom number four of the Lee County Justice Center.** The Defendant, JAMES EDWARD GARY, JR., was remanded to the custody of the Lee County jail to be held without bond pending the sentencing Hearing in this case. |

ACRO369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R
CASE ACTION SUMMARY
CONTINUATION                              CASE: CC 2002 000492.00
                                           JUDGE ID:  JVD

STATE  OF  ALABAMA                VS    GARY JAMES EDWARD (JR)

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 4/29/05 | Motion to Suppress set for Hearing on May 23 2005 at 9:00 a.m. |
| | FILED IN OFFICE MAY 0 2 2005 |

State of Alabama
Unified Judicial System

Form C-7  Rev. 2/79

**CASE ACTION SUMMARY**
CONTINUATION

Case Number

CC 02 492

ID    YR    Number

Style:

State v Gary, James Edward ___ of ___ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 5/9/03 | This case is continued to next term of court.. |
| | FILED IN OFFICE MAY 13 2003 |
| 8/15/03 | This case is continued to next term of court.. |
| | FILED IN OFFICE AUG 22 2003 |
| 9/4/03 | Renewed Motion to Transfer Defendant to Lee County Detention FAcility Pending Trial |
| 10/31/03 | This case is continued to next term of court.. |
| | FILED IN OFFICE NOV 17 2003 |
| 3/16/04 | This case is continued to next term of court.. |
| | FILED IN OFFICE MAR 17 2004 |
| 6/14/04 | This case is continued to next term of court.. |
| | FILED IN OFFICE JUN 14 2004 |
| 7/28/04 | Motion To Set Trial No Earlier Than Spring 2005 Trial Term |
| 8-9-04 | Order granting motion to Set Spring 05. |
| | |
| | |
| | |
| | |

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2002 000492.00
JUDGE ID:   RMH

STATE OF ALABAMA                    VS    GARY JAMES EDWARD (JR)

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 8-27-02 | Order Setting Hearing On 9-19-20-02   8:00 a.m. |
| 9-6-02 | State of Alabama's Response to Gary's Various Motions that Misrepresent the Holding of Ring v. Arizona. |
| 9-11-02 | Order continuing motions generally. |
| 9/18/02 | This case is continued to next term of court.. *RMH* |
| | FILED IN OFFICE SEP 2 0 2002 |
| 9/13/02 | Motion for Permission to Proceed Ex Parte on Application for funds |
| 9/13/02 | Ex Parte Motion for Funds for Private Investigator |
| 9/13/02 | Motion for An Order Directing Production of Records |
| 9/13/02 | Motion for The State To Place the Defendant On notice As to Any 404 b Evidence it intends To Use In Trial |
| 9/13/02 | Motion for Order directing The State to Notify the Accused Whether it Intends to Seek The Death Penalty If Defendant is Convicted of Captial Murder |
| 9/13/02 | Ex Parte Motion for Funds To Obtain A Mitigation Investigator |
| 9/13/02 | Ex Parte Motion to Provide Funds For EXpert Psychological Assistance |
| 10-28-02 | Order Setting Hearing On 11-7 2002   9:00 a.m. |
| 11/8/02 | This case is continued to next term of court. *RMH* |
| | FILED IN OFFICE NOV 1 9 2002 |
| 1/17/03 | Motion to Suppress Defendant's Statements |
| 1-23-03 | Order setting pending motions on February 6, 03, at 1:00 p.m. |
| 2-6-03 | Motion to Require the Prosecution to State Exactly which Aggravating Circumstances. |
| 2/18/03 | Motion to Transfer Defedant to The Lee County Detention Facility Pending Trial |
| 2/14/03 | This case is continued to next term of court, pending labs. *RMH* |

FILED IN OFFICE MAR 0 3 2003

```
ACRO372              ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2002 000492.00
OPER: LEW                     CASE ACTION SUMMARY
PAGE:   1                     CIRCUIT   CRIMINAL                 RUN DATE: 04/17/2002
================================================================================
IN THE CIRCUIT COURT OF      LEE                                    JUDGE: RMH

STATE  OF  ALABAMA              VS      GARY JAMES EDWARD (JR)
                                        1421 2ND PLACE SOUTH
CASE: CC 2002 000492.00
                                        PHENIX CITY, AL   36867 0000

DOB: 09/09/1979       SEX: M  RACE: W  HT: 5 09  WT: 170   HR: BLK EYES: HZL
SSN: 461619936   ALIAS NAMES:
================================================================================
CHARGE01: MURDER CAPITAL-ROBBE CODE01: CM02  LIT: MURDER CAPITAL TYP: F #: 001
OFFENSE DATE:                        AGENCY/OFFICER: 0430000 TAYLOR/

DATE WAR/CAP ISS:                    DATE ARRESTED: 02/21/2002
DATE    INDICTED: 04/12/2002         DATE      FILED: 04/17/2002
DATE    RELEASED:                    DATE    HEARING:
BOND      AMOUNT:          $.00 N       SURETIES:

DATE 1: 04/25/2002   DESC: ARRG        TIME: 0900 A
DATE 2: 05/20/2002   DESC: JTRL        TIME: 0830 A

TRACKING NOS: GJ 2002 000262 00   /                   /

   DEF/ATY:  Hon. Daniel Hamm         TYPE:  A                        TYPE:
             Hon. Richard Keith
                             00000                        00000

PROSECUTOR: ABBETT NICK

================================================================================
OTH CSE: GJ200200026200 CHK/TICKET NO:                    GRAND JURY: 295
COURT REPORTER: _____   SID NO:      000000000
DEF STATUS: JAIL           DEMAND:                          OPER: LEW

NOTE: 4-16-02  DISCOVERY ORDER
================================================================================
DATE          ACTIONS, JUDGEMENTS, AND NOTES
================================================================================
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 4-17-02 | NOTICE OF ARRAIGNMENT TO DEFENDANT AND SURETIES |
| 4-19-02 | WRIT ISSUED |
| 5-17-02 | Order that the court finds the defendant indigent and appoints Hon. Richard Keith and Hon. Daniel G. Hamm.  This case is set for arraignment on June 6 2002, at 8:30 a.m. |
| 5/23/02 | Continued pending lab. *RMH* |
| | FILED IN OFFICE MAY 2 9 2002 |
| 6/6/02 | It appearing to the Court that the Defendant is without and unable to employ counsel and upon Defendant's request, the Court appoints Hon. D Hm + R. Keith, Attorney-At-Law, to represent Defendant and assesses attorney's fee of $ _____ |
| | Defendant in open court accompanied by attorney of record, and being duly arraigned, does plead not guilty and not guilty by reason of mental disease or defect. Defendant ~~waives~~ ... ~~this case is set for docket on~~ ... ~~at~~ ... ~~and the case is set for trial on~~ ... |

This case is continued to next term of court, *pending lab.*   *RMH*

FILED IN OFFICE   JUN 1 2 2002

```
-----------------------------------------------------------------------
|IN THE CIRCUIT   COURT OF     LEE       COUNTY                JUDGE: JVD|
|                                                                       |
|   STATE OF ALABAMA   VS   GARY JAMES EDWARD (JR)                      |
|                                                                       |
-----------------------------------------------------------------------
```

| Date | Code | Description | Code |
|---|---|---|---|
| 04/17/2002 | DOCK | NOTICE SENT: 04/17/2002 GARY JAMES EDWARD (JR) | |
| | JUDG | ASSIGNED TO: (RMH) ROBERT M. HARPER | (AR01) |
| | FILE | CHARGE 01: MURDER CAPITAL-ROBBE/#CNTS: 001 | (AR01) |
| | INDT | DEFENDANT INDICTED ON: 04/12/2002 | (AR01) |
| | DAT1 | SET FOR:  ARRAIGNMENT ON 04/25/2002 AT 0900A | (AR01) |
| | ARRS | DEFENDANT ARRESTED ON: 02/21/2002 | (AR01) |
| | STAT | INITIAL STATUS SET TO: "J" - JAIL | (AR01) |
| | FILE | FILED ON: 04/17/2002 | (AR01) |
| | DAT2 | SET FOR: JURY TRIAL ON 05/20/2002 AT 0830A | (AR10) |
| | COMM | 4-16-02   DISCOVERY ORDER | (AR10) |
| | DAT2 | SET FOR: JURY TRIAL ON 05/20/2002 AT 0830A | (AR10) |
| | CASP | CASE ACTION SUMMARY PRINTED | (AR10) |
| 04/19/2002 | PRTY | PARTY ADDED  W007   BILL HARRIS | (AW21) |
| | PRTY | PARTY ADDED  W008   SARAH REYNOLDS | (AW21) |
| | PRTY | PARTY ADDED  W009   LT. JACKIE SMITH | (AW21) |
| | PRTY | PARTY ADDED  W010   INV. SCOTT BELTON | (AW21) |
| | PRTY | PARTY ADDED  W011   TERRY GODWIN | (AW21) |
| | PRTY | PARTY ADDED  W012   SGT. JEFF PITTS | (AW21) |
| | PRTY | PARTY ADDED  W013   DR. BEN BRISTOL | (AW21) |
| | PRTY | PARTY ADDED  W014   JOSHUA REYNOLDS | (AW21) |
| | PRTY | PARTY ADDED  W015   CPT. JAMES MAJORS | (AW21) |
| | PRTY | PARTY ADDED  W016   JIMMY LEE BROOKS JR | (AW21) |
| | PRTY | PARTY ADDED  W017   INV. SCOTT STOVER | (AW21) |
| | PRTY | PARTY ADDED  W018   KATRINA RATLIFF | (AW21) |
| | PRTY | PARTY ADDED  W019   INV. FREDY MARTINEZ | (AW21) |
| | PRTY | PARTY ADDED  W020   DAVID L VINES | (AW21) |
| | PRTY | PARTY ADDED  W021   INV. TAMMY BOOTH | (AW21) |
| | PRTY | PARTY ADDED  W022   CATRINA JACKSON | (AW21) |
| | PRTY | PARTY ADDED  W023   INV. DONNIE SURRETT | (AW21) |
| | PRTY | PARTY ADDED  W024   RAY LANSDON | (AW21) |
| | PRTY | PARTY ADDED  W025   ERNEST COLEMAN | (AW21) |
| | PRTY | PARTY ADDED  W026   ANDREW ELDRIDGE | (AW21) |
| | PRTY | PARTY ADDED  W027   SHEBA BRUTON | (AW21) |
| | PRTY | PARTY ADDED  W028   MICHAEL CARRUTH | (AW21) |
| | CAPS | CAPIAS ISSUED ON: 04/19/2002 | (AR08) |
| 05/06/2002 | DAT2 | CASE SET ON 05/28/2002 FOR JURY TRIAL | (SS07) |
| | NOTF | NOTICE FLAG SET TO: N | (SS07) |
| 05/20/2002 | ATY1 | ATTORNEY FOR DEFENDANT: KEITH RICHARD K | (AR10) |
| | DAT2 | SET FOR: JURY TRIAL ON 09/03/2002 AT 0830A | (AR10) |
| | DAT1 | SET FOR:  ARRAIGNMENT ON 06/06/2002 AT 0830A | (AR10) |
| | ATY2 | ATTORNEY FOR DEFENDANT: HAMM DANIEL GARY | (AR10) |
| | DAT2 | SET FOR: JURY TRIAL ON 08/26/2002 AT 0830A | (AR10) |
| | TEXT | ORDER | |
| 05/29/2002 | COMM | CONT PENDING LAB | (AR10) |
| 06/11/2002 | TEXT | EX PARTE MOTION FOR EXTRAORDINARY EXPENSES | |
| 06/13/2002 | TEXT | EX PARTE MOTION FOR EXTRAORDINARY EXPENSES | |
| 06/14/2002 | TEXT | ORDER GRANTING EX PARTE MOTION FOR EXTRAORDINARY | |
| | DAT1 | EXPENSES | |
| 06/19/2002 | DAT1 | DEFT'S REQUEST FOR PRODUCTION | |
| | TEXT | ORDER | |
| 06/24/2002 | TEXT | NOTICE TO DEFT REGARDING DISCOVERY | |
| 08/20/2002 | TEXT | MOTION TO DECLARE THE ALA CAPITAL SENTENCING | |
| | TEXT | PROCESS UNCONSTITUTIONAL AND TO BAR IMPOSITION OF | |
| | TEXT | THE DEATH PENALTY | |
| | TEXT | MOTION TO BAR IMPOSITION OF THE DEATH PENALTY | |
| | TEXT | WHERE JURY'S ROLE AND FACTUAL DETERMINATIONS ARE | |
| | TEXT | DEEMED ADVISORY | |
| 08/26/2002 | DAT1 | SET FOR: PENDING MOTIONS ON 09/19/2002 AT 0800A | |
| | TEXT | ORDER SETTING HEARING FOR 9/19/06 AT 8AM | |
| 08/27/2002 | ATTH | CAS ATTACHMENT PRINTED | (AR08) |
| 09/06/2002 | TEXT | STATE OF ALA RESPONSE TO GARY'S VARIOUS MOTIONS | |
| | TEXT | THAT MISREPRESENT THE HOLDING OF RING V ARIZONA | |
| 09/13/2002 | TEXT | EX PARTE MOTION TO PROVIDE FUNDS FOR EXPERT | |
| | TEXT | PSYCHOLOGICAL ASSISTANCE | |
| | TEXT | EX PARTE MOTION TO PROVIDE FUNDS TO OBTAIN | |
| | TEXT | MITIGATION INVESTIGATOR | |
| | TEXT | MOTION FOR ORDER DIRECTING THE STATE TO NOTIFY | |

```
|----------------------------------------------------------------------------|
|IN THE CIRCUIT COURT OF    LEE       COUNTY                    JUDGE: JVD   |
|                                                                            |
|  STATE OF ALABAMA  VS  GARY JAMES EDWARD (JR)                              |
|                                                                            |
|----------------------------------------------------------------------------|
|              TEXT     THE ACCUSED WHETHER IT INTENDS TO SEEK THE DEATH     |
|              TEXT     PENALTY IF DEFT IS CONVICTED OF CAPITAL MURDER       |
|              TEXT     MOTION FOR THE STATE TO PLACE DEFT ON NOTICE AS      |
|              TEXT     TO ANY 404B EVIDENCE IT INTENDS TO USE IN TRIAL      |
|              TEXT     MOTION FOR PERMISSION TO PROCEED EX PARTE ON APP      |
|              TEXT     FOR FUNDS                                            |
|              TEXT     EX PARTE MOTION FOR FUNDS FOR PRIVATE INVESTIGATOR   |
|              TEXT     ORDER                                                |
|09/16/2002    DAT2     MOTION TO CONTINUE AND CONSOLIDATION OF MOTION HEA   |
|09/23/2002    DAT2     SET FOR: JURY TRIAL ON 11/12/2002 AT 0830A  (AR10)   |
|10/28/2002    DAT2     ORDER SETTING A STATUS CONF ON NOV 7, 2002 9AM       |
|10/29/2002    DAT1     SET FOR: STATUS CONF ON 11/07/2002 AT 0900A (AR10)   |
|11/19/2002    DAT2     SET FOR: JURY TRIAL ON 02/24/2003 AT 0830A  (AR10)   |
|01/17/2003    DAT1     MOTION TO SUPPRESS DEFTS STATEMENTS                  |
|01/23/2003    DAT1     SET FOR: PENDING MOTIONS ON 02/06/2003 AT 0100P      |
|              DAT2     ORDER SETTING HEARING ON 2/6/2003 AT 1PM    (AR10)   |
|01/27/2003    DAT1     MOTION TO CONTINUE                                   |
|02/06/2003    DAT1     MOTION TO REQUIRE THE PROSECUTION TO STATE EXACTLY   |
|              DAT2     WHICH AGGRAVATING CIRCUMSTANCES UNDER 1975 CODE      |
|              DAT2     OF ALA 131-5-49 IT WILL ATTEMPT TO PROVE IF THERE    |
|              DAT2     IS A PENALTY PHASE IN THIS TRIAL                     |
|02/18/2003    DAT1     MOTION TO TRANSFER DEFT TO LEE CO DETENTION FACILI   |
|              DAT2     PENDING TRIAL                                        |
|03/03/2003    DAT2     SET FOR: JURY TRIAL ON 05/19/2003 AT 0830A  (AR10)   |
|05/13/2003    DAT2     SET FOR: JURY TRIAL ON 08/25/2003 AT 0830A  (AR10)   |
|08/22/2003    DAT2     SET FOR: JURY TRIAL ON 11/17/2003 AT 0830A  (AR10)   |
|09/04/2003    DAT2     RENEWED MOTION TO TRANSFER DEFT TO THE LEE CO DENT   |
|              DAT2     FACILITY PENDING TRIAL                               |
|11/18/2003    DAT2     SET FOR: JURY TRIAL ON 02/23/2004 AT 0830A  (AR10)   |
|03/17/2004    DAT2     SET FOR: JURY TRIAL ON 06/14/2004 AT 0830A  (AR10)   |
|06/14/2004    DAT2     SET FOR: JURY TRIAL ON 10/25/2004 AT 0830A  (AR10)   |
|07/28/2004    DAT2     MOTION TO SET TRIAL NO EARLIER THAN SPRING 2005      |
|              EXT      TRIAL TERM                                           |
|08/09/2004    DAT2     SET FOR: JURY TRIAL ON 02/28/2005 AT 0830A  (AR10)   |
|              DAT2     ORDER                                                |
|12/03/2004    TEXT     MOTION FOR COURT TO ADOPT AVA GUIDELINES AS         |
|              TEXT     STANDARD PRACTICE                                    |
|              DAT2     MOTION FOR COURT TO ADPOT ABA GUIDELINES AS          |
|              DAT2     STANDARD PRACTICE                                    |
|12/22/2004    TEXT     ORDER SETTING PENDING MOTIONS FOR 2/3/05 0900A       |
|12/28/2004    DAT1     SET FOR: PENDING MOTIONS ON 02/03/2005 AT 0900A      |
|01/13/2005    TEXT     MOTION TO TRANSPORT DEFT                             |
|01/14/2005    ATTH     CAS ATTACHMENT PRINTED                     (AR08)   |
|01/18/2005    TEXT     MOTION TO RESCHEDULE                                 |
|01/19/2005    TEXT     AMENDED EX-PARTE MOTION TO PROVIDE FUNDS FOR EXPER   |
|              TEXT     PSYCHOLOGICAL ASSISTANCE                             |
|              TEXT     AMENDED EX-PARTE MOTION FOR FUNDS FOR PRIVATE INVE   |
|              TEXT     AMENDED EX-PARTE MOTION FOR FUNDS TO OBTAIN A        |
|              TEXT     MITIGATION INVESTIGATOR                              |
|              TEXT     MOTION TO PLACE DEFENDANT'S FILED EX PARTE MOTION    |
|              TEXT     FOR EXTRAORDINARY FUNDS RE:EXPERT WITNESS FOR        |
|              TEXT     FOR TRIAL AND/OR MITIGATION HEARING UNDER SEAL       |
|01/20/2005    TEXT     MOTION FOR FORENSIC PSYCHOLOGICAL EVALUATION         |
|              TEXT     MOTION FOR AN ORDER DIRECTING PRODUCTION OF RECORD   |
|01/24/2005    TEXT     ORDER ALL PENDING MOTIONS SET FOR 2/3/05 AT 9AM      |
|01/26/2005    TEXT     AMENDED MOTION FOR OVERHEAD EXPENSES                 |
|              TEXT     ORDER SETTING HEARING ON 2/11/05 AT 9AM              |
|01/27/2005    TEXT     ORDER                                                |
|02/14/2005    TEXT     ORDER TO TRANSPORT DEFT FROM HOLMAN CORR FAC         |
|02/22/2005    TEXT     ORDER                                                |
|              TEXT     ORDER                                                |
|              TEXT     ORDER                                                |
|              TEXT     ORDER                                                |
|              TEXT     ORDER                                                |
|              TEXT     ORDER                                                |
|02/25/2005    TEXT     ORDER                                                |
```

IN THE CIRCUIT COURT OF      LEE      COUNTY

STATE OF ALABAMA   VS   GARY JAMES EDWARD (JR)

| Date | Type | Description |
|---|---|---|
| 03/03/2005 | TEXT | ORDER FOR OUTPATIENT EVALUATION |
| 03/04/2005 | DAT2 | SET FOR: JURY TRIAL ON 06/13/2005 AT 0830A   (AR10) |
|  | COMM | SPECIAL SET 6-27-05   (AR10) |
| 03/17/2005 | TEXT | BRIEF IN SUPPORT OF DEFTS MOTION TO SUPPRESS |
| 04/18/2005 | TEXT | EX PARTE MOTION FOR FUNDS FOR JURY CONSULTANT |
|  | TEXT | MOTION IN LIMINE TO PRECLUDE THE STATE FROM |
|  | TEXT | MOVING TO ADMIT INTO EVIDENCE PREJUDICIAL |
|  | TEXT | PHOTOGRAPHS |
| 04/26/2005 | TEXT | MOTION IN LIMINE REGARDING MEDICAL EXAMINER |
| 05/02/2005 | TEXT | ORDER |
| 05/03/2005 | DAT1 | SET FOR: MTN TO SUPPRESS ON 05/23/2005 AT 0900A |
| 05/11/2005 | TEXT | AMENDED MOTION IN LIMINE RE:   AUTOPSY REPORT OF |
|  | TEXT | VICTIMS |
| 05/13/2005 | TEXT | MOTION FOR DISQUALIFICATION FROM THE JURY VENIRE |
|  | TEXT | OF ALL POTENTIAL JURORS WHO WOULD AUTOMATICALLY |
|  | TEXT | VOTE FOR THE DEATH PENALTY IF THEY FOUND ACCUSED |
|  | TEXT | GUILTY OF CAPITAL MURDER OR BE UNABLE TO GIVE |
|  | TEXT | WEIGHT TO MITIGATING EVIDENCE |
|  | TEXT | AMENDED MOTION TO REQUIRE THE DISTRICT ATTY TO |
|  | TEXT | DISCLOSE PAST AND PRESENT RELATIONSHIPS AND |
|  | TEXT | ASSOCIATIONS WITH THE PROSPECTIVE JURORS ON THE |
|  | TEXT | VENIRE LIST |
|  | TEXT | MOTION TO EXCUSE FOR CAUSE ANY VENIREMAN WHOSE |
|  | TEXT | VIEWS IN FAVOR OF CAPTIAL PUNISHMENT ARE SUCH |
|  | TEXT | AS WOULD PREVENT OR SUBSTANTIALLY IMPAIR THEIR |
|  | TEXT | CONSIDERATION OF LIFE WITHOUT POSSIBILITY OF |
|  | TEXT | PAROLE AS A POSSIBLE SENTENCE |
|  | TEXT | MOTION TO REQUIRE DISCLOSURE OF ANY AND ALL INFO |
|  | TEXT | CONCERNING PROSPECTIVE JURORS THAT MAY BE |
|  | TEXT | FAVORABLE TO THE DEFENSE |
|  | TEXT | MOTION FOR COURT TO GIVE CAUTIONARY INSTRUCTIONS |
|  | TEXT | PRIOR TO VOIR DIRE |
|  | TEXT | STATE'S BRIEF IN OPPOSITION TO DEFTS MOTION TO |
|  | TEXT | SUPPRESS |
|  | TEXT | NOTICE OF STATE'S INTENT TO PURSUE THE DEATH |
|  | TEXT | PENALTY AND AGGRAVATING CIRCUMSTANCES |
|  | TEXT | MOTION FOR JURY QUESTIONNAIRE |
| 05/17/2005 | TEXT | STATE'S BRIEF IN OPPOSITION TO DEFTS MOTION TO SUP |
| 05/18/2005 | TEXT | MOTION IN LIMINE TO PROHIBIT THE STATE FROM USING |
|  | TEXT | ITS PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMIN |
|  | TEXT | FASHION |
|  | TEXT | MOTION FOR DISCLOSURE AND PRODUCTION OF DOC RECORD |
|  | TEXT | MOTION FOR CHARGE CONFERENCE AND TO REVIEW THE |
|  | TEXT | FINAL JURY CHARGE BEFORE THE COURT READS THE |
|  | TEXT | CHARGE TO THE JURY |
|  | TEXT | MOTION FOR TRIAL COURT TO GIVE CAUTIONARY INSTRUCT |
|  | TEXT | PRIOR TO CERTAIN PHOTOGRAPHS BEING IDENTIFIED TO |
|  | TEXT | THE JURY |
|  | TEXT | MOTION TO PERMIT EXTENSIVE VOIR DIRE ON THE ISSUE |
|  | TEXT | OF RACIAL BIAS |
|  | TEXT | MOTION TO HAVE THE JUNE 27, 2005 VENIRE COMPLETE |
|  | TEXT | QUESTIONNAIRE PRIOR TO TRIAL |
| 05/23/2005 | TEXT | ORDER |
| 05/27/2005 | TEXT | REPLY TO STATE'S OPPOSITION TO DEFTS MOTION TO |
|  | TEXT | SUPPRESS |
| 06/09/2005 | TEXT | ORDER |
| 06/10/2005 | TEXT | AMENDED EX PARTE MOTION FOR FUNDS FOR EXPERT |
|  | TEXT | JURY CONSULTANT |
|  | TEXT | EX PARTE MOTION TO REIMBURSE COSTS FOR EXTRA- |
|  | TEXT | ORDINARY EXPENSES |
|  | DAT2 | SET FOR: JURY TRIAL ON 08/01/2005 AT 0830A   (AR10) |
|  | COMM | SPECIAL SET 8-1 -05   (AR10) |
| 06/17/2005 | TEXT | ORDER |
|  | TEXT | ORDER |
| 06/22/2005 | TEXT | ORDER RE:   JUROR QUESTIONNARIRE |
| 06/30/2005 | TEXT | STATE'S VOIR DOIR QUESTIONS |
| 07/15/2005 | PRTY | PARTY ADDED  W029  KATRINA RATLIFF   (AW21) |

```
IN THE CIRCUIT COURT OF      LEE      COUNTY                        JUDGE: JVD

      STATE OF ALABAMA   VS   GARY JAMES EDWARD (JR)

--------------------------------------------------------------------------------
              SUBP   WITNESS SUBPOENA ISSUED TO W029 KATRINA RATLIFF
              SUBP   WITNESS SUBPOENA ISSUED TO W012 SGT. JEFF PITTS
              SUBP   WITNESS SUBPOENA ISSUED TO W002 CPL KEITH JORDAN
              PAD1   PARTY W006 ADD1 CHANGED FROM: % MIKE TAYLOR (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W006 SGT MIKE TAYLOR
              SUBP   WITNESS SUBPOENA ISSUED TO W007 BILL HARRIS (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W010 INV. SCOTT BELTON
              SUBP   WITNESS SUBPOENA ISSUED TO W013 DR. BEN BRISTOL
              PRTY   PARTY ADDED  W030  CATRINA L JACKSON          (AW21)
              ISSD   PARTY W030 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W030 CATRINA L JACKSON
              PRTY   PARTY ADDED  W031  JOE SALOOM                 (AW21)
              ISSD   PARTY W031 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W031 JOE SALOOM    (AW21)
              PRTY   PARTY ADDED  W032  SHANNON FITZGERALD         (AW21)
              ISSD   PARTY W032 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W032 SHANNON FITZGERALD
              SUBP   WITNESS SUBPOENA ISSUED TO W005 SGT VAN JACKSON
              PRTY   PARTY ADDED  W033  CRAIG BAILEY               (AW21)
              ISSD   PARTY W033 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W033 CRAIG BAILEY (AW21)
              PRTY   PARTY ADDED  W034  KRISTEN MATURI             (AW21)
              ISSD   PARTY W034 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W034 KRISTEN MATURI
              PRTY   PARTY ADDED  W035  HOLI SPIERS                (AW21)
              ISSD   PARTY W035 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W035 HOLI SPIERS  (AW21)
              PRTY   PARTY ADDED  W036  JOHN CASE                  (AW21)
              ISSD   PARTY W036 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W036 JOHN CASE    (AW21)
              PRTY   PARTY ADDED  W037  KATHY RICHERT              (AW21)
              ISSD   PARTY W037 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W037 KATHY RICHERT
              PRTY   PARTY ADDED  W038  THADDEUS JONES             (AW21)
              ISSD   PARTY W038 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W038 THADDEUS JONES
              PRTY   PARTY ADDED  W039  INV TOM FRANKLIN           (AW21)
              ISSD   PARTY W039 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W039 INV TOM FRANKLIN
              PRTY   PARTY ADDED  W040  DAVID VINES                (AW21)
              ISSD   PARTY W040 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W040 DAVID VINES  (AW21)
              PRTY   PARTY ADDED  W041  SARAH REYNOLDS             (AW21)
              ISSD   PARTY W041 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W041 SARAH REYNOLDS
              PRTY   PARTY ADDED  W042  TERRY KAY GOODWIN          (AW21)
              ISSD   PARTY W042 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W042 TERRY KAY GOODWIN
              PRTY   PARTY ADDED  W043  SGT TOMMY THREAT           (AW21)
              ISSD   PARTY W043 ISSUED DATE: 07152005  TYPE:       (AW21)
              SUBP   WITNESS SUBPOENA ISSUED TO W043 SGT TOMMY THREAT
07/25/2005    TEXT   ORDER
              TEXT   STATE'S REQUESTED JURY CHARGES
              TEXT   DEFTS PROPOSED DEATH PENALTY VOIR DIRE
              TEXT   MOTION FOR COURT TO GIVE CAUTIONARY INSTRUCTIONS
              TEXT    PRIOR TO DEATH PENALTY VOIR DIRE
              TEXT   MOTION FOR CHANGE OF VENUE
              TEXT   DEFTS OBJECTION TO BEING "SHACKLED" AT TRIAL
              TEXT   MOTION FOR DISCLOSURE AND PRODUCTION OF JUVENILE
              TEXT    RECORDS
              TEXT   DEFENDANT'S REQUESTED GUILT PHASE JURY CHARGES
              TEXT   DEFENDANT'S PROPOSED DEATH PENALTY VOIR DIRE
              TEXT   DEFENDANT'S REQUESTED SENTENCING PHASE JURY CHARGE
              TEXT   STATES'S REQUESTED JURY CHARGES
08/01/2005    TEXT   SECOND AMENDED EX PARTE MOTION FOR ADDITIONAL
              TEXT    FUNDS FOR MITIGATION INVESTIGATOR
              TEXT   EX PARTE MOTION TO REIMBUTSE EXTRAORDINARY
```

Case 3:07-cv-01074-WKW-SRW    Document 9-4    Filed 01/28/2008    Page 12 of 12

IN THE CIRCUIT COURT OF    LEE    COUNTY

STATE OF ALABAMA  VS  GARY JAMES EDWARD (JR)

---

|            |      |                                                      |        |
|------------|------|------------------------------------------------------|--------|
|            | TEXT | EXPENSES FOR REPRODUCTION OF EXHIBITS                 |        |
|            | TEXT | EX PARTE MOTION TO REIMBURSE EXTRAORDINARY EXPENSE    |        |
|            | TEXT | FOR HOLMAN PRISON RECORDS                             |        |
|            | TEXT | ORDER GRANTING $11.00 FOR EXP ON REPRODUC OF XHITS    |        |
|            | TEXT | ORDER GRANTING $142.85 FOR RECORDS                    |        |
|            | TEXT | ORDER GRANTING $10,706.27 FOR DEF INVESTIGATIVE SE    |        |
| 08/08/2005 | BDTE | BIRTH DATE CHANGED FROM: 09/09/1979                   | (AR01) |
|            | SSAN | SSN CHANGED FROM: 461619936                           | (AR01) |
| 09/09/2005 | TEXT | DEFTS SENTENCING MEMORANDUM                           |        |
| 10/13/2005 | TEXT | ORDER                                                 |        |
|            | DJID | DISPOSITION JUDGE ID CHANGED FROM:      TO: JVD       |        |
|            | DISP | CHARGE 01 DISPOSED BY: CONVICTED ON: 08/04/2005       |        |
|            | DISP | CHARGE 01: MURDER CAPITAL-ROBB/#CNTS: 001             | (AR10) |
|            | CH01 | DEFENDANT SENTENCED ON: 08/04/2005                    | (AR05) |
|            | CH01 | CVCC PROVISION ORDERED BY THE COURT                   | (AR05) |
|            | CH01 | HISTORY FEE PROVISION ORDERED BY THE COURT            | (AR05) |
|            | CH01 | SENTENCE TO BEGIN ON: 08/04/2005                      | (AR05) |
|            | CH01 | COST PROVISION ORDERED BY THE COURT                   | (AR05) |
|            | CH01 | JAIL CREDIT: 03 YR, 03 MO, 010 DAYS                   | (AR05) |
|            | CH01 | SUBPOENA FEE PROVISION ORDERED BY THE COURT           | (AR05) |
|            | CH01 | LIFE W/O PAROLE PROVISION ORDERED BY THE COURT        |        |
|            | CH01 | PENITENTIAR PROVISION ORDERED BY THE COURT            | (AR05) |
|            | D001 | ENFORCEMENT STATUS SET TO:  "P"                       | (FE52) |
|            | D001 | ENF PLACEMENT STATUS SET TO: "X"                      | (EC01) |
|            | D001 | FREQUENCY AMOUNT SET TO        $468.00                | (EC01) |
|            | D001 | PAYMENT DUE DATE SET TO 10/13/2020                    | (EC01) |
|            | TRSC | TRANSCRIPT OF RECORD ISSUED: 10/13/2005              | (AR08) |
|            | TEXT | SENTENCING ORDER                                      |        |
| 10/14/2005 | CH01 | SENTENCE TO BEGIN ON: 10/12/2005                      | (AR05) |
|            | TRSC | TRANSCRIPT OF RECORD ISSUED: 10/14/2005              | (AR08) |
| 10/20/2005 | APDT | APPEAL DATE CHANGED FROM: 00/00/0000                 | (AR11) |
|            | ATY2 | ATTY 2 TYPE CHANGED FROM:                             | (AR11) |
|            | ATY1 | ATTY 1 TYPE CHANGED FROM:                             | (AR11) |
|            | ATY2 | ATTY 2 CHANGED FROM:                                  | (AR11) |
|            | IRA0 | IRA TYPE CHANGED FROM:                                | (AR11) |
|            | ATY1 | ATTY 1 CHANGED FROM:                                  | (AR11) |
|            | PROS | PROSECUTOR CHANGED FROM:                              | (AR11) |
|            | CRP1 | COURT REPORTER 1 CHANGED FROM:                        | (AR11) |
|            | APTY | APPEAL TYPE CHANGED FROM:                             | (AR11) |
|            | INTR | INDTRL TYPE CHANGED FROM:                             | (AR11) |
|            | ATYW | ATYW TYPE CHANGED FROM:                               | (AR11) |
| 10/24/2005 | CRP1 | COURT REPORTER 1 CHANGED FROM: SMI002                 | (AR11) |
| 10/26/2005 | TEXT | NOTICE OF APPEAL TO THE COURT OFCRIMINAL APPEALS      |        |
|            | TEXT | REPORTER'S TRANSCRIPT                                 |        |
|            | TEXT | DOCKETING STATEMENT                                   |        |
| 12/05/2005 | TEXT | REQUEST FOR LOCAL EXTENSION OF THE TIME TO            |        |
|            | TEXT | COMPLETE THE REPORTER'S TRANSCRIPT AND ORDER          |        |
|            | TEXT | GRANTING                                              |        |
| 03/03/2006 | TEXT | ORDER FROM COURT OF CRIMINAL APPEALS-REPORTER'S       |        |
|            | TEXT | REQUEST FOR 28-DAY ENLARGEMENT OFR TIME TO FILE       |        |
|            | TEXT | THE TRANSCRIPT IS GRANTED--TRANSCRIPT DUE BEFORE      |        |
|            | TEXT | 3/29/06                                               |        |
| 01/26/2055 | TEXT | ORDER SETTING HEARING ON 2/11/05 AT 9AM              |        |

---

HARDNETT          04052006

Docket Number
CR-05-0133


Alabama Court of Criminal Appeals


State of Alabama
v.
James Edward Gary, Jr.


Appeal from
Lee County Circuit Court
Case Number CC-2002-492


Brief of Appellant
James Edward Gary, Jr., Defendant


Richard Keith
Attorney for Appellant/Defendant
22 Scott Street
Montgomery, Alabama 36104
Tel. 334-264-6776


Daniel G. Hamm
Attorney for Appellant/Defendant
560 S. McDonough St., Ste A
Montgomery, Alabama 36104
Tel. 334-269-0269
Fax 334-323-5666


ORAL ARGUMENT NOT REQUESTED

EXHIBIT
2
PENGAD 800-631-6989

## STATEMENT REGARDING ORAL ARGUMENT

The issues presented in this case are of the type that are effectively advanced by written presentation and do not require nor justify oral argument.

## TABLE OF CONTENTS

Statement Regarding Oral Argument ................... i

Table of Contents ................................. ii

Statement of Jurisdiction ......................... iv

  Basis and Filing dates establishing timelines of the

  appeal ........................................... iv

Table of Authorities .............................. vi

Statement of the Case ............................. 1

  Nature of the Case ............................... 1

  Course of Proceedings ............................ 1

  Disposition in court below ....................... 1

Statement of the Issues ........................... 3

    Issue I ........................................ 3

    Whether the trial court erred in
    denying defendant's motion to suppress
    statements whereby Gary requested an
    attorney on four occasions during an
    interrogation? ................................. 3

    Issue II ....................................... 3

    Whether the trial court erred by not
    suppressing Gary's statement after
    inducement of hope of lighter
    sentencing? .................................... 3

Statement of the Facts ............................ 4

Statement of the Standard of Review ............... 6

Summary of the Argument .............................. 7

Argument .............................................. 8

    Issue I ......................................... 8

    Whether the trial court erred in denying defendant's motion to suppress statements made after request for counsel was denied four times. ............... 8

   Transcript Excerpts as interpreted by the State.. 11

    Issue II ....................................... 15

    Whether the trial court erred by not suppressing the defendant's confession after inducement of hope of lighter sentencing? .................................... 15

Conclusion .......................................... 23

   Relief Sought.................................... 23

Certificate of Service .............................. 24

## STATEMENT OF JURISDICTION

### *BASIS AND FILING DATES ESTABLISHING TIMELINES OF THE APPEAL*

James Gary is appealing the trial court's denial of his motion to suppress his statement. Following the denial of Gary's motion, Gary was convicted of capital murder and sentenced on October 13, 2005 (C. 14). Gary filed a written notice of appeal (C. 836) on October 26, 2006 which was within the 42-day time limit as required by *Rule 4, Alabama rules of Appellate Procedure.*

Pursuant to *Rule 31, Alabama Rule of Appellate Procedure*, the original date of the appellant's brief was May 3, 2006. Gary filed a motion to supplement the record and upon the Circuit Clerk's filing of the supplemental record, the new deadline for filing the brief was May 30, 2006. Gary's appellate counsel requested a seven-day extension to file the brief on May 30, 2006. This court granted the request and extended the filing deadline until June 6, 2006. The notice of appeal and the Appellant's brief are timely

and therefore this Honorable Court has jurisdiction to consider this appeal.

# TABLE OF AUTHORITIES

**Cases**

Agee v. State, 465 So.2d 1196 (Ala. Crim. App., 1984) 18

Cannady v. Dugger, 931 F.2d 752 (11th Cir. 1991) .... 13

Craig v. Singletary, 80 F.3d 1509 at 1511-1512 (11th

  Cir. 1997) ........................................ 13

Davis v. U.S., 512 U.S. 452 ......................... 8

Eggers v. State, 914 So.2d 883 (Ala. Crim. App. 2004) 16

Ex parte Gospodareck, 666 So.2d 844 (Ala. 1995) quoting

  Oregon v. Bradshaw, 462 U.S. 1039 ................. 14

Hardy v. State, 920 So.2d 1117 (Ala. Crim. App. 2005) 16

McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) ........ 9

Miranda v. Arizona, 384 U.S. 436, 473 (1966) ..... 8, 14

Ready v. State, 574 So.2d 894 (Ala. Crim. App., 1990) 20

Slaten v. State, 387 So.2d 855 (Ala. Crim. App., 1978)

  ................................................. 20

Snowden v. State, [WL 1452925, May 26, 2006, Pg. 6;], _

  So.2d _ (Ala.Crim.App. 2006) ...................... 6

Wallace v. State, 275 So.2d 634, 636 (1973) ......... 16

**Statutes**

§13A-5-40(a)(2) Code of Alabama, 1975 ............... 1

**Rules**

Rule 31, Alabama Rule of Appellate Procedure ........ iv

Rule 4, Alabama rules of Appellate Procedure ........ iv

## STATEMENT OF THE CASE

### *NATURE OF THE CASE*

During the Spring 2002 Grand Jury term, the Lee County Grand Jury indicted Gary with one count of Capital Murder in violation of *§13A-5-40(a)(2) Code of Alabama, 1975* (C. 15). The indictment alleged that Gary intentionally caused the death of Thurman Ratliff by shooting him with a pistol and that this occurred during a robbery in the first degree.

### *COURSE OF PROCEEDINGS*

Gary's trial began on August 1, 2005 and concluded on August 5, 2005 (C. 1185). After hearing the evidence that included a video taped statement made by Gary to the police wherein he allegedly confessed to participating in robbing and shooting the victim, the jury convicted Gary of capital murder (C. 1260). The penalty phase began immediately after the jury issued its verdict.

### *DISPOSITION IN COURT BELOW*

The jury voted unanimously that Gary should be sentenced to serve life without the possibility of

Page 1

parole in the custody of the Alabama Department of Corrections (C. 823). The trial court followed the recommendation of the jury and ordered that Gary be sentenced to life without the possibility of parole (C. 825).

## STATEMENT OF THE ISSUES

### Issue I

Whether the trial court erred in denying defendant's motion to suppress statements whereby Gary requested an attorney on four occasions during an interrogation?

### Issue II

Whether the trial court erred by not suppressing Gary's statement after inducement of hope of lighter sentencing?

## STATEMENT OF THE FACTS

The facts relevant to this appeal focus on the trial court's denial of Gary's motion to suppress a video taped statement that he made to police officers prior to trial. The statement was later introduced as evidence at the trial (R. 1042). Gary did not testify during the trial.

Gary was arrested and interrogated pursuant to a murder investigation in Lee County, Alabama. The State alleged that on January 28, 2002, Gary and two other men (David Carruth and Jimmy Brooks) went to the home of Thurman and Katherine Ratliff to commit a robbery. During the course of the robbery both victims were shot multiple times. Medical testimony opined that the victims died as a result of being shot multiple times. Gary was indicted for Capital Murder as to the death of Thurman Ratliff.

Pursuant to the investigation in this case, Gary was eventually arrested and on February 19, 2002 he was interrogated by police officers regarding the death of

the victims. The interrogation was recorded with a video camera that also captured sound. The

Prior to trial, Gary filed a *Motion to Suppress Defendant's Statements* (C. 101 – 102) and *Brief in Support of Defendant's Motion to Suppress* (C. 190 – 202) Gary alleged that he had requested an attorney but that the officers ignored his requests and completed his interrogation without an attorney being present. A hearing was held on May 23, 2005 in conjunction with this motion. After hearing testimony regarding the motion the trial court issued a written Order (Supplemental Record Pg. 28 – 29) on June 3, 2005 denying the motion to suppress.

## STATEMENT OF THE STANDARD OF REVIEW

Gary's issues are based on the trial court's denial of his motion to suppress. Alabama appellate courts review issues related to motions to suppress using an abuse-of-discretion standard of review.

> "In reviewing a trial court's ruling on a motion to suppress, this Court reviews the trial court's findings of fact under an abuse-of-discretion standard of review. 'When evidence is presented *ore tenus* to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' *Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994)*; '[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' *Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App. 1985), aff'd, 494 So.2d 772 (Ala. 1986)*; and we make " 'all the reasonable inferences and credibility choices supportive of the decision of the trial court." ' *Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App. 1993), quoting Bradley, 494 So.2d at 761.* '[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court···· Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal.' *Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App. 1993).*"

*Snowden v. State, [WL 1452925, May 26, 2006, Pg. 6;], _ So.2d _ (Ala.Crim.App. 2006).*

Page 6

## SUMMARY OF THE ARGUMENT

Appellant James Gary contends that the trial court erred when it denied his motion to suppress the statement that he made to the police. Specifically, Gary contends that he requested an attorney during the statement on four different occasions and that the officers ignored each request and completed the interrogation.

Gary further contends that his statement was induced by the officer's promises that Gary would receive a lighter sentence, and because of the officers threats of manipulation of the court in the event that Gary choose not to assist them. The officers told Gary that he had a little power that he could use to either help him or have him electrocuted.

**ARGUMENT**

*Issue I*

Whether the trial court erred in denying defendant's motion to suppress statements made after request for counsel was denied four times?

The Trial Court erred by denying Defendant's motion to suppress his statements after he requested counsel on multiple occasions during one interrogation. Defendant James Gary (Gary) made four separate requests for an attorney during his interrogation, which were ignored and therefore illegally denied.

The Supreme Court held that when a person undergoing a custodial interrogation "indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona, 384 U.S. 436, 473 (1966).* The Supreme Court further expanded and delineated *Miranda* by requiring that a suspect must unambiguously request counsel. *Davis v. U.S., 512 U.S. 452.* The term unambiguously does not require the suspect to use any

particular word order or choice, to effectively make a request for counsel. *Davis* holding that ("Although the suspect need not "speak with discrimination of an "Oxford don", he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.) While the officers have no obligation to stop questioning the suspect *if* the suspect's statement is ambiguous or equivocal, the suspect's assertion in a request for counsel must be, "at a minimum, some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)*.

Gary's four requests for an attorney, although not spoken with the discrimination of an "Oxford don", were at a minimum reasonably construable as an expression for the desire for the assistance of an attorney. Although discrepancies exist in the transcripts of the videotaped interview, the four separate and distinct repetitious requests for counsel were at a minimum, an

expression of desire for assistance of an attorney. The State only contested two of the four requests for legal counsel made by Gary in its *Brief in Opposition to Defendant's Motion to Suppress*:

a. Discrepancy One:

    1. Defendant's Transcript:

    "If you know what I'm saying, you saying you gonna put something like that on me then **I want to talk to my lawyer then…**" (Emphasis added).

    2. State's Transcript:

    "if you know what I'm saying, you saying you gonna put something like that on me, **then you might as well talk to my lawyer then…**" (Emphasis added).

b. Discrepancy Two:

    1. Defendant's Transcript:

    "**I want to talk to my lawyer man** cause I'm telling you I didn't do no shit like that man…" (Emphasis added).

    2. State's Transcript:

    "**Man, you can talk to my lawyer, man.** Because I'm telling you I ain't got nothing to do with no shit like that, man." (Emphasis added).

The State failed to raise any objection to the other two requests for assistance of counsel by Gary. The State conveniently left these other two requests

Page 10

for counsel out of their Reply Brief to Defendant's Motion to Suppress, because the other two requests, coupled with either interpretation of the two statements contested, were reasonably understood as requests for counsel by Sergeant Jackson, then denied by his following response, omitted from the State Brief, as follows:

TRANSCRIPT EXCERPTS AS INTERPRETED BY THE STATE

(p. 19 of Gary Transcript)

**Sgt. Jackson:** "What I'm telling you right now is that this thing is going to go the distance today. It's going the distance its over with and my only hope is that you are going to tell the truth."

**Gary:** "Well only hope is y'all saying *if y'all got me on this I might as well stop talking now and talk to my lawyer* cause I'm telling you man I ain't had no dealings with that man in no kind of way as far as he got me out on bond and worried the shit out of me about that money man as far as that that's it. That's it you know what I'm saying. *If you know what I'm saying, you saying you gonna put something like that on me, then you might as well talk to my lawyer then*..." (Emphasis added).

(p. 20 of Gary Transcript)

**Sgt. Jackson:** "Alright. *Well you just sit here man its gonna be a while like I said*

Page 11

*its gonna be a while. But you know, I would like to show you something..."* (Emphasis added).

**Gary:** "Show...show...I would like to see it."

**Sgt. Jackson:** "Well you know I hate to see somebody make the decision to not tell the truth and that they suffer for the rest of their life and it's a big decision. That's a big choice.

**Gary:** *"Man, you can talk to my lawyer, man.* Because I'm telling you I ain't got nothing to do with no shit like that, man. (Emphasis added).

(p. 21 of Gary Transcript)

**Gary:** *"Show me what you have to show me other than that talk to my lawyer.* I would like to see it though. (Emphasis added).

Gary was neither required to use the language of an "Oxford don'" nor was he required to use the words, "I want [an attorney]" in order to invoke his right to silence by requesting counsel during his interrogation. The test from Davis is whether a reasonable police officer in those circumstances would understand the words to be a request for attorney. The 11th Circuit holds that statements that do not contain the words, "I want" to be unequivocal for the purposes of requesting

Page 12

counsel under *Davis*. The statement, "well if you have that against me you might as well get me a lawyer" was held an unequivocal request for counsel under Davis. *Craig v. Singletary*, 80 F.3d 1509 at 1511-1512 (11th Cir. 1997). The statement "I think I should call my lawyer" was held unequivocal, as well. *Cannady v. Dugger*, 931 F.2d 752 (11th Cir. 1991).

A reasonable officer should understand the statements made by Gary to Sergeant Jackson during interrogation as a request for counsel. Even using the State's version of the transcript, the words, along with the multiple requests indicate to a reasonable police officer that a lawyer was being requested. "If y'all got me on this, I might as well stop talking now and talk to my lawyer." "You saying you gonna put something like that on me then you might as well talk to my lawyer, then…" Those two phrases were made in the same single response to the Sergeant's assertion to Gary that "this thing is going to go the distance today" (referring to the investigation).

Page 13

The Trial Court gave no deference to Sergeant Jackson's immediate response to those requests for counsel. Sergeant Jackson's immediate response to Gary's statement ("...you might as well talk to my lawyer, then...") was "Alright. Well, you just sit here because it's gonna be a while. It's gonna be a while..." telling Gary that his requests were understood and that no lawyer would be present right then, but that "it would be a while", and therefore ultimately understood and ignored.

> ..."The denial of the defendant's request for his attorney thus undermined his ability to exercise the privilege—to remain silent if he chose or to speak without any intimidation, blatant or subtle..." *Miranda* at 444.

Alabama requires that the prosecution bear the burden of showing that subsequent events (after the accused expresses desire to deal with the police only through counsel) indicated a waiver of the Fifth Amendment right to counsel during the interrogation. *Ex parte Gospodareck, 666 So.2d 844 (Ala. 1995) quoting Oregon v. Bradshaw, 462 U.S. 1039.* By the Trial Court denying Gary's Motion to Suppress without addressing

Page 14

Sergeant Jackson's refusal of counsel to Gary, upon reasonably recognizing his request, the State prosecution has not met this burden and therefore Gary's statements made after his multiple requests for counsel are due to be suppressed and his sentence and conviction arising from those statements vacated.

## *Issue II*

Whether the trial court erred by not suppressing the defendant's confession after inducement of hope of lighter sentencing?

The Trial Court erred by not suppressing Gary's inculpatory statements made in custody, after the interrogating officer induced the confession by hope of a lighter sentence, and threats of manipulation of the court. The test for the voluntariness of an extrajudicial confession or an inculpatory statement is whether, in light of all the surrounding circumstances, the statement was free from inducement, threat, or promise, either express or implied, that would have produced in the mind of the accused any fear of harm or hope of favor. *Eggers v. State, 914 So.2d 883 (Ala.*

Page 15

*Crim. App. 2004).* A confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. *Hardy v. State, 920 So.2d 1117 (Ala. Crim. App. 2005).* Whether the threat or promise is true or false, if it operates in the mind of the accused, to produce the apprehension of harm, or hope or favor, inducing a confession, it must be excluded from the consideration of the jury. *Wallace v. State, 275 So.2d 634, 636 (1973).*

Investigator Taylor induced Gary's statements by producing in Gary's mind an implied promise of hope of leniency, coupled with express and implied promises, producing fear in Gary's mind directly before he made inculpatory statements. Taylor's statements were not made to appeal to Gary's morality, but to threaten two life sentences and the electric chair if he did not confess:

(p. 28 of Gary Transcript)

**Taylor:** "I'm sorry but let's get it over with. *Because if you don't James you're looking at going to trial for capital murder. Now capital*

Page 16

*murder and murder is two different things.
Capital murder means that you can possibly get
the death penalty for capital murder. Murder
means that you just do life in prison that you
could get life in prison. You could get 5
years but you could get life in prison. Now
<u>the difference is in my opinion the difference
is James. That's the difference not whether or
not they charge you with capital murder or not
but the difference is going to depend on
James</u>.* (Emphasis added).

(p. 32 of Gary Transcript)

*And all I'm telling you is you can believe me
if you want <u>but they're gonna do one of two
things. You can either say I'm sorry and tell
the truth as far as you're concerned about the
case or you can just say to hell with it y'all
ain't got nothing on me and let them take
everything that they got and take you to court
and you will lose. Listen to me. You will
lose</u>.* (Emphasis added).

(p. 33 of Gary Transcript)

**Taylor:** You don't have to believe me cause
what I'm going to suggest is this. *<u>I'm going
to go ahead and say to hell with you and
present you as being the ring leader that is a
ruthless fucking killer that don't ever need
to get out of jail. That's what I'm going to
do.</u> And <u>I'm going to do everything in my power
in Russell County to make sure that we treat
you that way in jail for the rest of the time</u>*
because I think that's possible...*I think it's
very possible and I think that when we get
done because <u>I've got a little bit of power
and a little bit of influence</u> and <u>when they
call me as an expert witness</u> in homicide <u>I'm
going to tell them that guy never ever needs
to be out from behind bars. Or you need to put</u>*

Page 17

***him, strap him to the chair and get rid of him
he's useless***. Because other than that you've
given me no reason to, other that that you
give this man no reason to. ***Without your side
and you being honest and you telling us what
happened in this house. We have no choice
James but to point to you and say the son of a
bitch that don't never need to be out of jail
again believe me when I tell you that's him***.
(Emphasis added).

Gary's next four statements from page 34 of his
transcript following Taylor's promise of leniency and
threat of using his influence to get him treated badly
in jail for the rest of the time and get him strapped
to the electric chair:

**Gary:** I didn't kill nobody.

**Gary:** I didn't kill nobody man. I'm talking
about that shit eat at me every day man. That
mother fucker there crazy man.

**Gary:** That mother fucker crazy man.

**Gary:** He went up in there man. ***Okay see you
got to promise me man***. (Emphasis added).

While any promise or inducement, however slight,
either *direct or implied*, will render a confession
involuntary, the test that must be applied in
determining the voluntariness of the confessor's
statements is whether the confessor's will was
overborne at the time he confessed (emphasis added).

Page 18

*Agee v. State*, 465 *So.2d* 1196 (*Ala. Crim. App.*, 1984). Investigator Taylor created an immediate apprehension of harm by threatening Gary with his power and influence in Russell County. Gary's will was overborne at the time of his confession through implied promises of not testifying against him and express promises of harsher punishment. Gary's immediate following statements produced inculpatory statements and confessions that were procured only through the hope of a lighter sentence ("you could get five years, but you could get life in prison"), upon confession, along with the apprehension and fear of the electric chair, through Investigator Taylor's testimony if he did not confess.

These two results were given as the only alternatives to confession of Gary's side of the story. Furthermore, Investigator Taylor told Gary that he thought it was very possible to do this to him, because he had "a little bit of power... and a little bit of influence... and would tell them you need to put him (Gary) strap him to the [electric] chair and get rid of

him he's useless." Using the fear of death by his own "expert witness testimony", Investigator Taylor induced all statements made after his assertions of personally seeing to it that Gary get the electric chair. These express statements did in fact induce Gary's inculpatory statements, as evidenced by the transcript, which shows the confession came immediately following the threats and implied promises of leniency (Taylor not telling the jury to strap him to the chair), in exchange for his confession.

Exhortation to the accused to tell the truth does not imply promise or inducement, which will render a confession involuntary. *Ready v. State, 574 So.2d 894 (Ala. Crim. App., 1990)*. Any confession induced by promise or offer of a collateral benefit lacks voluntariness as much as a confession induced by offer or promise of a direct benefit. *Slaten v. State, 387 So.2d 855 (Ala. Crim. App., 1978)*. In this case, Gary's inculpatory statements and subsequent confession was not coerced by a psychiatric sense of morality persuasion for the truth, nor was it freely given.

Gary's statements were the product of a promise by Investigator Taylor to tell the jury to "strap him to the chair" because he had "power…and influence in Russell County." Taylor's statement was not only an implied promise to use his power and influence to make sure Gary received the death penalty, but also an implied offer of not testifying against him, for the return of a confession of his side of the story, meliorating his sentence only through his confession Supra at note 11 (holding that if inducement or profit or benefit is held out or if any hope is engineered or encouraged the prisoner's case will be lightened, meliorated or more favorably dealt with if he will confess, confession thereby super induced is inadmissible)(emphasis added). Because Gary made all statements regarding his arrest directly after the threats and promises by Investigator Taylor, those inculpatory statements were the direct product of an overborne will and inspiration of alarm, dread, and fear, which makes his confession inadmissible. All statements made by Gary after Investigator Taylor's

Page 21

threats and promises are due to be dismissed and the conviction resulting from those confessions vacated.

**CONCLUSION**

RELIEF SOUGHT

James Gary respectfully requests that this Honorable Court rule that the trial court erred when it denied his motion to suppress. Gary further requests that this Court overturn his conviction and remand this case to the trial court with instructions that it shall conduct a new trial and suppress Gary's statement as evidence.

**RESPECTFULLY SUBMITTED** this the 6th day of June, 2006.


DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL HAMM, P.C.**
560 S. MCDONOUGH ST.,
STE. A
MONTGOMERY, AL 36104
TELEPHONE    334-269-0269
FAX          334-323-5666

RICHARD K. KEITH
(KEI003)
ATTORNEY FOR THE DEFENDANT
**KEITH & DUBIN**
22 SCOTT STREET
MONTGOMERY, AL 36104
TELEPHONE    334-264-6776

## CERTIFICATE OF SERVICE

This is to certify that I have this day placed a copy of this Brief in the United States Mail with sufficient postage for first class delivery to the attorneys named below or parties if not represented by counsel.

**DONE** this the 6th day of June, 2006.

DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL G. HAMM, P.C.**
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, ALABAMA 36104
TEL     334-269-0269
FAX     334-323-5666

Office of the Attorney General
Alabama State House
11 S. Union Street
Montgomery, Alabama 36130

CR-05-0133

In the COURT of CRIMINAL APPEALS
of ALABAMA

◆

JAMES E. GARY, JR.,

*Appellant,*

v.

STATE OF ALABAMA,

*Appellee.*

◆

On Appeal From the Circuit Court of
Lee County, Alabama
(CC-02-488-492)

BRIEF OF APPELLEE

Troy King
*Attorney General*

Marc Starrett
*Assistant Attorney General*

Marc S. Bass
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama 36130
June 27, 2006                   (334) 242-7300; 353-8563

EXHIBIT
3
PENGAD 800-631-6989

## STATEMENT REGARDING ORAL ARGUMENT

The State of Alabama does not request oral argument, because the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument. Ala. R. App. P. Rule 34 (a) (3).

i

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT......................... i

TABLE OF CONTENTS........................................ ii

TABLE OF AUTHORITIES.................................... iii

STATEMENT OF THE CASE.................................... 1

STATEMENT OF THE ISSUES................................. 3

STATEMENT OF THE FACTS.................................. 4

STANDARD OF REVIEW...................................... 9

SUMMARY OF THE ARGUMENT................................ 11

ARGUMENT............................................... 13

The Trial Court Did Not Abuse Its Discretion In Its
Denial Of Gary's Motion To Suppress His Statement....... 13

    A. Gary's Statements Were Properly Admitted Unless
       The Trial Court Determined Statements Made By
       Gary Were Unequivocal Requests For Assistance
       Of Counsel...................................... 16

    B. Gary's Confession Was Not The Product of
       Inducement Or Threat............................ 21

CONCLUSION............................................. 33

CERTIFICATE OF SERVICE................................. 34

## TABLE OF AUTHORITIES

**Cases**

Arizona v. Fulminante, 499 U.S. 279, 279 (1991) . . . . . . . . . 22

Balentine v. State, 730 So. 2d 255, (Ala. Crim.
   App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Davis v. United States, 512 U.S. 452, 452 (1994) . . . . . . . . 18

Edwards v. Arizona, 451 U.S. 477 (1981) . . . . . . . . . . . . . . . . . 18

Eggers v. State, 914 So. 2d 883, 899 (Ala. Crim.
   App. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Ex parte Jackson, 836 So. 2d 979, 983 (Ala. 2002) . . . . . . . . 26

Jackson v. State, 562 So. 2d 1373 (Ala. Crim.
   App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

McLeod v. State, 718 So. 2d 727, 730, (Ala. 1998) . . . . . . . . 23

Rutledge v. State, 680 So. 2d 997, 1002 (Ala. Crim.
   App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Nash, 910 F. 2d 749, 752-3,
   (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

iii

## STATEMENT OF THE CASE

James Edward Gary, Jr., appeals from the August 5, 2005 judgment of the Lee County Circuit Court, the Honorable John V. Denson, II, presiding, that sentenced the defendant, upon a jury finding of guilty of the charge of capital murder, a violation of Alabama Code (1975) Section 13A-5-40(a)(2) (R. 824-5)[1] and the jury's subsequent unanimous sentence recommendation, to life without the possibility of parole. (Supp. 3)

Gary was indicted on the charge of intentionally causing the death of another, in the course of committing a theft of lawful paper currency, with the intent to overcome resistance or compel acquiescence, while armed with a deadly weapon. (R. 15) The charges arose from a January 28, 2002 shooting and robbery of Thurman and Katherine Ratliff.

Prior to the August 1 - 5, 2005 trial, Gary moved to suppress a videotaped statement made to law enforcement[2] on February 19, 2002, while detained in the Randolph County

---

[1] (R.) due to the fact the entire record is numbered sequentially, all references to the clerk's record and trial record will be referenced the same, (Supp.) references the Supplemental Record.

[2] Gary filed his motion on January 15th, 2003. (R. 101)

Sheriff's detention facility.  (R. 101, R. 452-540)  A hearing on the merits of suppression was held May 23, 2005. (R. 895)  On June 1, 2005, the trial court entered an order denying Gary's motion to suppress his statement made during custody.  (Supp. 29)

Following Gary's conviction and sentence pursuant to a violation of Alabama Code (1973) Section 13A-5-40(a)(2) (R. 825), Gary appealed to this Court.

2

## STATEMENT OF THE ISSUES

1.  Did the trial court abuse its discretion in its denial of Gary's motion to suppress his statement, arising out of the defendant's references to an attorney during his statement?

2.  Did the trial court abuse its discretion in its denial of Gary's motion to suppress his statement, arising out of his claims of alleged offers of inducement and threat?

3

## STATEMENT OF THE FACTS

The facts relevant to this appeal pertain to a video taped statement made to law enforcement (R. 101), a motion to suppress a statement given by the defendant to law enforcement (R. 452-540), and the subsequent hearing on the defendant's motion to suppress his statement (R. 895-1061).

James Edward Gary, Jr., while detained at the Randolph County Sheriff's Office detention facilities under suspicion of an unrelated crime, was questioned on February 19, 2002, by Investigator Van Jackson of the Lee County Sheriff's Office and Lieutenant Heath Taylor of the Randolph County Sheriff's Office. (R. 452) Gary was apprised, prior to the beginning of his questioning, of his Miranda rights by verbal instruction and by the completion a physical form detailing those rights. (R. 453) Gary affirmed by oral response that he understood his rights, as well as signed the physical waiver form of his rights. (R. 453) Gary was subsequently questioned by Jackson and Taylor. (R. 452-540) The officers informed Gary during their questioning that they knew about murders he was involved with that occurred in Opelika, Alabama. (R.458)

4

During the course of the questioning, Gary was told, in detail, about the events of the murders:

> JACKSON:  "Right now they are blaming everything on you."  (R. 480)

> JACKSON:  "They are blaming everything on you." (R. 481)

> TAYLOR:  "You know why you walked in that house with Jimmy and why y'all did those things at Mike's request."  (R. 498-9)

> TAYLOR:  "We know that – who – how much money was divided up between the three of you, how much each of you got."  (R. 499)

> TAYLOR:  "We know you went into sit in somebody's car as part of an alibi."  (R. 499)

> TAYLOR:  "They saw you that day.  They saw you and they've got it.  They saw the three of you riding in the Crown Vic.  They saw – people have came forward and put you in the car with the two boys that day."  (R. 499-500)

> TAYLOR:  "[H]e is the one that got the InterTech and the nine MM handgun."  (R. 503)

> TAYLOR:  "He's the one that disposed of the guns."  (R. 503)

> TAYLOR:  "We know you went to LaGrange apartments. We know you sat there at Mike's house.  We know you took the guns apart.  We know where y'all parked and run and jumped the fence and went into the back of the house.  We know every single thing that happened.  We know you tried to shoot him in the ass and actually shot him in the back or the spine the first time.  We know you shot him in his hand. We know you shot him in the head."  (R. 509)

5

In addition to expressing certain facts to Gary about the events of the crime in question, Taylor expressed to Gary that he (Gary) now had an opportunity to tell his side of the story. (R. 496) Taylor told Gary that Jackson had everything needed to send Gary away for as long as he lived or to send him to the electric chair. (R. 497) Taylor explained to Gary that cooperation would portray him as someone who is "a good person, who has had something bad happen to them." (R. 492) Taylor drew a distinction between a good person, and someone who has "no conscience [because] they lock that person up for the rest of their life." (R. 492) Taylor asked Gary if that had also been his observation with the judicial system, to which Gary affirmed it had been. (R. 492) Taylor continued by telling Gary that it would be in his interests for the judge to see him as a good person, someone who has made some mistakes, but that in order for the judge to perceive Gary in that light, it would be necessary for Gary to be honest and come clean. (R. 495) Taylor explained to Gary that, because he was the only one involved that was denying his involvement, Gary would look like he "don't care about

anybody [he] hurt; that looks like that you're a person who don't need to be back in society".  (R. 498)

Taylor explained to Gary that, because the other two involved had confessed and corroborated each other's stories, and that the other two had put the blame on Gary, Gary was "going to appear to be this hardened criminal killer who don't give a dang about anybody but himself." (R. 500)  Then, Taylor told Gary that he could be looking at going to trial for capital murder.  (R. 500)  Taylor explained to Gary the difference between capital murder:

> "[n]ow capital murder and murder is two different
> things.  Capital murder means that you could
> possibly get the death penalty for capital murder.
> Murder means that you just do life in prison.  You
> could get life in prison.  You could get five
> years, but you could get life in prison."

(R. 501)

In an attempt to appeal to his morality, Taylor told Gary that, being honest and apologizing for what he had done, would help to begin the healing process, for him and the family that was involved.  (R. 505)  But, Taylor continued by saying that that, even those that make mistakes and admit them and are sorry for them, still have to be punished for them.  (R. 506)

Taylor stated:

7

"[Y]ou're going to be punished for that.  No doubt about that.  There's no doubt about it.  You have to.  Don't think for five minutes that society is not going to let you and them and anybody else that does that go and just not – just say I'm sorry and it be done.  But it's – it's so much easier when that is said, James.  It's so much smoother and easier to get over because you can close it in your life.  They can close it in their life."

(R. 506-7)

Gary, in his interview did make reference to an attorney four times.  Gary said:

GARY: "…y'all talk to my lawyer because I'm telling you man, I ain't had no dealings with that man" (R. 484)

GARY: "…then you might as well talk to my lawyer then" (R. 485)

GARY: "Man, you can talk to my lawyer, man" (R. 485)

GARY: "…show me what you have got to show me, other than that, talk to my lawyer. I would like to see it, though" (R. 488, 489).

Later, Jackson told Gary that he was about to play him a tape.  As Jackson was about to play the tape, because he was concerned about being "a black man [and] [t]hese two – you know, they ain't", Gary began to request that Jackson promise that he help Gary if he told what he knew.  (R. 513)  It was at this point that Gary told Jackson his recollections of the events in question.  (R. 513-538)

8

## STANDARD OF REVIEW

Gary's issues on appeal are based on the trial court's denial of his motion to suppress. Alabama appellate courts review issues related to motions to suppress using an abuse of discretion standard of review and the trial court's decision will not be disturbed unless it is palpably contrary to the great weight of the evidence, and all reasonable inferences and credibility choices are supportive of the decision of the trial court.

"In reviewing a trial court's ruling on a motion to suppress, this Court reviews the trial court's findings of fact under an abuse-of-discretion standard of review." State v. Hargett, 2005 WL 435125 (Ala. Crim. App. 2005).

"The trial court's ruling on a motion to suppress will not be disturbed unless it is palpably contrary to the great weight of the evidence." Rutledge v. State, 680 So. 2d 997, 1002 (Ala. Crim. App. 1996), citing Parker v. State, 587 So. 2d 1072, 1088 (Ala. Crim. App. 1991).

"In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court." Eggers v. State, 914 So.

2d 883, 899 (Ala. Crim. App. 2004), citing <u>Kennedy v. State</u>, 640 So. 2d 22, 26 (Ala. Crim. App. 1993), quoting <u>Bradley v. State</u>, 494 So. 2d 750, 761 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 772 (Ala. 1986).

## SUMMARY OF THE ARGUMENT

The trial court did not abuse its discretion in denying Gary's motions to suppress his voluntary statements made to law enforcement. The trial court's ruling was not palpably contrary to the great weight of the evidence.

Gary's appellate argument is that his statement should have been suppressed due to Gary's unequivocal request for assistance of counsel during a custodial interrogation and that Gary was induced to give his confession by promise of leniency and the threat from the custodial interviewing officers.

On the contrary, in the statement made on February 19, 2002, which was videotaped, Gary never made an unequivocal request for assistance of counsel and was not induced to give his confession due to inducements of promise or threat.

The trial court conducted a suppression hearing on May 23, 2005, where the videotaped statement of Gary was played and the trial court watched the entire video taped confession, accompanied by the transcript prepared by the court reporter, and testimony provided by the two officers that conducted the custodial interrogation. The defendant

11

did not testify.  The trial court also entertained briefs on the merits from both sides.  Gary supports his claims with excerpts of a transcript transcribed by Gary's attorney.  That transcript differs from a transcript of the same videotaped statement prepared by a court reporter from the Thirty-Seventh Judicial Circuit.

In examining the evidence at hand, the court determined, based upon the totality of the circumstances, that Gary's statement did not warrant suppression, and therefore was admissible.  Hence, the trial court's judgment should be affirmed.

12

**ARGUMENT**

**The Trial Court Did Not Abuse Its Discretion In Its Denial Of Gary's Motion To Suppress His Statement.**

Gary contends that the trial court erred in denying his motion to suppress the admission of a statement he made during custodial interrogations. (Appellant's Brief pp. 8) Gary alleges he made unequivocal requests for assistance of counsel during the custodial interrogation, and due to statements made by Investigator Van Jackson and Lieutenant Heath Taylor during Gary's interrogation, Gary was induced to confess in exchange for promises of a lighter sentence and by perceived threats to ensure Gary received the death penalty, in the event he did not cooperate. The trial court, upon the defendant's motion, conducted a suppression hearing based upon Gary's claims. The trial court was briefed on the issues, heard testimony from the interviewing officers, and watched the defendant's video taped confession. Upon examination of the totality of the circumstances, the trial court denied Gary's motion to suppress his statement. (Supp. 29)

"In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of

13

the decision of the trial court." <u>Eggers v. State</u>, 914 So.

2d 883, 899 (Ala. Crim. App. 2004), citing <u>Kennedy v.</u>

<u>State</u>, 640 So. 2d 22, 26 (Ala. Crim. App. 1993), quoting

<u>Bradley v. State</u>, 494 So. 2d 750, 761 (Ala. Crim. App.

1985), aff'd, 494 So. 2d 772 (Ala. 1986).

"'[A] trial court's ruling based upon conflicting

evidence given at a suppression hearing is binding on this

Court, ... and is not to be reversed absent a clear abuse

of discretion.' <u>Jackson v. State</u>, 589 So. 2d 781, 784

(Ala. Crim. App. 1991)." <u>Eggers</u>, 914 So. 2d at 899.

This Court, in <u>Jackson v. State</u>, 562 So. 2d 1373 (Ala.

Crim. App. 1990), set out the requirements of determining

whether a confession is voluntary, and subsequently, once a

trial court determines its voluntariness and admissibility,

on what grounds this Court will overturn that decision.

> The fundamental requirements for voluntariness of
> confessions are that the court must conclude, in
> order to find a defendant's confession voluntary,
> that he made an independent and informed choice of
> his own free will, that he possessed the capacity
> to do so, and that his will was not overborne by
> pressures and circumstances swirling around him.
> <u>Jurek v. Estelle</u>, 623 F.2d 929 (5th Cir.1980) (en
> banc), cert. denied, 450 U.S. 1001 (1981); <u>Lewis</u>
> <u>v. State</u>, [535 So.2d 228 (Ala. Cr. App. 1988)].
> <u>The test is whether, considering the totality of</u>
> <u>the circumstances, law enforcement officials have</u>
> <u>overborne the will of the accused.</u> <u>Haynes v.</u>
> <u>Washington</u>, 373 U.S. 503 (1963); <u>Townsend v. Sain</u>,

14

372 U.S. 293 (1963); Culombe v. Connecticut, 367 U.S. 568 (1961). The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. Mincey v. Arizona, 437 U.S. 385 (1978); Martin v. Wainwright, 770 F.2d 918 (11th Cir.1985); Jurek. The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. Fikes v. Alabama, 352 U.S. 191 (1957); Stein v. New York, 346 U.S. 156 (1953); Haley v. Ohio, 332 U.S. 596 (1948); Martin v. Wainwright.

The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parte Singleton, 465 So. 2d 443 (Ala.1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Lewis v. State; Magwood v. State; Marschke v. State, 450 So.2d 177 (Ala. Cr. App. 1984).

Jackson v. State, 562 So. 2d at 1380-1 (emphasis added).

"The trial court's ruling on a motion to suppress will not be disturbed unless it is palpably contrary to the great weight of the evidence." Rutledge v. State, 680 So. 2d 997, 1002 (Ala. Crim. App. 1996) citing Parker v. State, 587 So. 2d 1072, 1088 (Ala. Crim. App. 1991).

15

Unless the trial court's decision appears to be palpably contrary to the great weight of the evidence or manifestly wrong, the trial court's decision should be affirmed.

### A.   Gary's Statements Were Properly Admitted Unless The Trial Court Determined Statements Made By Gary Were Unequivocal Requests For Assistance Of Counsel.

Gary claims that, during his interrogation by law enforcement, he made requests for the assistance of an attorney, which should have been recognized as such, and any statements made after such requests should have been found inadmissible, and therefore his statement should have been suppressed. (Appellant's Brief pp. 8) Gary's references to an attorney were, in fact, at best, equivocal requests for assistance. Consequently, Gary was not entitled to immediate cessation of questioning, Gary's subsequent statements were properly admissible, and the trial court's decision to allow the statement to be entered as evidence in Gary's trial was proper. Gary's argument is even colored by the fact that he, in part, relies upon portions of his statement from a transcript produced by defense counsel, in which potentially dispositive language

16

differs from content of the statement as transcribed from
his videotaped confession by a court reporter.  Gary
claims, according to his own transcript, that he makes the
statement, "then I want to talk to my lawyer then...,"
(Appellant's Brief pp. 10) when the court reporter's
transcript indicates that Gary said: "then you might as
well talk to my lawyer then."  (R. 944)  In another
example, Gary claims he said: "I want to talk to my lawyer
man," (Appellant's Brief pp. 10) when the court reporter
transcript reads: "[m]an, you can talk to my lawyer, man."
(R. 945)

After having deemed a suppression hearing required,
the trial court heard testimony, the videotaped confession,
accompanied by the transcript prepared by the court
reporter, and having been briefed upon the issues, the
trial court deemed that, in the light of Gary's claims and
under the totality of the circumstances, the statement was
admissible and permitted its entry as evidence in Gary's
trial.

As it relates to the facts of this case and its
subsequent appeal, the United States Supreme Court

17

explained the process under which a law enforcement officer

may question a post-waiver detainee:

> After a knowing and voluntary waiver of rights
> under Miranda v. Arizona, 384 U.S. 436 1966 , law
> enforcement officers may continue questioning until
> and unless a suspect clearly requests an attorney.
> A suspect is entitled to the assistance of counsel
> during custodial interrogation even though the
> Constitution does not provide for such assistance.
> Id., at 469-473.

Davis v. United States, 512 U.S. 452, 452 (1994).  The

Court further explained, by referencing Edwards v. Arizona,

451 U.S. 477 (1981), that, specifically in the light of a

request for an attorney during custodial interrogation,

"[i]f the suspect invokes that right at any time, the

police must immediately cease questioning him until an

attorney is present.  Edwards v. Arizona, 451 U.S. 477,

484-485, (1981)."  Davis, 512 U.S. at 452.  The United

States Supreme Court explained the rationale behind Edwards

saying Edwards is a preventative that would keep law

enforcement from "badgering" a questionee into waiving his

or her Miranda rights.  The Court also used Edwards to have

courts "determine whether the accused actually invoked his

right to counsel."  Id. at 458.

> To avoid difficulties of proof and to provide
> guidance to officers conducting interrogations,

18

> this is an objective inquiry. <u>See</u> <u>Connecticut v.</u>
> <u>Barrett</u>, supra, 479 U.S., at 529. Invocation of
> the <u>Miranda</u> right to counsel "requires, at a
> minimum, some statement that can reasonably be
> construed to be an expression of a desire for the
> assistance of an attorney." <u>McNeil v. Wisconsin</u>,
> <u>501 U.S.</u>, at 178. But if a suspect makes a
> reference to an attorney that is <u>ambiguous or</u>
> <u>equivocal in that a reasonable officer in light of</u>
> <u>the circumstances would have understood only that</u>
> <u>the suspect might be invoking the right to counsel</u>,
> our precedents do not require the cessation of
> questioning. <u>See Id.</u>

<u>Davis</u>, 512 U.S. at 458-9 (emphasis added). The Court did

not, therefore, extend <u>Edwards</u> to require <u>any reference</u> to

an attorney to be deemed as a signal for officers to stop

in interrogation.

> Extending <u>Edwards</u> to create such a requirement
> would transform the <u>Miranda</u> safeguards into wholly
> irrational obstacles to legitimate investigative
> activity by needlessly preventing the police from
> questioning a suspect in the absence of an
> attorney, even if the suspect does not wish to have
> one present. The <u>Edwards</u> rule provides a bright
> line that can be applied by officers in the real
> world of investigation and interrogation without
> unduly hampering the gathering of information. This
> clarity and ease of application would be lost if
> officers were required to cease questioning based
> on an ambiguous or equivocal reference to an
> attorney, since they would be forced to make
> difficult judgment calls about what the suspect
> wants, with the threat of suppression if they guess
> wrong.

19

<u>Davis</u>, 512 U.S. at 452-3.[3]

> [W]e are unwilling to create a third layer of
> prophylaxis to prevent police questioning when the
> suspect might want a lawyer.

<u>Id</u>. at 462.

Therefore, using the <u>Edwards</u> language in <u>Davis</u>, the
trial court had to determine whether Gary "actually invoked
his right to counsel." <u>Id</u>. at 458. During Gary's hearing
on his motion for suppression of his statement, the court
listened to the videotaped confession. He heard the four
instances where Gary contends he unequivocally requests
assistance from an attorney, "y'all talk to my lawyer
because I'm telling you man, I ain't had no dealings with
that man" (R. 484) "then you might as well talk to my
lawyer then" (R. 485), "[m]an, you can talk to my lawyer,
man" (R. 485), and "show me what you have got to show me,
other than that, talk to my lawyer. I would like to see it,

---

[3] "Of course, when a suspect makes an ambiguous or
equivocal statement it will often be good police practice
for the interviewing officers to clarify whether or not he
actually wants an attorney. Clarifying questions help
protect the rights of the suspect by ensuring that he gets
an attorney if he wants one, and will minimize the chance
of a confession being suppressed due to subsequent judicial
second-guessing as to the meaning of the suspect's
statement regarding counsel. <u>But we decline to adopt a
rule requiring officers to ask clarifying questions</u>."
<u>Davis</u>, 512 U.S. at 461-2. (emphasis added)

20

though" (R. 488, 489). These excerpts were heard in context as they were delivered. The officer conducting the interview testified, based upon his experience as a law enforcement officer, to his impressions of the events. The trial court heard there was a conflict in the versions of the transcripts created. Subsequently, after also having been briefed on the issues, the trial court had to decide whether Gary was making an unequivocal or unambiguous request for assistance of counsel as required in Davis. Based upon the facts and law presented, the trial court deemed that Gary's statement should not be suppressed. Following the reasoning of Davis, the trial court did not abuse his discretion in his refusal to suppress Gary's statement. Gary has failed to show that the trial court's decision "was palpably contrary to the great weight of the evidence" and therefore should not be overturned. Rutledge, 680 So. 2d at 1002.

### B. Gary's Confession Was Not The Product of Inducement Or Threat.

Gary claims that inculpatory statements made during a videotaped statement were induced by hope of a lighter sentence and due to threats of manipulation of the court by

the law enforcement officer(s) conducting the defendant's

statement.  (Appellant's Brief pp. 15)  The defendant

claims that Taylor, during the interview process,

improperly led Gary to believe that a confession to the

murders of Thurman and Katherine Ratliff would result in

leniency in his sentence.  (Appellant's Brief pp. 16)

Additionally, Gary claims that Taylor threatened him with

"two life sentences and the electric chair if he did not

confess."  (Appellant's Brief pp. 16)

When examining the voluntariness of a confession by an

accused, the United States Supreme Court has set out the

"totality of the circumstances" test as the appropriate

measure.  "The court applied the appropriate test, totality

of the circumstances, cf. Schneckloth v. Bustamonte, 412

U.S. 218, 226, to determine the confession's

voluntariness…"  Arizona v. Fulminante, 499 U.S. 279, 279

(1991).

This Court has examined the voluntariness of a

confession in Balentine v. State, 730 So. 2d 255, (Ala.

Crim. App. 1998), in which it was cited:

> When determining the voluntariness of a confession,
> this Court must "examine the totality of the
> circumstances to determine if an implied promise of
> leniency caused the defendant to make the

22

> confession, i.e., if it overbore the will of the
> defendant." McLeod v. State, 718 So.2d 727
> (Ala.1998).

Balentine, 730 So. 2d at 258.

In determining whether the accused's will has been
overborne, this Court has held:

> To determine if a defendant's will has been
> overborne, we must assess "the conduct of the law
> enforcement officials in creating pressure and the
> suspect's capacity to resist that pressure"; "[t]he
> defendant's personal characteristics as well as his
> prior experience with the criminal justice system
> are factors to be considered in determining [the
> defendant's] susceptibility to police pressures."
> Jackson, 562 So.2d [1373] at 1380-81 [(Ala. Crim.
> App. 1990)] (citations omitted).

McLeod v. State, 718 So. 2d 727, 730, (Ala. 1998).

The trial court had to determine from the "totality of
the circumstances" whether Gary's will was overborne by law
enforcement during their interrogation to the extent that
he was induced by either promise and/or by threat.  To
determine whether Gary's will had been overborne, the court
conducted -- upon motion by the defendant -- a suppression
hearing to determine the merits of whether Gary's statement
should be suppressed.  (R. 101, 895-1091)  In the hearing,
the trial court was able to hear, in context, the entirety
of the statement, as well as testimony from the law

23

enforcement officers involved as to their recollections and perceptions. (R. 895-1091)  The trial court heard the comments made by Lieutenant Taylor and Investigator Jackson, specifically the content that Gary alleges in his appeal that caused his inducement. (Appellant's Brief pp. 16-21)  The trial court heard Taylor testify that his method of interrogation was to try to get Gary to yield to his morality and confess. (R. 1060)  The court heard Taylor testify that he affirmatively told Gary, "you're going to be punished for that.  No doubt about that." (R. 961)  Taylor also immediately went on to say:

> TAYLOR: "...[b]ut it's - it's so much easier when it is said, James.  It's so much smoother and easier to get over because you can close it in your life. They can close it in their life...In the back of your head you're saying I would like to tell somebody because it would help you get over it, and all I'm telling you, Bro - believe me if you want, I've seen a hundred people come in here and say I didn't touch him; I didn't do nothing...[t]hey just absolutely deny it, it's the same in every person every time...[but] when they said I'm sorry, I didn't mean to do it, but I did.  I did it, and - and I'm sorry for it, when they finally said that, I can give you a page full of names in murder cases that said I was one hundred percent at peace...I was happy because I got it off my chest and I couldn't live with it much more."

(R. 961-3)  Also, law enforcement had already expressed that the other two participants in the crime had confessed

24

to the crime and had detailed their versions of the events
(R. 953), and that the other two participants had put the
blame on Gary.  (R. 941)  Taylor let Gary know that he
needed to give his side of the story, or that Gary would be
painted, as drawn from to the confessions already taken by
the other participants and Gary's reluctance to admit his
involvement, that he was a "ruthless fucking killer" and
that if that was the case, he "don't ever need to get out
of jail."  (R. 964)  Jackson had also told Gary, "[r]ight
now they are blaming everything on you…[t]hey are blaming
everything on you."  (R. 941)

Gary claims that Taylor "threatened two life sentences
and the electric chair if he did not confess".
(Appellant's Brief pp. 16)  Gary quotes from his transcript
in an attempt to substantiate these claims:

> Taylor: "I'm sorry but let's get it over with.
> Because if you don't James, you're looking at going
> to trial for capital murder.  Now capital murder
> and murder is two different things. Capital murder
> means that you can possibly get the death penalty
> for capital murder. Murder means that you just do
> life in prison that you could get life in prison.
> You could get 5 years but you could get life in
> prison. Now the difference is in my opinion the
> difference is James. That's the difference not
> whether or not they charge you with capital murder
> or not but the difference is going to depend on
> James."

25

(R. 957)  Gary claims that this is an inducement of a
lighter sentence.  On the contrary, Taylor explained the
difference in capital murder and murder, only incidentally
mentioning the different sentences.  (R. 1048)  The
Eleventh Circuit has ruled that:

> "[T]elling the [defendant] in a noncoercive manner
> of the realistically expected penalties and
> encouraging [him] to tell the truth is <u>no more than</u>
> <u>affording [him] the chance to make an informed</u>
> <u>decision with respect to [his] cooperation</u> with the
> government."  <u>United States v. Ballard</u>, 586 F.2d
> 1060, 1063 (5th Cir.1978).

<u>United States v. Nash</u>, 910 F. 2d 749, 752-3, (11th Cir.
1990) (emphasis added).  Also, "[m]oreover, 'more subtle
forms of psychological manipulation, such as trickery or
deception by the police, have not been considered
sufficiently coercive, standing alone, to render a
confession or incriminating statement involuntary.'  Ex
parte <u>Hill</u>, 557 So.2d at 841."  <u>Ex parte</u> <u>Jackson</u>, 836 So.
2d 979, 983 (Ala. 2002).  Taylor, having expressed to Gary
that those also involved with the murders had confessed, in
the light of Jackson's assertion that the others involved
were blaming everything on Gary, was expressing to Gary
that there are differences between the two versions about
what happened.  One version is that the events occurred as

26

they were represented to law enforcement, or at least how

law enforcement told Gary it was expressed to them, as Gary

being the one blamed by the other two in custody.

Alternatively, Gary could truthfully explain his side, and,

if Gary was not solely to blame, there might be a

determination to be made by someone about whether to charge

Gary with capital murder or murder.  But, that

determination would not be made unless Gary confessed and

told his side of the story.  Otherwise, based solely upon

the confessions taken earlier, Gary would be "painted" as

the ringleader and a "ruthless fucking killer."

> TAYLOR:  And all I'm telling you is you can believe
> me if you want but they're gonna do one of two
> things.  You can either say I'm sorry and tell the
> truth as far as you're concerned about the case or
> you can just say to hell with it y'all ain't got
> nothing on me and let them take everything that
> they got and take you to court and you will lose.
> Listen to me.  You will lose.

(R. 964)  In this quote, Taylor told Gary that law

enforcement "know[s] you shot him in his hand.  We know you

shot him in the head."  (R. 964)  Taylor represented what

law enforcement knew about the incident, and that it

appeared that Gary was the one who shot and killed Mr.

Ratliff.  From Taylor's position, expressing to Gary that

he was the one solely responsible for the shooting of Mr.

27

Ratliff, it appeared Taylor was attempting to have Gary

defend himself, and confess that he was not the one to

shoot Ratliff three times in the head.  Assuming Gary shot

the victim three times and that was the cause of his death,

Gary could be charged with capital murder, and Taylor

wanted Gary to dispute those facts, which would allow Gary

to draw a distinction -- a "difference" -- in the facts.

Depending upon those facts, the difference could allow Gary

to not be charged with capital murder.  It was not a

promise of a lighter sentence or a threat.

> TAYLOR: You don't have to believe me cause what I'm
> going to suggest is this.  I'm going to go ahead
> and say to hell with you and present you as being
> the ring leader that is a ruthless fucking killer
> that don't ever need to get out of jail.  That's
> what I'm going to do and I'm going to do everything
> in my power in Russell County to make sure that we
> treat you that way in jail for the rest of the time
> because I think that's possible...I think it's very
> possible and I think that when we get done because
> I've got a little bit of power and a little bit of
> influence and when they call me as an expert
> witness in homicide I'm going to tell them that guy
> never ever needs to be out from behind bars. Or you
> need to put him, strap him to the chair and get rid
> of him he's useless Because other than that you've
> given me no reason to, other that that you give
> this man no reason to.  Without your side and you
> being honest and you telling us what happened in
> this house.  We have no choice James but to point
> to you and say the son of a bitch that don't never
> need to be out of jail again believe me when I tell
> you that's him.

(R. 964-6)  Again, Gary attempts to use what Taylor said to suggest that Taylor improperly induced his confession.  In context, Taylor simply explained that one of the other men involved had "spilled his guts" and that "he was right there with you."  (R. 964)  Again, as a reference to the fact that Gary was being blamed for the murder, and based upon that assumption that Gary was the ringleader, "useless", and "a killer", Taylor suggested that Gary be treated as such, specifically for the remainder of his time there in the Randolph County Sheriff's detention facility. Again, based upon the assumption Gary was the ringleader, when Taylor was called to give testimony, he would give his opinion that capital punishment should be administered.

Taylor's remarks were not an inducement by threat or promise, but merely explained to Gary his options; notably, what would be the likely result if he did not tell law enforcement his version of what happened.  Even if those statements were construed as manipulative or somewhat deceptive, that alone is certainly not grounds for reversal of the trial court's decision not to suppress Gary's statement.  See Ex parte Jackson, 836 So. 2d at 983.

29

Gary further contends that his next four statements followed Taylor's promises of leniency and threat, which the State can only assume Gary intends to mean that these statements were directly attributable to those alleged "promise[s] of leniency and threat": (Appellant's Brief pp. 18)

> [First]Gary: I didn't kill nobody.
> [Second]Gary: I didn't kill nobody man. I'm talking about that shit eat at me every day man. That mother fucker there crazy man.
> [Third]Gary: That mother fucker crazy man.
> [Fourth]Gary: He went up in there man. <u>Okay see you got to promise me man</u>. (Emphasis added)

(Appellant's Brief pp. 18) First, there is the possibility that, even though Gary shot Ratliff multiple times, Gary might have had the belief that he did not kill anybody, but he does admit that what he did "eat at me everyday man." (R. 966) Second, Gary appears to add as substantive text that he said "[t]hat mother fucker there is crazy, man." (R. 966) There is no explanation of who the person is to whom Gary refers. At the time, Jackson is preparing to show a tape of what was alluded to as potentially the confession from one of the others involved. Gary very easily could have been referring to the person on the tape.

30

There is no evidence to substantiate in any way that Gary's statement was directed in reference to Taylor, thereby substantiating any fear of threat, nor does Gary explicitly make that claim. Third, Gary makes the statement, "[o]kay see you got to promise me man" (R. 966), and in his brief to this Court Gary adds emphasis to that statement. (Appellant's Brief pp. 18) Considering that Taylor and Jackson had essentially laid out the chronology of the events of the crime, expressed to Gary they had confessions of the others that were involved, and had made assertions that they were going to show Gary the information they had, Gary was asking for assistance because he felt he would not get a fair proceeding. This conclusion can be drawn from the next statement he made following his request for help: "If you would - just think about it, man. Just put two and two together. I'm a black man. These two - you know, they ain't." (R. 967) Gary felt he needed to ask for assistance because of what he perceived was the probability he would not get fair treatment because of his race, not because he felt Jackson or Taylor were promising him anything.

Considering this Court's standard of review of a trial court's decision based upon a suppression hearing and

31

"making all reasonable inferences and credibility choices

in favor of the trial court['s]"[4] ruling and considering

the totality of the circumstances, the trial court's

determination that Gary voluntarily and knowingly made a

confession and was not coerced to do so by a promise of

leniency or threat was not an abuse of its discretion, nor

is it manifestly contrary to the great weight of the

evidence.

---

[4] <u>Kennedy v. State</u>, 640 So. 2d 22, 26 (Ala. Crim. App.
1993).

32

**CONCLUSION**

Therefore, for the foregoing reasons, the trial court's judgment is due to be affirmed.

Troy King
Attorney General

Marc Starrett
Assistant Attorney General
By-


Marc S. Bass (BAS 020)
Assistant Attorney General

33

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th of June, 2006, I did serve a copy of the foregoing on the attorneys for Gary, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

Richard K. Keith                    Daniel G. Hamm
Keith & Hamm, P.C.                  Keith & Hamm, P.C.
235 South McDonough Street          235 South McDonough Street
Montgomery, Alabama 36104           Montgomery, Alabama 36104


Marc S. Bass
Assistant Attorney General


ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300


148352/86839-001

34

Rel 04/20/2007 Gary, Jr.
Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d),
states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or
briefs and shall not be used by any court within this state, except for the purpose of establishing the application
of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals
State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

PAMELA W. BASCHAB
Presiding Judge
H.W."BUCKY" McMILLAN
GREG SHAW
A. KELLI WISE
SAMUEL HENRY WELCH
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-05-0133                    Lee Circuit Court CC-02-492

James Edward Gary, Jr. v. State

WELCH, Judge.

James Edward Gary, Jr., was convicted of one count of capital murder in connection with the killing of Thurman Ratliff.[1] The offense was made capital because Gary committed

---

[1]Gary's codefendants were Michael David Carruth and Jimmy Lee Brooks, Jr. The consequences to these individuals for their involvement in this murder is unclear from the instant record. However, we note that Carruth and Brooks are under a sentence of death following their convictions, as codefendants, in another unrelated capital murder of a 12-year old boy.

1



EXHIBIT

4

the murder during the course of a first-degree robbery, a violation of §13A-5-40(a)(2), Ala. Code 1975. After a sentencing hearing, the jury unanimously recommended that Gary be sentenced to life in prison without the possibility of parole. The trial court accepted the jury's recommendation and sentenced Gary accordingly.

Because the only issues raised on appeal concern whether the trial court erred in denying Gary's motion to suppress a videotaped statement he made to the police on February 19, 2002, a brief rendition of the facts will suffice.

The record shows the following. The bodies of Thurman Ratliff and his wife, Katherine, were discovered in their Opelika home by their adult daughter, Katrina Sue Ratliff, early in the afternoon of January 30, 2002. Thurman Ratliff was discovered lying face down on the den floor. He had been shot in the hand, the lower back, and in the back of the head. Katherine Ratliff was discovered lying face down in a bedroom. She had been shot in the shoulder, once in the leg, once in the left foot, and three times in the back of the head. The deaths were determined to be homicide by multiple gunshot wounds.

The investigation disclosed that the back door into the residence was the point of entry and that the door had clearly been forced open. The interior of the Ratliffs's home and the attic had been rifled through and the return for the air conditioner had been "ripped open." (R. 1657) Based on the appearance of the home, one officer opined that "somebody was looking for something." (R. 1652.) It was concluded, based on the investigation, that searching for "money was the motive for entering the home." (R. 1758.) An unopened safe containing $87,000.00 in cash was found hidden in the bathroom. (R. 1692.) Shell casings and bullets were retrieved from the crime scene.

The investigation of these murders led police to the home of Katrina Jackson, the mother of Gary's two children. Jackson testified that Gary was unemployed and owed money to Michael David Carruth, a bail bondsman who had bailed him out of jail. Jackson testified that Carruth came to her house more than once to discuss with Gary the debt incurred when Carruth bailed him out of jail.

2

Nine-millimeter shell casings fired during a New Year's Eve celebration were gathered from Jackson's yard as evidence. It was later determined that these shell casings were fired from two 9mm weapons. A 9mm shell casing taken from Jackson's yard matched a 9mm shell casing taken from the Ratliffs's den. Two 9mm shell casings taken from the Ratliffs's bedroom matched one 9mm shell casing taken from the den and matched two 9mm shell casings taken from Jackson's yard.

During a search of Jackson's home, police found $4,800 in cash that she said Gary had given her around the time of the Ratliffs's deaths.

I.

Gary contends that the trial court erred in denying his motion to suppress the statement he made to law enforcement officials despite what Gary he said were repeated requests for an attorney.

Before trial, Gary moved the trial court to suppress the videotaped statement he made to law enforcement officials on February 19, 2002, during his interrogation by Lee County Sheriff's Investigator Vann Jackson and Lt. Heath Taylor of the Russell County Sheriff's Department. In that statement, Gary confessed to taking part in the murder of Thurman Ratliff.

The suppression hearing was held outside the presence of the jury; therefore, we review the evidentiary findings of the trial court under the ore tenus standard. <u>Ex parte Jackson</u>, 886 So. 2d 155, 159 (Ala. 2004).

> "Where evidence is presented to the trial court
> ore tenus in a nonjury case, a presumption of
> correctness exists as to the court's conclusions on
> issues of fact; its determination will not be
> disturbed unless clearly erroneous, without
> supporting evidence, manifestly unjust, or against
> the great weight of the evidence. <u>Odom v. Hull</u>, 658
> So. 2d 442 (Ala. 1995). However, when the trial
> court improperly applies the law to the facts, no
> presumption of correctness exists as to the court's
> judgment. <u>Ex parte Board of Zoning Adjustment of</u>

the City of Mobile, 636 So. 2d 415 (Ala. 1994).

"[Ex parte Agee], 669 So. 2d [102,] at 104
[(Ala. 1995)]. 'Where the evidence before the trial
court was undisputed the ore tenus rule is
inapplicable, and [this Court] will sit in judgment
on the evidence de novo, indulging no presumption in
favor of the trial court's application of the law to
those facts."

Jackson, 886 So. 2d at 159.

In determining whether the statement at issue was due to
be suppressed, the Court first had to determine what Gary
actually said in certain portions of the videotaped statement.
Gary contends that he made four statements in which he
requested an attorney; the specific language of two of those
statements is in dispute.

The language of those disputed statements is set forth
below. Gary's versions of those statements are as they are
set forth in Gary's brief in support of his motion to suppress
(with the disputed portions underlined), followed by the
State's versions of the disputed portions of the statements,
which appear as court reporters transcribed the videotape of
Gary's statement to law enforcement officials.

GARY'S VERSION

"Gary: That's it you know what I'm saying. If you
know what I'm saying, you saying you gonna put
something like that on me then I want to talk to my
lawyer then and its, just that cause it ain't me
bro.

(CR. 192, Brief in Support of Defendant's Motion to Suppress.)

STATE'S VERSION

"Gary: That's it. Do you know what I'm saying, if
you know what I'm saying, you saying, you going to
put something like that on me, then you might as
well talk to my lawyer then, and it's just that
because it ain't me, bro.

4

(R. 484-85, law enforcement transcription, and R. 944, Transcript of Suppression Hearing.)

The second statement in which language is disputed is as follows:

GARY'S VERSION

"Jackson: Well you know I hate to see somebody make the decision to not tell the truth, and that they suffer for the rest of their life and it's a big decision. That a big choice.

"Gary: <u>I want to talk to my lawyer man cause I'm telling you I didn't do no shit like that man</u>. That's on everything man. Everything. My children everything man. I ain't got shit to do with no shit like that.

(CR. 192, Brief in Support of Defendant's Motion to Suppress.)

STATE'S VERSION

"Jackson: ... That's a big choice.

"Gary: <u>Man, you can talk to my lawyer, man</u>. Because I'm telling you I ain't got nothing to do with no shit like that, man.

(R. 485, law enforcement transcription, and R. 945, Transcript of Suppression Hearing.)

Two of the statements that Gary contends indicate he requested an attorney contain language not in dispute. Those statements are as follows:

"Jackson: When you gonna have to face the music. What I'm telling you right now is that this thing is going to go the distance today. It's going the, distance its over with and my only hope is that you are going to tell the truth.

"Gary: <u>Well, only hope. Y'all are saying y'all got me on this, I might as well stop talking now and</u>

<u>y'all talk to my lawyer</u> because I'm telling you, man, I ain't had no dealings with that man in no kind of way as far as he got me out on bond and worried the shit out of me about that money, man.

(R. 484, law enforcement transcription, and R. 944, Transcript of Suppression Hearing.)

The second statement whose language is not disputed but whose meaning is at issue is as follows:

"Jackson:    Well I'm telling you man.    We been working on it and uh we were trying to provide you an opportunity to tell your side and uh that's why I wanted to talk to you, to give you that opportunity and uh you know if you want to continue to and these boys are putting everything on you and if you continue to not tell the truth about what happened then I want you to know exactly what your up against cause everybody is saying you did it. Other people out there that don't know you was saying you was with them and uh....

"Gary:    <u>Uh, show me what you got to show me, other than that, talk to my lawyer.   I would like to see it, though</u>."

(R. 488-89, law enforcement transcription, and R. 948, Transcript of Suppression Hearing.)

The record shows that the trial court viewed the videotaped statement. Pursuant to the ore tenus rule, it was up to the trial court to resolve the alleged discrepancies between what the parties said was the specific language used in the disputed statements. Although the trial court did not specifically set out his findings of fact, for reasons discussed below, the court had to have found that Gary said "y'all talk to my lawyer" instead of "I want to talk to my lawyer," as Gary, in his motion to suppress, contended was actually said. Based on our review of the evidence, we cannot say that the trial court's determination was clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.

6

After determining the specific language Gary used during his interrogation, the trial court had to determine whether Gary unequivocally requested a lawyer during questioning.

"After a suspect has made a clear and unequivocal request that he or she does not wish to proceed with an interrogation until an attorney is present, the questioning must cease until an attorney has been made available or the suspect initiates contact with the authority and voluntarily and knowingly waives the right to be represented by counsel." Robinson v. State, 698 So. 2d 1160, 1163 (Ala. Crim. App. 1997), citing Arizona v. Roberson, 486 U.S. 675 (1988).

"The applicability of the '"rigid"' prophylactic rule' of Edwards [v. Arizona, 451 U.S. 477 (1981),] requires courts to 'determine whether the accused actually invoked his right to counsel.' Smith v. Illinois, 469 U.S. 91, 95 (1984), quoting Fare v. Michael C., 442 U. S. 707, 717 (1979). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. See Connecticut v. Barrett, 479 U.S. 523, 529 (1987). Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' McNeil v. Wisconsin, 501 U.S. [171] at 178 [(1991)]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning....

"Rather, the suspect must unambiguously request counsel. As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.' Smith v. Illinois, 469 U.S. at 97-98 (brackets and internal quotation marks omitted). Although a suspect need not 'speak with the discrimination of an Oxford don,' post, at 476, 114 S.Ct. At 2364 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable

7

>police officer in the circumstances would understand
>the statement to be a request for an attorney.   If
>the statement fails to meet the requisite level of
>clarity, <u>Edwards</u> does not require that the officers
>stop questioning the suspect."

<u>Davis v. United States</u>, 512 U.S. 452, 458 (1994)(emphasis added in <u>Davis</u>).

The Alabama Supreme Court has cited favorably the O.E.D.'s definition of "equivocal," that is, "having different significations equally appropriate or plausible; capable of double interpretation; ambiguous." 5 <u>Oxford English Dictionary</u> 359 (2d ed. J.A. Simpson & E.S.C. Weiner, eds., 1989), <u>Ex parte Cothren</u>, 705 So. 2d 861, 866 (Ala. 1997).

Alabama appellate courts have considered a number of cases in which the issue was whether a suspect under questioning had made an unequivocal request for an attorney. The query, "Where's the counselor?" was held not to be a clear request for an attorney. <u>Gray v. State</u> 507 So. 2d 1026, 1029 (Ala. Crim. App. 1987). We held that the question, "Is it going to piss y'all off if I ask for my -- to talk to a friend that is an attorney? I mean, I'm going to do whatever I have got to do.  Don't get me wrong," was "certainly not an unambiguous request for counsel as required by <u>Davis</u>." <u>Brown v. State</u>, 668 So. 2d 102, 103 (Ala. Crim. App. 1995). The Alabama Supreme Court held that the comment, "I think I want to talk to an attorney before I answer that," could have been directed at one specific question asked by the police and not the entire interrogation, as the policeman conducting the interrogation believed. Thus, the Court said, the statement was capable of equally plausible, differing interpretations and, therefore, equivocal. <u>Cothren v. State</u>, 705 So. 2d 861 (Ala. 1997).

In denying Gary's motion to suppress, the trial court determined that Gary did not unequivocally request an attorney during his questioning. As discussed above, the trial court obviously determined that Gary consistently told Investigator Jackson that "y'all" could talk with his attorney, as opposed to "I want to" talk with his attorney. In telling Jackson that <u>Jackson</u> could speak with Gary's lawyer, Gary did not make an unequivocal request to speak with an attorney. The

statement is capable of equally plausible, differing interpretations.

Accordingly, we cannot say that the trial court erred in denying Gary's motion to suppress his statement to law enforcement on the ground that Gary had requested an attorney during his interrogation by law enforcement.

## II.

Gary also contends that the trial court erred in denying his motion to dismiss because, he says, his statement was induced by what he said were Lt. Taylor's promises that Gary would receive a lighter sentence and would receive the death penalty if he did not assist law enforcement by giving a statement.

Whether a statement or confession was given voluntarily is initially a question to be determined by the trial court. Ex parte Singleton, 465 So. 2d 443 (Ala. 1985). The finding of the trial court on the issue of voluntariness will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Jackson v. State, 562 So. 2d 1373, 1381 (Ala. Crim. App. 1990). "Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty." Id., citing Chambers v. State, 455 So. 2d 1008 (Ala. Crim. App. 1984).

The general rule is that for a suspect's statement to law enforcement to be admissible, "the State must show that the defendant was advised of his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966), and its progeny, and that the defendant gave the statement after making a voluntary and knowing waiver of those rights." Robinson v. State, 698 So. 2d 1160, 1162. (Ala. Crim. App. 1997), and cases cited therein. Promises or threats by law enforcement officials during the interrogation may make a statement involuntary, however. Id. at 1162-63. "It is well settled that '[a]ny implied promises, however tenuous, render a statement to the police involuntary and the product of coercion." Johnson v.

9

State, 673 So. 2d 796, 799 (Ala. Crim. App. 1995), quoting Franklin v. State, 621 So. 2d 364, 367 (Ala. Crim. App. 1992).

Whether the statement was made voluntarily and was not the product of coercion must be determined on a case-by-case basis, in consideration of the particular facts and circumstances of each case, including the background, experience, and conduct of the accused -- in other words, the determination must be made based upon the totality of the circumstances. Jackson v. State, 562 So. 2d at 1380.

> "The fundamental requirements for voluntariness of confessions are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him. [Internal citations omitted.] The test is whether, considering the totality of the circumstances, law enforcement officials have overborne the will of the accused. [Internal citations omitted.] The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. [Internal citations omitted.] The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. [Internal citations omitted.]"

Id. at 1380-81.

In this case, the record shows that Gary was read his Miranda rights and no promises or threats were made. The videotape of the statement shows that Gary signed the waiver of rights form with no hesitation. The interrogation consisted of Investigator Jackson and Lt. Taylor speaking to Gary at different times. During the course of the interrogation Investigator Jackson and Lt. Taylor informed Gary that the two men who were with him had both given statements explaining their roles in the Ratliffs's murders and that they were saying Gary was the "main one" in

10

committing the murders. (R. 471 and 1943.) Both laid out the evidence that they had against Gary.

Both Investigator Jackson and Lt. Taylor told Gary that he needed to tell his side of the story -- that his side of the story could mean the difference between a charge of murder and a charge of capital murder, for which he could face the death penalty. Lt. Jackson explained that even if Gary told his side of the story, he would have to face punishment for the crime. Lt. Jackson also told Gary that judges and juries seemed to think better of defendants who admitted their mistakes, and explained the difference between someone who made a mistake and is remorseful about it and someone who is simply a bad person, who is not remorseful. If law enforcement officials had to say that although the two co-defendants confessed and said they were sorry but Gary refused to tell what happened and acted like he did not care, in that case, Lt. Taylor said, "I'm going to tell them that guy never ever needs to be out from behind bars or you need to put him -- strap him to the chair and get rid of him. He's useless. He's a killer. He never needs to be let out, and if he gets out again, he'll kill again." (R. 511 and 1975.) Lt. Taylor then spent a lot of time playing to Gary's conscience, explaining to Gary how he and the victims' family would begin to heal if he told what happened and how much better he would feel if he was honest about what happened.

In viewing the videotape in its entirety, and in considering the totality of the circumstances, we find that the evidence supports the trial court's finding that Gary's confession was given voluntarily. Gary was in jail for an unrelated offense at the time he was interrogated. The interrogation and statement, which took less than two hours to complete, took place in an interview room in which one could see sunlight through the window in the room.

Gary said that he finished the eleventh grade and acknowledged that he understood the form he signed waiving his rights. He had been to court before -- in fact, one of his co-defendants had been his bail bondsman for a previous arrest, before the Ratliffs's murders.

Despite Lt. Taylor's "tough talk," the videotape shows that the interrogation was not coercive or threatening. Gary

11

was not promised anything if he confessed, in fact, the investigators told Gary that he would have to be punished for bad conduct, even if he was honest and told his side of the story. Although Gary was told that a charge of capital murder against him could result in the death penalty, he was not threatened with the death penalty if he did not cooperate.

This court has upheld a trial court's decision to admit a confession given after police explained to the defendant the difference between getting a life sentence or the death penalty. See Jones v. State, [Ms. CR-03-1504, Aug. 25, 2006] ___ So. 2d ___ (Ala. Crim. App. 2006); and Jackson, 562 So. 2d 1373. Likewise, a confession given after comments by an investigator to the effect that the defendant could help himself by telling his side of the story was also deemed a voluntary confession. Brown v. State, 668 So. 2d 102 (Ala. Crim. App. 1995).

In reviewing the totality of the circumstances surrounding Gary's videotaped statement, we find that Investigator Jackson and Lt. Taylor did not create a situation in which Gary's will was overborne. The evidence supports the trial court's finding that Gary gave the statement voluntarily.

We have fully considered Gary's contentions regarding the admissibility of his videotaped statement and find no grounds for reversal. Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

Wise, J., concurs. Baschab, P.J., and McMillan, and Shaw, JJ., concur in the result.

12

Docket Number
CR-05-0133


Alabama Court of Criminal Appeals


State of Alabama
v.
James Edward Gary, Jr.


Appeal from
Lee County Circuit Court
Case Number CC-2002-492


Application for Rehearing and Brief in Support of
Application for Rehearing by
James Edward Gary, Jr., Defendant

Richard Keith
Attorney for Appellant/Defendant
22 Scott Street
Montgomery, Alabama 36104
Tel. 334-264-6776


Daniel G. Hamm
Attorney for Appellant/Defendant
560 S. McDonough St., Ste A
Montgomery, Alabama 36104
Tel. 334-269-0269
Fax  334-323-5666

ORAL ARGUMENT NOT REQUESTED

EXHIBIT

_5_

PENGAD 800-631-6989

# IN THE ALABAMA COURT OF CRIMINAL APPEALS

STATE OF ALABAMA,
APPELLEE

v.

JAMES EDWARD GARY, JR.,
APPELLANT

CASE NUMBER
CR-05-0133

## APPLICATION FOR REHEARING

**COMES NOW** the Appellant, James Edward Gary, Jr., by and through his attorneys of record, and respectfully moves this Honorable Court to set aside its dismissal of the Appellant's appeal and to review the issues presented for review. In support of the foregoing application, the Appellant shows the following:

The Lee County Circuit Court found the Appellant guilty of capital murder and imposed a life sentence without the possibility of parole. The Appellant appealed the conviction to this Honorable Court.

1

Appellant contended on appeal that the trial court erred to reversal whereby the trial court denied Appellant's motion to suppress his video taped statement. Specifically, Appellant contends that the trial court failed to suppress the statement based on the grounds that (1) Appellant had made requests to speak to a lawyer at different times when giving his statement; and secondly, that Appellant's statement was improperly obtained though use of threats or promises.

On April 20, 2007 this Honorable Court issued an unpublished memorandum affirming the Appellant's conviction. This Court held that (1) Appellant did not unequivocally request counsel while he was being interviewed by police investigators, and (2) that Appellant's statement to the police was given voluntary.

**WHEREFORE**, Appellant respectfully requests that this Honorable Court reconsider and set aside its decision, and upon review of the issues presented on appeal, to overturn his conviction and remand his case to the trial court with instructions directing that

2

Appellant's statement shall be inadmissible as evidence.

**RESPECTFULLY SUBMITTED** this the 4th day of May, 2007.


_Daniel G Hamm_
DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL HAMM, P.C.**
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, AL 36104
TELEPHONE    334-269-0269
FAX          334-323-5666

_Richard Keith_
RICHARD K. KEITH (KEI003)
ATTORNEY FOR THE DEFENDANT
**KEITH & DUBIN**
22 SCOTT STREET
MONTGOMERY, AL 36104
TELEPHONE    334-264-6776

3

## CERTIFICATE OF SERVICE

This is to certify that I have this day placed a copy of this Application for Rehearing in the United States Mail with sufficient postage for first class delivery to the attorneys named below.

**DONE** this the 4th day of May, 2007.

DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL G. HAMM, P.C.**
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, ALABAMA 36104
TELEPHONE     334-269-0269
FAX           334-323-5666

Office of the Attorney
General
Alabama State House
11 S. Union Street
Montgomery, Alabama 36130

4

## TABLE OF CONTENTS

Table of Contents...................................5

Statement of the Facts.............................6

Argument...........................................8

Conclusion........................................10

    Relief Sought.................................10

Certificate of Service............................11

## STATEMENT OF THE FACTS

In addition to James Gary adopting the *Statement of the Facts* as presented in the initial brief, Gary provides the following facts pertinent to this application:

For the purposes of this application for rehearing the statement of facts are relatively simple.

Defendant appealed the trial court's denial of his motion to suppress his statement wherein the state alleged that he confessed to being part of the offense of capital murder. The State introduced at trial a video taped statement that alleged to show that Gary confessed to the offense. Gary contends that during the course of the statement he made requests for the assistance of counsel. In support of Gary's motion to suppress the statement Gary presented a transcript of what was said on the video. The State disputed the exact wording of the transcript and the interpretation of what was said on the video tape and provided the trial court with its own transcript of the statement. The trial court overruled the motion to suppress and

6

found that the statement was given voluntarily. Gary appealed an on April 20, 2007 this Honorable Court issued an unpublished memorandum affirming Gary's conviction. This Court held that (1) the video-taped statement given by Gary did not show that Gary tell the police investigators, "I want to talk to my Lawyer" and that Appellant did not unequivocally request counsel while he was being interviewed by police investigators, and (2) that Appellant's statement to the police was not induced by threats or promises and that Gary voluntarily gave the video-taped statement.

Appellant now respectfully objects to this Court's decision and moves this Honorable Court to reconsider its decision to affirm Gary's conviction.

7

**ARGUMENT**

In addition to James Gary adopting the *Argument* as presented in his initial brief, Gary provides the following argument pertinent to this application:

Mr. Gary respectfully asks that this court reevaluate the contents of the video-taped statement. Specifically, the vital portions of the statement include two unequivocal instructions stating, "[...] I want to talk to my lawyer [...]." Respectfully, this Honorable Court has misapprehended the contents of the video-taped statement and should have held that the trial court's ruling on the motion to suppress was clearly erroneous.

Further, Gary argues that the State obtained his statement though use of threats and/or promises. Gary contends that this Honorable Court has misapprehended the impact of the effect that the investigators words had on the Gary during the statement. Clearly, the investigators statements toward Gary would lead any reasonable individual to believe that he was going to be sentenced to death if he did not admit to the

8

version of the story that the investigator was attempting to procure from the defendant. The investigator virtually promised that he would help Gary avoid the death penalty if he told him what the investigator wanted to hear. The investigator did not merely state what the possible punishment was if convicted of a capital murder offense, the investigator clearly threatened to seek the death penalty if Gary did not cooperate.

Gary respectfully request that this court reevaluate the contents of the statement and consider the overall effect of the investigators words towards Gary.

## CONCLUSION

RELIEF SOUGHT

James Gary respectfully asks this Honorable Court to grant the foregoing Application for Rehearing; and upon reviewing the record, to overturn his conviction and remand his case to the trial court with instructions directing the trial court to suppress Gary's statement from being admissible as evidence.

**RESPECTFULLY SUBMITTED** this the 4th day of May, 2007.

DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL HAMM, P.C.**
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, AL 36104
TELEPHONE      334-269-0269
FAX            334-323-5666

RICHARD K. KEITH (KEI003)
ATTORNEY FOR THE DEFENDANT
**KEITH & DUBIN**
22 SCOTT STREET
MONTGOMERY, AL 36104
TELEPHONE      334-264-6776

10

## CERTIFICATE OF SERVICE

This is to certify that I have this day placed a copy of this Application for Rehearing and Brief in the United States Mail with sufficient postage for first class delivery to the attorneys named below.

**DONE** this the 4th day of May, 2007.

DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL G. HAMM, P.C.**
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, ALABAMA 36104
TELEPHONE    334-269-0269
FAX          334-323-5666

Office of the Attorney
General
Alabama State House
11 S. Union Street
Montgomery, Alabama 36130

11

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

**Lane W. Mann**
  **Clerk**
**Gerri Robinson**
  **Assistant Clerk**



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 229-0521

May 11, 2007

**CR-05-0133**

James Edward Gary, Jr., alias v. State of Alabama  (Appeal from Lee  Circuit Court: CC02-492)

## <u>NOTICE</u>

You are hereby notified that on May 11, 2007 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

**cc:** Hon. Corinne Tatum Hurst, Circuit Clerk
  Daniel Gary Hamm, Attorney
  Richard K. Keith, Attorney
  Hon. Marc Bass, Asst. Attorney General



EXHIBIT
6

Alabama Supreme Court
Docket Number
No._____


State of Alabama
v.
James Edward Gary, Jr.


Appeal from
Lee County Circuit Court
Case Number CC-2002-492

Court of Criminal Appeals Case Number
CR-05-0133


Petition for Writ of Certiorari
by
James Edward Gary, Jr., Petitioner/Defendant


Richard Keith
Attorney for Appellant/Defendant
22 Scott Street
Montgomery, Alabama 36104
Tel. 334-264-6776


Daniel G. Hamm
Attorney for Petitioner/Defendant
dhamm@dghlegal.com
Daniel Hamm, P. C.
560 South McDonough Street
Montgomery, Alabama 36104
Tel. 334-269-0269
Fax  334-323-5666

EXHIBIT
7
PENGAD 800-631-6989

# IN THE SUPREME COURT OF ALABAMA

|  |  |
|---|---|
| **STATE OF ALABAMA** | **CASE NUMBER** |
| **v.** | **NO._____** |
| **JAMES EDWARD GARY, JR.,** | **ALABAMA COURT OF CRIMINAL** |
| **APPELLANT/DEFENDANT** | **APPEALS CASE NUMBER** |
|  | **CR-03-0017** |

## PETITION FOR WRIT OF CERTIORARI

**COMES NOW** the Petitioner, James Edward Gary, Jr., by and through his attorneys of record, and respectfully moves this Honorable Court to set aside the Alabama Court of Criminal Appeals affirmance of the Appellant's conviction and to overturn the conviction and issue an Order directing the trial court to schedule a new trial. In support of the foregoing Petition, the appellant shows the following:

## INTRODUCTION

James Edward Gary, Jr. was convicted in the Lee County Circuit Court for Capital Murder in violation of *§ 13A-6-40, Code of Alabama, 1975*. Gary appealed the conviction to the Alabama Court of Criminal Appeals. Gary argued on appeal that the trial court erred to reversal when it failed to grant his motion to suppress his statement on the grounds that Gary's constitutional right to an attorney was violated when he was refused counsel after informing investigators that he wanted to speak to an attorney. Further, Gary contends that his statement was coerced by threats and promises by the investigators.

The Alabama Court of Criminal Appeals issued an unpublished opinion (See attached Exhibit A) on April 20, 2007 holding that (1) Gary did not unequivocally request counsel while he was being interviewed by police investigators, and (2) that Gary's statement to the police was given voluntary. Gary filed an Application for Rehearing on May 11, 2007. The Alabama

2

Court of Criminal Appeals overruled the Application for Rehearing on May 18, 2007.

### GROUNDS FOR ISSUANCE OF WRIT

This is a case in which the petitioner is serving a sentence of life without the possibility of parole. The issues in this case meet this Court's criteria for review pursuant to Rule 39 of the Alabama Rules of appellate Procedure. Petitioner respectfully requests that this Court grant his Petition for Writ of Certiorari to review the following erroneous finding of the court below.

**Issue One: Mr. Gary was denied his constitutional Right to Assistance of an attorney while being interrogated.**

The Court should grant the certiorari petition pursuant to Rule 39(a)(1)(A) of the Alabama Rules of Appellate Procedure because the decision below violates the Sixth Amendment to the United States Constitution.

James Gary contends that the trial court erred when it denied his motion to suppress the statement

3

that he made to the police. Specifically, Gary contends that he requested an attorney during the statement on four different occasions and that the officers ignored each request and completed the interrogation. Gary's statement was video taped and later introduced as evidence at his trial. As part of the hearing pursuant to Gary's motion to suppress his video taped statement, both parties submitted transcripts of the video to the trial court that included conflicting transcriptions of what was said by Gary during the interrogation. The trial court denied Gary's motion to suppress and proceeded to trial where the video taped statement was introduced into evidence.

The United States Supreme Court has held that when a person undergoing a custodial interrogation "indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona, 384 U.S. 436, 473 (1966)*. The Supreme Court further expanded and delineated *Miranda* by requiring that a suspect must unambiguously request counsel. *Davis v. U.S., 512 U.S.*

4

*452*. The term unambiguously does not require the suspect to use any particular word order or choice, to effectively make a request for counsel. The Court in *Davis* stated, although the suspect need not "speak with discrimination of an "Oxford don", he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. While the officers have no obligation to stop questioning the suspect *if* the suspect's statement is ambiguous or equivocal, the suspect's assertion in a request for counsel must be, "at a minimum, some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)*.

Gary's four requests for an attorney, although not spoken with the discrimination of an "Oxford don", were at a minimum reasonably construable as an expression for the desire for the assistance of an attorney. Although discrepancies exist in the transcripts of the

5

videotaped interview, the four separate and distinct repetitious requests for counsel were at a minimum, an expression of desire for assistance of an attorney. The State only contested two of the four requests for legal counsel made by Gary in its *Brief in Opposition to Defendant's Motion to Suppress*:

  a. Discrepancy One:

    1. Defendant's Transcript:

    "If you know what I'm saying, you saying you gonna put something like that on me then **I want to talk to my lawyer then…**" (Emphasis added).

    2. State's Transcript:

    "if you know what I'm saying, you saying you gonna put something like that on me, **then you might as well talk to my lawyer then…**" (Emphasis added).

  b. Discrepancy Two:

    1. Defendant's Transcript:

    "**I want to talk to my lawyer man** cause I'm telling you I didn't do no shit like that man…" (Emphasis added).

    2. State's Transcript:

    "**Man, you can talk to my lawyer, man.** Because I'm telling you I ain't got nothing to do with no shit like that, man." (Emphasis added).

The State failed to raise any objection to the other two requests for assistance of counsel by Gary. The State conveniently left these other two requests for counsel out of their Reply Brief to Defendant's Motion to Suppress, because the other two requests, coupled with either interpretation of the two statements contested, were reasonably understood as requests for counsel by Sergeant Jackson, then denied by his following response, omitted from the State Brief, as follows:

TRANSCRIPT EXCERPTS AS INTERPRETED BY THE STATE

(p. 19 of Gary Transcript)

**Sgt. Jackson:** "What I'm telling you right now is that this thing is going to go the distance today. It's going the distance its over with and my only hope is that you are going to tell the truth."

**Gary:** "Well only hope is y'all saying *if y'all got me on this I might as well stop talking now and talk to my lawyer* cause I'm telling you man I ain't had no dealings with that man in no kind of way as far as he got me out on bond and worried the shit out of me about that money man as far as that that's it. That's it you know what I'm saying. *If you know what I'm saying, you saying you gonna put something like that on me, then*

7

*you might as well talk to my lawyer then...*" (Emphasis added).

(p. 20 of Gary Transcript)

Sgt. Jackson: "Alright. *Well you just sit here man its gonna be a while like I said its gonna be a while. But you know, I would like to show you something...*" (Emphasis added).

Gary:    "Show...show...I would like to see it."

Sgt. Jackson: "Well you know I hate to see somebody make the decision to not tell the truth and that they suffer for the rest of their life and it's a big decision. That's a big choice.

Gary:    "Man, *you can talk to my lawyer, man*. Because I'm telling you I ain't got nothing to do with no shit like that, man. (Emphasis added).

(p. 21 of Gary Transcript)

Gary: "*Show me what you have to show me other than that talk to my lawyer*. I would like to see it though. (Emphasis added).

Alabama requires that the prosecution bear the burden of showing that subsequent events (after the accused expresses desire to deal with the police only through counsel) indicated a waiver of the Fifth Amendment right to counsel during the interrogation. *Ex*

8

parte *Gospodareck, 666 So.2d 844 (Ala. 1995) quoting Oregon v. Bradshaw, 462 U.S. 1039.* By the trial court denying Gary's Motion to Suppress without addressing Sergeant Jackson's refusal of counsel to Gary, upon reasonably recognizing his request, the State prosecution has not met this burden and therefore Gary's statements made after his multiple requests for counsel are due to be suppressed and his sentence and conviction arising from those statements vacated.

Gary respectfully requests that this Honorable Court grant his Petition for Writ of Certiorari and review the video tape evidence and to overrule the decision of the Alabama Court of Criminal Appeals.

**Issue Two: Mr. Gary's Constitutional right against self incrimination was violated when officers obtained a confession by threat and promises.**

The Court should grant the certiorari petition pursuant to Rule 39(a)(1)(A) of the Alabama Rules of Appellate Procedure because the decision below violates

9

the Fifth and Fourteenth Amendments to the United States Constitution.

Specifically, Gary contends that his statement was induced by the officer's promises that he would receive a lighter sentence, and because of the officer's threats of manipulation of the court if Gary choose not to assist them. The officers told Gary that he had a little power that he could use to either help him or have him electrocuted.

The Trial Court erred by not suppressing Gary's inculpatory statements that were made in custody after the interrogating officer induced the confession by promising a hope of a lighter sentence and threats of manipulation of the court. The test for the voluntariness of an extrajudicial confession or an inculpatory statement is whether, in light of all the surrounding circumstances, the statement was free from inducement, threat, or promise, either express or implied, that would have produced in the mind of the accused any fear of harm or hope of favor. *Eggers v. State*, *914 So.2d 883 (Ala. Crim. App. 2004)*. A

10

confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. *Hardy v. State, 920 So.2d 1117 (Ala. Crim. App. 2005)*. Whether the threat or promise is true or false, if it operates in the mind of the accused, to produce the apprehension of harm, or hope or favor, inducing a confession, it must be excluded from the consideration of the jury. *Wallace v. State, 275 So.2d 634, 636 (1973)*.

Investigator Taylor induced Gary's statements by producing in Gary's mind an implied promise of hope of leniency, coupled with express and implied promises, producing fear in Gary's mind directly before he made inculpatory statements. Taylor's statements were not made to appeal to Gary's morality, but to threaten two life sentences and the electric chair if he did not confess:

(p. 28 of Gary Transcript)

**Taylor:** "I'm sorry but let's get it over with. *Because if you don't James you're looking at*

11

*going to trial for capital murder. Now capital murder and murder is two different things. Capital murder means that you can possibly get the death penalty for capital murder. Murder means that you just do life in prison that you could get life in prison. You could get 5 years but you could get life in prison. Now* <u>the difference is in my opinion the difference is James. That's the difference not whether or not they charge you with capital murder or not but the difference is going to depend on James.</u> (Emphasis added).

(p. 32 of Gary Transcript)

*And all I'm telling you is you can believe me if you want* <u>but they're gonna do one of two things. You can either say I'm sorry and tell the truth as far as you're concerned about the case or you can just say to hell with it y'all ain't got nothing on me and let them take everything that they got and take you to court and you will lose. Listen to me. You will lose.</u> (Emphasis added).

(p. 33 of Gary Transcript)

**Taylor:** You don't have to believe me cause what I'm going to suggest is this. <u>*I'm going to go ahead and say to hell with you and present you as being the ring leader that is a ruthless fucking killer that don't ever need to get out of jail. That's what I'm going to do.*</u> And <u>*I'm going to do everything in my power in Russell County to make sure that we treat you that way in jail for the rest of the time*</u> because I think that's possible...*I think it's very possible and I think that when we get done because* <u>*I've got a little bit of power and a little bit of influence*</u> and <u>*when they call me as an expert witness*</u> in homicide <u>*I'm*</u>

12

***going to tell them that guy never ever needs to be out from behind bars. Or you need to put him, strap him to the chair and get rid of him he's useless***. Because other than that you've given me no reason to, other that that you give this man no reason to. ***Without your side and you being honest and you telling us what happened in this house. We have no choice James but to point to you and say the son of a bitch that don't never need to be out of jail again believe me when I tell you that's him***. (Emphasis added).

Gary's next four statements from page 34 of his transcript following Taylor's promise of leniency and threat of using his influence to get him treated badly in jail for the rest of the time and get him strapped to the electric chair:

**Gary:** I didn't kill nobody.

**Gary:** I didn't kill nobody man. I'm talking about that shit eat at me every day man. That mother fucker there crazy man.

**Gary:** That mother fucker crazy man.

**Gary:** He went up in there man. ***Okay see you got to promise me man***. (Emphasis added).

While any promise or inducement, however slight, either *direct or implied*, will render a confession involuntary, the test that must be applied in determining the voluntariness of the confessor's

13

statements is whether the confessor's will was overborne at the time he confessed (emphasis added). *Agee v. State, 465 So.2d 1196 (Ala. Crim. App., 1984)*. Investigator Taylor created an immediate apprehension of harm by threatening Gary with his power and influence in Russell County. Gary's will was overborne at the time of his confession through implied promises of not testifying against him and express promises of harsher punishment. Gary's immediate following statements produced inculpatory statements and confessions that were procured only through the hope of a lighter sentence ("you could get five years, but you could get life in prison"), upon confession, along with the apprehension and fear of the electric chair, through Investigator Taylor's testimony if he did not confess.

These two results were given as the only alternatives to confession of Gary's side of the story. Furthermore, Investigator Taylor told Gary that he thought it was very possible to do this to him, because he had "a little bit of power… and a little bit of

14

influence... and would tell them you need to put him (Gary) strap him to the [electric] chair and get rid of him he's useless." Using the fear of death by his own "expert witness testimony", Investigator Taylor induced all statements made after his assertions of personally seeing to it that Gary get the electric chair. These express statements did in fact induce Gary's inculpatory statements, as evidenced by the transcript, which shows the confession came immediately following the threats and implied promises of leniency (Taylor not telling the jury to strap him to the chair), in exchange for his confession.

Exhortation to the accused to tell the truth does not imply promise or inducement, which will render a confession involuntary. *Ready v. State, 574 So.2d 894 (Ala. Crim. App., 1990)*. Any confession induced by promise or offer of a collateral benefit lacks voluntariness as much as a confession induced by offer or promise of a direct benefit. *Slaten v. State, 387 So.2d 855 (Ala. Crim. App., 1978)*. In this case, Gary's inculpatory statements and subsequent confession was

15

not coerced by a psychiatric sense of morality persuasion for the truth, nor was it freely given. Gary's statements were the product of a promise by Investigator Taylor to tell the jury to "strap him to the chair" because he had "power…and influence in Russell County." Taylor's statement was not only an implied promise to use his power and influence to make sure Gary received the death penalty, but also an implied offer of not testifying against him, for the return of a confession of his side of the story, meliorating his sentence only through his confession Supra at note 11 (holding that if inducement or profit or benefit is held out or if any hope is engineered or encouraged the prisoner's case will be lightened, meliorated or more favorably dealt with if he will confess, confession thereby super induced is inadmissible)(emphasis added). Because Gary made all statements regarding his arrest directly after the threats and promises by Investigator Taylor, those inculpatory statements were the direct product of an overborne will and inspiration of alarm, dread, and

16

fear, which makes his confession inadmissible. All statements made by Gary after Investigator Taylor's threats and promises are due to be dismissed and the conviction resulting from those confessions vacated.

## CONCLUSION

**WHERFORE,** Petitioner respectfully requests that this Honorable Court grant certiorari to review the judgment of the Alabama Court of Criminal Appeals in this case and reverse his conviction.

**RESPECTFULLY SUBMITTED** this the 25th day of May, 2007.

_____
DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL HAMM, P.C.**
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, AL 36104
TELEPHONE      334-269-0269
FAX            334-323-5666

_____
RICHARD K. KEITH (KEI003)
ATTORNEY FOR THE DEFENDANT
**KEITH & DUBIN**
22 SCOTT STREET
MONTGOMERY, AL 36104
TELEPHONE    334-264-6776

17

## CERTIFICATE OF SERVICE

This is to certify that I have this day placed a copy of this Petition for Writ of Certiorari in the United States Mail with sufficient postage for first class delivery to the attorneys named below or parties if not represented by counsel.

**DONE** this the 25th day of May, 2007.


DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL G. HAMM, P.C.**
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, ALABAMA 36104
TELEPHONE    334-269-0269
FAX          334-323-5666


Office of the Attorney General
Alabama State House
11 S. Union Street
Montgomery, Alabama 36130

18

# EXHIBIT A

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
Montgomery, AL 36130-1555

RELEASED

APR 20 2007

CLERK
ALA COURT CRIMINAL APPEALS

**PAMELA W. BASCHAB**
**Presiding Judge**
**H.W."BUCKY" McMILLAN**
**GREG SHAW**
**A. KELLI WISE**
**SAMUEL HENRY WELCH**
**Judges**

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-05-0133                    Lee Circuit Court CC-02-492

James Edward Gary, Jr. v. State

WELCH, Judge.

James Edward Gary, Jr., was convicted of one count of capital murder in connection with the killing of Thurman Ratliff.[1] The offense was made capital because Gary committed

---

[1]Gary's codefendants were Michael David Carruth and Jimmy Lee Brooks, Jr. The consequences to these individuals for their involvement in this murder is unclear from the instant record. However, we note that Carruth and Brooks are under a sentence of death following their convictions, as codefendants, in another unrelated capital murder of a 12-year old boy.

1

the murder during the course of a first-degree robbery, a violation of §13A-5-40(a)(2), Ala. Code 1975. After a sentencing hearing, the jury unanimously recommended that Gary be sentenced to life in prison without the possibility of parole. The trial court accepted the jury's recommendation and sentenced Gary accordingly.

Because the only issues raised on appeal concern whether the trial court erred in denying Gary's motion to suppress a videotaped statement he made to the police on February 19, 2002, a brief rendition of the facts will suffice.

The record shows the following. The bodies of Thurman Ratliff and his wife, Katherine, were discovered in their Opelika home by their adult daughter, Katrina Sue Ratliff, early in the afternoon of January 30, 2002. Thurman Ratliff was discovered lying face down on the den floor. He had been shot in the hand, the lower back, and in the back of the head. Katherine Ratliff was discovered lying face down in a bedroom. She had been shot in the shoulder, once in the leg, once in the left foot, and three times in the back of the head. The deaths were determined to be homicide by multiple gunshot wounds.

The investigation disclosed that the back door into the residence was the point of entry and that the door had clearly been forced open. The interior of the Ratliffs's home and the attic had been rifled through and the return for the air conditioner had been "ripped open." (R. 1657) Based on the appearance of the home, one officer opined that "somebody was looking for something." (R. 1652.) It was concluded, based on the investigation, that searching for "money was the motive for entering the home." (R. 1758.) An unopened safe containing $87,000.00 in cash was found hidden in the bathroom. (R. 1692.) Shell casings and bullets were retrieved from the crime scene.

The investigation of these murders led police to the home of Katrina Jackson, the mother of Gary's two children. Jackson testified that Gary was unemployed and owed money to Michael David Carruth, a bail bondsman who had bailed him out of jail. Jackson testified that Carruth came to her house more than once to discuss with Gary the debt incurred when Carruth bailed him out of jail.

2

Nine-millimeter shell casings fired during a New Year's Eve celebration were gathered from Jackson's yard as evidence. It was later determined that these shell casings were fired from two 9mm weapons. A 9mm shell casing taken from Jackson's yard matched a 9mm shell casing taken from the Ratliffs's den. Two 9mm shell casings taken from the Ratliffs's bedroom matched one 9mm shell casing taken from the den and matched two 9mm shell casings taken from Jackson's yard.

During a search of Jackson's home, police found $4,800 in cash that she said Gary had given her around the time of the Ratliffs's deaths.

## I.

Gary contends that the trial court erred in denying his motion to suppress the statement he made to law enforcement officials despite what Gary he said were repeated requests for an attorney.

Before trial, Gary moved the trial court to suppress the videotaped statement he made to law enforcement officials on February 19, 2002, during his interrogation by Lee County Sheriff's Investigator Vann Jackson and Lt. Heath Taylor of the Russell County Sheriff's Department. In that statement, Gary confessed to taking part in the murder of Thurman Ratliff.

The suppression hearing was held outside the presence of the jury; therefore, we review the evidentiary findings of the trial court under the ore tenus standard. Ex parte Jackson, 886 So. 2d 155, 159 (Ala. 2004).

> "Where evidence is presented to the trial court
> ore tenus in a nonjury case, a presumption of
> correctness exists as to the court's conclusions on
> issues of fact; its determination will not be
> disturbed unless clearly erroneous, without
> supporting evidence, manifestly unjust, or against
> the great weight of the evidence. Odom v. Hull, 658
> So. 2d 442 (Ala. 1995). However, when the trial
> court improperly applies the law to the facts, no
> presumption of correctness exists as to the court's
> judgment. Ex parte Board of Zoning Adjustment of

3

the City of Mobile, 636. So. 2d 415 (Ala. 1994).

"[Ex parte Agee], 669 So. 2d [102,] at 104 [(Ala. 1995)]. 'Where the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and [this Court] will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court's application of the law to those facts."

Jackson, 886 So. 2d at 159.

In determining whether the statement at issue was due to be suppressed, the Court first had to determine what Gary actually said in certain portions of the videotaped statement. Gary contends that he made four statements in which he requested an attorney; the specific language of two of those statements is in dispute.

The language of those disputed statements is set forth below. Gary's versions of those statements are as they are set forth in Gary's brief in support of his motion to suppress (with the disputed portions underlined), followed by the State's versions of the disputed portions of the statements, which appear as court reporters transcribed the videotape of Gary's statement to law enforcement officials.

GARY'S VERSION

"Gary: That's it you know what I'm saying. <u>If you know what I'm saying, you saying you gonna put something like that on me then I want to talk to my lawyer then</u> and its, just that cause it ain't me bro.

(CR. 192, Brief in Support of Defendant's Motion to Suppress.)

STATE'S VERSION

"Gary: That's it. Do you know what I'm saying, <u>if you know what I'm saying, you saying, you going to put something like that on me, then you might as well talk to my lawyer then</u>, and it's just that because it ain't me, bro.

4

(R. 484-85, law enforcement transcription, and R. 944, Transcript of Suppression Hearing.)

The second statement in which language is disputed is as follows:

GARY'S VERSION

"Jackson: Well you know I hate to see somebody make the decision to not tell the truth, and that they suffer for the rest of their life and it's a big decision. That a big choice.

"Gary: <u>I want to talk to my lawyer man cause I'm telling you I didn't do no shit like that man</u>. That's on everything man. Everything. My children everything man. I ain't got shit to do with no shit like that.

(CR. 192, Brief in Support of Defendant's Motion to Suppress.)

STATE'S VERSION

"Jackson: ... That's a big choice.

"Gary: <u>Man, you can talk to my lawyer, man</u>. Because I'm telling you I ain't got nothing to do with no shit like that, man.

(R. 485, law enforcement transcription, and R. 945, Transcript of Suppression Hearing.)

Two of the statements that Gary contends indicate he requested an attorney contain language not in dispute. Those statements are as follows:

"Jackson: When you gonna have to face the music. What I'm telling you right now is that this thing is going to go the distance today. It's going the, distance its over with and my only hope is that you are going to tell the truth.

"Gary: <u>Well, only hope. Y'all are saying y'all got me on this, I might as well stop talking now and</u>

5

> y'all talk to my lawyer because I'm telling you,
> man, I ain't had no dealings with that man in no
> kind of way as far as he got me out on bond and
> worried the shit out of me about that money, man.

(R. 484, law enforcement transcription, and R. 944, Transcript of Suppression Hearing.)

The second statement whose language is not disputed but whose meaning is at issue is as follows:

> "Jackson:    Well I'm telling you man.    We been
> working on it and uh we were trying to provide you
> an opportunity to tell your side and uh that's why
> I wanted to talk to you, to give you that
> opportunity and uh you know if you want to continue
> to and these boys are putting everything on you and
> if you continue to not tell the truth about what
> happened then I want you to know exactly what your
> up against cause everybody is saying you did it.
> Other people out there that don't know you was
> saying you was with them and uh....
>
> "Gary:    Uh, show me what you got to show me, other
> than that, talk to my lawyer.    I would like to see
> it, though."

(R. 488-89, law enforcement transcription, and R. 948, Transcript of Suppression Hearing.)

The record shows that the trial court viewed the videotaped statement. Pursuant to the ore tenus rule, it was up to the trial court to resolve the alleged discrepancies between what the parties said was the specific language used in the disputed statements. Although the trial court did not specifically set out his findings of fact, for reasons discussed below, the court had to have found that Gary said "y'all talk to my lawyer" instead of "I want to talk to my lawyer," as Gary, in his motion to suppress, contended was actually said. Based on our review of the evidence, we cannot say that the trial court's determination was clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.

6

After determining the specific language Gary used during his interrogation, the trial court had to determine whether Gary unequivocally requested a lawyer during questioning.

"After a suspect has made a clear and unequivocal request that he or she does not wish to proceed with an interrogation until an attorney is present, the questioning must cease until an attorney has been made available or the suspect initiates contact with the authority and voluntarily and knowingly waives the right to be represented by counsel." Robinson v. State, 698 So. 2d 1160, 1163 (Ala. Crim. App. 1997), citing Arizona v. Roberson, 486 U.S. 675 (1988).

"The applicability of the '"rigid"' prophylactic rule' of Edwards [v. Arizona, 451 U.S. 477 (1981),] requires courts to 'determine whether the accused actually invoked his right to counsel.' Smith v. Illinois, 469 U.S. 91, 95 (1984), quoting Fare v. Michael C., 442 U.S. 707, 717 (1979). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. See Connecticut v. Barrett, 479 U.S. 523, 529 (1987). Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' McNeil v. Wisconsin, 501 U.S. [171] at 178 [(1991)]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning....

"Rather, the suspect must unambiguously request counsel. As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.' Smith v. Illinois, 469 U.S. at 97-98 (brackets and internal quotation marks omitted). Although a suspect need not 'speak with the discrimination of an Oxford don,' post, at 476, 114 S.Ct. At 2364 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable

7

police officer in the circumstances would understand
the statement to be a request for an attorney.  If
the statement fails to meet the requisite level of
clarity, <u>Edwards</u> does not require that the officers
stop questioning the suspect."

<u>Davis v. United States</u>, 512 U.S. 452, 458 (1994)(emphasis
added in <u>Davis</u>).

The Alabama Supreme Court has cited favorably the
O.E.D.'s definition of "equivocal," that is, "having different
significations equally appropriate or plausible; capable of
double interpretation; ambiguous." 5 <u>Oxford English Dictionary</u>
359 (2d ed. J.A. Simpson & E.S.C. Weiner, eds., 1989), <u>Ex
parte Cothren</u>, 705 So. 2d 861, 866 (Ala. 1997).

Alabama appellate courts have considered a number of
cases in which the issue was whether a suspect under
questioning had made an unequivocal request for an attorney.
The query, "Where's the counselor?" was held not to be a clear
request for an attorney.  <u>Gray v. State</u> 507 So. 2d 1026, 1029
(Ala. Crim. App. 1987).  We held that the question, "Is it
going to piss y'all off if I ask for my -- to talk to a friend
that is an attorney? I mean, I'm going to do whatever I have
got to do.  Don't get me wrong," was "certainly not an
unambiguous request for counsel as required by <u>Davis</u>." <u>Brown
v. State</u>, 668 So. 2d 102, 103 (Ala. Crim. App. 1995).  The
Alabama Supreme Court held that the comment, "I think I want
to talk to an attorney before I answer that," could have been
directed at one specific question asked by the police and not
the entire interrogation, as the policeman conducting the
interrogation believed.  Thus, the Court said, the statement
was capable of equally plausible, differing interpretations
and, therefore, equivocal.  <u>Cothren v. State</u>, 705 So. 2d 861
(Ala. 1997).

In denying Gary's motion to suppress, the trial court
determined that Gary did not unequivocally request an attorney
during his questioning.  As discussed above, the trial court
obviously determined that Gary consistently told Investigator
Jackson that "y'all" could talk with his attorney, as opposed
to "I want to" talk with his attorney.  In telling Jackson
that <u>Jackson</u> could speak with Gary's lawyer, Gary did not make
an unequivocal request to speak with an attorney.  The

8

statement is capable of equally plausible, differing interpretations.

Accordingly, we cannot say that the trial court erred in denying Gary's motion to suppress his statement to law enforcement on the ground that Gary had requested an attorney during his interrogation by law enforcement.

## II.

Gary also contends that the trial court erred in denying his motion to dismiss because, he says, his statement was induced by what he said were Lt. Taylor's promises that Gary would receive a lighter sentence and would receive the death penalty if he did not assist law enforcement by giving a statement.

Whether a statement or confession was given voluntarily is initially a question to be determined by the trial court. Ex parte Singleton, 465 So. 2d 443 (Ala. 1985). The finding of the trial court on the issue of voluntariness will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Jackson v. State, 562 So. 2d 1373, 1381 (Ala. Crim. App. 1990). "Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty." Id., citing Chambers v. State, 455 So. 2d 1008 (Ala. Crim. App. 1984).

The general rule is that for a suspect's statement to law enforcement to be admissible, "the State must show that the defendant was advised of his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966), and its progeny, and that the defendant gave the statement after making a voluntary and knowing waiver of those rights." Robinson v. State, 698 So. 2d 1160, 1162. (Ala. Crim. App. 1997), and cases cited therein. Promises or threats by law enforcement officials during the interrogation may make a statement involuntary, however. Id. at 1162-63. "It is well settled that '[a]ny implied promises, however tenuous, render a statement to the police involuntary and the product of coercion." Johnson v.

9

State, 673 So. 2d 796, 799 (Ala. Crim. App. 1995), quoting Franklin v. State, 621 So. 2d 364, 367 (Ala. Crim. App. 1992).

Whether the statement was made voluntarily and was not the product of coercion must be determined on a case-by-case basis, in consideration of the particular facts and circumstances of each case, including the background, experience, and conduct of the accused -- in other words, the determination must be made based upon the totality of the circumstances. Jackson v. State, 562 So. 2d at 1380.

> "The fundamental requirements for voluntariness of confessions are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him. [Internal citations omitted.] The test is whether, considering the totality of the circumstances, law enforcement officials have overborne the will of the accused. [Internal citations omitted.] The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. [Internal citations omitted.] The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. [Internal citations omitted.]"

Id. at 1380-81.

In this case, the record shows that Gary was read his Miranda rights and no promises or threats were made. The videotape of the statement shows that Gary signed the waiver of rights form with no hesitation. The interrogation consisted of Investigator Jackson and Lt. Taylor speaking to Gary at different times. During the course of the interrogation Investigator Jackson and Lt. Taylor informed Gary that the two men who were with him had both given statements explaining their roles in the Ratliffs's murders and that they were saying Gary was the "main one" in

10

committing the murders.  (R. 471 and 1943.)  Both laid out the evidence that they had against Gary.

Both Investigator Jackson and Lt. Taylor told Gary that he needed to tell his side of the story -- that his side of the story could mean the difference between a charge of murder and a charge of capital murder, for which he could face the death penalty.  Lt. Jackson explained that even if Gary told his side of the story, he would have to face punishment for the crime.  Lt. Jackson also told Gary that judges and juries seemed to think better of defendants who admitted their mistakes, and explained the difference between someone who made a mistake and is remorseful about it and someone who is simply a bad person, who is not remorseful.  If law enforcement officials had to say that although the two co-defendants confessed and said they were sorry but Gary refused to tell what happened and acted like he did not care, in that case, Lt. Taylor said, "I'm going to tell them that guy never ever needs to be out from behind bars or you need to put him -- strap him to the chair and get rid of him.  He's useless. He's a killer.  He never needs to be let out, and if he gets out again, he'll kill again."  (R. 511 and 1975.)  Lt. Taylor then spent a lot of time playing to Gary's conscience, explaining to Gary how he and the victims' family would begin to heal if he told what happened and how much better he would feel if he was honest about what happened.

In viewing the videotape in its entirety, and in considering the totality of the circumstances, we find that the evidence supports the trial court's finding that Gary's confession was given voluntarily.  Gary was in jail for an unrelated offense at the time he was interrogated.  The interrogation and statement, which took less than two hours to complete, took place in an interview room in which one could see sunlight through the window in the room.

Gary said that he finished the eleventh grade and acknowledged that he understood the form he signed waiving his rights.  He had been to court before -- in fact, one of his co-defendants had been his bail bondsman for a previous arrest, before the Ratliffs's murders.

Despite Lt. Taylor's "tough talk," the videotape shows that the interrogation was not coercive or threatening.  Gary

was not promised anything if he confessed, in fact, the investigators told Gary that he would have to be punished for bad conduct, even if he was honest and told his side of the story. Although Gary was told that a charge of capital murder against him could result in the death penalty, he was not threatened with the death penalty if he did not cooperate.

This court has upheld a trial court's decision to admit a confession given after police explained to the defendant the difference between getting a life sentence or the death penalty. See <u>Jones v. State</u>, [Ms. CR-03-1504, Aug. 25, 2006] ___ So. 2d ___ (Ala. Crim. App. 2006); and <u>Jackson</u>, 562 So. 2d 1373. Likewise, a confession given after comments by an investigator to the effect that the defendant could help himself by telling his side of the story was also deemed a voluntary confession. <u>Brown v. State</u>, 668 So. 2d 102 (Ala. Crim. App. 1995).

In reviewing the totality of the circumstances surrounding Gary's videotaped statement, we find that Investigator Jackson and Lt. Taylor did not create a situation in which Gary's will was overborne. The evidence supports the trial court's finding that Gary gave the statement voluntarily.

We have fully considered Gary's contentions regarding the admissibility of his videotaped statement and find no grounds for reversal. Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

Wise, J., concurs. Baschab, P.J., and McMillan, and Shaw, JJ., concur in the result.

# IN THE SUPREME COURT OF ALABAMA

*84,839*
*Bass*



July 13, 2007

**1061197**

Ex parte James Edward Gary, Jr.  PETITION FOR WRIT OF CERTIORARI TO THE
COURT OF CRIMINAL APPEALS  (In re: James Edward Gary, Jr. v. State of
Alabama)  (Lee Circuit Court: CC02-492; Criminal Appeals : CR-05-0133).

## CERTIFICATE OF JUDGMENT

## Writ Denied

    The above cause having been duly submitted, IT IS CONSIDERED AND
ORDERED that the petition for writ of certiorari is denied.

    STUART, J. -  See, Lyons, Bolin, and Murdock, JJ., concur.  Cobb, C.J., recuses
herself.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this ___13th___ day of_____July,_____2007____

*Robert D Esdale Sr*

Clerk, Supreme Court of Alabama



EXHIBIT

8

/bb

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-05-0133**

James Edward Gary, Jr., alias v. State of Alabama  (Appeal from Lee  Circuit Court: CC02-492)

# CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on April 20th 2007:

## Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk**
**Court of Criminal Appeals, on this**
**the 13th day of July, 2007.**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. John V Denson, II, Circuit Judge
   Hon. Corinne Tatum Hurst, Circuit Clerk
   Daniel Gary Hamm, Attorney
   Richard K. Keith, Attorney
   Hon. Marc Bass, Asst. Attorney General

**EXHIBIT**
**9**

*Supplemental Transcript*

COURT OF CRIMINAL APPEALS NO. _CR 05-0133_

## APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____LEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO        CC 2002 492

CIRCUIT JUDGE        HON JOHN V DENSON II

Type of Conviction/ Order Appealed From:        CAPITAL MURDER

Sentence Imposed:        LIFE WITHOUT PAROLE

Defendant Indigent:        ☑ YES    ☐ NO

### JAMES EDWARD GARY JR

*Richard Keith*    *334-264-6776*        NAME OF APPELLANT

DANIEL G HAMM        334 269 0269

(Appellant's Attorney)        (Telephone No.)

*Dexter Street*

560 S MCDONOUGH ST., SUITE A

(Address)

MONTGOMERY        AL    36104

(City)        (State)        (Zip Code)

### V.

### STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df _____

_____

(For Court of Criminal Appeals Use Only)

EXHIBIT

10

PENGAD 800-631-6989

# INDEX

CASE ACTION SUMMARY -------------------------------------------------------------- 001

MOTION TO SUPPLEMENT RECORD ON APPEAL ---------------------------- 013

ORDER -------------------------------------------------------------------------------------- 016

ORDER -------------------------------------------------------------------------------------- 028

State of Alabama
Unified Judicial System

Form C-7 Rev. 2/79

# CASE ACTION SUMMARY
## CONTINUATION

Case Number

CC –2002-000492

CR-05-0133

| ID | YR | Number |

Style:  **STATE OF ALABAMA v. JAMES E. GARY, JR.**

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 05/11/06 | Motion to Amend Record on Appeal, **GRANTED.** |
| | John V. Denson, II, CIRCUIT JUDGE |

| State of Alabama<br>Unified Judicial System<br><br>Form C-7 Rev. 2/79 | | CASE ACTION SUMMARY<br>CONTINUATION | | Case Number<br>CC-02-492 | |
|---|---|---|---|---|---|
| | | | | ID      YR | Number |

**Style:**    STATE OF ALABAMA v.  GARY, JAMES EDWARD, JR.

Page Number _____ of _____ Page

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 10/12/05 | On this date, the Defendant, JAMES EDWARD GARY, JR.., along with his attorneys, Honorable Richard Keith and Honorable Daniel Hamm, appeared along with the State of Alabama being represented by District Attorney for Lee County, Alabama, Nick Abbett, and Chief Assistant District Attorney for Lee County, Alabama, David Glanzer.  This being the day set for sentencing, the Court hereby files the pre-sentence report and both the State and the defense attorneys confirmed that they have reviewed the report and the defense attorneys indicated that they had reviewed the report with their client.  The Court asked if there was any statement to be made before sentencing and both the State and the defense made statements on behalf of the State and the Defendant, respectively. The Defendant was asked if he had anything to say and he stated that he gave oral notice of Appeal. The defense attorneys stated that they were giving oral notice of Appeal and this would be followed by written notice to be filed with the Clerk.  The Court, in accordance with the jury verdict reached in this case on August 4, 2005, adjudged the Defendant guilty of CAPITAL MURDER sentenced the Defendant to life in imprisonment without parole.  A detailed, written Court Order will be filed with the Clerk immediately.  The Defendant was remanded to the custody of the Lee County Sheriff to be held without bond and transferred to the State Penal System for life imprisonment without parole. |

| State of Alabama Unified Judicial System Form C-7 Rev. 2/79 | CASE ACTION SUMMARY CONTINUATION | Case Number CC-02-492 |
|---|---|---|
| | | ID    YR    Number |

**Style:**    STATE OF ALABAMA v. GARY, JAMES EDWARD, JR.

Page Number _____ of _____ Page

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 08/04/05 | The Defendant, JAMES EDWARD GARY, JR., along with his attorneys, Honorable Richard Keith and Honorable Daniel Hamm, heretofore having been arraigned upon an indictment on the charge of CAPITAL MURDER and having pled not guilty thereto, issue joined on said plea. Thereupon comes a jury of men and women, who being duly impaneled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant, JAMES EDWARD GARY, JR., along with his attorneys, Honorable Richard Keith and Honorable Daniel Hamm, being in open Court at each and every stage and during all proceedings in this cause, now on this the 4th day of August, 2005, said jurors upon their oaths do say: <br><br> "We, the Jury, find the Defendant, JAMES EDWARD GARY, JR., guilty of CAPITAL MURDER, as charged in the Indictment." <br><br> /s/ Foreperson |
| 08/05/05 | The jury returned a unanimous verdict at the sentencing Hearing as follows: <br><br> "We, the Jury, fix the punishment of the Defendant, JAMES EDWARD GARY, JR.., at life imprisonment without parole." <br> /s/foreperson <br><br> The vote of the jury was unanimous; 12-0. |
| | The Court ordered the preparation of a pre-sentence report. The Court set the sentencing date for **October 12, 2005 at 9:00 a.m. in courtroom number four of the Lee County Justice Center.** The Defendant, JAMES EDWARD GARY, JR., was remanded to the custody of the Lee County jail to be held without bond pending the sentencing Hearing in this case. |

GCRO369   A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T E R
CASE ACTION SUMMARY
CONTINUATION
CASE: CC 2002 000492.00
JUDGE ID:  JVD

STATE  OF  ALABAMA                    VS    GARY JAMES EDWARD (JR)
------------------------------------------------------------------------
   DATE              ACTION, JUDGMENTS, CASE NOTES

4/29/05   Motion to Suppress set for Hearing on
          May 23 2005 at 9:00 a.m.

          FILED IN OFFICE  MAY 0 2 2005

                                    -4-

State of Alabama
Unified Judicial System

Form C-7  Rev. 2/79

CASE ACTION SUMMARY
CONTINUATION

Case Number

CC 02 492

ID  YR  Number

Style: _State v Gary, James Edward_ Page _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 5/9/03 | This case is continued to next term of court.. |
| | FILED IN OFFICE  MAY 1 3 2003 |
| 8/15/03 | This case is continued to next term of court.. |
| | FILED IN OFFICE  AUG 2 2 2003 |
| 9/4/03 | Renewed Motion to Transfer Defendant to Lee County Detention FAcility Pending Trial |
| 10/31/03 | This case is continued to next term of court.. |
| | FILED IN OFFICE  NOV 1 7 2003 |
| 3/16/04 | This case is continued to next term of court.. |
| | FILED IN OFFICE  MAR 1 7 2004 |
| 6/14/04 | This case is continued to next term of court.. |
| | FILED IN OFFICE  JUN 1 4 2004 |
| 7/28/04 | Motion To Set Trial No Earlier Than Spring 2005 Trial Term |
| 8-9-04 | Order granting Motion to Set Spring 05. |

5

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2002 000492.00
JUDGE ID:   RMH

STATE OF ALABAMA                    VS    GARY JAMES EDWARD (JR)

| ATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 8-27-02 | Order Setting Hearing On 9-19-20 02 — 8:00 a.m. |
| 9-6-02 | State of Alabama's Response to Gary's Various Motions that Misrepresent the Holding of Ring v. Arizona. |
| 9-11-02 | Order continuing motions generally. |
| 9/18/02 | This case is continued to next term of court.     *RMH* |
| | FILED IN OFFICE  SEP 2 0 2002 |
| 9/13/02 | Motion for Permission to Proceed Ex Parte on Application for funds |
| 9/13/02 | Ex Parte Motion for Funds for Private Investigator |
| 9/13/02 | Motion for An Order Directing Production of Records |
| 9/13/02 | Motion for The State To Place the Defendant On notice As to Any 404 b Evidence it intends To Use In Trial |
| /13/02 | Motion for Order directing The State to Notify the Accused Whether it Intends to Seek The Death Penalty If Defendant is Convicted of Captial Murder |
| 9/13/02 | Ex Parte Motion for Funds To Obtain A Mitigation Investigator |
| 9/13/02 | Ex Parte Motion to Provide Funds For EXpert Psychological Assistance |
| 10-28-02 | Order Setting Hearing On 11-7 20 02 — 9:00 a.m. |
| 11/8/02 | This case is continued to next term of court.     *RMH* |
| | FILED IN OFFICE  NOV 1 9 2002 |
| 1/17/03 | Motion to Suppress Defendant's Statements |
| 1-23-03 | Order setting pending motions on February 6, 03, at 1:00 p.m. |
| 2-6-03 | Motion to Require the Prosecution to State Exactly which Aggravating Circumstances. |
| 2/18/03 | Motion to Transfer Defedant to The Lee County Detention Facility Pending Trial |
| 2/14/03 | This case is continued to next term of court, pending labs.  *RMH* |

FILED IN OFFICE  MAR 0 3 2003

```
ACRO372                 ALABAMA JUDICIAL INFORMATION SYSTEM          CASE: CC 2002 000492.00
OPER: LEW                       CASE ACTION SUMMARY
PAGE:    1                       CIRCUIT    CRIMINAL
                                                              RUN DATE: 04/17/2002
IN THE CIRCUIT COURT OF      LEE
                                                                         JUDGE: RMH
STATE  OF  ALABAMA                  VS      GARY JAMES EDWARD (JR)
  I: CC 2002 000492.00                      1421 2ND PLACE SOUTH

                                            PHENIX CITY, AL  36867 0000

DOB: 09/09/1979          SEX: M  RACE: W  HT: 5 09  WT: 170     HR: BLK EYES: HZL
SSN: 461619936  ALIAS NAMES:
CHARGE01: MURDER CAPITAL-ROBBE CODE01: CM02  LIT: MURDER CAPITAL TYP: F #: 001
OFFENSE DATE:                               AGENCY/OFFICER: 0430020 TAYLOR/
DATE WAR/CAP ISS:                  DATE ARRESTED: 02/21/2002
DATE   INDICTED: 04/12/2002        DATE    FILED: 04/17/2002
DATE  RELEASED:                    DATE  HEARING:
BOND     AMOUNT:          5.00 N        SURETIES:
DATE 1: 04/25/2002    DESC: ARRG        TIME: 0900 A
DATE 2: 05/20/2002    DESC: JTRL        TIME: 0830 A
TRACKING NOS: GJ 2002 000262 00  /                    /
    DEF/ATY:   Hon. Daniel Hamm         TYPE:  A                        TYPE:
               Hon. Richard Keith
                          00000                          00000
PROSECUTOR: ABBETT NICK

OTH CSE: GJ200200026200 CHK/TICKET NO:                 GRAND JURY: 295
COURT REPORTER:                 SID NO:
DEF STATUS: JAIL                DEMAND:     000000000
                                                            OPER: LEW
NOTES: 4-16-02   DISCOVERY ORDER
```

| | ACTIONS,  JUDGEMENTS,  AND  NOTES |
|---|---|
| 4-17-02 | NOTICE OF ARRAIGNMENT TO DEFENDANT AND SURETIES |
| 4-19-02 | WRIT ISSUED |
| 5-17-02 | Order that the court finds the defendant indigent and appoints Hon. Richard Keith and Hon. Daniel G. Hamm.  This case is set for arraignment on June 6 2002, at 8:30 a.m. |
| 5/23/02 | Continued pending lab. RMH |
| 6/6/02 | FILED IN OFFICE MAY 29 2002  It appearing to the Court that the Defendant is without and unable to employ counsel and upon Defendant's request, the Court appoints Hon. D Hamm & R. Keith, Attorney-at-Law, to represent Defendant and assesses attorney's fee of $  Defendant in open court accompanied by attorney of record, and being duly arraigned, does plead not guilty and not guilty by reason of mental disease or defect. Defendant  at ____ and the case is ____ , 20__ , at ____ AM. |

This case is continued to next term of court, pending lab.

RMH

FILED IN OFFICE JUN 12 2002

7

```
CCS105            A L A B A M A    J U D I C I A L    D A T A  C E N T E R       CASE: CC 2002 000492.00
                                          C A S E   A C T I O N   S U M M A R Y
                                                                              CASE: CC 2002 000492.00
-----------------------------------------------------------------------------------------------------
IN THE CIRCUIT  COURT OF     LEE       COUNTY
                                                                                     JUDGE: JVD
    STATE OF ALABAMA   VS   GARY JAMES EDWARD (JR)
-----------------------------------------------------------------------------------------------------
 4/17/2002    DOCK    NOTICE SENT: 04/17/2002 GARY JAMES EDWARD (JR)
              JUDG    ASSIGNED TO: (RMH) ROBERT M. HARPER              (AR01)
              FILE    CHARGE 01: MURDER CAPITAL-ROBBE/#CNTS:  001      (AR01)
              INDT    DEFENDANT INDICTED ON: 04/12/2002               (AR01)
              DAT1    SET FOR:  ARRAIGNMENT ON 04/25/2002 AT 0900A     (AR01)
              ARRS    DEFENDANT ARRESTED ON: 02/21/2002                (AR01)
              STAT    INITIAL STATUS SET TO: "J" - JAIL                (AR01)
              FILE    FILED ON: 04/17/2002                             (AR01)
              DAT2    SET FOR:  JURY TRIAL ON 05/20/2002 AT 0830A      (AR01)
              COMM    4-16-02  DISCOVERY ORDER                         (AR10)
              DAT2    SET FOR: JURY TRIAL ON 05/20/2002 AT 0830A       (AR10)
              CASP    CASE ACTION SUMMARY PRINTED                      (AR10)
 04/19/2002   PRTY    PARTY ADDED  W007  BILL HARRIS                   (AW21)
              PRTY    PARTY ADDED  W008  SARAH REYNOLDS                (AW21)
              PRTY    PARTY ADDED  W009  LT. JACKIE SMITH              (AW21)
              PRTY    PARTY ADDED  W010  INV. SCOTT BELTON             (AW21)
              PRTY    PARTY ADDED  W011  TERRY GODWIN                  (AW21)
              PRTY    PARTY ADDED  W012  SGT. JEFF PITTS               (AW21)
              PRTY    PARTY ADDED  W013  DR. BEN BRISTOL               (AW21)
              PRTY    PARTY ADDED  W014  JOSHUA REYNOLDS               (AW21)
              PRTY    PARTY ADDED  W015  CPT. JAMES MAJORS             (AW21)
              PRTY    PARTY ADDED  W016  JIMMY LEE BROOKS JR           (AW21)
              PRTY    PARTY ADDED  W017  INV. SCOTT STOVER             (AW21)
              PRTY    PARTY ADDED  W018  KATRINA RATLIFF               (AW21)
              PRTY    PARTY ADDED  W019  INV. FREDY MARTINEZ           (AW21)
              PRTY    PARTY ADDED  W020  DAVID L VINES                 (AW21)
              PRTY    PARTY ADDED  W021  INV. TAMMY BOOTH              (AW21)
              PRTY    PARTY ADDED  W022  CATRINA JACKSON               (AW21)
              PRTY    PARTY ADDED  W023  INV. DONNIE SURRETT           (AW21)
              PRTY    PARTY ADDED  W024  RAY LANSDON                   (AW21)
              PRTY    PARTY ADDED  W025  ERNEST COLEMAN                (AW21)
              PRTY    PARTY ADDED  W026  ANDREW ELDRIDGE               (AW21)
              PRTY    PARTY ADDED  W027  SHEBA BRUTON                  (AW21)
              PRTY    PARTY ADDED  W028  MICHAEL CARRUTH               (AW21)
              CAPS    CAPIAS ISSUED ON: 04/19/2002                     (AR08)
 05/06/2002   DAT2    CASE SET ON 05/28/2002 FOR JURY TRIAL            (SS07)
              NOTF    NOTICE FLAG SET TO: N                            (SS07)
 05/20/2002   ATY1    ATTORNEY FOR DEFENDANT: KEITH RICHARD K          (AR10)
              DAT2    SET FOR: JURY TRIAL ON 09/03/2002 AT 0830A       (AR10)
              DAT1    SET FOR:  ARRAIGNMENT ON 06/06/2002 AT 0830A     (AR10)
              ATY2    ATTORNEY FOR DEFENDANT: HAMM DANIEL GARY         (AR10)
              DAT2    SET FOR: JURY TRIAL ON 08/26/2002 AT 0830A       (AR10)
              TEXT    ORDER
 05/29/2002   COMM    CONT PENDING LAB                                 (AR10)
 06/11/2002   TEXT    EX PARTE MOTION FOR EXTRAORDINARY EXPENSES
 06/13/2002   TEXT    EX PARTE MOTION FOR EXTRAORDINARY EXPENSES
 06/14/2002   TEXT    ORDER GRANTING EX PARTE MOTION FOR EXTRAORDINARY
              DAT1    EXPENSES
 06/19/2002   DAT1    DEFT'S REQUEST FOR PRODUCTION
              TEXT    ORDER
 06/24/2002   TEXT    NOTICE TO DEFT REGARDING DISCOVERY
 08/20/2002   TEXT    MOTION TO DECLARE THE ALA CAPITAL SENTENCING
              TEXT    PROCESS UNCONSTITUTIONAL AND TO BAR IMPOSITION OF
              TEXT    THE DEATH PENALTY
              TEXT    MOTION TO BAR IMPOSITION OF THE DEATH PENALTY
              TEXT    WHERE JURY'S ROLE AND FACTUAL DETERMINATIONS ARE
              TEXT    DEEMED ADVISORY
 08/26/2002   DAT1    SET FOR: PENDING MOTIONS ON 09/19/2002 AT 0800A
              TEXT    ORDER SETTING HEARING FOR 9/19/06 AT 8AM
 08/27/2002   ATTH    CAS ATTACHMENT PRINTED                           (AR08)
 09/06/2002   TEXT    STATE OF ALA RESPONSE TO GARY'S VARIOUS MOTIONS
              TEXT    THAT MISREPRESENT THE HOLDING OF RING V ARIZONA
 09/13/2002   TEXT    EX PARTE MOTION TO PROVIDE FUNDS FOR EXPERT
              TEXT    PSYCHOLOGICAL ASSISTANCE
              TEXT    EX PARTE MOTION TO PROVIDE FUNDS TO OBTAIN
              TEXT    MITIGATION INVESTIGATOR
              TEXT    MOTION FOR ORDER DIRECTING THE STATE TO NOTIFY
```

```
|------------------------------------------------------------------------------|
|IN THE CIRCUIT   COURT OF    LEE     COUNTY                      JUDGE: JVD    |
|                                                                              |
|   STATE OF ALABAMA  VS   GARY JAMES EDWARD (JR)                              |
|                                                                              |
|------------------------------------------------------------------------------|
|              TEXT    THE ACCUSED WHETHER IT INTENDS TO SEEK THE DEATH         |
|              TEXT    PENALTY IF DEFT IS CONVICTED OF CAPITAL MURDER           |
|              TEXT    MOTION FOR THE STATE TO PLACE DEFT ON NOTICE AS          |
|              TEXT    TO ANY 404B EVIDENCE IT INTENDS TO USE IN TRIAL          |
|              TEXT    MOTION FOR PERMISSION TO PROCEED EX PARTE ON APP         |
|              TEXT    FOR FUNDS                                                |
|              TEXT    EX PARTE MOTION FOR FUNDS FOR PRIVATE INVESTIGATOR       |
|              TEXT    ORDER                                                    |
| 09/16/2002   DAT2    MOTION TO CONTINUE AND CONSOLIDATION OF MOTION HEA       |
| 09/23/2002   DAT2    SET FOR: JURY TRIAL ON 11/12/2002 AT 0830A   (AR10)      |
| 10/28/2002   DAT2    ORDER SETTING A STATUS CONF ON NOV 7, 2002 9AM           |
| 10/29/2002   DAT1    SET FOR: STATUS CONF ON 11/07/2002 AT 0900A (AR10)       |
| 11/19/2002   DAT2    SET FOR: JURY TRIAL ON 02/24/2003 AT 0830A   (AR10)      |
| 01/17/2003   DAT1    MOTION TO SUPPRESS DEFTS STATEMENTS                      |
| 01/23/2003   DAT1    SET FOR: PENDING MOTIONS ON 02/06/2003 AT 0100P          |
|              DAT2    ORDER SETTING HEARING ON 2/6/2003 AT 1PM     (AR10)       |
| 01/27/2003   DAT1    MOTION TO CONTINUE                                       |
| 02/06/2003   DAT1    MOTION TO REQUIRE THE PROSECUTION TO STATE EXACTLY       |
|              DAT2    WHICH AGGRAVATING CIRCUMSTANCES UNDER 1975 CODE          |
|              DAT2    OF ALA 131-5-49 IT WILL ATTEMPT TO PROVE IF THERE        |
|              DAT2    IS A PENALTY PHASE IN THIS TRIAL                         |
| 02/18/2003   DAT1    MOTION TO TRANSFER DEFT TO LEE CO DETENTION FACILI       |
|              DAT2    PENDING TRIAL                                            |
| 03/03/2003   DAT2    SET FOR: JURY TRIAL ON 05/19/2003 AT 0830A   (AR10)      |
| 05/13/2003   DAT2    SET FOR: JURY TRIAL ON 08/25/2003 AT 0830A   (AR10)      |
| 08/22/2003   DAT2    SET FOR: JURY TRIAL ON 11/17/2003 AT 0830A   (AR10)      |
| 09/04/2003   DAT2    RENEWED MOTION TO TRANSFER DEFT TO THE LEE CO DENT       |
|              DAT2    FACILITY PENDING TRIAL                                   |
| 11/18/2003   DAT2    SET FOR: JURY TRIAL ON 02/23/2004 AT 0830A   (AR10)      |
| 03/17/2004   DAT2    SET FOR: JURY TRIAL ON 06/14/2004 AT 0830A   (AR10)      |
| 06/14/2004   DAT2    SET FOR: JURY TRIAL ON 10/25/2004 AT 0830A   (AR10)      |
| 07/28/2004   DAT2    MOTION TO SET TRIAL NO EARLIER THAN SPRING 2005          |
|              EXT     TRIAL TERM                                               |
| 08/09/2004   DAT2    SET FOR: JURY TRIAL ON 02/28/2005 AT 0830A   (AR10)      |
|              DAT2    ORDER                                                    |
| 12/03/2004   TEXT    MOTION FOR COURT TO ADOPT AVA GUIDELINES AS             |
|              TEXT    STANDARD PRACTICE                                        |
|              DAT2    MOTION FOR COURT TO ADPOT ABA GUIDELINES AS             |
|              DAT2    STANDARD PRACTICE                                        |
| 12/22/2004   TEXT    ORDER SETTING PENDING MOTIONS FOR 2/3/05 0900A           |
| 12/28/2004   DAT1    SET FOR: PENDING MOTIONS ON 02/03/2005 AT 0900A          |
| 01/13/2005   TEXT    MOTION TO TRANSPORT DEFT                                 |
| 01/14/2005   ATTH    CAS ATTACHMENT PRINTED                      (AR08)       |
| 01/18/2005   TEXT    MOTION TO RESCHEDULE                                     |
| 01/19/2005   TEXT    AMENDED EX-PARTE MOTION TO PROVIDE FUNDS FOR EXPER       |
|              TEXT    PSYCHOLOGICAL ASSISTANCE                                 |
|              TEXT    AMENDED EX-PARTE MOTION FOR FUNDS FOR PRIVATE INVE       |
|              TEXT    AMENDED EX-PARTE MOTION FOR FUNDS TO OBTAIN A            |
|              TEXT    MITIGATION INVESTIGATOR                                  |
|              TEXT    MOTION TO PLACE DEFENDANT'S FILED EX PARTE MOTION        |
|              TEXT    FOR EXTRAORDINARY FUNDS RE:EXPERT WITNESS FOR            |
|              TEXT    FOR TRIAL AND/OR MITIGATION HEARING UNDER SEAL           |
| 01/20/2005   TEXT    MOTION FOR FORENSIC PSYCHOLOGICAL EVALUATION             |
|              TEXT    MOTION FOR AN ORDER DIRECTING PRODUCTION OF RECORD       |
| 01/24/2005   TEXT    ORDER ALL PENDING MOTIONS SET FOR 2/3/05 AT 9AM          |
| 01/26/2005   TEXT    AMENDED MOTION FOR OVERHEAD EXPENSES                     |
|              TEXT    ORDER SETTING HEARING ON 2/11/05 AT 9AM                  |
| 01/27/2005   TEXT    ORDER                                                    |
| 02/14/2005   TEXT    ORDER TO TRANSPORT DEFT FROM HOLMAN CORR FAC             |
| 02/22/2005   TEXT    ORDER                                                    |
|              TEXT    ORDER                                                    |
|              TEXT    ORDER                                                    |
|              TEXT    ORDER                                                    |
|              TEXT    ORDER                                                    |
|              TEXT    ORDER                                                    |
| 02/25/2005   TEXT    ORDER                                                    |
|------------------------------------------------------------------------------|
```

CASE ACTION SUMMARY
SR CC 2002 000492.00

| IN THE CIRCUIT COURT OF | LEE | COUNTY | JUDGE: JVD |

STATE OF ALABAMA  VS  GARY JAMES EDWARD (JR)

---

| Date | Type | Description |
|------|------|-------------|
| 03/03/2005 | TEXT | ORDER FOR OUTPATIENT EVALUATION |
| 03/04/2005 | DAT2 | SET FOR: JURY TRIAL ON 06/13/2005 AT 0830A  (AR10) |
|  | COMM | SPECIAL SET 6-27-05  (AR10) |
| 03/17/2005 | TEXT | BRIEF IN SUPPORT OF DEFTS MOTION TO SUPPRESS |
| 04/18/2005 | TEXT | EX PARTE MOTION FOR FUNDS FOR JURY CONSULTANT |
|  | TEXT | MOTION IN LIMINE TO PRECLUDE THE STATE FROM |
|  | TEXT | MOVING TO ADMIT INTO EVIDENCE PREJUDICIAL |
|  | TEXT | PHOTOGRAPHS |
| 04/26/2005 | TEXT | MOTION IN LIMINE REGARDING MEDICAL EXAMINER |
| 05/02/2005 | TEXT | ORDER |
| 05/03/2005 | DAT1 | SET FOR: MTN TO SUPPRESS ON 05/23/2005 AT 0900A |
| 05/11/2005 | TEXT | AMENDED MOTION IN LIMINE RE:  AUTOPSY REPORT OF |
|  | TEXT | VICTIMS |
| 05/13/2005 | TEXT | MOTION FOR DISQUALIFICATION FROM THE JURY VENIRE |
|  | TEXT | OF ALL POTENTIAL JURORS WHO WOULD AUTOMATICALLY |
|  | TEXT | VOTE FOR THE DEATH PENALTY IF THEY FOUND ACCUSED |
|  | TEXT | GUILTY OF CAPITAL MURDER OR BE UNABLE TO GIVE |
|  | TEXT | WEIGHT TO MITIGATING EVIDENCE |
|  | TEXT | AMENDED MOTION TO REQUIRE THE DISTRICT ATTY TO |
|  | TEXT | DISCLOSE PAST AND PRESENT RELATIONSHIPS AND |
|  | TEXT | ASSOCIATIONS WITH THE PROSPECTIVE JURORS ON THE |
|  | TEXT | VENIRE LIST |
|  | TEXT | MOTION TO EXCUSE FOR CAUSE ANY VENIREMAN WHOSE |
|  | TEXT | VIEWS IN FAVOR OF CAPTIAL PUNISHMENT ARE SUCH |
|  | TEXT | AS WOULD PREVENT OR SUBSTANTIALLY IMPAIR THEIR |
|  | TEXT | CONSIDERATION OF LIFE WITHOUT POSSIBILITY OF |
|  | TEXT | PAROLE AS A POSSIBLE SENTENCE |
|  | TEXT | MOTION TO REQUIRE DISCLOSURE OF ANY AND ALL INFO |
|  | TEXT | CONCERNING PROSPECTIVE JURORS THAT MAY BE |
|  | TEXT | FAVORABLE TO THE DEFENSE |
|  | TEXT | MOTION FOR COURT TO GIVE CAUTIONARY INSTRUCTIONS |
|  | TEXT | PRIOR TO VOIR DIRE |
|  | TEXT | STATE'S BRIEF IN OPPOSITION TO DEFTS MOTION TO |
|  | TEXT | SUPPRESS |
|  | TEXT | NOTICE OF STATE'S INTENT TO PURSUE THE DEATH |
|  | TEXT | PENALTY AND AGGRAVATING CIRCUMSTANCES |
|  | TEXT | MOTION FOR JURY QUESTIONNAIRE |
| 05/17/2005 | TEXT | STATE'S BRIEF IN OPPOSITION TO DEFTS MOTION TO SUP |
| 05/18/2005 | TEXT | MOTION IN LIMINE TO PROHIBIT THE STATE FROM USING |
|  | TEXT | ITS PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMIN |
|  | TEXT | FASHION |
|  | TEXT | MOTION FOR DISCLOSURE AND PRODUCTION OF DOC RECORD |
|  | TEXT | MOTION FOR CHARGE CONFERENCE AND TO REVIEW THE |
|  | TEXT | FINAL JURY CHARGE BEFORE THE COURT READS THE |
|  | TEXT | CHARGE TO THE JURY |
|  | TEXT | MOTION FOR TRIAL COURT TO GIVE CAUTIONARY INSTRUCT |
|  | TEXT | PRIOR TO CERTAIN PHOTOGRAPHS BEING IDENTIFIED TO |
|  | TEXT | THE JURY |
|  | TEXT | MOTION TO PERMIT EXTENSIVE VOIR DIRE ON THE ISSUE |
|  | TEXT | OF RACIAL BIAS |
|  | TEXT | MOTION TO HAVE THE JUNE 27, 2005 VENIRE COMPLETE |
|  | TEXT | QUESTIONNAIRE PRIOR TO TRIAL |
| 05/23/2005 | TEXT | ORDER |
| 05/27/2005 | TEXT | REPLY TO STATE'S OPPOSITION TO DEFTS MOTION TO |
|  | TEXT | SUPPRESS |
| 06/09/2005 | TEXT | ORDER |
| 06/10/2005 | TEXT | AMENDED EX PARTE MOTION FOR FUNDS FOR EXPERT |
|  | TEXT | JURY CONSULTANT |
|  | TEXT | EX PARTE MOTION TO REIMBURSE COSTS FOR EXTRA- |
|  | TEXT | ORDINARY EXPENSES |
|  | DAT2 | SET FOR: JURY TRIAL ON 08/01/2005 AT 0830A  (AR10) |
|  | COMM | SPECIAL SET 8-1 -05  (AR10) |
| 06/17/2005 | TEXT | ORDER |
|  | TEXT | ORDER |
| 06/22/2005 | TEXT | ORDER RE:  JUROR QUESTIONNARIRE |
| 06/30/2005 | TEXT | STATE'S VOIR DOIR QUESTIONS |
| 07/15/2005 | PRTY | PARTY ADDED  W029  KATRINA RATLIFF  (AW21) |

Case 3:07-cv-01074-WKW-SRW    Document 9-13    Filed 01/28/2008    Page 13 of 32

```
|------------------------------------------------------------------------|
| IN THE CIRCUIT   COURT OF   LEE     COUNTY                  JUDGE: JVD  |
|                                                                        |
|    STATE OF ALABAMA   VS   GARY JAMES EDWARD (JR)                       |
|                                                                        |
|------------------------------------------------------------------------|
```

|            |      |                                              |
|------------|------|----------------------------------------------|
|            | SUBP | WITNESS SUBPOENA ISSUED TO W029 KATRINA RATLIFF |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W012 SGT. JEFF PITTS |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W002 CPL KEITH JORDAN |
|            | PAD1 | PARTY W006 ADD1 CHANGED FROM: % MIKE TAYLOR (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W006 SGT MIKE TAYLOR |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W007 BILL HARRIS (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W010 INV. SCOTT BELTON |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W013 DR. BEN BRISTOL |
|            | PRTY | PARTY ADDED W030  CATRINA L JACKSON     (AW21) |
|            | ISSD | PARTY W030 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W030 CATRINA L JACKSON (AW21) |
|            | PRTY | PARTY ADDED  W031  JOE SALOOM          (AW21) |
|            | ISSD | PARTY W031 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W031 JOE SALOOM (AW21) |
|            | PRTY | PARTY ADDED W032  SHANNON FITZGERALD   (AW21) |
|            | ISSD | PARTY W032 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W032 SHANNON FITZGERALD |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W005 SGT VAN JACKSON |
|            | PRTY | PARTY ADDED W033  CRAIG BAILEY         (AW21) |
|            | ISSD | PARTY W033 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W033 CRAIG BAILEY (AW21) |
|            | PRTY | PARTY ADDED W034  KRISTEN MATURI       (AW21) |
|            | ISSD | PARTY W034 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W034 KRISTEN MATURI |
|            | PRTY | PARTY ADDED W035  HOLI SPIERS          (AW21) |
|            | ISSD | PARTY W035 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W035 HOLI SPIERS (AW21) |
|            | PRTY | PARTY ADDED W036  JOHN CASE            (AW21) |
|            | ISSD | PARTY W036 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W036 JOHN CASE (AW21) |
|            | PRTY | PARTY ADDED W037  KATHY RICHERT        (AW21) |
|            | ISSD | PARTY W037 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W037 KATHY RICHERT |
|            | PRTY | PARTY ADDED W038  THADDEUS JONES       (AW21) |
|            | ISSD | PARTY W038 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W038 THADDEUS JONES |
|            | PRTY | PARTY ADDED W039  INV TOM FRANKLIN     (AW21) |
|            | ISSD | PARTY W039 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W039 INV TOM FRANKLIN |
|            | PRTY | PARTY ADDED W040  DAVID VINES          (AW21) |
|            | ISSD | PARTY W040 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W040 DAVID VINES (AW21) |
|            | PRTY | PARTY ADDED W041  SARAH REYNOLDS       (AW21) |
|            | ISSD | PARTY W041 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W041 SARAH REYNOLDS |
|            | PRTY | PARTY ADDED W042  TERRY KAY GOODWIN    (AW21) |
|            | ISSD | PARTY W042 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W042 TERRY KAY GOODWIN |
|            | PRTY | PARTY ADDED W043  SGT TOMMY THREAT     (AW21) |
|            | ISSD | PARTY W043 ISSUED DATE: 07152005  TYPE:  (AW21) |
|            | SUBP | WITNESS SUBPOENA ISSUED TO W043 SGT TOMMY THREAT |
| 07/25/2005 | TEXT | ORDER |
|            | TEXT | STATE'S REQUESTED JURY CHARGES |
|            | TEXT | DEFTS PROPOSED DEATH PENALTY VOIR DIRE |
|            | TEXT | MOTION FOR COURT TO GIVE CAUTIONARY INSTRUCTIONS |
|            | TEXT |  PRIOR TO DEATH PENALTY VOIR DIRE |
|            | TEXT | MOTION FOR CHANGE OF VENUE |
|            | TEXT | DEFTS OBJECTION TO BEING "SHACKLED" AT TRIAL |
|            | TEXT | MOTION FOR DISCLOSURE AND PRODUCTION OF JUVENILE |
|            | TEXT |  RECORDS |
|            | TEXT | DEFENDANT'S REQUESTED GUILT PHASE JURY CHARGES |
|            | TEXT | DEFENDANT'S PROPOSED DEATH PENALTY VOIR DIRE |
|            | TEXT | DEFENDANT'S REQUESTED SENTENCING PHASE JURY CHARGE |
|            | TEXT | STATES'S REQUESTED JURY CHARGES |
| 08/01/2005 | TEXT | SECOND AMENDED EX PARTE MOTION FOR ADDITIONAL |
|            | TEXT |  FUNDS FOR MITIGATION INVESTIGATOR |
|            | TEXT | EX PARTE MOTION TO REIMBUTSE EXTRAORDINARY |

| | | |
|---|---|---|
| | TEXT | EXPENSES FOR REPRODUCTION OF EXHIBITS |
| | TEXT | EX PARTE MOTION TO REIMBURSE EXTRAORDINARY EXPENSE |
| | TEXT | FOR HOLMAN PRISON RECORDS |
| | TEXT | ORDER GRANTING $11.00 FOR EXP ON REPRODUC OF XHITS |
| | TEXT | ORDER GRANTING $142.85 FOR RECORDS |
| | TEXT | ORDER GRANTING $10,706.27 FOR DEF INVESTIGATIVE SE |
| 08/08/2005 | BDTE | BIRTH DATE CHANGED FROM: 09/09/1979 |
| 09/09/2005 | SSAN | SSN CHANGED FROM: 461619936   (AR01) |
| 10/13/2005 | TEXT | DEFTS SENTENCING MEMORANDUM   (AR01) |
| | TEXT | ORDER |
| | DJID | DISPOSITION JUDGE ID CHANGED FROM:   TO: JVD |
| | DISP | CHARGE 01 DISPOSED BY: CONVICTED ON: 08/04/2005 |
| | DISP | CHARGE 01: MURDER CAPITAL-ROBB/#CNTS: 001   (AR10) |
| | CH01 | DEFENDANT SENTENCED ON: 08/04/2005   (AR05) |
| | CH01 | CVCC PROVISION ORDERED BY THE COURT   (AR05) |
| | CH01 | HISTORY FEE PROVISION ORDERED BY THE COURT   (AR05) |
| | CH01 | SENTENCE TO BEGIN ON: 08/04/2005   (AR05) |
| | CH01 | COST PROVISION ORDERED BY THE COURT   (AR05) |
| | CH01 | JAIL CREDIT: 03 YR, 03 MO, 010 DAYS   (AR05) |
| | CH01 | SUBPOENA FEE PROVISION ORDERED BY THE COURT   (AR05) |
| | CH01 | LIFE W/O PAROLE PROVISION ORDERED BY THE COURT |
| | CH01 | PENITENTIARY PROVISION ORDERED BY THE COURT   (AR05) |
| | D001 | ENFORCEMENT STATUS SET TO:  "P"   (FE52) |
| | D001 | ENF PLACEMENT STATUS SET TO: "X" |
| | D001 | FREQUENCY AMOUNT SET TO   (EC01) |
| | D001 | PAYMENT DUE DATE SET TO 10/13/2020   $468.00   (EC01) |
| | TRSC | TRANSCRIPT OF RECORD ISSUED: 10/13/2005   (EC01) |
| | TEXT | SENTENCING ORDER   (AR08) |
| 10/14/2005 | CH01 | SENTENCE TO BEGIN ON: 10/12/2005   (AR05) |
| | TRSC | TRANSCRIPT OF RECORD ISSUED: 10/14/2005   (AR08) |
| 10/20/2005 | APDT | APPEAL DATE CHANGED FROM: 00/00/0000   (AR11) |
| | ATY2 | ATTY 2 TYPE CHANGED FROM:   (AR11) |
| | ATY1 | ATTY 1 TYPE CHANGED FROM:   (AR11) |
| | ATY2 | ATTY 2 CHANGED FROM:   (AR11) |
| | IRA0 | IRA TYPE CHANGED FROM:   (AR11) |
| | ATY1 | ATTY 1 CHANGED FROM:   (AR11) |
| | PROS | PROSECUTOR CHANGED FROM:   (AR11) |
| | CRP1 | COURT REPORTER 1 CHANGED FROM:   (AR11) |
| | APTY | APPEAL TYPE CHANGED FROM:   (AR11) |
| | INTR | INDTRL TYPE CHANGED FROM:   (AR11) |
| 10/24/2005 | ATYW | ATYW TYPE CHANGED FROM:   (AR11) |
| 10/26/2005 | CRP1 | COURT REPORTER 1 CHANGED FROM: SMI002   (AR11) |
| | TEXT | NOTICE OF APPEAL TO THE COURT OFCRIMINAL APPEALS |
| | TEXT | REPORTER'S TRANSCRIPT |
| | TEXT | DOCKETING STATEMENT |
| 12/05/2005 | TEXT | REQUEST FOR LOCAL EXTENSION OF THE TIME TO |
| | TEXT | COMPLETE THE REPORTER'S TRANSCRIPT AND ORDER |
| | TEXT | GRANTING |
| 03/03/2006 | TEXT | ORDER FROM COURT OF CRIMINAL APPEALS-REPORTER'S |
| | TEXT | REQUEST FOR 28-DAY ENLARGEMENT OFR TIME TO FILE |
| | TEXT | THE TRANSCRIPT IS GRANTED--TRANSCRIPT DUE BEFORE |
| | TEXT | 3/29/06 |
| 01/26/2055 | TEXT | ORDER SETTING HEARING ON 2/11/05 AT 9AM |

HARDNETT                04052006

# IN THE CIRCUIT COURT OF
# LEE COUNTY,
# STATE OF ALABAMA

F I L E
MAY 0 4 2006
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**STATE OF ALABAMA**

**V.**

**JAMES E. GARY, JR.,**
**DEFENDANT**

**CASE NUMBER**

**CC-02- 492**

## MOTION TO SUPPLEMENT RECORD
## ON APPEAL

**COMES NOW** the defendant, James Gary, by and through his counsel of record, and moves this Honorable Court pursuant to *Rule 10, Alabama Rules of Appellate Procedure*, to issue an order to supplement the record on appeal. In support of the foregoing motion Defendant shows the following:

1.     Defendant was convicted of Capital Murder before this Honorable Court. Defendant case is currently pending on appeal before the Alabama Court of Criminal Appeals (CR-05-0133).

2.     One of the Defendant's primary issue on appeal is this Court's denial of his *Motion to Suppress Defendant's Statements* that was filed on January 17, 2003. This Court held a hearing on May 23, 2005, with respect to the suppression motion. Thereafter this Court issued a written *Order* denying the motion. The case action summary sheet does not indicate when the *Order* was issued.

3.     The record on appeal does not include the written *Order* denying the defendant's suppression motion. The Alabama Court of Criminal Appeals will not consider any

Page 1 of 3

matters, documents, or arguments that are not part of the record. *Bibby v. State  488 So.2d 1,*

*(Ala.Crim.App.1985)* therefore, this Court's written *Order* is vital to this issue on appeal.

**WHEREFORE, THE PREMISES CONSIDERED,** Defendant prays that this

Honorable Court will grant the foregoing and issue an order instructing the Circuit Clerk's office

to supplement the record with the requested *Order*.

**RESPECTFULLY SUBMITTED** this the 2nd day of May, 2006.

DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANT
**DANIEL HAMM, P.C.**
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, AL 36104
TELEPHONE      334-269-0269
FAX               334-323-5666

RICHARD K. KEITH (KEI003)
ATTORNEY FOR THE DEFENDANT
**RICHARD KEITH**
22 SCOTT STREET
MONTGOMERY, AL 36104
TELEPHONE      334-264-6776

Page 2 of 3

# CERTIFICATE OF SERVICE

This is to certify that I have this day placed a copy of this Motion To Supplement Record on Appeal in the United States Mail with sufficient postage for first class delivery to the attorneys named below or parties if not represented by counsel.

**DONE** this the 2nd day of May, 2006.


D ANIEL  G.  H AMM  (HAM043)
A TTORNEY  FOR  THE  D EFENDANT
**D ANIEL  G.  H AMM ,  P.C.**
560  S.  M C D ONOUGH  S T .,  S TE .  A
M ONTGOMERY ,  A LABAMA  36104
T ELEPHONE      334-269-0269
F AX               334-323-5666


Mr. Nick Abbett
Lee County District Attorney
2311 Gateway Drive, Suite 111
Opelika, Alabama 36801


Alabama Court of Criminal Appeals
P.O. Box 301555
Montgomery, Alabama, 36130-1555


Page 3 of 3



## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

THE STATE OF ALABAMA,                          *

                                                    Lee County

vs.                                            *    Case No. CC-02-492

JAMES E. GARY, JR.,                                 Court of Criminal Appeals

                                              Case No. CR-05-0133

        Defendant.                         *

### ORDER

This matter is before the Court on the Defendant's "Motion to Supplement Record on Appeal," and from an Order of the Alabama Court of Criminal Appeals, dated the 4th day of May, 2006, directing this Court to dispose of the Defendant's Motion within 14 days after the date of the Court's Order.

The Defendant requested in his "Motion to Supplement the Record on Appeal" that the Court enter an order to the Clerk's Office that the record[1] on appeal of this case be supplemented to include a copy of this Court's Order denying the Defendant's "Motion for Suppression of Statement." At the time the Court entered this Order[2] there were five different cases pending pertaining to this Defendant. These cases were numbered **CC-02-488** through **CC-02-492**. The order entered by this Court denying the Defendant's Motion to Suppress was styled to be entered in cases numbered **CC-02-488/492**. A review of all five of the case files pertaining to this Defendant revealed that the Order denying the Defendant's Motion to Suppress was placed in the case file of, *State of Alabama v. James E. Gary, Jr.*, Circuit Court of Lee County, Alabama, Case Number **CC-02-488** and was entered on the Case Action Summary for this case [**CC-02-488**] on 06/03/2005.[3] The entry and filing of this Order was not entered in the Case Action Summary, or filed, in any of the other cases pending at that time against this Defendant. Shortly before trial, the State elected to proceed to trial with the case styled *State of Alabama v. James E. Gary, Jr.*, Circuit Court of Lee County, Alabama, Case Number **CC-02-492**. After the trial of this case and the subsequent appeal by the Defendant, the files were consolidated to insure that all Motions, Orders and other pertinent documents

---

[1] Transcript of the case file in this case.
[2] On the 1st day of June, 2005...
[3] See Court's Exhibit "A," to this Order, attached, at p.6.

16

were included in the trial transcript of this case. For some unknown reason the Order denying the Defendant's Motion for Suppression of his statement was omitted from the final transcript which was prepared and filed by the Clerk's Office in the appeal of this case.

**THEREFORE** this Court finds that:

1. The Defendant's "Motion to Supplement the Record" in this case is due to be, and is hereby, **GRANTED**;

2. The Clerk is **ORDERED** to amend the record[4] in this case by including a copy of this Court's Order Denying the Defendant's "Motion for Suppression of Statement" which was entered on the 1st day of June, 2005, and filed in the Clerk's Office on the 3rd day of June, 2005.[5]

Done this 11th day of May, 2006.

John V. Denson, II
Circuit Judge

Copy to:
    Richard K. Keith
    Daniel G. Hamm
    Nick Abbett
    Office of the Attorney General

---

[4] Pursuant to Rule 10(g), Alabama *Rules of Appellate Procedure.*
[5] See Court's Exhibit "B," Order dated June 1, 2005, denying Defendant's Motion to Suppress.

## COURT'S EXHIBIT "A"
To ORDER dated 11th day of May, 2006
STATE v. JAMES EDWARD GARY, JR.
Lee County, CC-2002-000488
Alabama Court of Criminal Appeals, CR-05-013

### Case Information

| | | | | | | |
|---|---|---|---|---|---|---|
| County: | **43-LEE** | Case N°: | **CC-2002-000488.00** | JID: | **JVD JOHN V. DENSON II** | DEF status: **J Jail** |
| Filed: | **4/17/2002 12:00:00 AM** | AAGCY: | **C County** | Muni N°: **00** | | City: |
| Arrest date: | **02/21/2002** | Offe date: | | ORI: | **0430000** | Officer: **TAYLOR/LCSO** |
| Indict date: | **04/12/2002** | Grand jury: **257** | | Atty 1: | **KEI003-A** | Ticket N°: |
| Tracking N°'s: **GJ200200026300/ 0/ 0** | | | | | | |
| Date: | **05/23/2005** | Que: | Time: **09:00 AM** | Desc: | **MOTD MTN TO SUPPRESS** | |

### Defendant Information

| | | | | | |
|---|---|---|---|---|---|
| Name: | **GARY JAMES EDWARD (JR)** | Alias 1: | | Alias 2: | |
| DOB: | **12/16/1974** | SSN: | **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** | | **AL** |
| Height : | **5'09"** | Weight: | **170** | Driv License N°: | Eyes/Hair: **BRO/BLK** |
| SID: | **AL0** | YDate: | | Race/Sex: **Black /M** | |
| | | | | AIS: **222516** | PR: **2005 009283** |
| Address 1: | **1421 2ND PLACE SOUTH** | | Address 2: | | |
| Zip: | **36867** | City: | **PHENIX CITY** | State: **AL** | Country: **US** |

### Charges

| | | | | | |
|---|---|---|---|---|---|
| 1. Crime co: **CM04** Statute: | **MURDER CAPITAL-BURGLARY** | Stat Name: **13A-005-040(A)(4)** | Class/Categ: **F PE** | Counts: **1** |
| 2. Crime co: | Statute: | | Stat Name: | Class/Categ: | Counts: |
| 3. Crime co: | Statute: | | Stat Name: | Class/Categ: | Counts: |
| More: **N** | Dom Viol: **N** | | Case Type: **F** | Case Categ: **PE** | |
| Comment: | | | | | |

### Consolidated Case Action Summary

| | | | | |
|---|---|---|---|---|
| 04/17/2002 | 02:30:02 | DOCK | NOTICE SENT: 04/17/2002 GARY JAMES EDWARD (JR) | LEW |
| 04/17/2002 | 09:13:29 | JUDG | ASSIGNED TO: (RMH) ROBERT M. HARPER (AR01) | LEW |
| 04/17/2002 | 09:13:30 | STAT | INITIAL STATUS SET TO: "J" - JAIL (AR01) | LEW |
| 04/17/2002 | 09:13:31 | FILE | FILED ON: 04/17/2002 (AR01) | LEW |
| 04/17/2002 | 09:13:32 | FILE | CHARGE 01: MURDER CAPITAL-BURGL/#CNTS: 001 (AR01) | LEW |
| 04/17/2002 | 09:13:33 | INDT | DEFENDANT INDICTED ON: 04/12/2002 (AR01) | LEW |
| 04/17/2002 | 09:13:34 | ARRS | DEFENDANT ARRESTED ON: 02/21/2002 (AR01) | LEW |
| 04/17/2002 | 09:13:55 | DAT1 | SET FOR: ARRAIGNMENT ON 04/25/2002 AT 0900A(AR10) | LEW |
| 04/17/2002 | 09:13:56 | DAT2 | SET FOR: JURY TRIAL ON 05/20/2002 AT 0830A (AR10) | LEW |
| 04/17/2002 | 09:13:57 | COMM | 4-16-02 DISCOVERY ORDER (AR10) | LEW |

1

| | | | | |
|---|---|---|---|---|
| 04/17/2002 | 09:13:58 | DAT1 | SET FOR: ARRAIGNMENT ON 04/25/2002 AT 0900A(AR10) | LEW |
| 04/17/2002 | 09:13:59 | DAT2 | SET FOR: JURY TRIAL ON 05/20/2002 AT 0830A (AR10) | LEW |
| 04/17/2002 | 09:14:00 | CASP | CASE ACTION SUMMARY PRINTED (AR10) | LEW |
| 04/17/2002 | 11:41:59 | PRTY | PARTY ADDED W007 LT. JACKIE SMITH (AW21) | LEW |
| 04/17/2002 | 11:43:46 | PRTY | PARTY ADDED W008 BILL HARRIS (AW21) | CAG |
| 04/17/2002 | 11:44:20 | PRTY | PARTY ADDED W009 SARAH REYNOLDS (AW21) | CAG |
| 04/17/2002 | 11:44:38 | PRTY | PARTY ADDED W010 LT. JACKIE SMITH (AW21) | CAG |
| 04/17/2002 | 11:44:52 | PRTY | PARTY ADDED W011 INV SCOTT BELTON (AW21) | CAG |
| 04/17/2002 | 11:45:09 | PRTY | PARTY ADDED W012 TERRY GODWIN (AW21) | CAG |
| 04/17/2002 | 11:45:26 | PRTY | PARTY ADDED W013 SGT. JEFF PITTS (AW21) | CAG |
| 04/17/2002 | 11:45:41 | PRTY | PARTY ADDED W014 DR. BEN BRISTOL (AW21) | CAG |
| 04/17/2002 | 11:45:59 | PRTY | PARTY ADDED W015 JOSHUA REYNOLDS (AW21) | CAG |
| 04/17/2002 | 11:46:15 | PRTY | PARTY ADDED W016 CPT. JAMES MAJORS (AW21) | CAG |
| 04/17/2002 | 11:46:36 | PRTY | PARTY ADDED W017 JIMMY LEE BROOKS JR (AW21) | CAG |
| 04/17/2002 | 11:47:26 | PRTY | PARTY ADDED W018 INV. SCOTT STOVER (AW21) | CAG |
| 04/17/2002 | 11:47:44 | PRTY | PARTY ADDED W019 KATRINA RATLIFF (AW21) | CAG |
| 04/17/2002 | 11:48:01 | PRTY | PARTY ADDED W020 INV. FREDY MARTINEZ (AW21) | CAG |
| 04/17/2002 | 11:48:20 | PRTY | PARTY ADDED W021 DAVID L VINES (AW21) | CAG |
| 04/17/2002 | 11:48:34 | PRTY | PARTY ADDED W022 INV. TAMMY BOOTH (AW21) | CAG |
| 04/17/2002 | 11:49:20 | PRTY | PARTY ADDED W023 CATRINA JACKSON (AW21) | CAG |
| 04/17/2002 | 11:50:16 | PRTY | PARTY ADDED W024 INV. DONNIE SURRETT (AW21) | CAG |
| 04/17/2002 | 11:50:39 | PRTY | PARTY ADDED W025 RAY LANSDON (AW21) | CAG |
| 04/17/2002 | 11:51:00 | PRTY | PARTY ADDED W026 ERNEST COLEMAN (AW21) | CAG |
| 04/17/2002 | 11:51:31 | PRTY | PARTY ADDED W027 ANDREW ELDRIDGE (AW21) | CAG |
| 04/17/2002 | 11:52:32 | PRTY | PARTY ADDED W028 SHEBA BRUTON (AW21) | CAG |
| 04/17/2002 | 11:52:49 | PRTY | PARTY ADDED W029 MICHAEL CARRUTH (AW21) | CAG |
| 05/06/2002 | 11:06:09 | AWPR | LT. JACKIE SMITH DELETED W010 (AW21) | LEW |
| 05/06/2002 | 11:35:47 | DAT2 | CASE SET ON 05/28/2002 FOR JURY TRIAL (SS07) | LEW |
| 05/06/2002 | 11:35:48 | NOTF | NOTICE FLAG SET TO: N (SS07) | LEW |
| 05/20/2002 | 10:58:52 | ATY1 | ATTORNEY FOR DEFENDANT: KEITH RICHARD K (AR01) | LEW |
| 05/20/2002 | 11:30:34 | ATY1 | ATTORNEY FOR DEFENDANT: HAMM DANIEL GARY (AR01) | LEW |
| 05/20/2002 | 11:39:26 | ATY1 | ATTORNEY FOR DEFENDANT: KEITH RICHARD K (AR10) | LEW |
| 05/20/2002 | 11:39:27 | ATY2 | ATTORNEY FOR DEFENDANT: HAMM DANIEL GARY (AR10) | LEW |
| 05/29/2002 | 11:20:35 | DAT2 | SET FOR: JURY TRIAL ON 08/26/2002 AT 0830A (AR10) | LEW |
| 05/29/2002 | 11:20:36 | COMM | CONT PENDING LAB (AR10) | LEW |
| 06/11/2002 | 10:27:10 | TEXT | EX PARTE MTN FOR EXTRAORDINARY EXPENSES | LEW |

2

| 06/13/2002 | 15:37:52 | TEXT | EX PARTE MOTION FOR EXTRAORDINARY EXPENSES | KAH |
|---|---|---|---|---|
| 06/14/2002 | 14:14:24 | TEXT | ORDER GRANTING EX PARTE MTN | KAH |
| 06/24/2002 | 14:46:03 | TEXT | NOTICE TO DEFT REGARDING DISCOVERY | LEW |
| 08/20/2002 | 13:43:00 | TEXT | MOTION TO DECLARE THE ALA CAPITAL SENTENCING | KAH |
| 08/20/2002 | 13:43:01 | TEXT | PROCESS UNCONSTITUTIONAL AND TO BAR IMPOSITION | KAH |
| 08/20/2002 | 13:43:02 | TEXT | OF THE DEATH PENALTY | KAH |
| 08/20/2002 | 13:43:03 | TEXT | MOTION TO BAR IMPOSITION OF THE DEATH PENALTY | KAH |
| 08/20/2002 | 13:43:04 | TEXT | WHERE JURY'S ROLE AND FACTUAL DETERMINATIONS | KAH |
| 08/20/2002 | 13:43:05 | TEXT | ARE DEEMED ADVISORY | KAH |
| 08/26/2002 | 15:48:44 | DAT1 | SET FOR: PENDING MOTIONS ON 09/19/2002 AT 0800A | LEW |
| 08/27/2002 | 11:11:41 | ATTH | CAS ATTACHMENT PRINTED (AR08) | LEW |
| 09/11/2002 | 09:59:14 | TEXT | ORDER CONT MTNS GENERALLY | LEW |
| 09/13/2002 | 14:32:04 | TEXT | MOTION FOR PERMISSION TO PROCEED EX PARTE ON | KAH |
| 09/13/2002 | 14:32:05 | TEXT | APPLICATIONS FOR FUNDS | KAH |
| 09/13/2002 | 14:32:06 | TEXT | EX PARTE MOTION FOR FUNDS FOR PRIVATE INVEST | KAH |
| 09/13/2002 | 14:32:27 | TEXT | MOTION FOR AN ORDER DIRECTING PRODUCTION OF | KAH |
| 09/13/2002 | 14:32:28 | TEXT | RECORDS | KAH |
| 09/13/2002 | 14:33:18 | TEXT | MOTION FOR THE STATE TO PLACE THE DEF'T ON | KAH |
| 09/13/2002 | 14:33:19 | TEXT | NOTICE AS TO ANY 404 B EVIDENCE IT INTENDS TO USE | KAH |
| 09/13/2002 | 14:33:20 | TEXT | IN TRIAL | KAH |
| 09/13/2002 | 14:34:19 | TEXT | MOTION FOR ORDER DIRECTING THE STATE TO NOTIFY THE | KAH |
| 09/13/2002 | 14:34:20 | TEXT | ACCUSED WHETHER IT INTENDS TO SEEK THE DEATH PENA | KAH |
| 09/13/2002 | 14:34:21 | TEXT | IF DEFT IS CONVICTED OF CAPITAL MURDER | KAH |
| 09/13/2002 | 14:34:54 | TEXT | EX PARTE MOTION TO PROVIDE FUNDS FOR EXPERT | KAH |
| 09/13/2002 | 14:34:55 | TEXT | PSYCHOLOGICAL ASSISTANCE | KAH |
| 09/23/2002 | 08:46:12 | DAT2 | SET FOR: JURY TRIAL ON 11/12/2002 AT 0830A (AR10) | LEW |
| 11/19/2002 | 13:11:09 | DAT2 | SET FOR: JURY TRIAL ON 02/24/2003 AT 0830A (AR10) | LEW |
| 01/17/2003 | 14:47:07 | TEXT | MOTION TO SUPPRESS DEF'TS STATEMENTS | KAH |
| 01/23/2003 | 14:16:24 | DAT1 | SET FOR: PENDING MOTIONS ON 02/06/2003 AT 0100P | LEW |
| 02/06/2003 | 13:57:00 | TEXT | MTN TO REQUIRE PROS TO STATE CIRCUMSTANCES | LEW |
| 02/18/2003 | 15:06:11 | TEXT | MOTION TO TRANSFER DEF'T TO LEE CO DETENTION FACIL | KAH |
| 02/18/2003 | 15:06:12 | TEXT | PENDING TRIAL | KAH |
| 03/03/2003 | 13:24:09 | DAT2 | SET FOR: JURY TRIAL ON 05/19/2003 AT 0830A (AR10) | LEW |
| 05/13/2003 | 11:41:21 | DAT2 | SET FOR: JURY TRIAL ON 08/25/2003 AT 0830A (AR10) | LEW |
| 08/22/2003 | 08:52:39 | DAT2 | SET FOR: JURY TRIAL ON 11/17/2003 AT 0830A (AR10) | LEW |
| 09/04/2003 | 09:05:09 | TEXT | RENEWED MOTION TO TRANSFER DEFENDANT TO LEE COUNTY | KAH |

3

| 09/04/2003 | 09:05:10 | TEXT | DETENTION FACILITY PENDING TRIAL | KAH |
| 11/18/2003 | 09:38:27 | DAT2 | SET FOR: JURY TRIAL ON 02/23/2004 AT 0830A (AR10) | LEW |
| 03/17/2004 | 11:45:29 | DAT2 | SET FOR: JURY TRIAL ON 06/14/2004 AT 0830A (AR10) | LEW |
| 06/14/2004 | 14:07:23 | DAT2 | SET FOR: JURY TRIAL ON 10/25/2004 AT 0830A (AR10) | LEW |
| 07/28/2004 | 13:12:15 | TEXT | MOTION TO SET TRIAL NO EARLIER THAN SPRIG 2005 | KAH |
| 07/28/2004 | 13:12:16 | TEXT | TRIAL TERM | KAH |
| 08/09/2004 | 13:34:14 | DAT2 | SET FOR: JURY TRIAL ON 02/28/2005 AT 0830A (AR10) | LEW |
| 12/03/2004 | 10:36:56 | TEXT | MOTION FOR COURT TO ADOPT AVA GUIDELINES AS | KAH |
| 12/03/2004 | 10:36:57 | TEXT | STANDARD PRACTICE | KAH |
| 12/28/2004 | 14:04:57 | DAT1 | SET FOR: PENDING MOTIONS ON 02/03/2005 AT 0900A | LEW |
| 01/14/2005 | 10:38:55 | ATTH | CAS ATTACHMENT PRINTED (AR08) | KAH |
| 01/18/2005 | 10:09:18 | TEXT | MOTION TO RESCHEDULE | KAH |
| 01/19/2005 | 10:09:18 | TEXT | MOTION TO PLACE DEFT'S FILED EX PARTE MOTION | KAH |
| 01/19/2005 | 10:09:19 | TEXT | FOR EXTRAORDINARY FUNDS RE: EXPERT WITNESS | KAH |
| 01/19/2005 | 10:09:20 | TEXT | FOR TRIAL AND/OR MITIGATION HEARING UNDER SEAL | KAH |
| 01/19/2005 | 10:09:21 | TEXT | AMENDED EX PARTE MOTION FOR FUNDS TO OBTAIN A | KAH |
| 01/19/2005 | 10:09:22 | TEXT | MITIGATION INVESTIGATOR | KAH |
| 01/19/2005 | 10:09:23 | TEXT | AMENDED EX PARTE MOTION TO PROVIDE FUNDS FOR | KAH |
| 01/19/2005 | 10:09:24 | TEXT | EXPERT PSYCHOLOGICAL ASSISTANCE | KAH |
| 01/19/2005 | 10:09:25 | TEXT | AMENDED EX PARTE MOTION FOR FUNDS FOR PRIVATE | KAH |
| 01/19/2005 | 10:09:26 | TEXT | INVESTIGATOR | KAH |
| 01/20/2005 | 15:31:34 | TEXT | MOTION FOR AN ORDER DIRECTING PRODUCTIONS OF RECOR | KAH |
| 01/20/2005 | 15:31:52 | TEXT | MOTION FOR FORENSIC PSYCHOLOGICAL EVALUATION | KAH |
| 01/26/2005 | 09:54:43 | DAT1 | SET FOR: PENDING MOTIONS ON 02/11/2005 AT 0900A | LEW |
| 01/26/2005 | 15:04:47 | TEXT | AMENDED MOTION FOR OVERHEAD EXPENSES | KAH |
| 01/27/2005 | 16:26:08 | TEXT | ORDER DIRECTING S/O OF LEE COUNTY TO TRANSPORT | KAH |
| 01/27/2005 | 16:26:09 | TEXT | DEFT FROM HOLMAN CORRECTIONAL FACILITY IN ATMORE | KAH |
| 01/27/2005 | 16:26:10 | TEXT | TO THE LEE COUNTY JUSTICE CENTER FOR HEARING SET | KAH |
| 01/27/2005 | 16:26:11 | TEXT | FOIR 2/11/05 AT 9AM | KAH |
| 01/31/2005 | 09:56:50 | TRAN | TRANSMITTAL NOTICE SENT TO DEF ATTY 1 (AR09) | KAH |
| 02/14/2005 | 08:12:40 | TEXT | ORDER TO TRANSPORT DEFT FROM HOLMAN CORR FAC | LEW |
| 02/22/2005 | 08:43:42 | TEXT | DEFT PLED NOT GUILTY BY REASON OF MENTAL DEFECT OR | LEW |
| 02/22/2005 | 08:43:43 | TEXT | INSANITY | LEW |
| 02/22/2005 | 15:37:06 | TEXT | ORDER GRANTING OVERHEAD EXP OF $39 | LEW |
| 02/22/2005 | 15:37:07 | TEXT | ORDER TO PRODUCE SCHOOL RECORDS RIDGECREST ELEM | LEW |
| 02/22/2005 | 15:37:08 | TEXT | ORDER TO PRODUCE SCHOOL RECORDS PHENIX CITY MIDDLE | LEW |

4

| | | | | |
|---|---|---|---|---|
| 02/22/2005 | 15:37:09 | TEXT | ORDER TO PRODUCE SCHOOL RECORDS SOUTH GIRARD HIGH | LEW |
| 02/22/2005 | 15:39:52 | TEXT | ORDER GRANTING $6500 FOR INVESTIGATOR | LEW |
| 02/22/2005 | 15:39:53 | TEXT | ORDER GRANTING $5000 FOR PSYCHOLOGIST | LEW |
| 02/22/2005 | 15:39:54 | TEXT | ORDER GRANTING FUNDS FOR PRIVATE INVESTIGATOR | LEW |
| 03/03/2005 | 08:51:40 | TEXT | ORDER FOR OUTPATIENT EVALUATION | LEW |
| 03/04/2005 | 08:52:19 | DAT2 | SET FOR: JURY TRIAL ON 06/13/2005 AT 0830A (AR10) | LEW |
| 03/04/2005 | 08:52:20 | COMM | SPECIAL SET 6-27-05 (AR10) | LEW |
| 03/17/2005 | 09:16:03 | TEXT | BRIEF IN SUPPORT OF DEFTS MOTION TO SUPPRESS | KAH |
| 04/18/2005 | 11:10:06 | TEXT | EX PARTE MOTION FOR FUNDS FOR JURY CONSULTANT | KAH |
| 04/26/2005 | 10:03:35 | TEXT | MOTION IN LIMINE REGARDING MEDIAL EXAMINER | KAH |
| 05/03/2005 | 14:29:56 | DAT1 | SET FOR: PENDING MOTIONS ON 05/23/2005 AT 0900A | LEW |
| 05/11/2005 | 11:50:29 | TEXT | AMENDED MOTION IN LIMINE RE: AUTOPSY REPORT OF | KAH |
| 05/11/2005 | 11:50:30 | TEXT | VICTIMS | KAH |
| 05/13/2005 | 10:23:56 | TEXT | NOTICE OF STATE'S INTENT TO PURSUE THE DEATH | KAH |
| 05/13/2005 | 10:23:57 | TEXT | PENALTY AND AGGRAVATING CIRCUMSTANCES | KAH |
| 05/13/2005 | 10:24:17 | TEXT | MOTION FOR JURY QUESTIONNAIRE | KAH |
| 05/13/2005 | 14:50:04 | TEXT | MOTION FOR COURT TO GIVE CAUTIONARY INSTRUCTIONS | KAH |
| 05/13/2005 | 14:50:05 | TEXT | PRIOR TO VOIR DIRE | KAH |
| 05/13/2005 | 14:50:06 | TEXT | MOTION TO REQUIRE DISCLOSURE OF ANY AND ALL INFORM | KAH |
| 05/13/2005 | 14:50:07 | TEXT | CONCERNING PROPECTIVE JURORS THAT MAY BE FAVORABL | KAH |
| 05/13/2005 | 14:50:08 | TEXT | MOTION TO EXCUSE FOR CAUSE AND VENIREMAN WHOSE | KAH |
| 05/13/2005 | 14:50:09 | TEXT | WHOSE VIEWS IN FAVOR OF CAPITAL PUNISHMENT ARE | KAH |
| 05/13/2005 | 14:50:10 | TEXT | SUCH AS WOULD PREVENT OR SUBSTANTIALLY IMPAIR | KAH |
| 05/13/2005 | 14:50:11 | TEXT | THEIR CONSIDERATION OF LIFE W/O POSSIBILITY OF | KAH |
| 05/13/2005 | 14:50:12 | TEXT | PAROLE AS A POSSIBLE SENTENCE | KAH |
| 05/13/2005 | 14:50:31 | TEXT | AMENDED MOTION TO REQUIRE THE D.A. TO DISCLOSE PAS | KAH |
| 05/13/2005 | 14:55:47 | TEXT | AND PRESENT JURRORS ON THE VENIRE LIST | KAH |
| 05/13/2005 | 14:55:48 | TEXT | MOTION FOR DISQUALIFICATION FROM THE JURY VENIRE | KAH |
| 05/13/2005 | 14:55:49 | TEXT | OF ALL POTENTIAL JURORS WHO WOULD AUTOMATICALLY | KAH |
| 05/13/2005 | 14:55:50 | TEXT | VOTE FOR THE DEATH PENALTY IF THE FOUND ACCUSED | KAH |
| 05/13/2005 | 14:55:51 | TEXT | GUILTY OF CAPITAL MURDER OR BE UNABLE TO GIVE | KAH |
| 05/13/2005 | 14:55:52 | TEXT | WEIGHT OF MITIGAITING EVIDENCE | KAH |
| 05/17/2005 | 09:46:14 | TEXT | STATE'S BRIEF IN OPPOSITION TO DEFTS MTN TO SUPPRE | LEW |
| 05/18/2005 | 16:06:28 | TEXT | MOTION IN LIMINE TO PROHIBIT THE STATE FROM USING | KAH |
| 05/18/2005 | 16:06:29 | TEXT | ITS PEREMPTORY CHALLENGES IN A RACIALLY | KAH |
| 05/18/2005 | 16:06:30 | TEXT | DISCRIMINATORY FASHION | KAH |

5

| | | | | |
|---|---|---|---|---|
| 05/18/2005 | 16:06:31 | TEXT | MOTION FOR CHARGE CONFERENCE AND TO REVIEW THE FIN | KAH |
| 05/18/2005 | 16:06:32 | TEXT | FINAL JURY CHARGE BEFORE THE COURT READS THE | KAH |
| 05/18/2005 | 16:06:33 | TEXT | CHARGE TO THE JURY | KAH |
| 05/18/2005 | 16:13:28 | TEXT | MOTION FOR TRIAL COURT TO GIVE CAUTIONARY | KAH |
| 05/18/2005 | 16:13:29 | TEXT | INSTRUCTIONS PRIOR TO CERTAIN PHOTOGRAPHS BEING | KAH |
| 05/18/2005 | 16:13:30 | TEXT | IDENTIFIED TO THE JURY | KAH |
| 05/18/2005 | 16:13:31 | TEXT | MOTION FOR DISCLOSURE AND PRODUCTION OF DOC RECORD | KAH |
| 05/18/2005 | 16:13:32 | TEXT | MOTION TO HAVE THE JUNE 27 VENIRE COMPLETE QUESTIO | KAH |
| 05/18/2005 | 16:13:33 | TEXT | PRIOR TO TRIAL | KAH |
| 05/18/2005 | 16:13:34 | TEXT | MTN TO PERMIT EXTENSIVE VOIR DIRE ON THE ISSUE OF | KAH |
| 05/23/2005 | 16:12:36 | TEXT | ORDER GRANTING MTN TO PROVIDE COUNSEL WITH MED | LEW |
| 05/23/2005 | 16:12:37 | TEXT | RECORDS | LEW |
| 05/27/2005 | 14:50:12 | TEXT | REPLY TO STATE'S OPPOSITION TO DEFTS MOTION TO | KAH |
| 05/27/2005 | 14:50:13 | TEXT | SUPPRESS | KAH |
| 06/03/2005 | 09:39:46 | TEXT | ORDER DENYING MTN TO SUPPRESS | LEW |
| 06/07/2005 | 08:29:12 | PNME | PARTY W018 NAME CHANGED FROM: INV. SCOTT STOVER | LEW |
| 06/07/2005 | 08:29:13 | PAD1 | PARTY W018 ADD1 CHANGED FROM: LCSO (AW21) | LEW |
| 06/10/2005 | 09:14:51 | TEXT | AMENDED EX PARTE MOTION FOR FUNDS FOR EXPERT | KAH |
| 06/10/2005 | 09:14:52 | TEXT | JURY CONSULTANT | KAH |
| 06/10/2005 | 09:15:34 | TEXT | EX PARTE MOTION TO REIMBURSE COSTS FOR EXTRA- | KAH |
| 06/10/2005 | 09:15:35 | TEXT | ORDINARY EXPENSES | KAH |
| 06/10/2005 | 14:13:43 | DAT2 | SET FOR: JURY TRIAL ON 08/01/2005 AT 0830A (AR10) | LEW |
| 06/10/2005 | 14:32:46 | COMM | SPECIAL SET 8-1 -05 (AR10) | LEW |
| 06/17/2005 | 15:20:22 | TEXT | ORDER DENYING MTN TO REIMBURSE COSTS FOR XTRA EXPE | LEW |
| 06/17/2005 | 15:20:23 | TEXT | ORDER DENYING MTN FOR FUNDS | LEW |
| 06/22/2005 | 15:18:14 | TEXT | ORDER RE: JUROR QUESTIONNARIRE | KAH |
| 07/25/2005 | 13:37:00 | TEXT | MOTION FOR COURT TO GIVE CAUTIONARY INSTRUCTIONS | KAH |
| 07/25/2005 | 13:37:01 | TEXT | PRIOR TO DEATH PENALTY VOIR DIRE | KAH |
| 07/25/2005 | 13:37:02 | TEXT | MOTION FOR CHANGE OF VENUE | KAH |
| 07/25/2005 | 13:37:03 | TEXT | DEFTS OBJECTION TO BEING "SHACKLED" AT TRIAL | KAH |
| 07/25/2005 | 13:37:04 | TEXT | MOTION FOR DISCLOSURE AND PRODUCTION OF JUVENILE | KAH |
| 07/25/2005 | 13:37:05 | TEXT | RECORDS | KAH |
| 07/25/2005 | 14:08:16 | TEXT | DEFENDANT'S REQUESTED GUILT PHASE JURY CHARGES | KAH |
| 07/25/2005 | 14:10:11 | TEXT | DEFENDANT'S PROPOSED DEATH PENALTY VOIR DIRE | KAH |
| 07/25/2005 | 14:10:12 | TEXT | DEFENDANT'S REQUESTED SENTENCING PHASE JURY CHARGE | KAH |
| 07/25/2005 | 14:12:39 | TEXT | ORDER | KAH |

6

| 07/25/2005 | 16:08:16 | TEXT | STATES'S REQUESTED JURY CHARGES | KAH |
| 08/08/2005 | 09:46:18 | BDTE | BIRTH DATE CHANGED FROM: 09/09/1979 (AR01) | KAH |
| 08/08/2005 | 09:46:19 | SSAN | SSN CHANGED FROM: 461619936 (AR01) | KAH |
| 10/17/2005 | 09:44:59 | DJID | DISPOSITION JUDGE ID CHANGED FROM: TO: JVD | KAH |
| 10/17/2005 | 09:45:00 | DISP | CHARGE 01 DISPOSED BY: W/DRN FILED ON: 10/14/2005 | KAH |
| 10/17/2005 | 09:45:00 | DISP | CHARGE 01: MURDER CAPITAL-BURG/#CNTS: 001 (AR10) | KAH |
| 10/17/2005 | 09:45:00 | D001 | ENFORCEMENT STATUS SET TO: "N" (AR10) | KAH |
| 12/05/2005 | 08:58:14 | TEXT | REQUEST FOR LOCAL EXTENSION OF THE TIME TO | KAH |
| 12/05/2005 | 08:58:15 | TEXT | COMPLETE THE REPORTER'S TRANSCRIPT AND ORDER | KAH |
| 12/05/2005 | 08:58:16 | TEXT | GRANTING | KAH |
| 01/03/2006 | 10:45:57 | TEXT | REQUEST FOR EXTENSION OF TIME TO COMPLETE THE | KAH |
| 01/03/2006 | 10:45:58 | TEXT | REPORTER'S TRANSCRIPT | KAH |

7

**COURT'S EXHIBIT "B"**
To ORDER dated 11th day of May, 2006
STATE v. JAMES EDWARD GARY, JR.
Lee County, CC-2002-000488
Alabama Court of Criminal Appeals, CR-05-013

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

THE STATE OF ALABAMA,             *
                                  *
                                  *
vs.                               *
                                  *         Case No. CC-02-488/492
JAMES E. GARY, JR.,               *
                                  *
          Defendant.              *

## ORDER

On Monday, the 23rd day of May, 2005 a Hearing on the Defendant's Motion for Suppression of Statement made by the Defendant was held. Present in open Court were the Defendant, represented by his Attorneys, Hon. Richard K. Keith and Hon. Daniel G. Hamm. and the Hon. Nick Abbett, District Attorney, and Hon David Glanzer, Chief Assistant District Attorney, representing the State.

The Defendant having filed a Motion to Suppress the Defendant's statement made during an interrogation of the Defendant by Investigator Van Jackson, Lee County Sheriff's Office and Investigator Heath Taylor, Russell County Sheriff's Office, on February 19, 2002. The interrogation of the Defendant was video taped.

At this hearing the Court watched the entire video of the Defendant's interrogation, along with a Court Reporter's transcript of the interrogation, and heard arguments from the attorneys.

After careful review of the cases cited in the briefs of the Parties it is the opinion of the Court that the interrogation of the Defendant, James E. Gary, Jr., by Investigators Van Jackson and Heath Taylor was conducted in accordance with the rulings of the Alabama Court of Criminal Appeals in *STATE v. COLLINS*, _ _ _ _ _ So.2d _ _ , 2005 WL 182727, 2005 Ala.Crim.App. Lexis 28, wherein the Court of Criminal Appeals adopted

*Court's Exhibit "B", page 1*

the U.S. Supreme Court's findings in *DAVIS* v. *U.S.*, 512 U.S. 452, 114 S.Ct 2350, 129 L Ed 2d 362, as it applied to post waiver interviews, and Judge Ed Carnes' opinion in *COLEMAN* v. *SINGLETON*, 30 F. 3d 1420 (Tab A), U.S. Court of Appeals for the Eleventh Circuit, addressing the effects of *DAVIS* on cases heard within the Eleventh Circuit after the Supreme Court's ruling in *DAVIS*. Further, the Court is of the opinion that the interrogation of the Defendant was within the guidelines of *MILLER* v. *FENTON*, 796 F.2d 598, at 224 (3d Cir. 1996).

When a Defendant is being interrogated by law enforcement offices, the United States Supreme Court stated that the determination regarding voluntariness of a confession must be viewed in the totality of the circumstances to determine if the accused's will has been overborne, *ARIZONA* v. *FULMINANTE*, 499 U.S. 279, 111 S.Ct. 1246 U.S. Ariz., 1991. Applying the totality-of-the-circumstances test, the Court concludes that the Defendant's confession was voluntary.

**THEREFORE** this Court finds that the Defendant's Motion to Suppress the statement of the Defendant made during the interrogation by Investigators Jackson and Taylor on February 19, 2002 is **DENIED**.

Done this 1st day of June, 2005.

John V. Denson, IV
Circuit Judge

Copy to:
    Richard K. Keith
    Daniel G. Hamm
    Nick Abbott

F I L E D
JUN 03 2005
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

*Court's Exhibit "B", page 2*

27

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

THE STATE OF ALABAMA,                    *
                                         *
                                         *
vs.                                      *
                                         *        Case No. CC-02-488/492
JAMES E. GARY, JR.,                      *
                                         *
        Defendant.                       *

## ORDER

On Monday, the 23rd day of May, 2005 a Hearing on the Defendant's Motion for Suppression of Statement made by the Defendant was held. Present in open Court were the Defendant, represented by his Attorneys, Hon. Richard K. Keith and Hon. Daniel G. Hamm. and the Hon. Nick Abbett, District Attorney, and Hon David Glanzer, Chief Assistant District Attorney, representing the State.

The Defendant having filed a Motion to Suppress the Defendant's statement made during an interrogation of the Defendant by Investigator Van Jackson, Lee County Sheriff's Office and Investigator Heath Taylor, Russell County Sheriff's Office, on February 19, 2002. The interrogation of the Defendant was video taped.

At this hearing the Court watched the entire video of the Defendant's interrogation, along with a Court Reporter's transcript of the interrogation, and heard arguments from the attorneys.

After careful review of the cases cited in the briefs of the Parties it is the opinion of the Court that the interrogation of the Defendant, James E. Gary, Jr., by Investigators Van Jackson and Heath Taylor was conducted in accordance with the rulings of the Alabama Court of Criminal Appeals in *STATE* v. *COLLINS*, _ _ _ _ _ So.2d _ _ , 2005 WL 182727, 2005 Ala.Crim.App. Lexis 28, wherein the Court of Criminal Appeals adopted

the U.S. Supreme Court's findings in *DAVIS* v. *U.S.*, 512 U.S. 452, 114 S.Ct 2350, 129 L Ed 2d 362, as it applied to post waiver interviews, and Judge Ed Carnes' opinion in *COLEMAN* v. *SINGLETON*, 30 F. 3d 1420 (Tab A), U.S. Court of Appeals for the Eleventh Circuit, addressing the effects of *DAVIS* on cases heard within the Eleventh Circuit after the Supreme Court's ruling in *DAVIS*. Further, the Court is of the opinion that the interrogation of the Defendant was within the guidelines of *MILLER* v. *FENTON*, 796 F.2d 598, at 224 (3d Cir. 1996).

When a Defendant is being interrogated by law enforcement offices, the United States Supreme Court stated that the determination regarding voluntariness of a confession must be viewed in the totality of the circumstances to determine if the accused's will has been overborne, *ARIZONA* v. *FULMINANTE*, 499 U.S. 279, 111 S.Ct. 1246 U.S. Ariz., 1991. Applying the totality-of-the-circumstances test, the Court concludes that the Defendant's confession was voluntary.

**THEREFORE** this Court finds that the Defendant's Motion to Suppress the statement of the Defendant made during the interrogation by Investigators Jackson and Taylor on February 19, 2002 is **DENIED.**

Done this 1st day of June, 2005.

John V. Denson, II
Circuit Judge

Copy to:
Richard K. Keith
Daniel G. Hamm
Nick Abbott

FILED

JUN 03 2005

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

*Suppleamental Transcript*

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP - 14    11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

| TO:  THE CLERK OF<br>       THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF NOTICE OF APPEAL:<br>10/12/05 |
|---|---|

| APPELLANT | JAMES EDWARD GARY JR. |
|---|---|
| v. | STATE OF ALABAMA |

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of ___29___ pages) ( _____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

Dated this ___11TH___ day of _____MAY_____ , 20 _06_ .

_____
Circuit Clerk

49

### STATE OF ALABAMA
### IN THE CIRCUIT COURT FOR THE COUNTY OF LEE
### THIRTY-SEVENTH JUDICIAL CIRCUIT
### CRIMINAL

STATE OF ALABAMA,

     PLAINTIFF,

    VS.

JAMES EDWARD GARY, JR.,

    DEFENDANT

CASE NOS. CC-2002-489
CC-2002-490
CC-2002-491
CC-2002-492

### REPORTER'S OFFICIAL TRANSCRIPT OF
### MOTIONS HEARING BEFORE THE COURT

Before:

    HON. JOHN V. DENSON, II, Circuit Judge, in Courtroom Number Four of the Lee County Justice Center located at Opelika, Alabama, on the 23rd of May, 2005, and being concluded on the same day.

### A P P E A R A N C E S

    HON. HON. VANCE NICHOLAS ABBETT, District Attorney for the 37th Judicial Circuit of Alabama, and HON. DAVID GLANZER, Assistant District Attorney for the 37th Judicial Circuit of Alabama, appearing for the State of Alabama.

    MESSRS. HON. RICHARD C. KEITH and HON. DANIEL G. HAMM, Attorneys at Law, appearing for the Defendant.



EXHIBIT
11

50

## WITNESSES AT SUPPRESSION HEARING

PAGE

STATE'S WITNESSES:

VANN JACKSON:
    Direct Exam by Mr. Glanzer        60
    Cross Exam by Mr. Hamm        159
    Redirect Exam by Mr. Glanzer        172
    Recross Exam by Mr. Hamm        180

HEATH TAYLOR:
    Cross Exam by Mr. Keith        184
    Direct Exam by Mr. Glanzer        209

## EXHIBITS AT SUPPRESSION HEARING

STATE'S EXHIBITS:

| NUMBER | MARKED | RECEIVED |
|--------|--------|----------|
| 1 | 63 | 64 |
| 2 | | |
| 3 | 66 | 70 |
| 4 | 147 | 148 |
| 5 | 149 | 150 |
| 6 | 151 | 151 |
| 7 | 154 | 154 |
| 8 | 159 | 159 |

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

51

<u>P R O C E E D I N G S</u>

THE COURT: Everyone ready?

MR. HAMM: Yes, sir.

THE COURT: You ready, Nick?

MR. ABBETT: Ready.

THE COURT: Y'all ready?

MR. KEITH: Yes, sir.

THE COURT: All right. The Court calls for hearing at this time on motions the case of State of Alabama versus James E. Gary, Jr., Case 488 and sequence. This date was previously set by the Court to hear all motions and as I count it there are some eighteen motions. I understand that there's a pending motion to suppress. Both sides want to proceed with that first?

MR. ABBETT: Yes, sir.

THE COURT: All right. The record will show that the Defendant is present in the courtroom along with his two attorneys and the State is present with the witnesses and the victim's family is present and other family members of the Defendant I assume.

All right. You want to address the motion to suppress?

52

MR. GLANZER:  What we intend to do, there's two statements actually, there's one video statement that's over an hour and a half long and we intend to address that one first, along with a Miranda rights on that one.

After Mr. Gary had completed that statement which he made on February 19th of '02 he contacted members of the jail and had a message referred to Vann Jackson that he wanted to talk to him again.  So on April 22nd he was interviewed again.  That one is not on video but it is recorded, a summary of it and there's a rights form going along with it.  So we intend to discuss both of those.

THE COURT:  All right.

MR. KEITH:  Your Honor, Defendant has filed this brief in support of Defendant's motion to suppress based on several grounds, one of which was the Defendant's, you'll see it in the video tape, the Defendant's request for a lawyer he made on several different occasions.  He essentially also invoked his right to remain silent.  He said he didn't want to talk anymore.  And Your Honor, the third prong in the Defendant's Motion to Suppress are the numerous promises made by both Vann Jackson and Heath

53

Taylor wherein they induced the Defendant into
making a confession with the essential promise
that he would be given a sentence of less than
life without parole. They talk about a murder,
they talk about a sentencing where it would be
five to twenty years. And Mr. Gary accepted
that assurance and made the confession and there
was no consideration for that inducement.

THE COURT: All right. One question I want to
ask you, I've read your briefs, both sides,
there's a significant difference in the
transcript of the State as to some critical
things than the transcript that the State, the
State and Defendant's, there are critical
differences there. Have y'all reconciled that
difference?

MR. KEITH: Judge, the Defendant concedes that
in one of -- which is another reason we want the
Court to listen to the tape. It will clear some
of it.

THE COURT: Yeah, I will do that.

MR. KEITH: There is one statement that the
Defendant concedes wherein the Defendant claimed
that he said I want to talk to my lawyer. We
admit that that statement appears to be more
accurately transcribed as y'all might as well

54

1  talk to my lawyer. There is another statement

2  that was made where the State insists that he

3  says y'all can talk to my lawyer. We think it's

4  quite clear from the tape where it says I want

5  to talk to my lawyer. So there are a couple of

6  discrepancies, Judge, on the critical statements

7  and there are a number of different

8  transcriptions of the other non-critical

9  portions of the suppression that we really

10  weren't too concerned about but on the critical

11  parts those were --

12  THE COURT: Yeah, two in particular were pointed

13  out by the State.

14  MR. GLANZER: Judge, if I could, it's probably

15  something we ought to resolve before we get into

16  it, we believe it would be helpful for the Court

17  to follow along with the transcript as it goes.

18  The way the room is set up the actual camera and

19  microphone are in a thermostat within this room,

20  and that thermostat is on the far wall from the

21  Defendant. So his conversations, although

22  pretty well clear are more difficult to hear

23  than the interviewer who is closer to the

24  camera. And in situations like that in front of

25  juries normally what the State would do would be

26  prepare the transcript, hand it out to the jury

55

so they could follow along because it will assist them in understanding it. And the problem we have, we obviously have two transcripts. So I don't know whether the Court would want to have both transcripts in front him or to go back to those key areas and review it at some point, but we do believe it would be of assistance to the Court to have our transcript but obviously the Defense is going to object to that, or maybe not. But I think it would be of assistance and I think it's something we ought to resolve before we get into to the film itself.

MR. ABBETT: Your Honor, our transcript was prepared by an official court reporter, Judge Walker's court reporter.

MR. KEITH: Your Honor, I don't, I think we agree that 99 percent of the transcript as prepared by the court reporter is probably most accurate. We didn't have the benefit of a certified, qualified court reporter when we prepared the transcript.

THE COURT: How did you do your transcript?

MR. KEITH: Myself and a secretary went through it and listened to it and tried to write it all down. It was very difficult and otherwise it's

56

just those critical areas that we're concerned about. Otherwise, the rest of the transcript really we really had no objection to.

THE COURT: Well, I would think we need to try to reconcile that if possible. If we can't we may have to submit both sides.

MR. KEITH: Well, possibly the Court could do that today or if it's in dispute --

THE COURT: Possibly.

MR. KEITH: -- the jury might decide what the tape would mean, I would suggest.

MR. ABBETT: Your Honor, it's the State's position that the tape is controlling anyway, that's the best evidence.

MR. KEITH: That's true.

MR. ABBETT: And what we would ask the Defense to do is introduce their transcript as an exhibit today and we'll introduce ours and then the Court could have both of them to review later as you make a decision on the suppression issue.

THE COURT: Okay.

MR. ABBETT: Is that satisfactory?

MR. KEITH: That's fine. We filed, I think you have our transcript, it was filed with our motion or at some point in time afterwards, I

57

believe.

MR. ABBETT:  We'll mark ours and introduce it.

MR. KEITH:  Does the Court have our version, Judge?

THE COURT:  I don't think I have your version.

MR. KEITH:  I'm not clear if we had filed that with the Court, but I know we did with the District Attorney.

MR. GLANZER:  We'd go ahead and offer ours as State's Exhibit Number Eight at this time.

THE COURT:  Okay.

       (WHEREUPON, the instrument hereinabove referred to was marked for identification and received into evidence as Suppression Hearing Exhibit Number Eight.)

MR. ABBETT:  Is that all right with y'all?

MR. KEITH:  Sure.

MR. ABBETT:  State's Number Eight?

MR. KEITH:  Yeah, we -- Your Honor, our copy is marked up, the one that we've got right now.

THE COURT:  Did you file one with the Clerk?

MR. I don't think we did.  We just gave a copy to the D.A., Judge.

58

THE COURT: Okay. I haven't seen your copy.

MR. HAMM: If we could provide that prior to the Court making a decision?

THE COURT: All right.

MR. KEITH: We've got one, Judge, I've just written on mine as well for today's hearing. We can get one here pretty quick.

THE COURT: I'll follow along with the State's. You want me to sit over here and watch this, is that what you intend to do?

MR. GLANZER: When we get to that point. We might add too that as far as the law that might assist the Court in reviewing the tape, our contention is that at one time obviously Miranda was controlling, strict Miranda, and if there's any reference to a lawyer that usually triggered the, I guess the right to an attorney. That later progressed to if it was an equivocal statement where the law enforcement officer couldn't tell whether he was invoking or not, there became a requirement to pursue what he meant by that last statement. The Davis case which the State is relying on in this has progressed that one step further and said if it's equivocal then unless it's clear to law enforcement based on their experience and

59

1    everything else, they have no requirement to

2    stop. And that's what we're saying here, that

3    he makes these statements that are referring to

4    you can talk to my lawyer, and we're saying that

5    that is not an indication, that's an equivocal

6    statement, it's not unequivocal and that law

7    enforcement, unless it's clear, has the right to

8    continue. And in some cases you've even notice

9    that Vann Jackson basically just looks at him

10    and he keeps going. So we're saying it's

11    entirely voluntary. So that would be the

12    State's position as to what the Court would be

13    looking for.

14    THE COURT: I've read the Davis case and the

15    State versus Collins and I think those are

16    significant cases.

17    MR. KEITH: Yes, sir, our position is he not

18    only made some equivocal requests, he made some

19    unequivocal requests.

20    MR. ABBETT: Your Honor, we're ready to call our

21    first witness.

22    THE COURT: All right. How do you want to do

23    this, you want to put witnesses on and then show

24    the tape?

25    MR. ABBETT: Yes, sir.

26    MR. GLANZER: Yes, sir.

60

THE COURT:  All right.

MR. GLANZER:  State calls Vann Jackson.

THE COURT:  Will you raise your right hand?


**VANN JACKSON,**

a witness, having first been duly sworn to speak the truth,
the whole truth and nothing but the truth, ~~was examined~~ and
testified as follows:


THE COURT:  Take the stand and ~~speak into~~ the
microphone, please.


~~DIRECT EXAMINATION~~

BY MR. GLANZER:

Q.   And what is your name?

A.   Vann Jackson.

Q.   And where are you employed?

A.   Lee County Sheriff's Department.

Q.   And were you so employed back on February 19th of
2002?

A.   Yes, sir.

Q.   And at some point did you become ~~involved~~ in the
investigation of, I guess not only some murders in Lee
County but some in Russell County back on that date?

A.   Yes, sir.

61

Q. And how did you become involved in that?

A. We had a investigation that we were conducting, a double homicide that occurred on Highway 51, Mr. and Mrs. Ratliff. At that point we conducted our investigation which ended up, we had a contact from Russell County about two weeks later that they were investigating a similar homicide. We assisted them and that is how we came together and ended up on the 19th together.

Q. Okay. Which event occurred first?

A. The Ratliff murder.

Q. Okay. And you indicated that you went to Russell County. At some point on the 19th did you come in contact with the Defendant?

A. Yes, sir, I did.

Q. And what was the nature of the contact, how did that come about?

A. We actually had made some interviews with two other Defendants in the case and one of the Defendants in the case had named Mr. Gary, James Gary as a possible suspect in the case.

Q. And did you interview Mr. Gary?

A. Yes, we did.

Q. Was there anybody else involved in the interview of Mr. Gary on that date?

A. Yes, sir.

62

Q.    And who was that?

A.    Lt. Taylor from Russell County Sheriff's Office.

Q.    And is he in the courtroom today?

A.    Yes, sir, he is.

Q.    And is this Mr. Taylor right here?

A.    Yes, sir, it is.


            MR. HAMM:  Excuse me, Your Honor, I'm sorry.  We
            would invoke the rule.
            THE COURT:  Well, all right, it's a little late
            but --
            MR. HAMM:  I apologize, Judge.
            THE COURT:  Mr. Taylor, if you'll wait outside.
            MR. GLANZER:  You can go to the side over here,
            there's a jury room.
            MR. ABBETT:  There's a jury room right there.
            THE COURT:  Just stay close by where we can get
            you on short notice.
            MR. TAYLOR:  Yes, sir.


BY MR. GLANZER:

Q.    Okay.  You indicated that you had interviewed Mr. Gary
      on that date.  Prior to interviewing him did you
      advise him of his constitutional rights under Miranda?

A.    Yes, sir, I did.

Q.    And let me show you what's marked State's Exhibit

63

1    Number One and ask if you can identify this document?

2    A.    Yes, sir, this is a copy of the rights forms I read to

3    him that day.

4

5    (WHEREUPON, the instrument hereinabove

6    referred    to    was    marked    for

7    identification as Suppression Hearing

8    Exhibit Number One.)

9

10    BY MR. GLANZER:

11    Q.    Okay.  And how do you identify that that's the rights

12    form that you read to Mr. Gary that day?

13    A.    It has him identified on it, the date and also my

14    signature.

15    Q.    Okay.  On some place on the form does it also have

16    his?

17    A.    Yes, sir, it does.

18    Q.    And did he sign that in your presence?

19    A.    He did.

20    Q.    If you would, read that entire form into the record.

21    A.    The heading is --

22

23    MR. KEITH:  Objection.  Not for the purposes of

24    this hearing, Your Honor.

25    MR. GLANZER:  We'd offer State's One before --

26    THE COURT:  All right.  That will be admitted.

64

(WHEREUPON, the instrument hereinabove referred to was received into evidence as Suppression Hearing Exhibit Number One.)

THE WITNESS JACKSON: The heading is "Your rights. Name, James Edward Gary. Place, Russell County Sheriff' Office. The date is 2/19/02, time 11:45 a.m. Central Standard Time. Education, eleventh."

The form reads: "Before we ask you any questions you must understand your rights. You have the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you can not afford a lawyer one can be appointed for you before questioning if you wish. If you decide to answer questions now without a lawyer present you will still have the right to stop answering until you talk to a lawyer. You also have the right to stop until you talk to your lawyer."

The next section is "Waiver of rights," also on the same page. It says, "I have read this statement of rights and I understand what my rights are. I am willing to make a statement.

65

and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

Underneath that is signed with an X, name, James Gary. Written into that location, witnessed by Vann Jackson. The time, 11:46 a.m. was when it was completed.

BY MR. GLANZER:

Q. Did you appear to understand everything that you advised him of?

A. Yes, sir, he did.

Q. And did it appear that he could read and write as far as the information on that form?

A. Yes, sir.

Q. Did he appear coherent at the time, and by that I mean did he make sense in what he was saying to you? Did he seem to say the right things back and forth as if he understood the conversation clearly?

A. Yes, sir, he did.

Q. Did he give any indication that he was under the influence of any, like alcohol, drugs or anything of that?

A. No, sir.

66

Q. Did he complain of any illnesses like a headache or any pains that he was suffering or anything that would have caused him any inability to understand what was going on or to be able to give a statement?

A. No, sir.

Q. Did he complain of any injury anytime during that, say I can't go forward or anything like that?

A. He did not.

Q. Did he appear to freely waive his rights and want to make a statement to you?

A. Yes, sir.

Q. Okay. Let me show you what's marked State's Exhibit Number Three and ask if you can identify that?

A. Yes, sir, this is a copy of the tape, of the interview with Mr. Gary.

(WHEREUPON, the instrument hereinabove referred to was marked for identification as State's Exhibit Number Three at the Suppression Hearing.)

BY MR. GLANZER:

Q. Okay. Prior to taking that tape or during it, you indicated that Heath Taylor was present, was there anybody else present besides the two of you?

67

1  A.  No, sir.

2  Q.  Was there anybody present including the both of you,

3      I guess, that threatened Mr. Gary in any way if he

4      didn't make a statement?

5  A.  No, sir.

6  Q.  Did anybody make any promises, to make it go better

7      for him or whatever if he'd make a statement?

8  A.  No, sir.

9  Q.  Did anyone promise him anything of monetary value if

10     he would make a statement?

11 A.  No, sir.

12 Q.  Was there anything of a threatening nature, promising

13     nature that anyone made that was what caused Mr. Gary

14     to give this statement?

15 A.  No, sir.

16 Q.  Were both you and Heath Taylor in the room at the same

17     time?

18 A.  At one point, but no, sir.

19 Q.  Okay.  When the interviews were going on your first

20     interview and then you made a second interview and I

21     believe you made a third interview, was Heath Taylor

22     present during any of those?

23 A.  no, sir.

24 Q.  Was he observing it from another room?

25 A.  He was.

   Q.  Okay.   While Mr. Taylor was in there with the

FORM CSR - LASER REPORTERS PAPER & MFG. CO.   800-826-6313

68

1        Defendant were you observing it from another room?

2   A.  Yes, sir.

3   Q.  Okay.  So in essence y'all knew what was going on

4        inside the room?

5   A.  Yes, sir.

6   Q.  Did y'all have direct contact with each other?  In

7        other words, while he was out of the room and you were

8        in the room were you wearing a microphone or --

9   A.  No, sir.

10   Q.  -- anything like that?  So you were independent from

11       the others in the interview?

12   A.  Yes, we were.

13   Q.  Did you observe Mr. Taylor do anything to influence or

14       threaten or offer anything to the Defendant while you

15       were out of the room?

16   A.  No, sir.

17

18       MR. GLANZER:  We can either play the tape or we

19       can bring in Heath Taylor or we can have you

20       cross or whatever you want to do, but we maybe

21       need both of them in here before we play the

22       tape.

23       MR. HAMM:  We'd like to cross after the tape I

24       think would be most --

25       THE COURT:  After the tape?

26       MR. HAMM:  Yes, sir.

69

THE COURT: All right.

BY MR. GLANZER:

Q.    Okay.  Now, have you reviewed this tape since the recording?

A.    Yes, sir.

Q.    And is it a fair and accurate portrayal of the interview as it was conducted?

A.    Yes, sir.

Q.    Do you, is there anything omitted, changed, altered in any way from the original recording?

A.    No, sir.

Q.    Okay.  The transcript that the State has submitted under State's Exhibit Number Eight, have you had an opportunity to review that transcript?

A.    Yes, sir, I have.

Q.    Have you reviewed that transcript against the tape itself?

A.    Yes, sir.

Q.    And do you feel like the transcript is an accurate portrayal of the tape?

A.    Yes, sir, I do.

Q.    Was there any admissions or additions to the transcript that are not in the tape that you were able to determine?

A.    No, sir.

70

1    Q.    Okay.

2

3        MR. ABBETT:  We offer the tape.

4        MR. GLANZER:  We offer the tape.

5        MR. ABBETT:  What's the new exhibit number?

6        MR. GLANZER:  State's Exhibit Three.

7        THE WITNESS:  Number Three.

8        MR. HAMM:    There are no objections for this

9        hearing.

10       THE COURT:    All right.    Let me ask you

11       something, Detective Jackson.    When you or

12       Taylor are outside are you still looking into

13       the room through a one way mirror?

14       THE WITNESS: No, sir, I was actually viewing it

15       on a television that was set up in another room.

16       THE COURT:  Okay.  That's how you viewed it was

17       the television?

18       THE WITNESS:  Yes, sir.

19       THE COURT:  Anything else?

20           All right.  That will be admitted for the

21       purpose of this hearing.

22

23           (WHEREUPON, the instrument hereinabove

24           marked for identification as State's

25           Exhibit    Number    Three    for    the

26           Suppression Hearing was admitted and

71

1        received   into   evidence   for   the

2        purposes of the Suppression Hearing.)

3

4        MR. GLANZER: Would you rather have Heath Taylor

5        afterwards or do you want him now or would you

6        rather him afterwards and then cross examine?

7        MR. HAMM:   We just want to cross afterwards.

8        However y'all want to do it is fine.

9        MR. GLANZER:  Okay.  We'd go ahead and play the

10       tape at this time and --

11       THE COURT:  All right.

12       MR. GLANZER:  -- maybe the Court will need to

13       move down to the jury box.

14       THE COURT:  All right.

15

16               (WHEREUPON, the taped interview of the

17               Defendant was played for the Court,

18               the transcription of which is as

19               follows, to-wit:)

20

21       VANN JACKSON: "Now, my name is Vann Jackson.  I

22       am going to be back to talk to you in just a

23       minute.  All right?"

24       JAMES GARY:  "Okay."

25       VANN JACKSON: "All right.  Okay.  Like I said,

26       my name is Vann Jackson.  I am an investigator

72

1    with the Lee County Sheriff Office."

2    JAMES GARY:  "Lee County?"

3    VANN JACKSON:  "Yeah.  You know --"

4    JAMES GARY:  "Smith's Station?"

5    VANN JACKSON:  "Yes.  Smith's Station.  And your

6    first name is?"

7    JAMES GARY:  "James Gary."

8    VANN JACKSON:  "Middle name?"

9    JAMES GARY:  (Inaudible.)

10   VANN JACKSON:  "Are you a Junior or anything

11   like that?"

12   JAMES GARY:  "No.  Just James Gary.  That's it."

13   VANN JACKSON:  "What's the highest grade you

14   completed in school?"

15   JAMES GARY:  "Eleventh."

16   VANN JACKSON:  "Did you get a GED or anything?"

17   JAMES GARY:  "Nah."

18   VANN JACKSON:  "All right.  Here's your rights'

19   form.  I'm going to read it to you and get you

20   to just sign right here."

21

22        (Vann Jackson reading rights.)

23

24   VANN JACKSON:  "Do you understand that?"

25   JAMES GARY:  "Yes."

73

(Continues reading waiver.)

VANN JACKSON:   "And coercion means force.   All right?"

JAMES GARY:   (No response.)


(Mr. Gary writing.)


JAMES GARY:   "Man, what y'all want to ask me questions about Smith Station?"

VANN JACKSON:   "Huh?"

JAMES GARY:   "Why y'all want to ask me questions about Smith's Station?   I mean, it's been like about 2000 since we moved from out there."

VANN JACKSON:   "Where did you used to live in Smith Station?"

JAMES GARY:   "Right there on, uh, what is it -- it's on -- the little dirt road right there by the Boons."

VANN JACKSON:   "You are talking about -- uh -- the one that goes behind the Dudley Lumber Company?"

JAMES GARY:   "Uh-huh."   (Negative response.) No, the one -- "

VANN JACKSON:   "By the junkyard?"

JAMES GARY:   "You know where the Boons is at?"

74

1   VANN JACKSON:   "Yeah."

2   JAMES GARY:   "Okay.  Them houses sitting right

3   there before you get to the Boons, we stay right

4   there.  My sister stay right there."

5   VANN JACKSON:   "What's your sister's name?

6   JAMES GARY:   "Tracy Hill."

7   VANN JACKSON:   "Tracy Hill?"

8   JAMES GARY:   "Yeah."

9   VANN JACKSON:   "You got any brothers?"

10  JAMES GARY:   "Nah.  Well, I got a step-brother.

11  Well, my brother-in-law, he married my sister."

12  VANN JACKSON:   "Who is that?"

13  JAMES GARY:   "And I got a little baby brother.

14  Do you know what I am saying?"

15  VANN JACKSON:   "Who is your brother?"

16  JAMES GARY:   "Charles Hill."

17  VANN JACKSON:   "Charles Hill?"

18  JAMES GARY:   "Yeah.  He's gone down the road

19  now."

20  VANN JACKSON:   "Oh, okay.  See, I have been

21  working out in that area for a while, man.  I am

22  just trying to see if I knew who some of your

23  folks was.  Some of your people.  You got people

24  that live out in Crawford?"

25  JAMES GARY:   "Nah.  Not that I know of."

    VANN JACKSON:   "You don't know any down there?

75

1  Because there is some Garys that live out that

2  way, too."

3  JAMES GARY:  "No, see, like my dad's uncle, see

4  he was a Gary. Do you see what I am saying? My

5  family is really Alexanders and Coles."

6  VANN JACKSON:  "Oh, okay. Well, there are some

7  Alexanders out there, too, ain't it?"

8  JAMES GARY:  "Yeah." (Inaudible.)

9  VANN JACKSON:  "Oh, okay. All right. Well, why

10  do you think that a Lee County Investigator

11  would be interested in talking to you?"a

12  JAMES GARY:  "Um, I'd say about some drugs.

13  That's why I say I ain't -- do you know what I

14  am saying -- I know I ain't sold nobody nothing,

15  so -- you know."

16  VANN JACKSON:  "Can you think of any other

17  reason?"

18  JAMES GARY:  "I mean, tickets. You know, but I

19  ain't never even got no ticket out there,

20  though."

21  VANN JACKSON:  "You ain't got no ticket out

22  there? What are you in jail for?"

23  JAMES GARY:  "Tickets."

24  VANN JACKSON:  "What, driving?"

25  JAMES GARY:  "Yeah."

26  VANN JACKSON:  "What you got?"

76

JAMES GARY:  "False information."

VANN JACKSON:  "When did this happen?"

JAMES GARY:  "Uh, about last year, around this time."

VANN JACKSON:  "Oh, So you just -- they just ran up on you like that?"

JAMES GARY:  "Well, I had went to court, do you know what I'm saying, my court date came up.  I went on to court.  I got a little bit."

VANN JACKSON:  "Oh.  Okay.  So how long have you been locked up?"

JAMES GARY:  "Uh, probably about -- about fourteen days."

VANN JACKSON:  "Fourteen days.  See, you said that like you wasn't sure.  Most of the folks that I talk to that's in jail, they can tell you exactly how many days they did."

JAMES GARY:  "I mean, it's like that give me sixty days, so -- do you know what I am saying?"

VANN JACKSON:  "All right."

JAMES GARY:  "Yes."

VANN JACKSON:  "Well, like I told you, man, what I do is I investigate major cases, you know, and that's what I'm doing now."

JAMES GARY:  "Okay."

VANN JACKSON:  "And, uh, we have been working on

77

it for quite some time, and so that's why I pulled you out to talk to you about it. And I want to give you a chance to think about the stuff that you have been involved with, and, uh, we are going to have to talk about it because it's very serious, and I know you know exactly what I'm talking about, because we did a lot of legwork on it and we got a lot of information, and, you know, the best thing now is for you to tell the truth so we can work through all this stuff. So --"

JAMES GARY: "Well, what you want to know?"

VANN JACKSON: "Well, the first thing is, is how long have you known Michael?"

JAMES GARY: "Who?"

VANN JACKSON: "How long have you know Michael?"

JAMES GARY: "Michael? What Michael?"

VANN JACKSON: "That works for the bonding company."

JAMES GARY: "Oh, shit. Since he got me out on bond."

VANN JACKSON: "When was that?"

JAMES GARY: "September."

VANN JACKSON: "Back in September?"

JAMES GARY: "Yeah."

VANN JACKSON: "How much did you have to pay him

78

to get out?"

JAMES GARY: "Uh, well, I had a $16,000 bond."

VANN JACKSON: "What kind of case was that on?"

JAMES GARY: "A trafficking charge."

VANN JACKSON: "All right."

JAMES GARY: "But I sat down for a month before, do you know what I am saying, they dropped my bond. See, it was 40 -- I think it was like about $42,000. They dropped my bond to $16,000.

VANN JACKSON: "So you have been working since you got out on it?"

JAMES GARY: "Oh, yeah. I do all kinds of stuff now. Do you know what I am saying? I hang sheetrock. Do you know what I am saying. Paint. Yard work."

VANN JACKSON: "All right. When was the last time you saw Michael?"

JAMES GARY: "Hum, I could say like -- I know I made my last payment to him like -- like at the end -- right before Christmas."

VANN JACKSON: Right before Christmas?"

JAMES GARY: "Uh-huh. (Affirmative response.)

VANN JACKSON: "You haven't seen him since then?"

JAMES GARY: (Shakes head in the negative.)

VANN JACKSON: "Now, see, now what I'm doing now

79

is, is I'm asking you questions before I told
you we did a lot of legwork on this case that
I'm working on right now and that I'm talking to
you about, and it's very important that you be
truthful because t his is serious.  Serious --"

JAMES GARY:  "Yeah.  I seen them boys on the
news, through, and that's fucked up that they
killed that little child like that, man.  That's
nasty.

VANN JACKSON:  "Yeah."

JAMES GARY:  "I mean, you know, that was a baby,
man.  Do you know what I am saying."

VANN JACKSON:  "So what about the other boy that
you saw on the news?"

JAMES GARY:  "I don't know that cat."

VANN JACKSON:  "You don't know him?"

JAMES GARY:  (Shaking head in the negative.)

VANN JACKSON:  "Never met him?"

JAMES GARY:  (Shaking head in the negative.)

VANN JACKSON:  "Well, let me tell you this right
here, what we are working on in Lee County is
the death of two folks, and uh, it's in your
best interest to go on and shoot it to me
straight what happened."

JAMES GARY:  "It's in my best interest?"

VANN JACKSON:  "It's in your best interest to

80

tell me the truth about what happened on that
day."

JAMES GARY:    "I don't know nothing about no
death, now.  Do you know what I'm saying.  I do
know -- I don't know nothing about no death and
shit like that, man.  I mean --"

VANN JACKSON:  "uh-huh.  You don't know anything
about it?"

JAMES GARY:    "Not no death.  Not in no Lee
County.  Nothing like that."

VANN JACKSON:  "What kind of car does Michael
drive?"

JAMES GARY:  "I don't know.  He used to drive a
red Blazer."

VANN JACKSON:  "What else?"

JAMES GARY:   "I know he used to come in that
Blazer and that red TransAm."

VANN JACKSON:  "And what else?"

JAMES GARY:  "Shit.  Ain't no telling.  I know
he come down to my house, do you know what I am
saying, in like the red Blazer and the TransAm."

VANN JACKSON:  "When was the last time he came
down to your house?"

JAMES GARY:   "Shit, like in -- before Christmas
when I made my last payment?"

VANN JACKSON:   "What if I were to tell you that

81

he had ben to your house since then that we know
of?"

JAMES GARY: "Shit." (Shaking head negatively.)

VANN JACKSON: "See, what I'm trying to tell you
is, is we have been doing a lot of homework,
man. We know what has happened, and right now,
it's in your best interest to tell me the truth
about what happened. Because you know, I know
this man, He is making your bond, he got you
out; you owe him money, but you need to come
clean."

JAMES GARY: "I done paid him his money . I
don't owe him nothing."

VANn JACKSON: "Now, you need to tell the truth
about what happened."

JAMES GARY: "Well, he got me out on bond. I
started making payments on the bond and paid him
off. I mean --"

VANN JACKSON: "When did you pay him off?"

JAMES GARY: "Like before Christmas."

VANN JACKSON: "Where'd you get the money?"

JAMES GARY: "I been working doing all kinds of
stuff. I'm telling you."

VANN JACKSON: "For who?"

JAMES GARY: "Man, wherever I could go to work
at. I could do some work for you if you let me.

82

I know how to hang sheetrock; do you know what
I'm saying.  I did some work out on Summerville
road."

VANN JACKSON:  "Out on Summerville Road?"

JAMES GARY:  "Yeah."

VANN JACKSON:  "Where at?"

JAMES GARY:  "Right there on -- that yellow
house.  You see that yellow house right across
from that big house; that's the lawyer's house -
- the Judge house --"

VANN JACKSON:  "Uh-huh."

JAMES GARY:  "-- that yellow house.  We painted
that.  Me and my Uncle Rick."

VANN JACKSON:  "Rick who?"

JAMES GARY:  "Rick -- Rick Crool."

VANN JACKSON:  "Oh, okay."

JAMES GARY:  "Yeah."

VANN JACKSON:  "Oh.  All right.  Well, Mike has
got you in a position now that you need to come
clean and tell the truth about what happened,
and that's what I'm asking you, man.  I'm asking
you what happened.  Right now, you know, this is
-- this is strictly for you to have an
opportunity to tell your side of what happened."

JAMES GARY:  "Of what?  Tell my side of what?
Okay.  You saying -- uh -- he got me out on

83

bond."

VANN JACKSON:    "Uh-huh."    (Affirmative response.)

JAMES GARY:  "Okay. I made my payment -- paid -- what -- what you want me to tell you?"

VANN JACKSON:    "I want you to tell me what happened the day he came and got you -- that Mike came and got you."

JAMES GARY:   "He came and got me and took me home."

VANN JACKSON:   "And y'all went to these folks' house.  He told you what needed to be done."

JAMES GARY:   "I ain't never went nowhere with Mike.  I ain't never went nowhere with Mike."

VANN JACKSON:   "See, that's what I'm saying. Now, see, we have got evidence to show that you did."

JAMES GARY:   "Well, you ain't shown me because I'm telling you I ain't never went nowhere with Mike.  Nowhere.  Anybody, do you know what I'm saying, can tell you I ain't never went nowhere -- my old lady house, now -- that man came down there and hounded me about that money.  I give him his money.  That was it.  I paid him off right before Christmas.  It was probably about 15th or 16th, somewhere up in there.  But that

84

was it. Do you know what I'm saying. I ain't got nothing else to do with that. Mike -- I don't owe him nothing else, so -- do you know what I'm saying, about what he done did to the little child, he was wrong for that, and he is going to get what he deserves, but other than that, I ain't got no dealings with Mike, as far as he got me out on bond and got my boys out on bond. Do you know what I'm saying."

VANN JACKSON:  "What was your boy in jail for?"

JAMES GARY:  "Dope."

VANN JACKSON:  "Where does he live at?"

JAMES GARY:  "Oh, he locked up now."

VANN JACKSON:  "Where did he live when he -- before he got locked up?"

JAMES GARY:  "Out there by the Boons. Right across from the dog wash." (Phonetic).

VANN JACKSON:  "And so, uh, so I know you all -- you have been involved in cocaine selling."

JAMES GARY:  "That's what I thought y'all was trying to put a little sale case on me, man. I ain't -- do you know what I'm saying -- I ain't selling nobody no drugs, man."

VANN JACKSON:  "What about Mike and cocaine? What's up with that?"

JAMES GARY:  "Uh, I know my partner, he said

85

1  something about it before, do you know what I'm

2  saying?"

3  VANN JACKSON:  "Who did?"

4  JAMES GARY:  "Little T."

5  VANN JACKSON:  "What did he say?"

6  JAMES GARY:  "He was like saying something

7  about, do you know what I'm saying, he wanted to

8  hook up."

9  VANN JACKSON:  "He wanted to hook up with Mike?"

10  JAMES GARY:  "Yeah.  I guess so.  But see, I

11  didn't trust him.  I was like, shit, he is a

12  bond, but he wanted to fuck with us once we got

13  out on bond.  This was after, do you know what

14  I'm saying, he got us out on bond.  He got my

15  boy out on bond."

16  VANN  JACKSON:    "Uh-huh."    (Affirmative

17  response.)

18  JAMES GARY:  "So I was, like, well, that don't

19  sound right because he is on my bond, so why he

20  want, do you know what I'm saying, to be into

21  drugs, do you know what I'm saying?  Then y'all

22  was in with it."

23  VANN JACKSON:  "So what did Little T do?"

24  JAMES GARY:  "Nothing really.  He couldn't do

25  nothing because it was my call."

26  VANN JACKSON:  "So he didn't mess with him at

86

all?"

JAMES GARY:  (Shaking head negatively.)  "Huh-uh.  It was my choice."

VANN JACKSON:  "Okay.  What is Little T's real name?"

JAMES GARY:  "Benjamin Hastings."

VANN JACKSON:  "Benjamin -- Benjamin Hastings?"

JAMES GARY:  "Yeah."

VANN JACKSON:  "So y'all got locked up together?"

JAMES GARY:  "Yeah.  Do you know what I'm saying.  He got locked up the day I got locked up.  See, they on some --"

VANN JACKSON:  "All right."

JAMES GARY:  "-- some more cases, though, do you know what I'm saying?  Do you know what I am saying; out there by the Boons.  That's what I am saying.  When y'all called me out saying Lee County, out in Smith's Station by the Boons, do you know what I am saying, I said I know I ain't sold -- I ain't do no selling out there, do you know what I am saying."

VANN JACKSON:  Well, uh, we are going to have to deal with this today, man, and I think from what I observe from you that you want to do the right thing, and the right thing is this: --"

87

JAMES GARY:  "Yeah, I'm trying to --"

VANN JACKSON:  "--is for you to tell the truth. See, you are not telling me the truth right now. Let me tell you this --"

JAMES GARY:  "I am not going to lie.  I'm telling you the truth, man."

VANN JACKSON:  "I am fixing to explain this to you.  I'm fixing to explain this to you.  We have done a tremendous amount of legwork in this case.  Not the one involving the little boy. The one that happened in Lee County.  And what we have discovered is, is that you were with these boys when it happened, and the only person that can tell the circumstances about -- behind why you were with them is you.  Okay.  What we are getting told is that you is the main one."

JAMES GARY:  "The main one of what?"

VANN JACKSON:  "And so you need to -- in committing these murders."

JAMES GARY:  "Man, y'all gone crazy.  Look a here.  Listen to me, brother.  Now, I admit that I mess around these streets and I do a lot of hustling, but hey, I don't care; you can go out in the middle of the street and ask anybody about me.  I make my money and I go home.  I don't got nothing to do with no kind of murder.

88

I ain't never harmed or hurt nobody; never. I make my money and do my thing now. But y'all ain't putting me in no murders and all that junk there because I ain't got nothing to do with no murder. Anybody can tell you, you can go catch anybody on the street. Any -- any inform. Anything. Anybody you can find that will tell you I ain't fixing to do nothing like that. I'm telling you. I promise you that. That's on my mamma's grave and my mamma's been dead for thirteen years. I ain't never hurt, murdered and all that shit. I ain't -- y'all need to go find out who did it."

VANN JACKSON:   "We have who did it.   What we need is for you to tell us what happened.   You are not going --"

JAMES GARY:  "See, you telling me --"

VANN JACKSON:  "Because from what we got as far as evidence -"

JAMES GARY:  "You're -- see, you steadily saying that I need to tell you something about -- I can tell you anything about drugs."

VANN JACKSON:   "You need to tell me what happened that night."

JAMES GARY:  "But I don't know nothing about no murder."

89

VANN JACKSON: "You was with Mike and this other boy. You need to tell the truth because we have tracked this thing from your house to the storage building over there in Phenix City. We tracked this thing to LaGrange. We tracked this thing to these folks' house, and everyone continues to say and some which have picked out you as the person that as with them. You need to tell me what happened and how it was t hat you was with them because it's gotten serious. Anything is possible, but we need to hear -- we need to hear your side of what happened that day. It's that serious. And any -- any lies right now is the worst thing you can do."

JAMES GARY: "I'm just saying, man, what is you trying to say: I'm talking about, okay, you are saying this man got me out on bond. True enough. Okay. Yeah. He come to my house to, do you know what I am saying, to pick his payment up, worrying me and shit; do you know what I am saying, worrying the shit out of me, waking my children up. Okay? But see, you talking, do you know what I'm saying, on some other shit in Lee County. Lee County."

VANN  JACKSON:       "Uh-huh."       (Affirmative response.)

90

JAMES GARY:  "Smith Station."

VANN JACKSON:  "Opelika."

JAMES GARY:  "See, I don't even go to Opelika."

VANN JACKSON:  "You did this day."

JAMES GARY:  "I mean, that's all I can tell you,
man.  All I can tell you, man.  All I can tell
you is, do you know what I am saying, I'm just
telling you, do you know what I am saying, this
is what you came at me with.  I'm telling you
what I know, do you know what I am saying.  True
enough, he got me out on bond, yeah, worry the
shit out of me, do you know what I am saying.  I
paid him the money, but as far as me going
anywhere with him like that, no, I ain't had no
dealings with him like that on nothing, no
drugs, no nothing."

VANN JACKSON:  "Well --"

JAMES GARY:  "I mean, that -- that's the
straight up, honest truth.  That's the truth.  I
mean, do you know what I am saying, I mean, do
you know what I am saying, whatever you got, you
just got, but that -- you ain't got me on it
because I'm telling you I ain't got nothing to
do with no shit like that, do you know what I am
saying.  I hustle.  Don't get me wrong.  I admit
that, do you know what I am saying.  I'm locked

91

up and I got to go to court for that, do you
know what I am saying. I hustle. It's obvious
to me. Everybody know what I do; but, you see,
I ain't never did nothing to nobody. I ain't
never hurt nobody."

VANN JACKSON:    "Listen.    I understand you
hustle, and I understand why you are saying you
do it and it's our job to do what we need to
do."

JAMES GARY:    "I have hustled.    I ain't still
hustling now."

VANN JACKSON:    "I ain't concerned about that."

JAMES GARY:    "Yeah."

VANN JACKSON:    "Right now the only thing I'm
concerned about is what happened the night the
three of y'all were together.    You went to
Opelika, and now two people are dead.    Today,
this thing is not going to go away, and the
thing that you are going to have to do is you
are going to have to face up to it, and you are
going to have to tell the truth about it because
lying ain't going to work."

JAMES GARY:    "You are steadily saying I'm lying,
man, and I'm telling you everything about -- do
you know what I am saying, you asking me about
dealings with this man Mike, do you know what I

92

am saying.  I'm telling you everything that --

do you know what I am saying, that we ever had

dealings with.  That's it.  That man got me out

on bond, do you know what I am saying.  He

hounded the shit out of me.  You can ask -- my

old lady is at home.  She is at home."

VANN JACKSON: "Yeah.  Well, you know, I thought

that, you know, a man like you of some

intelligence would know when it gets to the

point, the best thing for you to do is to t ell

the truth.  It's not -- it's -- you -- the only

person that can take care of you and all of this

is --"

JAMES GARY:  "Is me."

VANN JACKSON:  "-- is tell the truth of what

happened.  I'm telling you step by step all the

things that you are up against and you are not

going to be able to explain why different people

from all over, Seale, Seale Road, Phenix City,

Opelika, and LaGrange, they don't have any

reason to lie on you.  They don't have any

reason.  So if you really see what I'm telling

you --"

JAMES GARY: "Nah.  you need to go on and speak

out in open because, do you know what I am

saying, you are talking about --"

93

VANN JACKSON:   "Out in the open, man.  Out in the open now is, I don't know -- I know that your connection with Mike is this bonding thing. I don't know how much money you owe him."

JAMES GARY:   "1,600."

VANN JACKSON:   "You know that you paid him. Paid him with cash.  And you know where that money came from."

JAMES GARY:  "Two here or three or whatever."

VANN JACKSON:  "So what I'm getting at is you need to tell me the truth about what happened. Just lay it on the line.  Just lay it on the line."

JAMES GARY:  "I'm trying.  See, you are still speaking in general, man."

VANN JACKSON:  "No, I'm not, man.  No, I'm not, man.

JAMES GARY:  "You take it down --"

VANN JACKSON:  "Man, if somebody -- if somebody -- if someone asks you to do something and be involved in something and you might not want to do it, but you feel pressured -- I mean, I don't know.  If that's it, you need to tell me Everything you did was because of money and that's why you went and did this, you need to tell me.  If you just went along, you need to

94

1    tell me.  But whatever the circumstances is you

2    need to tell me what happened."

3    JAMES GARY:   "I'm telling you what happened,

4    man.  The man used to come to my house, worry

5    the shit out of me about me paying him."

6    VANN JACKSON:  "About his money."

7    JAMES GARY:  "Every time he came, I have him

8    $150, $200.  I ain't just straight gave him no

9    cash money because I ain't have it.  I still

10   ain't got no money.  I always gave him -- when

11   he come -- every time he came -- my old lady can

12   tell you, every time I would give him 100.  I

13   even got money from her when she get paid, $200,

14   $150, what I ain't have.  Every time I paid him,

15.  just like that.  Other than that, that's that.

16   I ain't have no dealings with him, man.

17   VANN JACKSON:  "Man -- they tell me --"

18   JAMES GARY:   "You need to tell me what you

19   trying to say."

20   VANN JACKSON:  "They tell me you did it all as

21   well."

22   JAMES GARY:  "Did what?"

23   VANN JACKSON:  "Went in the house."

24   JAMES GARY:  "Who is they?  Who is they?"

25   VANN JACKSON:  "The guys you was with the night

16   this happened.  Mike and this other guy that you

95

1   say you don't know.  He knows you and you were

2   with them."

3   JAMES GARY:   "Well, I mean, whatever you are

4   going to say, you got to --"

5   VANN JACKSON:  Man, what I want you to do, man,

6   is just tell me the truth about what happened

7   and we will take it step by step.  Right now

8   they are blaming everything on you."

9   JAMES GARY:   "Me?"

10  VANN JACKSON:  "They are blaming everything on

11  you."

12  JAMES GARY:   "How I killed the kid and I'm in

13  jail?"

14  VANN JACKSON:  "Nah.  Not that case.  Uh, the

15  two folks in Opelika.  That's in Lee County.

16  That's what I'm talking to you about, man.  I'm

17  not talking to you about the little kid because

18  you was in jail.  We know that.  I'm talking

19  about the folks in Lee County."

20  JAMES GARY:   (Shaking head in the negative.)

21  VANN JACKSON:  "Oh, yeah."

22  JAMES GARY:   "You are saying Opelika.  Do you

23  know what I am saying?  I know I ain't been no

24  farther than Smith's Station, man.  I'm telling

25  you."

26  VANN JACKSON:  We've got people that's telling

96

1     us, besides these guys, that you was in

2     Opelika."

3     JAMES GARY: "Well shit, you got me on a camera

4     or a picture or anything, because I'm telling

5     you, I ain't been to no Opelika. As far as I

6     been -- you are talking about Lee County. I

7     know Smith's Station out there on Almond Road

8     right there by the Boons. That is as far as I

9     ever been. And you can even go bring my sister

10    back up, because I stayed out there with them."

11    VANN JACKSON: "Uh-huh." (Affirmative

12    response.)

13    JAMES GARY: "We had a house in the back, do you

14    know what I am saying, other than that, I ain't

15    been no farther, no -- do you know what I am

16    saying, you are talking about Opelika. I don't

17    know nobody in no Opelika. And I do not -- I

18    will tell you again, I ain't had no dealings

19    with no Mike like that. He used to come worry

20    me about that money. He got paid. I paid him

21    his money. He done left me alone. My old lady

22    can tell you that. She can tell you. She at

23    home now. Now, you trying to, do you know what

24    i am saying, talking about I killed two people

25    now. No, man. I'm telling you, I might do my

26    little thing on the side, man, but I ain't going

97

to hurt nobody, man, and anybody that knows me
can tell you that, man. I don't care what they
say, do you know what I am saying. They ain't
got me on nothing like that, man. Not that, do
you know what I am saying. Now, I'm thinking
like, okay. True enough. I know I ain't sold
nobody no dope, do you know what I am saying,
because I ain't never really just straight out
hand sold nobody nothing, but as far as, do you
know what I am saying, you are talking about
killing somebody, no, man. That ain't even me,
man. I ain't even that type of person, man. I
do a lot of things. Now, don't get me wrong,
now, as far as hustling, do you know what I am
saying, I might, do you know what I am saying,
steal a little bit, shoot me some dice, do you
know what I am saying, but as far as that, I
ain't going to do nothing like that, man, and
that's the honest to God truth, man. I'm
telling you. That's the -- that's the truth. I
mean, do you know what I am saying, that's just
-- that's it. That's what it is. That is what
is it. So if this is why y'all got me shackled
up --"

VANN JACKSON:  "Yeap.  Because today is the
day."

98

JAMES GARY:  "Today is the day for what?"

VANN JACKSON:  "Where you are going to face the music.  What I'm telling you right now is that this thing is going the distance today.  It's going the distance.  It's over with.  And my only hope is that you are going to tell the truth."

JAMES GARY:  "Well, only hope.  Y'all are saying y'all got me on this, I might as well stop talking now and y'all talk to my lawyer because I'm telling you, man, I ain't had no dealings with that man in no kind of way as far as he got me out on bond and worried the shit out of me about that money, man.  As far as that, that's it.  That's it.  Do you know what I am saying, if you know what I'm saying, you saying you going to put something like that on me, then you might as well talk to my lawyer then, and it's just that because it ain't me, bro.  Now, I promise you and that's t he honest to God truth, and I'll put that on my mamma, and she's been dead thirteen years."

VANN JACKSON:  "All right.  Well, you just sit here, man.  It's gonna be a while, like I said, it's gonna be a while.  But you know, I would like to show you something."

99

1   JAMES GARY: "Show me.   Show me.   I would like

2   to see."

3   VANN JACKSON:   "Well, you know, I hate for

4   somebody to make a decision to not tell the

5   truth and that they suffer for the rest of their

6   life, and it's a big decision.   That's a big

7   choice.

8   JAMES GARY:   "Man, you can talk to my lawyer,

9   man.   Because I'm telling you I ain't got

10  nothing to do with no shit like that, man.

11  That's on everything, man.   Everything.   My

12  children.  Everything, man.  I ain't got shit to

13  do with no shit like that.   I do my thing, true

14  enough, but I ain't fixing to do nothing like

15  that.   I ain't fixing to go no distance, do you

16  know what I am saying, to do nothing.   I hustle.

17  Do you know what I am saying; it's obvious to

18  everybody that knows, it's there, it's out there

19  in the open.   I got to go to court for it now,

20  but that is as far as I'm gonna go.   As far as

21  you talking about killing somebody, ain't no way

22  in the world I'll kill nobody, especially no

23  children.   And I know for a fact I ain't killed

24  no children.   You keep hollering about two

25  people got killed, that man and that child.

26  That's them two people.   But y'all ain't fixing

100

1    to put that on me because I know I been in

2    jail."

3    VANN JACKSON:  Oh, no.  We're not trying to put

4    that on you.  Like I told you, that -- that case

5    right now, we know you didn't have nothing to do

6    with that."

7    JAMES GARY:  "Well, what are you talking about

8    some two people murdered?  Do you know what I am

9    saying?"

10    VANN JACKSON:  "This happened to two people

11    that's in Opelika and this was before this

12    happened with this little kid and this man.

13    That's what we are talking about."

14    JAMES GARY:  I'm telling you I ain't been to

15    Opelika, man.  I ain't' been to Opelika for

16    nothing."

17    VANN JACKSON:  "Do you want me to show you?"

18    JAMES GARY:  "Yeah."

19    VANN JACKSON:  "Hold on a minute.  I'll be right

20    back.  Just sit there."

21

22    (Pause in statement while Detective

23    Jackson left the room, after which the

24    following occurred, to-wit:)

25

26    VANN JACKSON:  "Let's see.  'Mike left me and

101

James at the storage building on Pierce Road in
Phenix City.' That is just one segment here.
That's just one segment."

JAMES GARY: "I mean, Mike left me and James at
a storage room."

VANN JACKSON: "Yeap. You know who that is?"

JAMES GARY: (Nodding head affirmatively.)

VANN JACKSON: "Who is that right here?"


        (Mr. Gary viewing document.)


JAMES GARY: "That's me."

VANN JACKSON: "Well, I'm telling you, man, we
have been working on it and, uh, we were trying
to provide you an opportunity to tell your side,
and, uh, that's -- that's why I wanted to talk
to you, to give you that opportunity, and, uh,
you know, if you want to see it, I will show you
a little segment that these boys are putting
everything on you, and if you continue to not
tell the truth about what happened, then I don't
know what we can do. But hold on. Let me see.
I am going to get this thing and show you.
Because I want you to know exactly what you are
up against, because everybody is saying you did
it. Other people out there that don't know you

102

1   are saying you was with them and uh --"

2   JAMES GARY:  "Uh, show me what you have got to

3   show me, other than that, talk to my lawyer.  I

4   would like to see it, though."

5

6        (Short pause while Jackson left and

7         re-entered.)

8

9   VANN JACKSON:  "Now, this isn't it.  This isn't

10  everything, but I'm going to collect this stuff

11  right here because what we're talking about is

12  so serious that I think that you really need to

13  think about, you know, what we are talking about

14  and reading the paper or trying to take your

15  mind away from it, this is -- this is about you.

16  This is about the future for you, and you need

17  to think about what I'm talking to you about.

18  That's one thing, but I'm still getting you

19  another thing that's going to, you know, show

20  you how important this is."

21

22       (Detective Jackson left the room and

23        Keith Taylor entered the room.)

24

25  HEATH TAYLOR:  "How are you doing?"

26  JAMES GARY:  "All right."

103

HEATH TAYLOR:  "Good.  My name is Heath Taylor.
I'm a lieutenant here with the Sheriff's Office
in Russell County.  I'm kind of over the
investigative unit back here.  I'm just going to
talk to you for a few minutes.  I'm gonna take
these cuffs off you.  Are you going to go
somewhere?  Huh?"

JAMES GARY:  "I ain't going nowhere, man."

HEATH TAYLOR:  "All right.  I'm just -- I'm just
asking, bro.  I just don't -- you know.  I'll
take the cuffs off of you and make you a little
more comfortable, but you know, don't act crazy
up in here."

JAMES GARY:  "I ain't gonna act crazy."

HEATH TAYLOR:  "You know, we get some folks up
here sometimes that just act all crazy.  I just
want to talk to you for a few minutes while
Detective Jackson is getting a couple of things
ready that he wants to show you.  Um, James,
there's a couple of things t hat I think is
important to you, okay, and I'm just gonna be
front with you.  Okay.  I'm working the case
that happened a couple of days ago, but I have
been working with Vann and the folks from Lee
County for a long time, and they are really good
guys.  They came down and helped me yesterday

104

and we got to looking at some things, and some
things happened that kind of fell into place.
Okay? I'm just telling you. From the case I'm
working in Russell County that you was in jail
on, you ain't got nothing to do with. I agree
with you. You keep saying --"

JAMES GARY: "That's what I keep telling him."

HEATH TAYLOR: "But listen to me. There are
some things that happened, bro, that go back a
couple of weeks. Now, I'm going to tell you
something. Look at me. Now, I'm going to tell
you some things that are not important to me.
They're not important to Vann. They are not
important to nobody but James. I'm gonna tell
you that. Now you can believe me. You don't
have to believe me. You've been in the system
long enough to know. Okay? When you go before
somebody, you go before a jury, you go before a
judge, you go before me, you talk to your
attorney, you talk to the district attorney, it
don't matter. In this business -- and I'm
talking law enforcement, the --the justice
system. Okay? You follow me? When you talk to
somebody in that system, the only type person
that they care to help is a person who is still
a good person, who has had something bad happen

105

to them.  The people that have no conscience, the people that don't care about any mistakes they make, the people that don't want to do the right thing, they lock that person up for the rest of their life.  You know that.  You see that on a daily basis.  Am I telling you the truth?"

JAMES GARY:  "Yeah."

HEATH TAYLOR:  "When you are a person who we in this profession consider to be socially redeemable, you're a good person; you have redeeming values that are good, you are sociable.  And I mean -- socially, I mean society in -- in a whole.  That is what we consider somebody that we want to rehabilitate, change their actions, and put them back in society.  You follow me?  When there is a person who what we consider a sociopath -- now, that's a big word, but do you know what a sociopath is?"

JAMES GARY:  (Shaking head negatively.)

HEATH TAYLOR:  "A sociopath in this line of work is somebody who has no redeeming values; who is a bad person, who has no social value in our society, who we don't want to rehabilitate, and put back out on the streets.  Somebody that we

952

106

1    want to lock away for as long as we can.  That's

2    what we call a sociopath personality.  Now,

3    there's only -- that's only two people that we

4    deal with.  That's it.  A person who is a good

5    person who has had bad things happen to them.  I

6    have had bad things happen to me.  I have made

7    bad decisions, but I am a good person.  You are

8    a good person who has had some bad unfortunate

9    things happen in your life that have caused you

10    to make bad decisions.  That's understandable,

11    but you are still a good person.  Okay?  The

12    person that I'm talking about is the person --

13    the other -- there's only two.  The other person

14    I'm talking about is that guy that I'm telling

15    you is a sociopath personalty.  That's a bad

16    person.  That's a -- that's a bad, bad person

17    that we never want to get out of the jail as

18    long as they live.  Now, when you go before a

19    judge or a jury, you don't want to be portrayed

20    as a sociopath personality.  Right?"

21    JAMES GARY:  (Nodding head affirmatively.)

22    HEATH TAYLOR:  "You don't want to be the bad

23    guy.  You want to be portrayed as a good guy.

24    Somebody that is a good guy that has had some

25    bad incidents happen.  You see what I'm saying?

26    You want them to think that you are worth

107

1    putting back in society. Do you not follow what

2    I'm saying?"

3    JAMES GARY: "Man, you lost me for a second."

4    HEATH TAYLOR: "Well, what I'm saying is -- is

5    when you go before a jury or a judge, you want

6    that judge to know that you are a good person.

7    James is a good person. You don't want that

8    judge to think that you are a sociopath

9    personality, that you have no conscious, that

10   you don't care about things you've done wrong.

11   Do you follow what I'm saying? You want that

12   judge to know that you are a good guy. You just

13   made some mistakes like everybody else in this

14   world. What I'm telling you, James, is you

15   can't do that unless you're honest. You can't

16   portray that you're a good guy that made

17   mistakes unless you're honest. We had two guys

18   yesterday and the day before in a Russell County

19   case who decided they can't make a -- anybody

20   believe that they are not bad people unless they

21   tell the truth. And I'm telling you -- "

22   JAMES GARY: (Inaudible.)

23   HEATH TAYLOR: "Okay. And I'm telling you that

24   this man and Mike has came clean about

25   everything they have done."

26   JAMES GARY: "I see. I see."

108

HEATH TAYLOR: "They came clean. Listen to me.
This is important to you, James. They came
clean about what happened in Russell County,
that you was in jail, in the last two days.
They came clean about what happened in Lee
County three weeks ago when you were with them.
Now, what I'm telling you is, you've got an
opportunity -- listen to me, buddy. You have an
opportunity to tell your side of the story
because they have told theirs. We know the
whole deal. Vann has got everything he needs to
send you away as long as you live or possibly to
send you to the electric chair. Now, the
difference is James, because James has a chance
to be a good person who had something bad happen
and James made a mistake, just like they have,
or you can say to hell with it. Y'all think
y'all got me on something. Y'all ain't got
shit, and make Jackson -- make Vann, make
Investigator Taylor, make all those guys from
Lee County show in a courtroom to a jury and a
judge everything they've got, and you're going
to be in bad, bad trouble. Two reasons. One,
because they've got all the evidence they need,
and, two, because you're going to appear --
because they've already admitted it; they've

109

1  come forward and said I'm sorry. I didn't mean

2  to kill her. I didn't mean to kill this woman.

3  We got there. It went wrong. Things happened,

4  and we did, I'm sorry. That's what they're

5  saying. You, on the other hand, are going to

6  stand up there and go, they're lying on me; I

7  ain't done a damn thing. You know what that

8  looks like? That looks like you don't care

9  about anybody you hurt; that looks like that

10  you're a person who don't need to be back in

11  society, who needs to be locked up for the rest

12  of his life. Now, those things are important to

13  you for one reason, one reason only; you know

14  what happened. You know in your head why you

15  walked in that house with Jimmy and why y'all

16  did those things at Mike's request. Now, I'm

17  going to tell you, he is in the same boat you

18  are and he sat right there and was honest

19  because it was on his heart. He didn't like it,

20  but y'all did it and it's a mistake and now he

21  sees the only way that he can overcome it,

22  James, is to be honest. He was pressured by

23  Mike. That's his story. Now, my thing to you

24  is he can't speak for James, but he can and has

25  told us every step of the way. We've got it.

26  We've got Mike. Mike is saying the same thing.

110

He is what we call corroborating. We -- we get one story. We get another story. We put them together, and if they match, that's called corroboration. We've corroborated everything they have said, James. Everything. We know that -- who -- how much money was divided up between the three of you, how much each one of you got. We know that -- the whole nine yards. We know that you went into sit in somebody's car as part of an alibi. We know the whole -- and I'm going to tell you this: You're talking about ain't nobody saw you. They saw you that day. They saw you and they've got it. They saw the three of you riding in the Crown Vic. They saw -- people have came forward and put you in the car with the two boys that day. Got it. And what I'm telling you is you're looking at an opportunity to be truthful and honest and you tell what was in your head and the reason you did that because he can't speak for you. He can only speak for himself. But he is able to tell the truth about what happened and tell the truth about everybody there. Okay? That is a fact; that has been already corroborated between the two of them. The difference is, is James going to appear to be this hardened criminal killer

111

who don't give a dang about anybody but himself
or did James make some mistakes and is he sorry
for that mistake and does he want to at least
rectify the things he's done wrong. Does he at
least want to say I'm sorry? I've done this.
I'm sorry, but let's get it over with, because
if you don't, James, you're looking at going to
trial for capital murder. Now, capital murder
and murder is two different things. Capital
murder means that you could possibly get the
death penalty for capital murder. Murder means
that you just do life in prison. You could get
life in prison. You could get five years, but
you could get life in prison. Now, the
difference is -- in my opinion, the difference
is James. That's the difference. Not whether
or not they charge you with capital murder or
not, but the difference is what James is going
to do is depending on James. Because nobody can
speak for James. See, Detective Jackson,
Investigator -- Sergeant Jackson, with the
sheriff's office that was just in here, he is
going to tell you or he is -- his job is a lot
like an artist. You follow me?"

JAMES GARY:    (No response.)

HEATH TAYLOR:    "He has to paint a picture to a

112

jury.  When he goes to trial, his job is to
paint a picture for a jury to show them what
happened.  Okay?  Now, his job can be one or two
ways.  He can either paint it by what Jimmy and
Mike and everybody has told him, that everybody
was there.  Y'all were all involved.  Y'all two
went in.  Or he can paint it the way he wants to
and the way you're going to make him paint it is
that you're the bad guy and you're not wanting
to be honest with it, and you're not wanting to
say what the deal is and that you're this --
you're this monster that's not wanting to come
forward.  Everybody in the whole picture that
he's  going  to  paint  is  being  truthful.
Everybody in the whole picture is sorry that
they made some mistakes.  Everybody but James.
So see, he has got to go to court and paint this
nice big picture of Mike and Jimmy and James all
in this thing together and now when they get
caught, when the things go to shit, when
everything starts going down hill, at least they
were honest and said the gig's up.  Everybody
but James.  So they are -- he's going to take
his paintbrush; he's going to walk in that
courtroom and he's going to say you know what, I
think James was the mastermind.  I think James

113

1    is the one that convinced these two to do it and

2    he is the one that got the InterTech and the

3    nine MM handgun.  He's the one that did it.

4    He's the one that disposed of the guns because

5    he's the one not wanting to admit it.  He's the

6    person that we don't need to put back in

7    society; he's the person we need to lock away

8    for the rest of his life or send him to the

9    death chair.  That's what he's going to take his

10   paintbrush and paint for the jury.  You're going

11   to look like terrible because you still can't

12   come to the reality and see where I'm coming

13   from, in that everything is not excusable,

14   James, but at least if you -- if me and you get

15   into a fight and you come up to me the next day

16   -- and you started the fight and you came up to

17   me the next day and you busted my lip and you

18   walked up and you say, man, I'm sorry, I was

19   pissed off, I didn't mean to do it, I apologize,

20   and I'm sorry.  Does my lip automatically go

21   back to being fixed or is it still swollen and

22   still busted?"

23   JAMES GARY:  "It's still swollen."

24   HEATH TAYLOR:  "That's right, but at least I

25   forgave you.  At least you were man enough to

26   come forward and say I'm sorry.  Now, my wound

114

won't go away right off the bat, but eventually

it heals, don't it?  If you come to me and say

you are sorry and my wound heals, three weeks

down the road, we're friends again.   If you

never come to me and say you're sorry, every

time something happens to my lip, I'm going to

cuss you like a dog, ain't I?"

JAMES GARY:   "Yeap."

HEATH TAYLOR:   "I'm going to think about you

busting my lip and that son of a gun is swollen

up -- and see I'm a fat man --"

JAMES GARY:   "Right."

HEATH TAYLOR:   "-- and I like to eat and every

time something happens and I can't eat for that

whole three weeks that my lip is swole up, I'm

going to be cussing you like a dog."

JAMES GARY:   "Yeah."

HEATH TAYLOR:   "But if you apologize to me and

you tell me you're sorry, it don't take away the

injury, but it does heal eventually, and what

I'm telling you, James, is you made a mistake.

I'm not -- don't -- you have never one time

heard me say I think anything.   I know what

happened.  We know what happened.  The question

is:   Does James want to at least heal the

injury, because to me, that's the most important

115

thing.    That's a man and a woman's daddy.
That's a son's parent and mother and father.    To
me, you've -- you've got a choice.    You can help
heal or you cannot help heal, and it be a thorn
in your side until your last breath is taken.    I
don't believe for five minutes, James -- I don't
believe for five minutes that you wanted to hurt
nobody, and that it don't bother you in your
heart to this day.    I don't believe you don't
have nightmares about it because if you don't,
you're a lot harder person than I thought.
People make mistakes.    Things happen that are
out of control and sometimes they're
irreversible.    This is one of them.    But you
know what?    You have an opportunity to heal and
close that chapter of your life.    You're going
to have to -- you're going to be punished for
that.    No doubt about that.    There's no doubt
about it.    You have to.    Don't think for five
minutes that society is going to let you and
them and anybody else that does that go and just
not -- just say I'm sorry and it be done.    But
it's -- it's so much easier when that is said,
James.    It's so much smoother and easier to get
over because you can close it in your life.
They can close it in their life.    Right now,

116

they can't. Right now, there's a son and a family that is grieving over the loss of that man and woman. They don't know what happened. They are still guessing. Well, we know. We're going to -- they're going to know eventually, but the difference is, you can help solve it. You can help in your heart get rid of it. You don't want to. I understand that. You don't want to come out and say because in the back of your head, maybe you've killed somebody before. I don't know. But in the back --"

JAMES GARY: "I ain't never killed nobody."

HEATH TAYLOR: "Listen. In the back of your head you're saying I would really like to tell somebody because it would help you get over it, and all I'm telling you, bro -- believe me if you want, I've seen a hundred people come in here and say I didn't touch him; I didn't do nothing, and I -- and I go through this process, and it's -- it's normal. It's a phase. First is denial. They just absolutely deny it, and it's the same in every person every time. You can write a book by it. You deny it. You deny it. You deny it. Then you start accepting it, and you start minimizing what happened. Then you go into the phase of acceptance to where

117

it's just all off your chest and -- and it's a
burden that you would not believe.  Now what I'm
telling you is, is I've had people a lot harder
than you, a lot harder than you, and they will
tell you that when they finally said, okay, when
they finally said I'm sorry, I didn't mean to do
it, but I did.  I did it, and -- and I'm sorry
for it, when they finally said that, I can give
you a page full of names in murder cases that
said I was one hundred percent at peace, no
matter if I went to the death chair, no matter
if I went to life without parole, no matter if I
did five years, I was happy because I got if off
my chest and I couldn't live with it much more,
and I'm telling you, you can deny all you want,
James; you're not going to beat this case.
You're not going to beat it.  Don't look at me
like we don't have a case.  We've got
everything.  Do you hear me?  We've got
everything.  We know you went to LaGrange
afterwards.  We know you sat there at Mike's
house.  We know you took the guns apart.  We
know where y'all parked and ran and jumped the
fence and went into the back of the house.  We
know every single thing that happened.  We know
you tried to shoot him in the ass and actually

118

1   shot him in the back or the spine the first
2   time.  We know you shot him in his hand.  We
3   know you shot him in the head.  And all I'm
4   telling you is you can believe me if you want,
5   but they are going to put you away for life, and
6   you can do one or two things.  You can either
7   say I'm sorry and tell the truth as far as
8   you're concerned about the case, or you can just
9   say to hell with it, y'all ain't got nothing on
10  me and let them take everything that they have
11  got and take you to court and you will lose.
12  Listen to me.  You will lose.  This man was
13  standing right there with you.  He was in that
14  house.  He had the other gun, and he was right
15  there with you.  And he has spilled his fucking
16  guts.  Believe me when I tell you, he spilled
17  them.  And I don't care.  I've done told them
18  use my case, use it.  Get the -- get the video
19  and show James the video of him running his
20  mouth.  You know why, because I don't care.  You
21  don't have to believe me because what I'm going
22  to suggest to them is this:  I'm going to
23  suggest that they go ahead and just say to hell
24  with you and present you as being the ring
25  leader that is a -- that is a ruthless fucking
26  killer that don't ever need to get out of jail.

119

1   That's what I'm going to do.  And I'm going to

2   do everything in my power in Russell County to

3   make sure that we treat you that way in that

4   jail for the rest of the time because I think

5   that's possible."

6

7           (Vann Jackson entered the room.)

8

9   HEATH TAYLOR:  "You got the tape?"

10  VANN JACKSON:  "I got the tape."

11  HEATH TAYLOR:  "I think it's possible.  I think

12  you are the one.  And I think it's very possible

13  and I think that when we get done because I've

14  got a little bit of power and a little bit of

15  influence, and when they call me as an expert

16  witness in homicide, I'm going to tell them that

17  guy never ever needs to be out from behind bars

18  or you need to put him -- strap him to the chair

19  and get rid of him.  He's useless.  He's a

20  killer.  He never needs to be let out, and if he

21  gets out again, he'll kill again.  That's what

22  I'm going to say.  Because other than that,

23  you've given me no reason to; other than that,

24  you give this man no reason to.  Without your

25  side and you being honest and you telling us

26  what happened in that house, we have no choice,

120

1     James, but to point to you and say that's the

2     son of a bitch that don't never need to be out

3     of jail again, believe me when I tell you that's

4     him."

5     JAMES GARY:  "I didn't kill nobody."

6     HEATH TAYLOR:  "Well, that's good. Let's show

7     him the tape."

8     VANN JACKSON:  "All right.  See if you can set

9     it up.  Let me know when you get it ready.  See,

10    man, what I'm trying to tell you is, like you

11    say, is all I want to do is just tell your side

12    of what happened."

13    JAMES GARY:  "I didn't kill nobody, man."

14    VANN JACKSON:  "I mean, if you would -- if you

15    would just tell me.  If you would tell me."

16    JAMES GARY:  "I'm talking about that shit eat at

17    me every day, man.  That mother fucker there is

18    crazy, man."

19    VANN JACKSON:  "And that's what we -- what we

20    need to know what happened.  And I know you can

21    tell me."

22    JAMES GARY:  "That mother fucker there is crazy,

23    man."

24    VANN JACKSON:  "Okay.  So what happened?"

25    JAMES GARY:  "He went up in there, man.  Okay.

26    See -- but you got to promise me, man."

121

1    VANN JACKSON:  "Tell me what happened."

2    JAMES GARY:  "I want it in writing that you

3    gonna help me if I tell you everything that

4    happened, man. If you would -- just think about

5    it, man. Just put two and two together. I'm a

6    black man. These two -- you know, they ain't

7    --"

8    VANN JACKSON:  "I understand."

9    JAMES GARY:  "They came at me with this shit,

10   man."

11   VANN JACKSON:  "Why do you think I'm asking you,

12   because I understand what you're saying."

13   JAMES GARY:  "Mike -- I owed Mike all this

14   money, man."

15   VANN JACKSON:  "Right."

16   JAMES GARY:  "He came to me, he said well, you

17   got it today or you going back to jail, and I

18   don't want to leave my children, man."

19   VANN JACKSON:  "I understand."

20   JAMES GARY:  "He came to me, man. He said well,

21   this kid, Jim, they call him Jim, got this lick,

22   just go in, do you know what I am saying, and

23   get the money out. This son of a bitch here

24   just lose -- straight lose his mind, man."

25   VANN JACKSON:  "And he did everything in there

26   and you just --"

122

1    JAMES GARY:    "Man, I'm talking he -- when he

2    shot that lady, man, I was like nah, when he

3    first walked in, man."

4    VANN JACKSON:    "Let me talk to him just a

5    minute.    I don't think we are going to need it.

6    He's telling me right now what happened so we

7    can work it out."

8    JAMES GARY:    "That man shot that man at first.

9    Okay.    He said well, he went in -- he jumped the

10    fence, cut the wire or something.    He said we

11    gonna cut the phone wire."

12    VANN JACKSON:    "All right."

13    JAMES GARY:    "When he went in -- okay.    I opened

14    the screen door.    He kicked the door in.    He

15    made her lay down.    I said I'm not fixing to go

16    in there like that because I'm thinking these

17    white folks got guns, they might be shooting,

18    kicking the door in.    He opened it blind, man.

19    This man here, go in there, he kicked the door

20    in, he made them lay down, man.    I came in

21    shortly behind him.    By the time this man is

22    laying down like this and he shot him in the

23    hand.    The man was shot in his hand."

24    VANN JACKSON:    "Yes, you are right."

25    JAMES GARY:    "He just shot him in his hand.    The

26    lady was sitting up praying.    I was like, nah,

123

man, just because it didn't supposed to go that way. We was supposed to take the ties and tie them up, and just get the money and leave. This mother fucker just goes on a rampage, man. I'm talking about out of control like he wasn't even Jim no more. It's like he just -- like he already just instinct just -- do you know what I am saying, he knew what he was going to do before we even got there."

VANN JACKSON: "Uh-huh." (Affirmative response.)

JAMES GARY: "And he shot that man in his hand, then he grabbed the lady -- I already had the man laying down."

VANN JACKSON: "Right."

JAMES GARY: "Okay."

VANN JACKSON: "So you had the -- you had the tech 9; right?"

JAMES GARY: "At first. Then he came and got it because, you know, he had -- when he took the tech because I was like, hell, no, because I'm not fixing to kill. I didn't kill nobody. I promise. I put that on my children."

VANN JACKSON: "Okay."

JAMES GARY: "I was there, --"

VANN JACKSON: "All right."

124

1   JAMES GARY:  "-- but that man killed them folks,

2   man.  I wasn't fixing to kill no old people like

3   that, man.  My mission was just to get the

4   money.  Okay.  Make them lay down and, do you

5   know what I am saying, get my little shit, and

6   get the fuck on."

7   VANN  JACKSON:      "Uh-huh."      (Affirmative

8   response.)

9   JAMES GARY:   "But that man killed them folks,

10  man."

11  VANN JACKSON:  "Yeah."

12  JAMES GARY:  "He killed them people, man."

13  VANN JACKSON:  "And see, -- and you had to --

14  you had to witness this and this is what we been

15  trying to talk to you t his whole time."

16  JAMES GARY:  I witnessed this shit and don't you

17  know I dream about this shit every night, man."

18  VANN JACKSON:  "You dream about it every night?"

19  JAMES GARY:  "I been here.   I know I lost

20  weight, man.  I see that man every night.  Every

21  night, man, I see that man.  That old man.  The

22  expression on his face when he was looking, man,

23  that man shot him in his hand."

24  VANN JACKSON:  "So what time did, uh, Mike come

25  and get you?"

26  JAMES GARY:  "I don't know.  It like -- well, he

125

1    came like a couple of days before, he was like

2    well, I'm gonna come back and holler at you in a

3    couple of days and let you know what is going

4    on. Now see about that -- like that kid -- that

5    man and that kid --"

6    VANN    JACKSON:    "Uh-huh."    (Affirmative

7    response.)

8    JAMES GARY:    "-- see, that's the one it was

9    supposed to have been."

10   VANN JACKSON:  "Okay."

11   JAMES GARY:    "All right.    The old lady was

12   supposed to been -- the old lady was supposed to

13   tell where the money was at, do you know what I

14   am saying, and that was that, but the lady was

15   gone, so Jim started talking about the man, do

16   you know what I am saying, was supposed to be in

17   the mob and got the car lot, and do you know

18   what I am saying, and I don't know the sum was

19   supposed to be like -- it's got to be like three

20   million or something like that he was saying and

21   he had a safe at the house, but then, do you

22   know what I am saying, when we went to, uh,

23   where -- out by the storage room."

24   VANN    JACKSON:    "Uh-huh."    (Affirmative

25   response.)

26   JAMES GARY:    "Okay.  The man who -- like the kid

126

1  who they did the other day, do you know what I
2  am saying, they stay like around the street from
3  the storage room."
4  VANN    JACKSON:      "Uh-huh."      (Affirmative
5  response.)
6  JAMES GARY:    "All  right.    Now,  they  wasn't
7  there, some reason I was like it was an act of
8  Got that they wasn't there, but the whole time I
9  really didn't want to go like that, man."
10 VANN JACKSON:  "Yeah."
11 JAMES GARY:    "Because, do you know what I am
12 saying, really, do you know what I am saying, I
13 did leave, I did -- but he hounded me so much,
14 man, about that money, man, my old lady will
15 tell you he is calling my house like early in
16 the morning, seven o'clock.  He come at night
17 when I'm at home worrying me about that money,
18 man.  He gonna lock me back up, and then, do you
19 know what I am saying, on top of that, he had
20 gave me some more money."
21 VANN    JACKSON:      "Wait.    He    loaned  you  some
22 money?"
23 JAMES GARY:  "Yeah."
24 VANN JACKSON:  "How much money?"
25 JAMES GARY:  "Well, really, like first he gave
26 me $800 and then I think $200.  Do you know what

127

1   I am saying."

2   VANN JACKSON:  "So you were really in debt?"

3   JAMES GARY:  "Yeah."

4   VANN JACKSON:  "At that point?"

5   JAMES GARY:  "Yes."

6   VANN JACKSON:  "So how much money did y'all get

7   out of the house after --"

8   JAMES GARY:  I know I left with like -- he gave

9   me, like $8,000."

10  VANN JACKSON:  "8,000?"

11  JAMES GARY:  "Uh-huh."  (Affirmative response.)

12  VANN JACKSON:  "How much money was in the house

13  all together there?"

14  JAMES GARY:  "Uh, I think it was like 25,000;

15  something like that."

16  VANN JACKSON:  "All right.  So where did y'all

17  split the money up at?"

18  JAMES GARY:  "At that, uh, storage room."

19  VANN JACKSON:  "When y'all got back to the

20  storage room.  All right.  And then when y'all

21  left from the storage room, where did you go

22  then?"

23  JAMES GARY:  "I went home."

24  VANN JACKSON:  "And Mike took you back home?"

25  JAMES GARY:  "Uh-huh."  (Affirmative response.)

26  VANN JACKSON:  "In his car?"

128

1    JAMES GARY:  "Uh-huh.  In the Blazer."

2    VANN JACKSON:  "In the Blazer?"

3    JAMES GARY:  (Nodding head affirmatively.)

4    VANN JACKSON:  "All right.  Well, you have done

5    the right thing.  You know, that is what we were

6    trying to get you to do from the very beginning,

7    is just to tell the truth.  Your side of what

8    happened, because like I said, you know, we have

9    been working on it a long time and this was

10    coming.  We was on y'all's track, and of course,

11    then they go and do something else."

12    JAMES GARY:  "That's why I say that ought to

13    tell you who did all the killing.  Man, that man

14    is a psychopath, man.  That man killed --

15    VANN JACKSON:  "Where the guns at, man?"

16    JAMES GARY:  "Huh?"

17    VANN JACKSON:  "Where the guns at?"

18    JAMES GARY:  "I don't know.  Mike took the

19    guns."

20    VANN JACKSON:  "He did?"

21    JAMES GARY:  "Yeah."

22    VANN JACKSON:  "Where did he take them to?"

23    JAMES GARY:  "I don't know.  He just took the

24    guns; he put the guns in a bag and just left, I

25    jumped in the Blazer with him and he got in the

26    Crown Vic and left."

129

1    VANN JACKSON:  "What kind of bag did he put them

2    in?"

3    JAMES GARY:  "Like a plastic bag.  Like when you

4    go to the store.  Do you know what I am saying.

5    One of them store bags.  Like a -- like a Home

6    Depot bag."

7    VANN JACKSON:  "Did he tell you what he did with

8    the guns after that?"

9    JAMES GARY:  "Nah, he just said he got rid of

10   the guns."

11   VANN JACKSON:  "When was that?".

12   JAMES GARY:  "Like, that as that night."

13   VANN JACKSON:  "That night he told you that.

14   All right.  Okay.  Now, when -- all right."

15   JAMES GARY:  "He told -- like then when he was

16   riding I told Mike.  And Mike should be able to

17   tell you that I said that man done killed them

18   folks and he wasn't supposed to do it because it

19   wasn't supposed to go that way; right."

20   VANN JACKSON:  "So you did tell Mike that?"

21   JAMES GARY:  "Yeah.  I told him.  I was like,

22   man, this man shot -- he shot that lady in the

23   head.  He said, I just seen her brains splatter

24   like -- you know, all excited about this shit,

25   man, so I was just sitting there -- really, I

26   was in shock kind of.  But then he just like you

130

1   got -- I was like, no, man.  He was like, you

2   got to finish.  I was just like, no; he just

3   took the gun and he -- pow.  And I stood there

4   for a minute, man, and that's when I see -- I

5   still see that.  That's when I see when he shot

6   that man in the back of his head."

7   VANN JACKSON:  "Where was the man at when he

8   shot him?  I mean, what part of the house?"

9   JAMES GARY:  "Like when you first walk in; like

10  in front of the T.V."

11  VANN JACKSON:  "Was he sitting up or where was

12  he?  And I know he --"

13  JAMES GARY:  "And then the man, he was laying

14  down.  The man wasn't bucking or nothing.  He

15  wasn't doing nothing.  The man just -- I already

16  know I'm through now, but shit."

17  VANN JACKSON:  "Man, you have done the right

18  thing.  You have done the right thing.  And

19  being a good person, you feel better having an

20  opportunity to tell what happened at that house.

21  I mean, that's just the way it is.  It's a fact

22  of life.  Do you still have any of the money

23  from that?"

24  JAMES GARY:  "Shit, he came and got most of that

25  back, because I still owed him $3,800, and I

26  bought my kids some shoes, and shit, that was

131

1    it.  I owed all the rest of the money to people

2    I owed."

3    VANN JACKSON:  "Who did you owe?"

4    JAMES GARY:  "Shit, man, I owed another cat on

5    the street for some reefer and stuff."

6    VANN JACKSON:  "How much did you owe him?"

7    JAMES GARY:  "Like 1,600."

8    VANN JACKSON:  "You said you paid him $1,600.

9    JAMES GARY:  "Yes, and Mike got it out of the

10    8,000, you know.  Shopped.  Went shopping.  Got

11    my kids because I didn't get my kids nothing for

12    Christmas.  And all that shit was just on me,

13    man, what -- I'm thinking about; I'm in the

14    house and I can't get my kids nothing for

15    Christmas and then this man he is hounding me.

16    He is on my bond and he give me the money, you

17    know."

18    VANN JACKSON:  "So did anything else happen that

19    I hadn't asked you about that you want to tell

20    me about now?  So -- while we are getting it all

21    out there in the open, you can tell me about it

22    now."

23    JAMES GARY:  "Well, that night, right -- because

24    the whole night, it was just like -- we just

25    rode the whole -- like all fucking night, like

26    from six all the way up until like say about ten

132

or eleven. Okay. We was waiting trying to get the one that they killed the other day, the little kid, he was, like, the kid go to school and the dude stay there, but that got a lady keep the kid. She was supposed to be where we was supposed to went at, do you know what I am saying, but for some reason the lady -- the lady she was outside when we first seen them."

VANN JACKSON:    "Uh-huh."    (Affirmative response.)

JAMES GARY:  "Okay.  But then there's a golf course across from their house --"

VANN JACKSON:    "Uh-huh."    (Affirmative response.)

JAMES GARY:  "-- and then people was out there playing golf and that's when Jim was like, you know, we can go and check on this other cat, do you know what I am saying.  He in the mob, do you know what I am saying.  I know it's got to be -- see, like with the dude and the kid, was -- he was like, well, I know it's at least $50,000 or $60,000. but I'm like it's money. I'm with it, you know."

VANN JACKSON:  "Yes."

JAMES GARY:  "I mean, we ain't gonna kill nobody; do you know what I am saying.  That's

133

why we had ties. We had the ties; we had, do you know what I am saying, the things that go over our faces, you know."

VANN JACKSON: "What do you mean? Masks or something?"

JAMES GARY: "Yeah. So, I am like, do you know what I am saying. He ain't got no means of killing nobody. We got all this; you know, gloves. Then, shit, I don't know what happened, man. It seemed like, you know, he kicked that door. Okay. We got the door, rolled back, and there's are car lot at the front of the house."

VANN JACKSON: "Uh-huh." (Affirmative response.)

JAMES GARY: "Okay. We seen the last dude had left, and he dropped me off on the back. Jumped the fence. Climbed -- well, he ran down that field. Climbed the fence. And he went on down. I was standing behind the shed. He was over there doing something. He cut a wire or something. He cut some wires or something, then we went in. Then when I opened the screen door, he kicked the door in and he ran in and that's when, you know, I stood back because I was, like, this man is fixing to open fire with you kicking that door in, because we didn't really

EXHIBIT

11

134

know where he was at in the house."

VANN    JACKSON:    "Uh-huh."    (Affirmative response.)

JAMES GARY:    "So, you know, me -- I'm not just fixing to go up in no house like that, you know. But just so happens that the man and the lady was just sitting right there, because he -- do you know what I am saying, right there --"

VANN JACKSON:    "Yes."

JAMES GARY:    "-- when he ran in, I -- like I heard a gunshot.  Pow.  Shot the man in the hand.  The man's hand was like -- the man was laying down, 'til he grabbed the lady.  He was like snatching on the old lady.  The man wasn't going to move.  He took the old lady in the back.  That's when I heard some more gunshots. It was like -- do you know what I am saying.  I heard like a couple of shots."

VANN JACKSON:    "What did you hear him saying?"

JAMES GARY:    "Then he came out, he was, like, man, the lady tried to shoot me.  Do you know what I am saying.  Something -- I guess he took the pistol from the lady or something and, of course, I walked back there.  The lady was laying down.  She was bleeding.  I was like, nah, man.  You know, I was ready to go, really.

135

You know, he was like you can't leave without
it, you know. He was, like, well, where's the
safe; where's the safe. Man, a lot -- a lot --
a lot really went on in that house that night,
man. I mean, it was like -- we just like -- it
was like he was really just there to kill. It
wasn't -- like it wasn't even about getting the
money no more, man."

VANN JACKSON: "Uh-huh. And you was just right
there caught up in the middle of it. Because
you had decided you needed the money and the
chips was down."

JAMES GARY: "The chips was down. Then he was
like -- when -- like, when I saw the lady laying
on t he floor and she was like praying, I was
like -- that's when it really just got to me,
you know. I was like, man, I'm not fixing to do
nothing. He got the gun. Do you know what I am
saying? (Inaudible). You got to finish.
(Inaudible). He seen her brains like he was
excited. He was like go on and finish it. I
was like man, shit, man. I mean, we got the
money; do you know what I am saying?"

VANN JACKSON: "Where was the money at?"

JAMES GARY: "It was in the back somewhere
because he came out with it. It was like in

136

some -- in a little zipper like bank thing, you know. And when he came out, he was like finish it, you got to finish it. I was like no, you already got the money. Then he was like -- and he just shot the man. Then just -- like he just -- like his whole body just contracted, you know."

VANN JACKSON: "You have been having a hard time dealing with all this, huh?"

JAMES GARY: "Yeah, man."

VANN JACKSON: "What did you wear out there that night when y'all went out there?"

JAMES GARY: "Once again?"

VANN JACKSON: "What kind of clothes did you have on that night?"

JAMES GARY: "Uh, a pair of blue jeans and a gray shirt."

VANN JACKSON: "Some blue jeans and a gray shirt. Are you sure?"

JAMES GARY: "Yeah."

VANN JACKSON: "Do you remember what Jim had on? This guy right here?"

JAMES GARY: "I think he had on something like blue jeans and I think some -- I don't know, I know it was some Nikes because he kept talking about he got them from Texas. I can't remember

137

what kind of shirt he had on."

VANN JACKSON: "So he had on some Nikes that he said he got from Texas?"

JAMES GARY: "Yeah."

VANN JACKSON: "All right. What did Mike have on?"

JAMES GARY: "Um, like a regular old like gray T-shirt and some jeans."

VANN JACKSON: "Okay. So Mike never got out?"

JAMES GARY: "He pulled up. He was just driving. He like had some walkie talkies. He came back with the walkie talkies and stuff."

VANN JACKSON: "What kind of walkie talkie? What do they look like?"

JAMES GARY: "Like some, like walkie talkies you buy from Radio Shack or somewhere."

VANN JACKSON: "And what was -- how was they involved in it?"

JAMES GARY: "Like when we leave out, we was supposed to mash the button twice."

VANN JACKSON: "Who had the walkie talkies?"

JAMES GARY: "Jim and Mike."

VANN JACKSON: "Uh-huh. So where did the guns come from originally?"

JAMES GARY: "Well, I had the tech that had been in my house, you know; he used to be in the

138

Army.   Then he bought, do you know what I am
saying, the tech and I still had it.  And he was
like he needed a gun and I gave it to him;
really, do you know what I am saying, but I owe
him, you know."

VANN JACKSON:  "Wait a minute."

JAMES GARY:  "I gave it to him."

VANN JACKSON:  "So you gave it to Mike?"

JAMES GARY:  "Yeah."

VANN JACKSON:  "Okay.  And the nine MM pistol,
where did it come from?"

JAMES GARY:  "I don't know.  I guess they
already had it."

VANN JACKSON:  "So he didn't give you the tech
back after all this?"

JAMES GARY:  "Nah.  He just said he was going to
get rid of them.  You know what I am saying.
And I didn't need them, you know."

VANN JACKSON:  "So which gun was the lady shot
with?"

JAMES GARY:  "Shit, uh, he had that nine.  He
shot her with that nine."

VANN JACKSON:  "With the nine.  And the man was
shot with what?"

JAMES GARY:  "With the tech."

VANN JACKSON:  "All right.  Okay.  Well, listen,

139

man. You are really doing the right thing. And all of this is telling the truth about what happened. There's one thing that you still need to tell me that happened in that house. What we have discovered -- I'm sure you've seen all these forensic shows about how they can determine what exactly happened in the house. Whenever a person goes into a room, they leave evidence that they were there that you can find."

JAMES GARY: "Uh-huh. Uh-huh." (Affirmative response.)

VANN JACKSON: "And when that person leaves, they leave the room, then that evidence is still there. What our scientists do is they find it. And what I'm suggesting to you that has happened --"

JAMES GARY: "I walked through the whole house."

VANN JACKSON: "I know."

JAMES GARY: "Yeah."

VANN JACKSON: "But you see, one of the problems is is that from where one of the guns was fired, you shot the gun one time."

JAMES GARY: "Yeah, I did."

VANN JACKSON: Tell me about when you made that shot."

140

1  JAMES GARY: "Well, when he shot him -- when he

2  shot him in the hand, he was like -- do you know

3  what I am saying, he was -- like he was really

4  talking, but he was like mumbling, and do you

5  know what I am saying, he was like, prove -- do

6  you know what I am saying, he was like prove it

7  to him, you know, you are the man; like I stood

8  over him and he was laying like this.  I was

9  standing like this.  But I was hesitant, you

10  know, but I pulled the trigger and I tried to

11  shoot him in the back of the leg --"

12  VANN  JACKSON:      "Uh-huh."     (Affirmative

13  response.)

14  JAMES GARY: "-- but I like hit him like above

15  his butt."

16  VANN JACKSON: "Okay.  All right.  So your -- so

17  your intentions when you shot the man was to try

18  to shoot him in his leg or in his butt."

19  JAMES GARY: "In the back of his leg, really."

20  VANN JACKSON: "Hit him in the back.  Okay.  All

21  right.  And where else did you shoot him?"

22  JAMES GARY: "I didn't shoot him no more."

23  VANN JACKSON:  "You didn't shoot him no more.

24  So Jim did all the rest of the shooting and that

25  was the only one?"

26  JAMES GARY: "He was just shooting."

141

1    VANN JACKSON:  "Which -- which gun did you have

2    when you shot that one?"

3    JAMES GARY:  "With the tech."

4    VANN JACKSON:   "With the tech 9.   Okay.

5    Anything else you want to tell me about that

6    you've been involved with that happened with

7    this or any other case that you want to tell me

8    about?"

9    JAMES GARY:  (Shaking head in the negative.)

10    VANN JACKSON:  "You know, it's like I told you

11    to begin with, you know, this -- this is the

12    step that we needed to take to start helping you

13    deal with this stuff.  You got to deal with it.

14    And you feel better already."

15    JAMES GARY:  "Yeap.  I still ain't gonna be able

16    to sleep, though, I know -- you know what I am

17    saying.  I saw that man die, you know."

18    VANN JACKSON:  "Yeah.  Humph.  All right."

19    JAMES GARY:   "He shot that man in the head,

20    man."

21    VANN JACKSON:  "Was that on the way while you

22    were standing up there or was that when he was

23    in the back?  How did that happen?"

24    JAMES GARY:  "See, like I heard the gunshots.

25    He was came out with the money.  He went back

16    and he was like I saw the lady's brain, do you

142

know what I am saying, he shot -- he shot -- do
you know what I am saying -- obviously shot her
in the head. He was like, I seen the lady's
brains splatter, like he got excited. When he
came in, see, I was standing like behind the
chair, I was looking at him because, do you know
what I am saying, the dude, he was still
breathing, but he was like taking deep breaths.
Like -- you know, like -- so he was like well,
go on finish him. I was like, no, man; you got
the money. So he was like -- grabbed the gun,
do you know what I am saying, and stood over
him, man, and he was like -- I think he shot
like two times. He shot like two times; like,
pow; pow. I seen him do it. Just like -- his
whole body, like it stretched out. I sat there
and just looked at him for a minute, man."
VANN JACKSON: "Um. Well, that's horrible. But
like I say, it's the step, and we have made it
and what we are going to do is, is you know at
this point now is -- of course, you know these
guys is in jail on this other case, and we are
going to have to find out exactly what our next
step is, you know, because, you know, we can't
tell you what's going to happen, what the
outcome is going to be, but the best thing that

143

1    you could have done was tell your side of what

2    happened inside that house."

3    JAMES GARY:  "And I could tell you again and it

4    would be the same story because that's the

5    truth.   And that's really the honest to God

6    truth."

7    VANN JACKSON:  "And I believe you.  Well, all

8    right.  Just bear with me for a minute, and I'll

9    be back right with you. All right?"

10

11              (TAPED STATEMENT STOPPED.)

12

13    MR. GLANZER:  Judge, at this point there's a

14    pause in the tape recording, actually they re-

15    engaged, but the court reporter didn't do it so

16    we've got a portion that's not on the tape.

17    THE COURT:  All right.  Why don't we take --

18    MR. GLANZER:  Not on the transcript.

19    THE COURT:  It's not on the transcript?  Have

20    you got it on the tape?

21    MR. HAMM:  It's just a couple of minutes, Judge,

22    it's very short.

23    MR. GLANZER:  The court reporter thought it was

24    over and it wasn't.

25

26              (TAPED STATEMENT RESUMED AS FOLLOWS:)

144

1    VANN JACKSON:   "All right.   You still holding

2    on?"

3    JAMES GARY:   "I bet you say you hate me though."

4    VANN JACKSON:   "Huh?"

5    JAMES GARY:   "You say you hate me, right?"

6    VANN JACKSON:   "Oh, no."

7    JAMES GARY:   (Inaudible.)

8    VANN JACKSON:   "Hate you?   That was some other

9    case, somebody else.   No, I don't hate you.   But

10   that thing for you to do is, we've got these,

11   both of these guys, Mike and we've got Jim.--"

12   JAMES GARY:   (Inaudible.)

13   VANN JACKSON:   "Yeah.   But what you need to do

14   is, is you need to tell the court system I'm

15   trying to cooperate and do the right thing all

16   the way through.   This murder that involved this

17   little kid and his father that just happened,

18   see, you wasn't involved in that but you knew

19   everything having to do with that.   You follow

20   me?   Would you be willing to go to court and

21   testify against them --"

22   JAMES GARY:   "Would that help me in this case?"

23   VANN JACKSON:   "What that will do is show your

24   willingness to cooperate and it's going to go

25   the difference."

16   JAMES GARY:   "Yeah, I can go to court and"

145

1     (inaudible).

2     VANN JACKSON: "You ain't involved in that."

3     JAMES GARY: "I can tell what I know he said."

4     VANN JACKSON: "Sure. Okay."

5     JAMES GARY: "Because I mean, I didn't want to

6     see nobody die, man." (Inaudible.)

7     VANN JACKSON: "This is what my intentions are:

8     I'm going to go up and talk to our D.A. in Lee

9     County and tell him that you're cooperating and

10    tell him what you've told me thus far, that

11    you're willing to testify against them in a case

12    over here and then let him make the final

13    decision. But I will go to bat for you like

14    that and tell him that you are cooperating"

15    (inaudible).

16    JAMES GARY: (Inaudible).

17    VANN JACKSON: "And we're going to go step by

18    step and work through this thing."

19    JAMES GARY: "I didn't kill nobody, you know."

20    VANN JACKSON: "Yeah."

21    JAMES GARY: "I mean I was there, man."

22    VANN JACKSON: "Okay."

23    JAMES GARY: "But I didn't kill nobody."

24    VANN JACKSON: "Is there anything else you want

25    to tell me that happened that you know about

26    that did involve you or didn't involve you?"

146

1    JAMES GARY:  "I wasn't involved in that other."

2    VANN JACKSON:  "Do you know anything else that

3    Mike's involved in?"

4    JAMES GARY:  "No."

5    VANN JACKSON:  "Do you know of anything else

6    that Jim's involved in?"

7    JAMES GARY:  "I didn't hardly even know him,

8    man."

9    VANN JACKSON:  "Uh-huh."

10   JAMES GARY:  "You know, Mike came to me and that

11   was my first time meeting him.  I didn't even

12   know him."

13

14           (The remainder of the taped statement

15            was inaudible.)

16

17   THE COURT:  Is that the end of the tape?

18   MR. GLANZER:  Yes, sir.

19   THE COURT:  Let's take about a fifteen minute

20   break.

21

22           (WHEREUPON, proceedings were in a

23            brief   recess,   after   which   the

24            following occurred, to-wit:)

25

26   THE COURT:    Court will come to order.   Lt.

147

1        Jackson is back on the stand. Everyone present

2        now, all the attorneys present?

3

4                    <u>DIRECT EXAMINATION RESUMED</u>

5

6    BY MR. GLANZER:

7    Q.    Vann, the tape we just watched occurred on February

8          19th of 2002. At sometime subsequent to that,

9          somewhere around April 19th of '02 did you receive a

10         note that was sent to Major Torbert from the

11         Defendant?

12   A.    Yes, sir, I did.

13   Q.    Let me show you what's marked State's Exhibit Number

14         Four and ask if you can identify that?

15   A.    Yes, sir, it's a copy of a handwritten letter that is

16         marked Stated Exhibit Number Four that had been

17         written to Major Torbert from James Gary.

18

19                        (WHEREUPON, the instrument hereinabove

20                        referred    to    was    marked    for

21                        identification as State's Exhibit

22                        Number Four for the purposes of the

23                        Suppression hearing.)

24

25   BY MR. GLANZER:

26   Q.    Okay. And was that information in the note to be

148

1        passed on to you?

2   A.   Yes, sir, it is.

3

4             MR. GLANZER:  We'd offer State's Four.

5             THE COURT:  Any objection to this?

6             MR. HAMM:  No objection, Your Honor.

7             THE COURT:  All right.  It will be admitted.

8

9             (WHEREUPON, the instrument hereinabove

10             marked for identification as State's

11             Exhibit Number Four was admitted and

12             received  into  evidence  for  the

13             purposes of the Suppression Hearing.)

14

15  BY MR. GLANZER:

16  Q.   If you would, just go ahead and, since it's short,

17       just go ahead and read the context?

18  A.   It's headed "Major Torbert, it is very important that

19       I speak with Investigator Vann Jackson pertaining to

20       my case down here in Lee County.  Mr. Jackson informed

21       me to let you know anytime that I need to speak with

22       him and you will get in touch with him.  So if you

23       will please get in touch with the Investigator Vann

24       Jackson immediately because I have some important

25       facts in my case that I will" -- looks like "be of

26       good health."  And then it says "Thank you, James

149

Gary."

Q:   Okay.  April 19th, did you also receive another note
     from the jail which I believe is written on an inmate
     request slip, and let me show you State's Exhibit
     Number Five and ask if you can identify that?

A.   Yes, sir.  State's Exhibit Number Five is a copy of
     the Lee County Detention Center's Inmate Request slip.
     In this particular request slip it's, the person named
     is James Gary, dated the 19th, set up requesting to
     speak to Investigator Jackson.

                    (WHEREUPON, the instrument hereinabove
                    referred    to     was     marked    for
                    identification    as    State's    Exhibit
                    Number Five.)

          MR. GLANZER:  Okay.  We would offer State's Five
     at this time.
          THE  COURT:    I  hear  no  objection  for  this
     hearing.

BY MR. GLANZER:

Q.   And if you would, since that's relatively short also,
     read that into the record?

          THE COURT:  It will be admitted.

150

(WHEREUPON, the instrument hereinabove marked for identification as State's Exhibit Number Five was admitted and received into evidence for the purposes of the Suppression Hearing.)

THE WITNESS: It's, the location was E-6, names, James Gary, date, 4/19/02. In the brief outline request it says: "Investigator Jackson told me to write up front anytime I felt like discussing my case matter and I feel that it is in my best interest to discuss this matter with Jackson at this time. So if you will please contact Jackson and tell him that it is very important that I speak with him." And it's Correctional Officer 3 is the person it was turned over to.

BY MR. GLANZER:

Q.  And was that eventually passed on to you?

A.  Yes, sir, it was.

Q.  Based on those two notes that you received from the jail did you set up an appointment with Mr. Gary?

A.  I did.

Q.  And did you take another statement from him?

A.  Yes, sir, I did.

Q.  And prior to taking that statement did you again advise him of his constitutional rights?

A.  Yes, sir, I did.

151

Q.  Let me show you a rights form from April 22nd, 2002
    and ask if you can identify this, it will be State's
    Exhibit Number Six.

A.  Yes, sir, State's Exhibit Number Six is a copy of a
    rights form which I read to James Gary on the 22nd of
    2002.

        THE COURT:  April 22nd?

        THE WITNESS:  Yes, sir.

        THE COURT:  Any objection?

        MR. HAMM:  No objection.

        THE COURT:  It will be admitted.

            (WHEREUPON, the instrument hereinabove
             referred    to    was    marked    for
             identification    and    admitted    and
             received    into    evidence    as    State's
             Exhibit Number Six at the Suppression
             Hearing.)

BY MR. GLANZER:

Q.  And do you recognize that from having both ya'll's
    signature on there?

A.  Yes, sir, I do.

Q.  If you would, go ahead and read that form into the
    record.

A.  It's headed "Your Rights." Name, James Edward Gary.
    Place, the Lee County Jail. The date, 4/22/02. Time,

152

3:40 p.m. Central Standard Time. Education, 11th/GED.
It says: "Before I ask you any questions you must
understand your rights. You have the right to remain
silent. Anything you say can be used against you in
court. You have the right to talk to a lawyer for
advice before we ask you any questions and to have him
with you during questioning. If you cannot afford a
lawyer one can be appointed for you before questioning
if you wish. If you decide to answer questions now
without a lawyer present you will still have the right
to stop answering at anytime. You also would have the
right to stop answering until you talk to a lawyer."

The next section is a waiver of rights. It says:
"I have read this statement of rights and I understand
what my rights are. I am willing to make a statement
and answer questions. I do not want a lawyer at this
time. I understand and know what I am doing. No
promises or threats have been made to me and no
pressure or coercion of any kind has been used against
me." Signed by James Gary. Witnessed by myself and
it's timed 3:42 p.m. Central Standard Time.

Q.   Okay. Obviously he had been in the jail for a couple
of months at this point. Did he appear to understand
what was going on as far as waiving the form and
talking to you about making a statement?

A.   Yes, sir, he did.

153

Q. Waiving his rights.  Did he appear to be otherwise coherent?

A. Yes, sir.

Q. And he, did the conversation he carried on with you, did it seem to be rational in respect to what you were saying and what he was saying back?

A. Yes, sir, it did.

Q. Did appear to be under the influence of any alcohol, drugs or anything that would have altered his senses as to being able to voluntarily give a statement?

A. No, sir, he did not.

Q. Did he complain of any injury or any problem which would prevent him from understanding what was going on and voluntarily waiving his rights and his statement?

A. No, sir.

Q. At the time you took the statement was anybody else in the room?

A. No, sir.

Q. And did you threaten him in any way or coerce him or promise him anything if he would make this second statement?

A. No, sir.

Q. Did he appear to be entirely voluntary that he was making this second statement?

A. Yes, sir.

Q. Let me show you what's marked State's Exhibit Number

154

1    Seven and ask if you can identify this?

2    A.    Yes, sir.    State's Exhibit Number Seven is

3    documentation of the interview that I had with him

4    that I prepared.

5                        (WHEREUPON, the instrument hereinabove

6                        referred    to    was    marked    for

7                        identification    as    State's    Exhibit

8                        Number    Seven    to    the    Suppression

9                        Hearing.)

10    MR. GLANZER:    We would offer State's Seven at

11    this time.

12    THE COURT:    Any objection?

13    MR. HAMM:    No objection.

14    THE COURT:    What's the date of that?

15    MR. GLANZER:    April 22nd, 2002.

16    THE COURT:    All right.    It will be admitted.

17                        (WHEREUPON, the instrument hereinabove

18                        marked for identification as State's

19                        Exhibit Number Seven was admitted and

20                        received    into    evidence    to    the

21                        Suppression Hearing.

22    BY MR. GLANZER:

23    Q.    In regards to that statement, did he indicate anything

24    significantly different than he had during his first

25    statement?

26    A.    No, sir.    The only thing different was his concerns

155

about some other homicides that the two co-defendants
might have been involved with.  That was the major
change.  Other than that the facts were the same.  He
felt as though he should not be charged with murder
because he didn't actually kill anyone according to
him.  He of course says that Jim is the one that did
the murders.

Q.  And so he seemed to be having difficult with the
concept of complicity?

A.  Yes, sir.

Q.  I have nothing further.

Nothing?  We'll go ahead and read the second
then.

A.  This is the statement of James Gary, time 3:50 p.m.
Central Standard Time, the date April the 22nd, 2002.
It was taken in the Lee County Detention Facility.  It
says:  "My name is James Gary, age 27, birthday 12/16
of '74.  It gives an address of 1909 Seale Road,
Number 7, Phenix City, Alabama, 36867."  It says: "I
am making a voluntary statement to Sgt. Vann Jackson
who I know to be a deputy sheriff of Lee County about
the case that I am involved with.  This statement is
of my own free will without any threats, promises or
duress having been made to me.  I have been advised by
Sgt. Jackson that I do not have to make a statement
and that I may have legal counsel."

156

It goes on to say that: "The main reason that I want to talk to you is to find out how I can be charged with murder when I did not kill anyone. Please help me and make me this deal. I will do a ten year split on this case. I know I was doing wrong but I did not kill anyone. I know that I went there to rob those people but I did not go there to kill anyone. Just give me ten years and I will do every day. I just want to see my kids again. I have a lot to lose if I pay for something I did not do. The plan was for me and Brooks to get the money and leave. We had masks and gloves on and there was no reason for Brooks to kill them. But after all this happened with the murders I knew how they did their business. I can't even sleep at night for hearing that old lady begging and pleading for her life. I heard her scream -- I hear her scream every time Brooks shot her. Them old folks were no threat to us and I don't know why he had to kill them. I really don't think that I have to pay for the murders. I will do whatever I need to do to get back home and see my kids. I will testify against these guys in court. There is a whole bunch of stuff you all don't know. This stuff is really bigger than it looks. See, Brooks used to work for these folks' son. Terry, the old folks' son, is big in the drug business and so is Boyer. Brooks worked

157

for both of them towing cars. He knew that they kept a lot of money in their houses because they could not put it in the bank. Brooks also said that they both had safes in their homes to keep the money in. I will tell you everything if you guarantee me that I will just do ten years. I will tell you from the beginning to the end. Mike has been in a whole bunch of stuff. I will tell you the things that he has told me straight from his mouth that he has done. He told me either he pushed a guy out of his car in Birmingham that had messed up his money. Mike said that he was accelerating as fast as he could before he pushed him out. Mike had given me some dope and that is why he was always stopping by the house trying to get his money. He hounded me all the time about the money. Mike told me that they had done jobs in Valley, Mobile and all over the place. There ain't no telling how many people they have killed. I realized this after they did when I went with them on one of the jobs. This is why I was dodging them when they were talking about doing the Boyer job. I did not want any part of the murders, any other murders. Oh, yeah, I remember that when we were on our way to the old people's house that Mike said this brings back old memories. I asked him what he was talking about. He said ask Freddie. Then him and Brooks started laughing. I did not know

158

what they were talking and laughing about but I guess now I know. They must have robbed ~~and killed~~ Fast Freddie. I could tell you a whole bunch of stuff about Mike because I used to deal with him regular. Mike wanted people to be scared of him so he'd tell all kinds of stories about what he had done. He told me about the police -- he told me that the police was not going to mess with him and that they would believe anything he said. He told me that he tied up a guy in this business for two weeks and that his business was right across from the sheriff's office. I know that officers were in and out of there all the time so this made me believe that what Mike was saying was true. I also used to go pick up dope at his office across from the county house -- the courthouse in Phenix City. I knew than that -- I knew then that no one was going to mess with Mike. Let me know what I need to do. I will tell you everything. These guys would do anything. Anyone who would kill a little kid would do anything. Please look out for me. I just want a chance to see my kids."

Q.  And other than that he made an offer to plead to ten years. At any point did you give him an offer?

A.  No, sir, I did not.

Q.  At any point did you agree to any offer that he might be making?

159

1    A.    No, sir, I did not.

2    Q.    Nothing further.

3              THE COURT:  Any cross exam?

4              MR. HAMM:  Yes, sir.

5                      CROSS EXAMINATION

6    BY MR. HAMM:

7    Q.    Mr. Jackson, I'm handing you State's Exhibit Number

8          Eight.

9

10             THE COURT:  I don't think that's been admitted.

11        Has that been offered?

12             MR. GLANZER:  We'll offer it.

13             THE COURT:  All right.  Any objection?

14             MR. HAMM:  Your Honor we would object to that

15        being hearsay evidence of the tape.  The tape is

16        the best evidence of that.

17             THE COURT:  Overruled.  Admitted.

18                  (WHEREUPON, the instrument hereinabove

19                  referred    to    was    marked    for

20                  identification    and    admitted    and

21                  received    into    evidence    as    State's

22                  Exhibit    Number    Eight    to    the

23                  Suppression Hearing.)

24   BY MR. HAMM:

25   Q.    Mr. Jackson, my name is Dan Hamm and I would like to

26         ask you a few questions about your previous testimony.

160

1    Let me ask you on State's Exhibit Number Eight if you

2    would turn to page 33, please?

3    A.    (Witness Complying.)  Yes, sir.

4    Q.    During this portion of the interview were you, Vann

5    Jackson, interviewing James Gary, that is on page 33?

6    A.    Yes, sir.

7    Q.    Let me direct your attention to line 12 and 13.  Does

8    Mr. Gary say:  "That I may as well stop talking now

9    and y'all talk to my lawyer"?

10    A.    Yes, sir.

11    Q.    Amongst other things?

12    A.    Yes, sir.

13    Q.    You continued questioning him; is that correct?

14    A.    Yes, sir.

15    Q.    Let me also ask you to turn to page 34.  You were

16    interviewing James Gary at that stage?

17    A.    Yes, sir, I was.

18    Q.    At the very top of page 34?

19    A.    Yes, sir.

20    Q.    The first line, "And you might as well talk to my

21    lawyer then"?

22    A.    Yes, sir.

23    Q.    Did James Gary say that?

24    A.    Yes, he did.

25    Q.    And you continued questioning him?

26    A.    Yes, sir, I did.

161

Q. Actually line seven of that same page did you say to Mr. Gary, "Well, you just sit here man, it's going to be a while"?

A. Yes, sir, I did.

Q. "Like I said, it's going to be a while"?

A. Yes, sir.

Q. What were you referring to when you said "Sit here man, it's going to be a while"?

A. Because the interview was going to take some time.

Q. It didn't have anything to do with you obtaining an attorney for him?

A. No, sir.

Q. You did leave the room shortly within a few seconds after that; is that correct?

A. Sure. Yes, sir.

Q. But he did mention, he did request an attorney?

        MR. ABBETT: Objection.

        THE WITNESS: No, he did not.

        THE COURT: Sustain the objection.

BY MR. HAMM:

Q. Then again on page 34 at the bottom, line 16, 17 and 18.

A. Page 34?

Q. Yes. Were you interviewing James Gary at that stage?

A. Yes, sir, I was.

Q. Did James Gary say, "Man, you can talk to my lawyer,

162

1    man"?

2    A.    Yes, he did.

3    Q.    Did you continue questioning him?

4    A.    Yes.

5    Q.    Mr. Jackson, I believe you've stated that you have

6          reviewed this tape and the State's transcript of that

7          tape; is that correct?

8    A.    Yes, sir.

9    Q.    But you agree that the tape itself is the best

10         evidence of what was said?

11   A.    Yes, sir.

12   Q.    You also agree that a court reporter, that is this

13         court reporter's interpretation of what is on the

14         transcript -- what was actually on the tape, is that

15         correct?

16   A.    Yes, sir.

17   Q.    That other people could have other interpretations?

18   A.    Sure.

19   Q.    Thank you.


21         THE COURT:  Anything further?

22         MR. HAMM:  Sure.


24   BY MR. HAMM:

25   Q.    Mr. Jackson, again, if you will turn to page 37, the

26         very bottom line, line 20.  First of all, let me ask,

163

1    are you the Vann Jackson that's interviewing James

2    Gary at this stage of the conversation?

3    A.    Yes, sir, I am.

4    Q.    Does James Gary say to you in response to a lengthy

5          statement made by you at the bottom of page 20, "Show

6          me what you have got to show me, other than that talk

7          to my lawyer"?

8    A.    Yes, sir.

9    Q.    And Mr. Gary was questioned following that; is that

10         correct?

11   A.    Yes, he was.

12   Q.    And your position is that none of these were requests

13         for attorney?

14   A.    That's correct.

15   Q.    You left the room shortly after that, within moments

16         of that statement; is that correct?

17   A.    Yes, sir.

18   Q.    I believe Heath Taylor came in following that?

19   A.    That's correct.

20   Q.    Was Mr. Taylor watching the video tape or watching

21         what was going on in that interview room where you and

22         Mr. Gary were talking?

23   A.    Yes, sir, he did.

24   Q.    Would Mr. Heath Taylor have known that James Gary made

25         these statements referencing an attorney?

26   A.    Yes.

164

| | | |
|---|---|---|
| 1 | Q. | You feel certain that he was watching the entire |
| 2 | | interview? |
| 3 | A. | I feel certain, yes. |
| 4 | Q. | And he came in and then began talking with James Gary; |
| 5 | | is that correct? |
| 6 | A. | Yes, sir. |
| 7 | Q. | While Mr. Taylor was interviewing James Gary were you |
| 8 | | also watching? |
| 9 | A. | Yes, sir. |
| 10 | Q. | Did you hear Mr. Taylor make representations or make |
| 11 | | statements about being a good person in society and |
| 12 | | the criminal justice system wanting to help good |
| 13 | | people? |
| 14 | | |
| 15 | | MR. ABBETT:  Your Honor, I object. The record |
| 16 | | is the record that's already in.  The question - |
| 17 | | - |
| 18 | | THE COURT:  If you've got a specific question |
| 19 | | and answer go to that first. |
| 20 | | MR. HAMM:  I'll be glad to. |
| 21 | | THE COURT:  All right, sir. |
| 22 | | |
| 23 | BY MR. HAMM: | |
| 24 | Q. | Mr. Jackson, let me direct your attention to page 74, |
| 25 | | line 2. |
| 26 | A. | 74, line 2? |

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

165

Q.  Line 2, second line. Were you interviewing James Gary
    at this time?

A.  Yes, sir.

Q.  Was this following Heath Taylor's interview?

A.  Yes, sir, it is.

Q.  And had you been watching Mr. Taylor's interview of
    James Gary in some manner?

A.  Yes, sir.

Q.  How were you watching that interview?

A.  There was a camera that was installed in the interview
    room.  It was connected to a television that was set
    up in another location in the Russell County Sheriff's
    Office.

Q.  You could determine what was going on in the interview
    room from that camera and --

A.  Yes, sir.

Q.  -- that television?

A.  Sure.

Q.  Was the, was the audio portion of that interview
    coming through to you also?

A.  Yes, sir, it was.

Q.  So you could hear what was going on also?

A.  Yes, sir.

Q.  Did you hear Mr. Taylor talk about being a good person
    and society wanting to redeem those people?

A.  Yes, sir.

166

Q. And you also made the statement to James Gary at the top of page 7, "And being a good person you feel better about having an opportunity to tell what happened in that house"?

A. Yes.

Q. Was that suggesting to Mr. Gary that if he cooperated and told you what you wanted him to tell you that there would be some compromise of this case?

A. No, sir.

Q. Not at all?

A. No, sir.

Q. And if somebody gleaned that or gathered that from the tape you would differ with their position?

A. Yes, sir.

Q. Again, let me direct your attention to page 63. More particular line 15 and 16. Were you the Vann Jackson interviewing James Gary at that time?

A. Yes, sir.

Q. Did you tell Mr. Gary, "And telling me right now what happened so we can work it out"?

A. Yes, sir.

Q. Did you tell Mr. Gary that?

A. Yes, sir, I did.

Q. What were you speaking of, working what out?

A. The problem out.

Q. What problem?

167

| | | |
|---|---|---|
| 1 | A. | That we had two deceased victims in Lee County. |
| 2 | Q. | Okay. What was worked out? |
| 3 | A. | The case. |
| 4 | Q. | Was there anything resolved? |
| 5 | A. | No, sir. |
| 6 | Q. | And your position is you were not suggesting anything |
| 7 | | to James Gary with respect to helping him on his case? |
| 8 | A. | Oh, no, sir. |
| 9 | Q. | Not at all? |
| 10 | A. | No, sir. |
| 11 | Q. | But whatever was suggested will be demonstrated by the |
| 12 | | actual video tape, is that correct? |
| 13 | A. | That's correct. |
| 14 | Q. | You testified earlier that the tape itself is an |
| 15 | | accurate representation of what happened in that room? |
| 16 | A. | Yes, sir. |
| 17 | Q. | There was also a second interview with James Gary, is |
| 18 | | that correct? |
| 19 | A. | Yes, sir. |
| 20 | Q. | Was that video taped, was that interview video taped? |
| 21 | A. | No, sir, it was not. |
| 22 | Q. | Can you tell me where that occurred? |
| 23 | A. | Yes, sir, it happened in the Lee County Detention |
| 24 | | Facility, in the interview room in the jail. |
| 25 | Q. | Where did the interview of February the 19th, 2002 |
| 26 | | occur? |

168

1    A.    It was in the Russell County -- there was no interview

2          that was conducted on the 19th of April.

3    Q.    I'm sorry, February 19th?

4    A.    Yes, sir.   That was conducted in Russell County

5          Sheriff Offices, investigative division.

6    Q.    Is there video taping equipment here at the Lee County

7          facility.

8    A.    We have some now but we didn't at that time.

9    Q.    Mr. Jackson, what does one have to say to get an

10         attorney?

11

12              MR. ABBETT:   Objection.

13              THE COURT:   Sustained.

14              MR. HAMM:   Your Honor, that's relevant in that

15         he --

16              THE COURT:   The objection is sustained, what a

17         person has to say.   You can ask him what he

18         requested.

19

20   BY MR. HAMM:

21   Q.   How does one request an attorney?

22   A.   I want a lawyer.

23   Q.   So that's the words they need?

24   A.   Yes, sir.

25   Q.   Only those words?

26   A.   Yes, sir.

169

1    Q.    Those are the only words that will suffice to request

2          an attorney and cease an interview in Lee County,

3          Alabama?

4    A.    Yes, sir.

5    Q.    Well, an I want to talk to my lawyer does not do it?

6    A.    And he didn't say that.

7    Q.    Okay.  You will agree that whatever is on the tape is

8          what he said?

9    A.    Yes, sir.

10   Q.    If one mentions an attorney within a statement, is it

11         your position that that is not a request for an

12         attorney?

13

14              MR. ABBETT:  Objection.

15              THE COURT:  Overruled.

16              THE WITNESS:  Repeat the question?

17

18   BY MR. HAMM:

19   Q.    If one mentions that they wish to talk with their

20         attorney is it your position that is not a request for

21         an attorney if it is combined within another

22         statement?

23

24              MR. ABBETT:  Your Honor, I object to the form of

25         the question.  It's totally taken out of

26         context.

170

1       THE COURT: Sustained. That's not the testimony

2       on the tape.

3       MR. HAMM: I'm sorry?

4       THE COURT: That's not the testimony in the

5       tape. You're asking a hypothetical that's

6       outside the evidence.

7       MR. HAMM: Well, no, I mean I think the request

8       for an attorney is part of other statements.

9       THE COURT: Sustain the objection as to the form

10      of the question.

11

12  BY MR. HAMM:

13  Q.  Let me ask you this, Mr. Jackson: To the statement,

14      "Y'all are saying y'all got me on that, I might as

15      well stop talking now and y'all talk to my lawyer

16      because I'm telling you man, I ain't had no dealings

17      with this man no kind of way as far he got me out on

18      bond and worried the shit out me about that, man."

19      That is not a request for an attorney?

20  A.  No, sir, it's not.

21  Q.  Is it not a request for an attorney because it's part

22      of another statement?

23  A.  It's not because he refers only to the attorney by

24      saying that y'all can talk to my attorney. He doesn't

25      ask for counsel.

26  Q.  Well, then there's the statement, "Then you might as

171

```
1        well talk to my lawyer," if that is part of another
2        statement; is that not a request for an attorney in
3        Lee County?
4    A.  No, sir, it's the same thing.
5
6            MR. ABBETT:    I object to the term that he's
7            using "in Lee County."  I think the law is the
8            same throughout the United States.
9            MR. HAMM:  Well, it's not the same --
10           THE COURT:  Move on.
11
12   BY MR. HAMM:
13   Q.  Were there any requests for an attorney during this
14       second interview?
15   A.  No, sir.
16
17           MR. HAMM:  I have nothing further, Your Honor.
18           THE COURT:  Anything further?
19           MR. GLANZER:  Yes, sir.
20
21                   REDIRECT EXAMINATION
22
23   BY MR. GLANZER:
24   Q.  Let's go back to page 34.
25   A.  Page 34.
26   Q.  Here you're talking about where you just said, "Well,
```

172

1    you just sit here, man.  It's gonna be a while.  Like

2    I said, it's gonna be a while.  But you know, I would

3    like to show you something."  What did you go get at

4    that point?

5    A.  It was a recording, taped interview.

6    Q.  Okay.  And then on 37-38 I believe there was the same

7    thing where you get up and go get something.  (Jackson

8    left and entered.)  What were you going to show him at

9    that point?

10   A.  If I remember right it's a photograph.

11   Q.  At some point he had a picture in his hand, was that,

12   and I'm just guessing because I don't know, I haven't

13   asked you this question before, did you show him a

14   picture of Jimmy Brooks, is that -- he was holding

15   something?

16   A.  No, what I actually showed him was a photographic

17   line-up that had a picture of him.  Also at one point

18   I showed him another photographic line-up that had a

19   picture of Brooks in it.

20   Q.  Okay.  That's settled.  One of those times was Brooks

21   and the other was you went and got a tape and I think

22   you had that in your hand when you came back in after

23   he had been talking?

24   A.  That's correct.

25   Q.  And, but he immediately broke down and started talking

26   so you didn't need to show him the tape?

173

1    A.    That's correct.

2    Q.    So on those two occasions it appears that you left not

3          to sever relations with him but to go get evidence;

4          correct?

5    A.    That's correct.

6    Q.    And did he repeatedly say in there show me, show me

7          what you got?

8    A.    Yes, sir.

9    Q.    And in fact he talked about talking in generalities?

10   A.    Yes, sir.

11   Q.    And so he was looking for more information?

12

13          MR. HAMM:    Objection, that's not a question,

14          Your Honor.

15          THE COURT:   Well, he's leading him a little bit.

16          MR. GLANZER:  Probably a lot.

17          MR. HAMM:   Mr. Glanzer can testify.

18

19   BY MR. GLANZER:

20   Q.    Okay.  I believe there was a question at some point

21          when you had read State's Exhibit Number Eight and

22          also compared it against the video and whether you

23          agreed with, I guess the court reporter version.  And

24          I believe --

25

26          MR. HAMM:    Objection, that's misstating the

174

1    question.

2    THE COURT:  Overruled.

3

4    BY MR. GLANZER:

5    Q.    I can't recall what it was.  But anyway, you have read

6          State's Exhibit Number Eight, correct?

7    A.    Yes, sir.

8    Q.    And you've compared it against the tape, correct?

9    A.    Yes, sir.

10   Q.    And prior to reading State's Exhibit Eight did you go

11         back  and  review  the  tape  once  you  had  read  the

12         Defendant's version?

13   A.    Yes, sir.

14   Q.    Upon initially reading the Defendant's version --

15

16         MR.  HAMM:    Judge,  we  object,  that's  not  in

17         evidence, there's not a Defendant's version in

18         evidence.

19         THE COURT:  Well, that's true.

20

21   BY MR. GLANZER:

22   Q.    Had  you  received  a,  something  from  the  Defendant

23         indicating what was on the tape?

24   A.    Yes, sir, I did.

25   Q.    And did you review that against the video itself?

26   A.    Yes, sir, I did.

175

Q.   Did you agree with the Defendant's version?

A.   No, sir.

Q.   Based on that did you request that a court reporter do the version, review the tape and do a version?

A.   I did.

Q.   Having read the court reporter's version do you believe it's a correct representation of the tape?

A.   Yes, sir.

Q.   Page 74, you're talking about a good person. When you're trying to get him to talk what was the basis for trying to get him to talk? I mean, what were you using against it?

A.   The basis in trying to get him to talk is at that point of course all of the information that we had on that particular case was being supplied by two co-defendants. Therefore, it would be in his best interest to tell his side because of course their minimize their involvement in placing blame.

Q.   Were you trying to make him make some kind of moral decision about testifying?

     Well, let me put it another way. You're not promising that you're going to do something for him, but are you trying to guilt him into saying I'll fell better if I talk to you?

     MR. HAMM:  Your Honor, we object to the leading.

176

1    THE COURT:  It's all right.  Go ahead.

2    THE WITNESS:    In my usual servicing in

3    interviewing people I do believe that there is a

4    good that is in all people and if I can get to

5    the good that they will do the right thing and

6    will tell the truth about the situation.  And

7    that is what I was targeting when I made the

8    comment to him about a good person.

9

10    BY MR. GLANZER:

11    Q.   So appealing to his ethics?

12    A.   Yes, sir.

13    Q.   63, I believe that's when you're -- it says "Let me

14    talk to him just a minute.  I don't think we're going

15    to need it.  He's telling me right now what happened

16    so we can work it out."  Who were you talking to when

17    you said that?

18    A.   Lt. Taylor from Russell County.

19    Q.   You weren't talking to the Defendant?

20    A.   No, sir.

21    Q.   And I believe there were some questions about what

22    kind of magic words you need to hear to know when

23    somebody is actually invoking their right to an

24    attorney.  There's many things somebody could say;

25    correct>

26    A.   Yes, sir.

177

1          MR. HAMM:  Objection --

2

3     BY MR. GLANZER:

4     Q.   But they would have to have some indication that they

5          actually want to --

6

7               MR. HAMM:  Your Honor, this is --

8               MR. GLANZER:  -- invoke their right; correct?

9               THE COURT:   I'm going to sustain it as to

10              leading.  Rephrase your question.

11

12    BY MR. GLANZER:

13    Q.   If somebody makes an unequivocal or makes an equivocal

14         ambiguous statement would you consider them to have

15         invoked?

16    A.   No, sir.

17

18              MR. HAMM:  Your Honor, we object.

19

20    BY MR. GLANZER:

21    Q.   Now that would be based on your experience in law --

22

23              MR. HAMM:  Objection to leading.

24              MR. GLANZER:  -- enforcement, correct?

25              THE COURT:  Overruled.

26              THE WITNESS:  Yes, sir.

178

BY MR. GLANZER:

Q.  . At the time that this Defendant made the statement had he waived his rights?

A.  Yes, sir.

Q.  So this is a post-waiver situation; correct?  In other words, he's already waived his rights, it's not before?

A.  Yes, sir.

Q.  When all this discussion was going on?

A.  Yes.

Q.  Okay.  That's just for the point of time.

    In your professional opinion and experience --

    MR. HAMM:  Objection, irrelevant.

    MR. ABBETT:  He hasn't asked the question yet.

    THE COURT:  We haven't heard the question yet.

BY MR. GLANZER:

Q.  Had he invoked his rights by any of the references to an attorney?

    MR. HAMM:  Objection, relevance.

    THE COURT:  Overruled.

    THE WITNESS:  No, sir, in the statements that was made by him he made references to communicating with a lawyer ourselves, the law

179

enforcement personnel to talk to his lawyer, but
he did not request to have a lawyer.  If he had
been more specific in saying that he wanted one
of course then he would have been granted that.
But because he didn't ask for it specifically he
was not granted.

BY MR. GLANZER:

Q.    Every time he made this reference to a lawyer, you can
      talk to him or whatever the words happened to be, did
      he ever stop talking?

A.    No, sir.  In actuality and of course as you saw on the
      tape, in each one of the situations where he did make
      some reference of you can talk to my lawyer, he
      continued the conversation and he also asked me to
      show him things after the fact.

Q.    And the fact that you left the room to get things to
      show him, when you came back did he re-initiate right
      away?

A.    Yes, sir.

Q.    Nothing further.


                    RECROSS EXAMINATION


BY MR. HAMM:

Q.    Mr. Jackson, Mr. Glanzer just asked you about post-

180

1    waiver, that is discussing an attorney following one's

2    waiver of their right to counsel.  Do you remember him

3    asking you that question?

4    A.    Yes, sir.

5    Q.    And is it your thinking that once one waives counsel

6          they can never invoke their request for counsel?

7    A.    No, that's not true.

8    Q.    You didn't mean to suggest that at all, did you?

9    A.    I have not, no, sir.

10   Q.    So the fact that he made the statements after he

11         signed the waiver is of no consequence; is that

12         correct?

13

14              MR. GLANZER:  We object.

15              THE COURT:  Sustained.

16              MR. GLANZER:  That requests legal conclusion.

17

18   BY MR. HAMM:

19   Q.    One can invoke their right to counsel after signing a

20         waiver form; is that correct?

21   A.    Yes.

22   Q.    The statement, "we can work it out," was made to Heath

23         Taylor in front of James Gary; is that correct?

24   A.    Yes.

25   Q.    And he could hear that?

26   A.    Sure.

181

1   Q.  Has that tape been edited in any fashion?

2   A.  No, sir.

3   Q.  As a matter of fact, the tape is representative of

4        exactly what occurred in that room; is that correct?

5   A.  That's correct.

6   Q.  You mentioned Defendant's versions of that tape.  Have

7        you got a marked up version of where the Defendant's

8        version is incorrect?

9   A.  I do.  I do, in our office.

10  Q.  And can you provide that to our office?  Well, will

11       you provide it to the District Attorney's office?

12  A.  The one that was prepared by your office?

13  Q.  Yes.

14  A.  Yes.

15  Q.  You have a marked up version?

16  A.  Yes, it has some marks on it, yes.

17  Q.  Very well.  Directing your attention back to State's

18       Exhibit Number Eight, you have reviewed this tape and

19       you maintain that it's -- on line sixteen.

20

21          THE COURT:  What page?

22          MR. HAMM:  34.

23

24  BY MR. HAMM:

25  Q.  You have reviewed this tape and you maintain that it

26       says, "Man, you can talk to my lawyer, man"?

182

1    A.   Yes, sir.

2    Q.   And it's subject to no other interpretation?

3

4         MR. ABBETT:  Your Honor, I object.  The words on

5         the tape are the words on the tape.

6         THE COURT:  Sustained.

7         MR. HAMM:  I have nothing further.

8         THE COURT:  Anything else from this witness?

9         MR. GLANZER:  Nothing further.

10        THE COURT:  All right, sir.  You can step down.

11              How long do you expect Mr. Taylor to be?

12        MR. GLANZER:  I would think it would be mostly

13        cross.

14        THE COURT:  It's a little after twelve, we've

15        been going since nine, how about a lunch break

16        and come back.  We've got a lot to do after this

17        hearing.

18        MR. ABBETT:  Yes, sir, we do.

19        THE COURT:  One o'clock be all right?

20        MR. HAMM:  Yes, sir.

21        MR. ABBETT:  Yes, sir.

22        THE COURT:  All right.  Court will be in recess

23        until one o'clock.

24

25              (WHEREUPON,  proceedings  were  in  a

26              luncheon  recess,  after  which  the

183

1          following occurred, to-wit:)

2

3                    **HEATH TAYLOR,**

4    a witness, having first been duly sworn to speak the truth,

5    the whole truth and nothing but the truth, was examined and

6    testified as follows, to-wit:

7

8              MR. GLANZER:   The State is going to defer any

9              questions at this time and let him be crossed or

10             direct for y'all, either way you want to

11             approach it.

12

13                    **CROSS EXAMINATION**

14

15   BY MR. KEITH:

16   Q.    State your name for the record, please?

17   A.    Heath Taylor.

18   Q.    And how are you employed, Mr. Taylor?

19   A.    I'm the chief investigator at the Russell County

20         Sheriff's Office, hold the rank of lieutenant.

21   Q.    And is Lt. Taylor, would that be your proper title?

22   A.    That's fine, yes, sir.

23   Q.    And you were employed as such back on February 19th of

24         2002?

25   A.    I was.

26   Q.    And you were, are you familiar with the video tape

184

1    where there's an alleged statement made by Mr. Gary?

2    A.    Yes, sir, I am.

3    Q.    You were present during that, all the recording of the

4          tape?

5    A.    Yes, sir, I was.

6    Q.    And have you had the opportunity to review any

7          transcripts of the tape, be it the State's transcripts

8          or the Defendant's version of the transcript?

9    A.    Yes, sir, I have.

10    Q.    Have you reviewed both?

11    A.    I've reviewed, I think yours.  I believe it was your

12          version.

13    Q.    Okay.  And did you have, it was you and Sgt. Vann

14          Jackson?

15    A.    Uh-huh, yes, sir.

16    Q.    Did you have a different role than he did as far as

17          your presence there during the interview?

18    A.    Initially I was viewing the interview when Sgt.

19          Jackson was in there by himself with Mr. Gary.  I was

20          viewing the interview over my television in my office

21          through the video system.

22    Q.    Well, apart from being there to watch what was going

23          on did you have a purpose there, were you a part of

24          the interrogation team or what?

25    A.    Eventually, yes, sir, I went in and spoke with him

26          myself.

185

Q. Was the plan always for you to go speak to Mr. Gary after Mr. Jackson?

A. No, sir, the -- initially you know, we were just letting, Sgt. Jackson was going to interview him himself. During that interview after I watched it I felt like that I may have a little more luck than he did and so he said that I could try.

Q. And clearly if Mr. Jackson had obtained a confession, if you will, from Mr. Gary you probably would have never gone in there and talked to him; correct?

A. Probably.

Q. Okay. And would it also be true that if Mr. Jackson were to have a problem or if he were unable to obtain any confession then you would go in there and try to do the same?

A. That's correct.

Q. Okay. And Is that why you went in there after Mr. Jackson finished his part of the interview?

A. Yes, sir.

Q. Because Jackson couldn't get a confession and it was going to be your turn to try to get a confession from the Defendant; correct?

A. He didn't confess to Sgt. Jackson at the time, that's correct.

Q. Which is why you went in there to give it a shot?

A. Yes, sir.

186

Q.  Okay.  And you've done how many interviews before roughly?

A.  Hundreds.

Q.  And be it murder, capital murder cases?

A.  Several capital murder cases.

Q.  Okay. And when you interviewed Mr. Gary, I'm going to refer to the State's transcript, do you have --

A.  I don't have it with me.


        MR. GLANZER:  Do you have State's Eight up there, sir?

        THE WITNESS:  Thank you, Judge.


BY MR. KEITH:

Q.  Have you had an opportunity, Lt. Taylor, have you reviewed that transcript?

A.  The transcript I reviewed was produced by y'all's side.

Q.  Okay.  Well, if I represented to you that transcript in your hand, the Court's court prepared is supposed to be, it's virtually identical or close the actual video tape recording, is that, will that assist you in your recollection of what was said during the interview?

A.  Yes, sir.

Q.  Okay.  I'll refer you to page 38, would be about the

187

1    page where you entered in on the interview of Mr.

2    Gary.

3  A.  Okay.

4  Q.  And you agree that's when you took over the interview

5    roughly after Mr. Jackson left -- Sgt. Jackson left

6    the room?

7  A.  That's correct.

8  Q.  Okay.  Now, Lt. Taylor, due to the fact that Sgt.

9    Jackson was unable to elicit any type of confession or

10    admission from Mr. Gary, you went in that room with

11    the intentions of, would it be fair to say, to

12    interrogate Mr. Gary?

13  A.  No, sir.  I went in there to just see if I could get

14    Mr. Gary to see the side of morality that I try in an

15    interview.

16  Q.  Right.  You wanted to see if you could get him to

17    confess?

18  A.  Absolutely.

19  Q.  Okay.  And were there any particular means that you

20    would generally use to get someone to change their

21    mind and confess to you?

22  A.  There are several, there are several tactics that we

23    can use, several things that we can try to make them

24    see, yes, sir, during an interview.

25  Q.  And Lt. Taylor, is one such means is it possible to

26    where you might have a reason, you might have the

188

1    authority or the, I guess the authority to offer

2    someone some type of plea bargain agreement should

3    they make a statement, have you ever done that before?

4    A.  If a plea bargain has ever been made it was through

5        the District Attorney's office.

6    Q.  Right.

7    A.  We don't have that ability.

8    Q.  Right.  But like when Sgt. Jackson says I'm going to

9        go talk to the D.A. or I'm going to do things for you

10       and go to bat for you, is that -- that would be part

11       of the plea bargaining process; correct?

12   A.  That's a normal part of an interview process if

13       they're along those conversations, yes, sir.

14   Q.  Right.

15   A.  That's how it would go.

16   Q.  Well, and it wouldn't be a normal part of the

17       interview process if the interviewer didn't intend to

18       do what he was exactly he was saying;, isn't that

19       right, meaning that if, say, you or Sgt. Jackson, if

20       he told the Defendant he was going to do something

21       would it be expected that that would be done or is

22       that just something you just say to them to get them

23       to talk?

24   A.  Me personally if I tell you I'm going to do something

25       I do it.

26   Q.  Okay.  And how about Sgt. Jackson?

189

1  A.  All of my dealings with Sgt. Jackson has been the

2      same.  If he says he's going to do something he does

3      it.  Whether or not the outcome is what he wants is a

4      completely different ball game.

5  Q.  Well, I understand.  If there's just a representation

6      you will try then I understand that.

7  A.  Sure.

8  Q.  Do you have any knowledge of whether Sgt. Jackson did

9      the things he told Mr. Gary that he would do in that

10     video tape?

11 A.  I have no idea.  Once they left the sheriff's office

12     there in Russell County I have no idea what

13     transpired.

14 Q.  Are you like an assistant case agent in this case?

15 A.  No, sir, I'm not.  I'm not a case agent in this case

16     at all.  The interview took place at my office and he

17     was in jail in the Russell County Jail on some other

18     charges.  We got involved in this case from our case.

19     That's all my involvement in it.

20 Q.  Okay.  Well, I guess what I'm asking you about, and

21     you've seen the whole tape and you watched Sgt.

22     Jackson the whole time.  When Sgt. Jackson was telling

23     Mr. Gary he was going to go talk to the D.A. about his

24     willingness to testify and he's going to go to bat for

25     the Defendant and that weighs a lot and when he tells

26     him I want -- those things, would you expect Sgt.

190

1   Jackson to follow through on those representations to

2   Mr. Gary?

3   A.   I have no reason to believe that he didn't follow

4        through with any of that.

5   Q.   Okay.  And it would be proper and appropriate for

6        someone to follow through?

7   A.   I would think so.

8   Q.   Okay.  Now, getting back to the plea bargain part of

9        it, did you have any conversation, during the course

10       of the interview were you having any conversation with

11       Mr. Gary about life sentences, with without parole

12       sentences, death sentencings or sentences less than

13       life?

14  A.   Yes, sir, I did.

15  Q.   Okay.  And you thoroughly explained to him, did you

16       not, what a sentence less than life parole was?

17  A.   Yes, sir, I did.

18  Q.   And that, did you thoroughly explain the difference to

19       him, and the difference between a capital murder or a

20       capital offense versus a non-capital offence such as

21       murder?

22  A.   I did.

23  Q.   Okay.

24

25            MR. ABBETT:  Your Honor, could I object at this

26            point to the general nature of these questions.

191

1     If he's going to ask questions about the

2     transcript then I would ask that the office

3     refer to a page and a line and answer the

4     questions that way other than just making

5     general representations about what occurred.

6     THE COURT: Well, I'll let him lead up to it and

7     then go to specifics.

8     MR. KEITH: That's what I'm heading.

9

10    BY MR. KEITH:

11    Q.   Lt. Taylor, let go ahead and just look at the

12     transcript. And preparatory remarks, you don't deny

13     talking to him about how he could get a life sentence?

14    A.   I didn't say how he could get one, I just simply

15     explained to him the difference between murder and

16     capital murder in the State of Alabama.

17    Q.   And you talked --

18

19     MR. ABBETT: Your Honor, I'm going to object

20     under the best evidence rule. The best evidence

21     of what was said is the transcript and the tape,

22     and I object.

23     THE COURT: All right. Go directly to the

24     transcript.

25     MR. KEITH: Yes, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

192

BY MR. KEITH:

Q.    Lt. Taylor, I want to refer you to a copy of the transcript and I would need you to start on page 42. You explained to Mr. Gary, did you not, what a socially redeemable person is?

A.    Yes, sir, I believe I did.

Q.    And that socially redeemable person in this portion of your interview you say is a good person, a person that's socially redeemable?

A.    That's correct.

Q.    You say, "When you are a person who we in this profession consider to be socially redeemable, you're a good person;" right?

A.    Correct.

Q.    And you go on to say, do you not, that "That is what we consider somebody that we want to rehabilitate, change their actions, and put them back in society," correct

A.    That's correct.

Q.    So the good person is someone socially redeemable that be rehabilitated that ends up back in society out of prison; right?

A.    That's the person that we feel like most go back into that society.

Q.    Right. And the person you're focusing these comments to is James Gary?

193

1   A.   That's correct.

2   Q.   That wasn't just general statements you were making,

3        you're telling James that that's the kind of person

4        you can be or can choose not to be; correct?

5   A.   That's correct.

6   Q.   Okay.   And that was the intent of this colloquy

7        ultimately was to get him to either choose to be a

8        good person or a bad person?

9

10            MR. ABBETT:   I object.

11

12  BY MR. KEITH:

13  Q.   Right?

14

15            THE COURT:   Overruled.

16

17  BY MR. KEITH:

18  Q.   Right?

19  A.   The reasoning for me --

20  Q.   No, sir.   You were trying to get him --

21

22            MR. ABBETT:   Your Honor, I object, let him

23        answer the question.

24            THE COURT:   Sustained.

25            MR. KEITH:   If he'll be responsive.

26            THE COURT:   Ask the question then pause and let

194

1    him answer.

2

3    BY MR. KEITH:

4    Q.    You wanted James to decide for himself whether or not

5          he was going to be one of these good, socially

6          redeemable people or a bad sociopath type person?

7    A.    I wanted James to determine how he wanted to present

8          himself in this case.

9    Q.    Correct.  And by doing that you explained to him that

10         if he were to choose to tell the truth and tell

11         everything that happened that he would be

12         rehabilitated, he'd be a good person and that he'd be

13         put back in society?

14

15             MR. ABBETT:  Objection.

16             THE COURT:  Overruled.  That's cross.  Go on.

17

18    BY MR. KEITH:

19    Q.    You didn't tell him that?

20    A.    No, sir, I never said that.

21    Q.    Well, when you say "that is what we consider somebody

22         that we want to rehabilitate, change their actions and

23         put them back in society," what do you mean to put

24         them back in society?

25    A.    I'm telling him exactly the two choices he has to

26         make.  I never said that that's what he's going to do

195

1    or not do or will be out or will not be out.

2    Q.   No, sir, but that's what you said to get him to make

3         the statements to you, his confession; correct?

4    A.   That's exactly what I wanted him to see.  He had a

5         choice to make at that point in his life.

6    Q.   On down the page on page 42 you further explain to him

7         what a sociopath is; right?

8    A.   Absolutely.

9    Q.   And that that's a bad person; and what happens to the

10        sociopaths that are bad people that kill people; what

11        do you tell him?

12   A.   I hope they never get out of prison.

13   Q.   Right, they get the death penalty or they get life

14        without parole; right?

15   A.   Absolutely.

16   Q.   Okay.  And you tell him that those are the type of

17        people, and I quote on page 42 towards the bottom,

18        "those people who has no social value in our society,

19        who we don't want to rehabilitate and put back out on

20        the streets."  So you write it out, who gets back on

21        the streets and who doesn't; right, because you're

22        going to get him to make a choice whether he wants to

23        cooperate or not.  You don't need to look at them, you

24        can look at me.

25   A.   Excuse me?

26   Q.   I thought you were looking at them for an answer.

196

A.   I'm sorry, I didn't realize who I could and couldn't
     look at.

Q.   Well, I thought you were answering and speaking to me,
     you can look at me and not look at the District
     Attorney.

          THE COURT:   All right.   Move on with the
     question.

          MR. ABBETT:   Your Honor, for the record, I was
     writing, I'm not looking at him.

          MR. KEITH:   I'm not -- I'm just --

          MR. ABBETT:   We're objecting for the record.

          THE COURT:   That's enough.   Ask the question and
     you give the answer.


BY MR. KEITH:

Q.   And Lt. Taylor, on page 43 when you ask Mr. Gary down
     at the bottom of the page and I quote, "Now, when you
     go before a judge or a jury you don't want to be
     portrayed as a sociopath personality.   Right?"

A.   That's correct.

Q.   And on the next page, on the top of page 44 you tell
     him, "You want them to think that you are worth
     putting back in society."  You told him that; right?

A.   Yes, sir, I did.

Q.   Okay.  And towards the bottom of page 44 you tell him

197

1  that you want the judge to know that you are a good

2  guy and you tell him on the bottom of page 45 that

3  he's got an opportunity, and you're talking about

4  whether he's going to cooperate with you or not;

5  correct?

6  A.  I'm talking about whether he wants to appear to be a

7  person of truth or not.  That's exactly what I'm

8  saying which is exactly what the transcript reads.

9  Q.  Okay.  But then on the next page, on page 46 towards

10  the top when you talk about that distinction you tell

11  him that "Vann has got everything he needs to send you

12  away as long as you live or possibly send you to the

13  electric chair."  And then you tell him, "Now the

14  difference is James, because James has a chance to be

15  a good person who had something bad happen and James

16  made a mistake, just like they have"?

17  A.  Yes, sir.

18  Q.  And again, that's the difference between the good

19  people that get back into society and the bad people

20  that don't ever; correct?

21

22  MR. ABBETT:  Your Honor, I object to the

23  characterization by the defense attorney as to

24  what that means.

25  THE COURT:  It's already been -- it's cross.

26

198

BY MR. KEITH:

Q. And you further explain that, do you not, on page 47, your sixth sentence down, and would you read that to the Court, please, where it says "That looks like"?

A. "That looks like you don't care about anybody you hurt; that looks like that you're a person who don't need to be back in society, who needs to be locked up for the rest of his life."

Q. And why did you make that comment to Mr. Gary?

A. If he chose not to tell the truth about his involvement in the case that's what it appears to society.

Q. That if he chose not to confess that he would look like this person that needs to be locked up for the rest of their life; right?

A. I believe, I think it, I mean my opinion is that I said exactly what I meant to say.

Q. That if he doesn't --

A. That if you choose not to tell the truth and you choose to let the other people in the case tell your side of the story then that is what it appears. That's what I meant to say and that's what I said.

Q. And what was your meaning when you talk about if he does choose to tell the truth that he's a good person and --

A. Then he appears to have some remorse for the mistake

199

1    he made.  That's exactly.

2    Q.   Can you tell me in this transcript where you say

3         anything like that?

4    A.   I can tell you all over it.  It says he appears to be

5         a person who, you know, is sorry for what he did and

6         has made a mistake.   That's my whole line of

7         questioning here.

8    Q.   Right, and therefore he gets rehabilitated and put

9         back into society --

10

11        MR. ABBETT:  Your Honor, I object.

12        MR. KEITH:  -- as part of that; correct?

13        THE WITNESS:  I never said that, sir.

14        THE COURT:  Overruled.

15

16   BY MR. KEITH:

17   Q.   Well, when you talk about on page, top of page 42,

18        "That is what we consider somebody that we want to

19        rehabilitate, change their actions, and put them back

20        in society," you were talking to Mr. Gary, right?

21   A.   Yes, sir, I was.

22   Q.   And about him making a truthful statement to you?

23   A.   I was.

24   Q.   And giving the impression that that's what would

25        happen to him if he did so?

26   A.   No, sir.  I said that he will pay for his crime.  In

200

1  our conversation I made it very clear that society
2  will not let him get off for what he did.  And that's
3  spelled out in that whole interview.  I told him point
4  blank, you're going to pay for what you did, period.
5  Don't think you're not.
6  Q.  Right.  We're not talking about him having the charges
7      dismissed against him just because -- we're not
8      talking about that, we're talking about the difference
9      in life without versus something less than a life
10     without sentence; right?
11 A.  And to me --
12

13     MR. ABBETT:  I object to the form of the
14     question, what we're talking about.  He should
15     be asking questions, not making statements.
16     THE COURT:  All right.  Sustained.
17

18 BY MR. KEITH:
19 Q.  When you talked to Mr. Gary on the top of page 44 that
20     you want them to think that you are worth putting back
21     in society, what does he have to do to get put back,
22     what are you telling him he had to do to get put back
23     in society some day?
24 A.  Sir, I didn't tell him that he had to do anything to
25     get put back in society.  I was simply making an
16     observation as to the way our society is and what we

1048

201

1   view and don't view as a person who is at least decent

2   when they make a mistake.   That's it.   You can take

3   from that what you want.

4   Q.   Let me refer you to the bottom, middle to bottom of

5        page 45.

6   A.   Yes, sir.

7   Q.   And would you read your brief colloquy with Mr. Gary

8        where it starts out right in the middle of the page

9        "the difference is"?

10  A.   "The difference is, is James going to appear to be

11       this hardened criminal killer who don't give a dang

12       about anybody but himself or did James make some

13       mistakes and is sorry for the mistakes and does he

14       want to at least rectify the things he did wrong?

15       Does he at least want to say I'm sorry I've done this,

16       I'm sorry but let's get over with it, let's get it

17       over with, because if you don't James, you're looking

18       at trial for capital murder.   And capital murder and

19       murder is two different things."

20  Q.   Finish your, you've got a couple of more sentences.

21  A.   Okay.   "Capital murder means that you could possibly

22       get the death penalty for capital murder.   Murder

23       means that you just do life in prison.   You could get

24       life in prison, you could get five years, but you

25       could get life in prison.   Now the difference is in my

26       opinion, the difference is James.   That's the

202

1       difference."

2   Q.   So when you explained to Mr. Gary about capital cases,

3        non-capital cases, life without parole, the death

4        penalty and prison or five years up to life, you

5        explained to him the difference in a capital murder

6        charge and a non-capital murder charge; correct?

7   A.   Yes, sir.

8   Q.   And you were doing that because he was to be given the

9        -- you were explaining, you and Sgt. Jackson were

10       explaining to him that he could give you an honest

11       statement and confess that that could be the

12       difference whether James did that or not and that

13       would be the outcome.

14  A.   No, sir.

15  Q.   No?

16  A.   I was telling him that if his involvements in this

17       case did not reach one or the other threshold then

18       that's what we're looking at.   If his involvements

19       does that's fine too.

20  Q.   Y'all already told him he was guilty of capital murder

21       and you had all the evidence and two co-defendants and

22       you had the goods on him and he was guilty of capital

23       murder.   You're not talking about here where you're

24       trying to decide whether you're going to charge him --

25

26            MR. ABBETT:   Your Honor, I object to him arguing

203

1       with the witness.

2       THE COURT:  Sustained.

3       THE WITNESS:  Sir, I believe your client is

4       guilty if that's what you're asking me.

5

6   BY MR. KEITH:

7   Q.  Well, I didn't ask you that, but I'm saying when

8       you're explaining, you were trying to get him to

9       confess under the illusion that he could get a less

10      than a life without parole sentence and get back into

11      society and get rehabilitated; isn't that what you

12      were telling him?

13  A.  No, sir.  I was just simply trying to get him to see

14      that morality is such that if when you do something

15      wrong you should confess to that and get it off your

16      chest.  That's the whole line of questioning here.

17  Q.  Well, and no one is arguing with you about that, but

18      how about the get back in society, get rehabilitated

19      to where he can get back some day, did you not think

20      that that might, Mr. Gary might think that if he

21      confessed that that was what would happen to him?

22  A.  No, sir.  I don't -- if he portrayed that then I, you

23      know, that's the way he perceived it.  I simply stated

24      facts and nothing more.

25  Q.  Well, you tell him that he might be looking at going

26      to trial for capital murder, that was, that was a

204

1    fact?

2    A.    That's absolutely a fact.  It's very possible that he

3          could be looking at going to trial for capital murder

4          and it's very possible that he did not.  And we told

5          Mr. Gary that.  We had some co-defendants' statements

6          that his involvements in their words and his

7          involvements in his own words were different.  And

8          that's what we were trying to get him to see.

9    Q.    So how can -- when you told him that the difference is

10         James in the outcome of the death or life without

11         parole or life and the difference is James, how can

12         James be the difference then?

13   A.    Because if James, in my opinion, if James was telling

14         the truth about his involvement and was able to allow

15         the investigators in this case to prove or not prove

16         what he's saying to be true or not then you could have

17         a hugh difference.  You absolutely could.

18   Q.    You can understand why someone like Mr. Gary may not

19         have understood the words you had --

20

21              MR. ABBETT:  Your Honor, I object, there's no

22              evidence he didn't understand.

23              THE COURT:  Sustained, move on.  You've been

24              over that enough.

25              MR. KEITH:  Yes, sir.

26

205

BY MR. KEITH:

Q.    And so the conversation you had with Mr. Jackson, Sgt. Jackson later on about y'all getting it worked out, that was just --

    MR. ABBETT:    Your Honor, I object to that, it's taken out of context.

    THE COURT:    Sustained.    What page and line are you talking about?

    MR. KEITH:    Judge, that was on page 63, about line 15 or 16 about the work it out comment.

    And on that Your Honor, no further questions.

    THE COURT:    Well, do you want to answer that?

    MR. ABBETT:    Your Honor, I object as to what he's asking him on 63 is something that Vann Jackson said and I assume he's asking the witness to read Vann Jackson's mind as to what his meaning was.    But I object to that.

    MR. KEITH:    Vann Jackson was speaking to Lt. Taylor.

    THE COURT:    And what's your question?

    MR. KEITH:    What he meant by the getting it worked out part.

    THE COURT:    Well, I sustain it as to what Jackson meant.

206

1    MR. KEITH:  Yes, sir.

2    THE COURT:  Do you have any questions?

3    MR. GLANZER:  Yes, sir.

4

5                    VOLUME ONE CONCLUDED

207

<u>C E R T I F I C A T E</u>

STATE OF ALABAMA        )

LEE COUNTY              )


    I, Willie T. Bennett, Official Court Reporter at Opelika, Alabama, do hereby certify that I reported in shorthand the proceedings and testimony in the foregoing styled cause at the time and place stated in the caption hereof; that I later reduced my shorthand notes to typewriting; or the same was done under my supervision; that the foregoing pages beginning with the word "Proceedings", where the same appears in the center of the page, following the style of the case, the caption and the appearances, contain a full, true and correct transcript of the proceedings and testimony of Volume One as therein set out.

    I FURTHER CERTIFY that I have placed in the Court File all of the exhibits offered in said trial in the order offered, which fact is certified to the Clerk of the Court.

    I FURTHER CERTIFY that I have on this date notified counsel for the parties of the filing of this transcript in the Office of the Clerk of the 37th Judicial Circuit of Alabama, Law Division.

208

THIS ___27th___ day of ~~February~~ March, 2006.

_Willie T. Bennett_
OFFICIAL COURT REPORTER

FILED

MAR 2 9 2006

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

VOLUME TWO
STATE OF ALABAMA
IN THE CIRCUIT COURT FOR THE COUNTY OF LEE
THIRTY-SEVENTH JUDICIAL CIRCUIT
CRIMINAL

STATE OF ALABAMA,

        PLAINTIFF,

    VS.                  CASE NOS.  CC-2002-489
                                    CC-2002-490
JAMES EDWARD GARY, JR.,             CC-2002-491
                                    CC-2002-492
        DEFENDANT

REPORTER'S OFFICIAL TRANSCRIPT
OF STATUS CONFERENCE BEFORE THE COURT

Before:

    HON. JOHN V. DENSON, II, Circuit Judge, in Courtroom Number Four of the Lee County Justice Center located at Opelika, Alabama, on the 28th of July, 2005, and being concluded on the same day.

**A P P E A R A N C E S**

    HON. HON. VANCE NICHOLAS ABBETT, District Attorney for the 37th Judicial Circuit of Alabama, and HON. DAVID GLANZER, Assistant District Attorney, appearing for the State of Alabama.

    MESSRS. HON. RICHARD C. KEITH and HON. DANIEL G. HAMM, Attorneys at Law, appearing for the Defendant.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

209

# P R O C E E D I N G S

(WHEREUPON, the following is a continuation of the Suppression Hearing in the James Gary proceedings as follows:)

## ~~DIRECT EXAMINATION~~

BY MR. GLANZER:

Q.    You had indicated that you had an opportunity to review the defense version and were you reviewing that version while watching the tape?

A.    I was, yes, sir.

Q.    And did you see any discrepancies between the two?

A.    Yes, sir, I did.

Q.    Okay. Let me ask you, I think one of the initial things you had said here when they asked you did your part of this interview, started on page 38, and then I think they asking what your purpose was in doing it.

A.    Yes, sir.

Q.    And I believe you stated morality, and if you could, could you expand on what you mean by that, what you were trying to accomplish?

MR. HAMM:  I object.  I think his statements

210

1    speak for itself at this point.  What he meant
2    to accomplish at this point in time are not
3    relevant.
4    THE COURT:  Overruled.  Go ahead.
5    THE WITNESS:    There are several different
6    tactics and what happened here is very common.
7    A investigator will speak to someone and they
8    will try to get them by whatever conversation
9    he's having to plead or to tell the truth and
10   his involvement in the case.   I, when I was
11   watching the video I didn't see Sgt. Jackson at
12   the time really touch on the morality side of
13   this case in that his heart is heavy in getting
14   past what he actually did and the family side of
15   it and the society side of it.   So when Sgt.
16   Jackson came out I simply asked him in my office
17   do you have a, you know, is it okay if I go in
18   and try to talk to him a minute and see if I
19   can, you know, show him the morality of what has
20   happened in this case.  And he said yes.  And my
21   whole intent was to get Mr. Gary to see that in
22   our opinion he had made a mistake and he himself
23   will feel better, the family of the people that
24   they victimized can have closure and can move on
25   past this case if the truth is told by everyone
26   involved.  That's the way to close things, the

211

honesty and truthfulness, the morality of our
society is a forgiving society.

BY MR. GLANZER:

Q. Okay. And as far as your authority when interviewing
any defendant, do you have any authority make plea
agreements at the interview level?

A. No, sir. We have absolutely zero authority to make
any type of deals during the interview process at all.

Q. Do you recall making any promises to Mr. Gary?

A. I made no promises.

Q. Let me call your attention to page 54 of the
transcript and I think right below the middle of the
page -- I'll wait until you get there.

A. I'm here.

Q. Okay. Where it starts "I think anything. I know what
happened." And just go on from there?

A. "I think anything. I know what happened. We know
what happened. The question is: Does James want to
at least heal the injury, because to me, that's the
most important thing. That's a man and a woman's
daddy. That's a son's parents and a mother and a
father. To me, you've -- you've got a choice. You
can help heal or you cannot help heal, and it be a
thorn in your side until your last breath is taken.
I don't believe in five minutes, James -- I don't

212

1. believe for five minutes that you wanted to hurt
2. nobody, and that" ain't -- "that it don't bother you
3. and hurt your heart to this day.  I don't believe you
4. don't have nightmares about it because if you don't,
5. you're a lot harder person than I thought.  People
6. make mistakes."  Keep going or stop?
7. Q.  Yeah, keep going.
8. A.  "Things happen that are out of control and sometimes
9. they're irreversible.  This is one of them.  But you
10. know what?  You have an opportunity to heal and close
11. that chapter of your life.  You're going to have --
12. you're going to have to be punished for that.  No
13. doubt about that.  There's no doubt about it.  You
14. have to.  Don't think for five minutes that society is
15. not going to let you and them and anybody else that
16. does not go -- that does that go and just not just say
17. I'm sorry and it be done.  But it's -- it's so much
18. easier when that is said, James.  It's so much
19. smoother and easier to get over because you can close
20. it in your life.  They can close it in their life.
21. Right now, they can't.  Right now, there's a son and
22. a family that is grieving over the loss of that man
23. and woman.  They don't know what happened.  They are
24. still guessing.  We all know.  We're going to --
25. they're going to know eventually, but the difference
26. is, you can help solve it."

213

Q. In that passage do you promise him anything?

A. No, sir, I don't. I guess you could say I promise him that he's going to be punished, but I don't promise him that he's not going to be punished.

Q. And does that pretty much sum up your point that you started with that you were heading towards a morality type of interview?

A. That's the whole process that I took with Mr. Gary, the whole picture in itself.

Q. Nothing further.


MR. HEATH: Nothing further.

THE COURT: Anything else?

MR. HEATH: No, sir.

THE COURT: Anything else from this witness?

MR. ABBETT: No, sir.

THE COURT: You want to release him?

MR. GLANZER: Yes, sir.

THE COURT: All right, sir. Thank you. You're released.

THE WITNESS: Thank you, Judge.

Anything else on the motion for suppression?

MR. ABBETT: No, sir.

THE COURT: From the Defense?

MR. HAMM: No, sir.

214

1    THE COURT:    Anything else on the motion for

2    suppression?

3    MR. HAMM:  No, Your Honor.

4    THE COURT:  Okay.  I'm going to rule on this

5    probably toward the end of the week and if you

6    want to get something to me you need to do it

7    right away.

8    MR. HAMM:  Yes, sir.  Thank you, Judge.

9    THE COURT:  I'll give you a written opinion on

10   it.  So if you've got anything to add or

11   authorities give them to me right away.

12   MR. HAMM:  Thank you, Judge.

13   THE COURT:  All right.  Which motion do y'all

14   want to go to next?  There were some that you've

15   already, what I call old motions and then

16   there's some new ones filed on May 18.  I've

17   got, you've got four motions in limine that you

18   had filed.  Well, one's a motion in limine not

19   to admit photos.  There's a motion for funds for

20   a jury consultant.  A motion limine about a

21   medical examiner must be present who is now in

22   Texas.  And the autopsy report, you don't want

23   it in unless he's here.  So you want to take up

24   those?

25   MR. HAMM:  Yes, sir.  Sure.

26   THE COURT:  Okay.